## Attachment 4

Declaration of Rikki Hrenko-Browning, President, Utah Petroleum
Association

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

UTAH PETROLEUM ASSOCIATION,)
)
         Petitioner,      )
)
v.                  )     Case No. 25-9520
)
U.S. ENVIRONMENTAL     )
PROTECTION AGENCY and  )
LEE ZELDIN, Administrator, U.S. )
EPA,               )
)
)
         Respondents.   )

---

## DECLARATION OF RIKKI HRENKO-BROWNING ON BEHALF OF THE UTAH PETROLEUM ASSOCATION IN SUPPORT OF MOTION TO STAY FINAL RULE

---

I, Rikki Hrenko-Browning, hereby declare and state that the following is true and correct to the best of my knowledge, information, and belief.

1.    I am the President of the Utah Petroleum Association ("UPA"), which is a statewide oil and gas trade association established in 1958, representing companies involved in all aspects of Utah's oil and gas industry. I've been employed at UPA for approximately six years. I

1

am over the age of 18 years and am competent to testify concerning the matters of this declaration.

2.      I hold a Bachelor of Science in Botany and Environmental Science, as well as a Master of Science in Public Policy and Management. Prior to leading UPA, I served as the CEO of Enefit American Oil. I also served as Enefit's International Project Director and Environmental Policy Expert. I have served on the Board of the National Oil Shale Association and the Utah Mining Association.

3.      As part of my duties as President of UPA, I act as the voice for the oil and gas industry on federal and state legislative and regulatory issues.

4.      This declaration is submitted in support of UPA's request for stay of EPA's Final Rule titled "Finding of Failure To Attain and Reclassification of an Area in Utah as Serious for the 2015 Ozone National Ambient Air Quality Standards," published in the Federal Register at 89 Fed. Reg. 97,545 (Dec. 9, 2024) (the "Final Rule"). Through this Final Rule, EPA determined that the Northern Wasatch Front ("NWF") area failed to attain the 2015 8-hour ozone National Ambient Air Quality Standard ("NAAQS") of 70 parts per billion ("ppb")

by the applicable attainment date, August 3, 2024. Based on that determination, EPA reclassified the NWF area from "Moderate" nonattainment to "Serious" nonattainment.

5. This Declaration in support of UPA's Motion for Stay of the Final Rule provides an overview of the highly regulated environment in which UPA's five member refineries in the NWF area operate and the substantial harms that UPA's members face under the Final Rule, particularly where EPA failed to consider that high levels of international emissions are a major factor driving nonattainment with the ozone nonattainment area ("NAA").

## I.     UPA's Interest in the Final Rule

6. Utah's oil and gas industry operates under a complex system of environmental laws and regulations promulgated and implemented by local, state, tribal, and federal governments. While such regulations are a necessary part of doing business in the United States, regulatory compliance is already costly to companies in our industry.

7. It is UPA's goal to advance the responsible development of Utah's natural resources and manufacture of fuels that drive Utah's economy. UPA's member refineries are committed to implementation of

air quality controls that are demonstrated to be cost effective and will move the NWF towards attainment. Indeed, the refineries voluntarily agreed to produce lower sulfur Tier 3 gasoline at substantial cost, which allowed for sale of Tier 3 gasoline in the NWF and meaningfully reduced volatile organic compounds ("VOC") emissions from gasoline vehicles.

8.    To that end, UPA and its members regularly interface with the Utah Division of Air Quality ("UDAQ") and the Environmental Protection Agency ("EPA") regarding rules and regulations impacting the oil and gas industry. UPA regularly comments on proposed new rules and regulations that may affect its members.

9.    For example, UPA has been heavily involved in Utah's development of State Implementation Plans ("SIP") as a stakeholder on behalf of and in coordination with its members, and UPA regularly provides public comment on proposed SIPs and associated EPA actions.

10.    EPA promulgated the Final Rule without providing members of the public prior notice of or an opportunity to comment on a proposed rule. Had EPA allowed the public an opportunity to comment on a proposed rule, UPA would have provided comments. The

redesignation of the NWF to "Serious" Nonattainment causes substantial harm to UPA's member refineries operating along the NWF and, therefore, is of great interest and significance to UPA members.

11.    In addition, prior to EPA's promulgation of the Final Rule, I am aware that Utah developed its 2024 Clean Air Act ("CAA") 179B(b) demonstration,[1] which demonstrated that the NWF area would have attained the 2015 ozone NAAQS "but for" international emissions of ozone precursor chemicals—VOC and nitrogen oxides ("NOx")—transported into the area (the "2024 179B(b) Demonstration"). I understand that EPA did not consider the 2024 179B(b) Demonstration when promulgating the Final Rule and, because EPA did not publish a proposed rule for public comment, UPA, the State, and other members of the public did not have an opportunity to raise the importance of the 2024 179B(b) Demonstration during a public comment period.

---

[1] Section 179B(b) of the CAA states: "Notwithstanding any other provision of law, any State that establishes to the satisfaction of the Administrator that, with respect to an ozone nonattainment area in such State, such State would have attained the national ambient air quality standard for ozone by the applicable attainment date, but for emissions emanating from outside of the United States, shall not be subject to the provisions of section 7511(a)(2) or (5) of this title or section 7511d of this title." 42 U.S.C. § 7509a.

5

12.    Additionally, EPA is well past the 18-month statutory deadline to act on Utah Governor Spencer Cox's February 27, 2023, request under CAA section 107(d)(3)(D) to expand the boundary of the NWF area to include U.S. Magnesium, a large emissions source located just outside the existing boundary. Governor Cox made the request after UDAQ found that VOC emissions from U.S. Magnesium significantly contribute to ozone levels in the NWF area. Utah's inability to address these VOC emissions in its SIP and attainment demonstrations places additional pressure on UPA's members to further reduce their own emissions.

## I.    Reclassification from "Moderate" to "Serious" Nonattainment with the Ozone NAAQS

13.    The NWF previously was classified as "Moderate" nonattainment with the ozone NAAQS. In 2023, UDAQ submitted to EPA its Moderate Nonattainment SIP, which included control technology determinations for sources emitting more than 100 tons per year of VOC or NOx, including four UPA members. Under this SIP, UDAQ determined that due to recent enhanced control determinations made under a separate planning process, the existing controls at all but one refinery met the required Reasonably Available Control Technology

("RACT") standard and no further controls were required. For that refinery, UDAQ required installation of selective catalytic reduction for the cogeneration turbines, installation of a secondary seal on one tank, and installation of a closed vent system controlled by carbon adsorption on the Wastewater System.

14. As a consequence of the Final Rule reclassifying the NWF to "Serious," the State of Utah is now obligated to develop and submit to EPA a Serious Nonattainment SIP. The SIP must demonstrate how Utah will attain the ozone NAAQS as expeditiously as practicable and no later than August 3, 2027, based on average air quality measurements from 2024, 2025, and 2026.

15. Under the Moderate SIP, Utah was required to identify a 15% reduction in VOC emissions by 2023 from sources within the nonattainment area, referred to as Reasonable Further Progress. UDAQ was not able to identify adequate reductions to meet this requirement. Moreover, as a result of the Final Rule, additional required reductions of 3% per year of NOx or VOC emissions are automatically triggered.

7

16.    Utah also must reevaluate RACT for sources in the NWF with the potential to emit 50 tons per year or more of VOC or NOx (down from 100 tons per year or more). Not only will additional controls likely be required for UPA members as a result of this reevaluation, but one of UPA's members will be required to install RACT on its emitting equipment or implement enforceable reductions in emissions to stay below the 50 ton per year threshold.

17.    Additionally, all major sources (those emitting 50 tons per year or more of VOC or NOx) and "major modifications" commencing construction on or after January 8, 2025, will be required to obtain emissions offsets at a ratio of 1.2:1 (as opposed to an offset ratio of 1.15:1 under "Moderate" nonattainment). This means that emissions from new major sources or major modifications of sources may only occur if they are offset by a greater number of emission credits.

18.    Reclassification to Serious also changes the threshold at which a change at a facility is a "major modification" and thus subject to new source review ("NSR") permitting. Major modifications are modifications that result in a significant emissions increase. Reclassification from Moderate to Serious reduces the level of a

"significant emissions increase," from 40 tons per year to 25 tons per year. This means that NSR permitting will be required for a broader swath of modifications.

19.    The reduction in the major source threshold also means that more existing sources will be required to apply for Title V operating permits and must do so in a relatively short amount of time—within one year of the source being reclassified to major.

20.    UDAQ currently counts ten potential existing sources that require a permit to stay under the new major source threshold or a new major source permit. *See* Exhibit 1, Utah Petition for Repeal or Reconsideration and Administrative Stay of the Final Rule at 16 (January 22, 2025).

## II.    The Final Rule's "Serious" Nonattainment Reclassification Substantially Harms UPA's Member Companies

21.    As a result of EPA reclassifying the NWF as a Serious nonattainment area, UPA members—primarily refineries—will be substantially harmed through imposition of new and more costly air emission control measures and further restrictions on their ability to undertake projects that may result in emissions increases.

22.    Our refinery members' operations will be more stringently regulated with the imposition of costly new control measures. These refineries will experience considerable cost increases under the Final Rule, in capital project expenditures for control measures, operating costs for control measures, and expedited planning for controls that implicate planned maintenance turnarounds and associated cost increases for turnarounds. While the financial impact of the harms described may be difficult to predict with precision, substantial financial impact is certain.

23.    Capital projects that refineries must plan for have multi-year lead times to design, procure, install, test, and calibrate new equipment. This process must start now in order to ensure compliance and as such, facilities have no choice but to spend substantial sums of money now in order to meet potential compliance obligations in the future.

24.    These substantial additional costs may place refineries in the NWF area at an economic disadvantage compared to refineries elsewhere.

10

### a.   <u>Costs Associated with Reasonably Available Control Technology</u>

25.   First, under the Final Rule's Serious reclassification, the State of Utah must reassess RACT in its Serious SIP on sources emitting 50 tons per year or more of VOC or NOx.

26.   EPA defines RACT as "the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility." 44 Fed. Reg. 53,762 (Sept. 17, 1979).

27.   At the request of UDAQ, sources in the NWF nonattainment area that emit 50 tons per year or more of VOC and NOx—down from 100 tons per year or more—have submitted updated RACT analyses.

28.   Although UDAQ's formal RACT determinations are forthcoming, UDAQ has already initiated discussions with the refineries regarding additional controls that they anticipate the refineries will be required to install—which will come with higher costs.

29.   As part of Utah's "Moderate" SIP for the NWF, for example, UDAQ required RACT controls at a cost of $39,770 per ton of emissions reduced; in other words, UDAQ required more than $23 million in capital expenditures plus operating costs of nearly $600,000 per year, to

11

reduce 69 tons per year of NOx emissions. The $39,770 threshold is substantially higher than jurisdictions outside of Utah, which use RACT costs of less than $10,000 per ton of emissions reduced—a point that UPA made in comments to UDAQ during Moderate SIP development.

30.    Indeed, the refineries have submitted RACT analyses that include controls with costs as high as $13 million for estimated emission reductions of less than ten tons per year of NOx. In light of the limited available opportunities for emission reductions[2] and based on UPA's experience with the Moderate Nonattainment SIP, the risk that these controls will be required under a Serious SIP is high.

### b.    Harms from Other Serious Nonattainment SIP Requirements

31.    The State's Serious SIP also must include measures to reduce VOC or NOx emissions by an additional 3% each year beyond the 15% Reasonable Further Progress reduction required in the

---

[2] One reason that RACT costs in the NWF area are so high is because the NWF area was designated nonattainment for the 2006 24-hour PM2.5 NAAQS, and the resulting SIP required refineries to install many VOC and NOx controls, which are precursors to both PM2.5 and ozone, as well as other controls. As a result, there are fewer reductions available at lower cost thresholds.

Moderate Nonattainment Ozone SIP—which UDAQ could not meet. In light of the limited sources in the NWF and UDAQ's inability to find necessary VOC reductions under the Moderate SIP, there is a substantial risk that UDAQ could look to UPA members to further reduce their emissions.

32. On the January 8, 2025, effective date of the Final Rule, additional onerous permitting requirements were triggered for all major sources planning major modifications to their facilities. Previously, the ratio of emissions offsets required for major modification permitting was set at 1.15:1. As a result of the Final Rule, that ratio increased to 1.2:1, which means that if major source permitting is triggered, for ten tons of increased emissions, a source must or obtain or purchase 12 tons of emission reduction credits.

33. I understand that while Utah maintains an emissions offset bank for VOC and NOx, it does not contain ample credits and there are limited opportunities to generate credits because there are few industrial sources in the NWF nonattainment area. This increase in required limited available offsets for a project, coupled with the difficulty in identifying emissions reductions at the facilities that could

result in an overall emissions increase lower than the 25 tons per year threshold, would make any large change to operations at the refineries extremely difficult and costly. This would include projects to improve operating efficiency as well as regulatory requirements, including a CAA requirement to produce reformulated gasoline which will likely be required for the NAA in 2029 unless EPA reconsiders the rule.

### c.　Harms from Future "Severe" Reclassification

34.　By designating the NWF as a "Serious" Ozone Nonattainment Area without consideration of the State's 2024 179B(b) Demonstration, which showed that the NWF area would have met its attainment deadline but for the influence of international emissions, EPA has made it nearly impossible for Utah to avoid reclassification of the NWF to Severe nonattainment in 2028.

35.　Under the Serious reclassification, Utah must attain the ozone NAAQS as expeditiously as practicable and no later than August 3, 2027, based on averaged air quality measurements from 2024, 2025, and 2026. This constrained timeframe for implementation of additional reductions, including lead time for new capital investments for air

emissions controls, provides inadequate time to attain the ozone NAAQS by the 2027 attainment date.

36. In Severe nonattainment areas, the major source threshold drops to 25 tons per year for major source permitting. In addition to an even more unattainable offset ratio of 1.3:1 ratio, RACT will be required for numerous additional sources. For example, this lower threshold would trigger major source status for one small refinery, subjecting it for the first time to RACT and substantial new monitoring, recordkeeping, and reporting requirements necessary for compliance with Title V operating permits. This refinery already is spending resources to assess controls that are not otherwise required to reduce emissions that would take it below the Serious major source threshold.

III. **The Final Rule Will Result in Widespread Negative Economic Impacts with Minimal Air Quality Improvement**

37. The oil and gas industry is a vital source of public funding for the State of Utah and local communities in the NWF. From 2019 through 2023, the oil and gas industry generated $5.5 billion in taxes and fees for State, local, and federal governments. *See* Exhibit 2, Snapshot of the Fiscal Impact of Utah's Oil & Natural Gas Industry, Utah Petroleum Association 1 (August 2024),

https://utahpetroleum.org/wp-content/uploads/2024/09/Oil-and-Gas-Sector-Impact-Utah_Final.pdf. In the NWF specifically, the oil and gas industry generated $997 million in tax revenue for Salt Lake County over that period. *Id.* This revenue funds crucial public services including roads, emergency services, and the public school system.

38.    In 2023, the oil and gas industry directly employed 11,555 people in Utah and provided $1.4 billion in wages. *Id.* at 1.

39.    The harms associated with the Final Rule may ultimately curtail refinery operations and reduce gas and diesel production in the NWF. This would negatively impact employment within the area and directly cut funding for crucial public services that local communities rely upon.

40.    The harms associated with the Final Rule will also be borne by individuals residing in the western United States, who depend on cost-effective and reliable energy and liquid fuels. The costs of additional emissions control measures described above would be passed on to consumers at the pump.

41.    Additionally, given that refineries located in the NWF supply jet fuel to the Salt Lake City International Airport, increased

16

costs imposed on refineries as a result of the Final Rule will likely impact airlines and their customers, due to supply and pricing changes of jet fuel.

42. The high costs and other harms associated with the Final Rule are not outweighed by air quality improvements, as it is unclear whether further emission controls will meaningfully reduce ozone concentrations in the NWF area. In recent studies, Salt Lake City was shown to have a much higher background ozone[3] level than most other cities, meaning attainment of the ozone NAAQS was influenced more by background ozone than the background influence on other cities. *See* Exhibit 3, Parrish, et. al., *Maximum ozone concentrations in the southwestern US and Texas: implications of the growing predominance of the background contribution*, 25 ATMOS. CHEM. PHYS. 263, 264 (2025) (background contributions of ozone in the Southwestern United States, including Utah "exceed 60 ppb . . . and have even approached 70 ppb, making achievement of the 70 ppb NAAQS threshold quite difficult in those regions" compared to Northeastern states); Exhibit 4, Evaluation

---

[3] Background ozone includes ozone that forms from emissions from sources outside of the United States, as well as ozone that forms due to natural events, such as wildfires.

of Ozone Patterns and Trends in 8 Major Metropolitan Areas in the U.S., Coordinating Research Council Report No. A-124 at 28–29 (March 2021) (noted ozone researcher Dr. Dan Jaffe, as part of a study undertaken for the Coordinating Research Council, determined that Salt Lake City's air quality is influenced much more strongly by background ozone than most other cities). These studies demonstrate that Salt Lake City would have to reduce ozone precursor emissions to a much greater degree than other cities to see a reduction in ozone concentrations.

43. The State's 2024 179B(b) Demonstration provided data showing continually increasing ambient ozone concentrations, despite large reductions in emissions of ozone precursors over the last 15 years. *See* Exhibit 5, Excerpts from 2024 179B(b) Demonstration at 21–24. The recent SAMOZA study done in Salt Lake City and led by Dr. Jaffe—and resulting peer-reviewed study journal article—concluded that ozone at one NWF air quality monitor was only sensitive to changes in NOx when NOx concentrations were reduced by at least 75%, that NOx reductions exceeding 75% were needed to reach attainment at that monitor, and that "a 75% reduction in NOx" at that monitor location

18

"corresponds to an approximately 60% reduction in NOx regionwide." *See* Exhibit 6, Ninneman, et. al., *Investigation of Ozone Formation Chemistry during the Salt Lake Regional Smoke, Ozone, and Aerosol Study (SAMOZA)*, ACS Earth and Space Chemistry at I (2023). Lastly, 60% of local ozone precursor emissions come from mobile sources, which are not controlled by Utah. Thus, expensive RACT controls may not reduce ozone concentrations in the NWF in a meaningful way.

44.    The significance of these international emissions is underscored by Utah's limited authority to regulate ozone pollution in the NWF. On average exceedance days, natural and out-of-state sources of ozone are responsible for approximately 58 to 59% of the ozone pollution in the NWF, in-state Utah natural sources contribute 10%, and international anthropogenic sources contribute 6.5 to 7%. *See* Exhibit 5, Excerpts from 2024 179B(b) Demonstration at 34–35. Of the 24 to 25% attributed to Utah anthropogenic sources, *id.*, UPA estimates that approximately 14% of the ozone pollution emanates from federally regulated sources—primarily cars, trucks, rail, and construction

equipment—which Utah has limited authority to control.[4] That leaves approximately 11% of the ozone pollution in the NWF available for Utah to regulate, of which only 3% comes from major stationary sources, and refineries are responsible for only a subset of this pollution.[5]

45.    UDAQ has explained that meeting the ozone standard based solely on regulating the emission sources that Utah can control would require the elimination of all VOC and NOx emissions from such sources. *Hearing Before the Nat. Res., Agric., and Env't Quality*

---

[4] 2023 UDAQ data demonstrates that federally-regulated and state-regulated anthropogenic sources account for 7.9% and 6.3% of the ozone pollution in the NWF, respectively, on average. *See* Exhibit 7, Northern Wasatch Front O3 State Implementation Plan: Modeling Updates, Technical Analysis Section at 14, Utah Department of Environmental Quality, Division of Air Quality (February 15, 2023). Based on this data, UPA calculated the portion of anthropogenic emissions attributed to federally-regulated sources (7.9/(6.3 + 7.9) = 0.556). UPA then multiplied this ratio by the percentage of ozone pollution in the NWF attributable to all Utah anthropogenic sources (0.556 x 25% = 13.9%).
[5] Major point sources—including not only refineries, but all major sources—account for only 13% of the local anthropogenic ozone precursor emissions in the NWF. *See* Exhibit 8, UPA Comments on UDAQ Preliminary RACT Determinations for Petroleum Refineries in the Northern Wasatch Front Ozone Nonattainment Area at 6 (March 10, 2023). Thus, the emissions from major stationary sources only account for 3.25% of the total ozone pollution in the NWF (0.13 x 25% = 3.25%).

*Appropriations Subcomm.*, 2025 Utah Gen. Session at 27:25 (January 31, 2025) (statement of Bryce Bird, Director, Utah Division of Air Quality), available at

https://le.utah.gov/av/committeeArchive.jsp?mtgID=19733.

46.    Furthermore, Utah demonstrated in its 2024 179B(b) Demonstration that the NWF would have attained the NAAQS but for international emissions.

47.    Additionally, if the NWF is reclassified to Severe nonattainment with the ozone standard, the CAA requires reformulated gas ("RFG") to be sold in the nonattainment area during the summer. RFG is expensive to produce—the U.S. Energy Information Administration shows price differences between RFG and conventional gasoline of up to $0.70 per gallon, which the UPA member refineries estimate will cost tens of millions of dollars per refinery. Those costs ultimately will be passed on to consumers. While each refinery may take a different path to producing RFG, the high costs and equipment limitations associated with producing RFG will necessitate a reduction in fuels supplied in the market, again resulting in price increases for customers in Utah and the western United States.

48. There is no evidence showing that RFG will improve ozone in the NWF area. For example, the Denver Metro/North Front Range ("DMNFR") area in Colorado modeled the ozone reduction benefit from RFG to be approximately 0.1 parts per billion. *See* Exhibit 9, Ozone State Implementation Plan Passes RAQC Board, Regional Air Quality Council (August 5, 2022). The NWF and DMNFR share similar air quality challenges due to similarities in their terrain, weather, and background ozone. Therefore, RFG will be costly without commensurate ozone air quality benefits.

49. If the Final Rule is ultimately vacated by the Court, the harm caused by the Final Rule would be redressed because the NWF would remain in Moderate nonattainment and UPA member refineries would not be subject to the heightened regulation and associated costs required for Serious or Severe nonattainment areas. UPA, in conjunction with Utah, EPA, and our research partners, would have the ability to undertake additional research regarding the most efficient means of improving air quality in the NWF but would not be faced with draconian reductions and costly controls that result from the Final Rule but do not move the ball towards attainment.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 19, 2025.

_____
Rikki Hrenko-Browning

Exhibit 1

**PETITION FOR REPEAL OR RECONSIDERATION AND ADMINISTRATIVE STAY BY THE STATE OF UTAH ON:**

**FINDING OF FAILURE TO ATTAIN AND RECLASSIFICATION OF AN AREA IN UTAH AS SERIOUS FOR THE 2015 OZONE NATIONAL AMBIENT AIR QUALITY STANDARDS, FINAL RULE 89 FED. REG. 97,545 (DEC. 9, 2024)**

**EPA-R08-OAR-2024-0552; FRL-12458-01-REGION 8**

**JANUARY 22, 2025**

# Table of Contents

I.    INTRODUCTION AND SUMMARY OF REQUESTED ACTION ............................... 1

II.    BACKGROUND ................................................................................................... 5

    A.    2015 8-Hour Ozone NAAQS in the Northern Wasatch Front ........................................ 5

    B.    UDAQ's 179B(b) Demonstrations ...................................................................... 6

    C.    Utah's Pending Request for Boundary Adjustment for the Northern Wasatch Front .. 10

    D.    The Final Rule Reclassifying the Northern Wasatch Front to a Serious Nonattainment Area for the 2015 8-Hour Ozone NAAQS and Public Comment Period Exemption ........... 11

III.    PETITION FOR REPEAL OR RECONSIDERATION...................................................... 12

    A.    EPA's Failure to Follow the APA's Mandatory Public Notice and Comment Process is a Fatal Procedural Flaw ............................................................................. 13

    B.    EPA Should Convene a Reconsideration Proceeding under 42 U.S.C. § 7607(d)(7)(B) Because of the Pending 179B(b) Demonstration Centrally Relevant to the Final Rule ....... 20

IV.    REQUEST FOR ADMINISTRATIVE STAY OF THE FINAL RULE .......................... 21

    A.    Utah is Likely to Succeed on the Merits ........................................................ 23

    B.    Absent an Immediate Stay, Utah will Suffer Irreparable Harm ................................. 24

    C.    The Remaining Factors Strongly Favor a Stay ........................................................ 28

V.    CONCLUSION.................................................................................................... 29

BEFORE THE ADMINISTRATOR
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

| | |
|---|---|
| In re: Finding of Failure To Attain and Reclassification of an Area in Utah as Serious for the 2015 Ozone National Ambient Air Quality Standards, Final Rule, 89 Fed. Reg. 97,545 (Dec. 9, 2024) ) ) ) ) ) | Docket No. EPA-R08-OAR-2024-0552 |

## I.    INTRODUCTION AND SUMMARY OF REQUESTED ACTION

The State of Utah (Utah) petitions the Environmental Protection Agency (EPA) to repeal or reconsider and immediately stay the final rule "Finding of Failure To Attain and Reclassification of an Area in Utah as Serious for the 2015 Ozone National Ambient Air Quality Standards,"[1] (Final Rule). The Final Rule's promulgation not only contradicts "cooperative federalism," but also is procedurally flawed, premature, and causes multiple irreparable harms to the state. In the Final Rule, EPA determined that the Northern Wasatch Front area failed to attain the 2015 8-Hour Ozone National Ambient Air Quality Standards (NAAQS) by the applicable attainment date of August 3, 2024, and reclassified the area to serious nonattainment with an attainment date of no later than August 3, 2027.[2]

EPA issued the Final Rule on December 9, 2024, without first publicly proposing the rule or providing an opportunity for public comment,[3] a procedural error that Utah will ask the Tenth Circuit to review, and here urges the EPA to repeal the Final Rule on this basis. EPA found that the "notice and public procedures [were] unnecessary" because the decision was "governed . . . solely by area design value of that date," which was based "on the certified air quality monitoring data" and "involve[d] no exercise of judgment of discretion."[4] Yet when issuing the

---

[1] 89 Fed. Reg. 97,545 (Dec. 9, 2024) (to be codified at 40 C.F.R. pt. 81).
[2] *See id*. at 97,548.
[3] *See id*. (citing the Administrative Procedure Act's (APA) "good cause" exception to notice and comment rulemaking in 5 U.S.C. § 553(b)).
[4] *Id.*

Final Rule, EPA had already seen a draft and had multiple discussions with the state about Utah's Clean Air Act, Section 179B(b)[5] demonstration centrally relevant to the Final Rule's promulgation. Utah's 179B(b) analysis concluded that the Northern Wasatch Front area would have attained the 2015 Ozone NAAQS by August 3, 2024—the moderate nonattainment area attainment date—but for international emissions.

Utah submitted its draft 179B(b) demonstration to the EPA on November 26, 2024, several weeks before the EPA issued the Final Rule without notice and comment. Utah followed its draft submission with the final 179B(b) demonstration on December 12, 2024. This demonstration is central to the Final Rule, yet EPA failed to consider it and to provide public comment barring any opportunity for Utah and the public to object to EPA's decision to reclassify the area as serious under the ozone NAAQS.

Utah requests that EPA repeal the procedurally flawed Final Rule under 5 U.S.C. § 553,[6] consider Utah's 179B(b) analysis, and only then (if warranted) begin the rulemaking process anew, allowing Utah, sources located in the nonattainment area, and the interested public to comment on the redesignation as it has done before in similar rulemakings.[7] In the alternative,

---

[5] 42 U.S.C. § 7509a(b).

[6] Utah presents its request for reconsideration under the Administrative Procedures Act (APA) in the alternative to a request under section 7607(d)(7)(B) of the Clean Air Act due to potential ambiguous reference to the APA in the Clean Air Act's rulemaking provisions. 42 U.S.C. § 7607(d)(1) states that §§ 553 through 557 of the APA "shall not . . . apply to actions to which" 42 U.S.C. § 7607(d) applies. This language could be interpreted as making reconsideration procedures under Section 7607(d) mutually exclusive with the APA repeal provisions, or potentially unavailable when the EPA invokes the APA's "good cause" exception to notice and comment, even if that invocation is erroneous. Given the ambiguity, Utah files this petition under both the Clean Air Act (42 U.S.C. § 7607(d)(7)(B) and the APA (5 U.S.C. § 553(e)) in the alternative.

[7] *See e.g.,* 87 Fed. Reg. 21,842 (proposed April 13, 2022) (codified at 40 C.F.R. pts. 52, 81) (proposing to reclassify the Northern Wasatch Front from marginal to moderate nonattainment for 2015 8-hour ozone NAAQS); 81 Fed. Reg. 91,088 (proposed Dec. 16, 2016) (codified at 40 C.F.R. pts. 52, 81) (proposing to find failure to attain by attainment date for eleven areas, including three nonattainment areas in Utah, for the 2006 24-hour $PM_{2.5}$ NAAQS and to reclassify areas to serious nonattainment); 72 Fed. Reg. 61,315 (proposed Oct. 30, 2007) (codified at 40 C.F.R. pt. 81) (proposing to find that Baton Rouge marginal 8-hour ozone nonattainment area has failed to attain the NAAQS and to reclassify the area to moderate nonattainment by operation of law based on design value); 72 Fed. Reg. 58,577 (proposed Oct. 16, 2007) (codified at 40 C.F.R. pt. 81) (same but applicable to Memphis, Tennessee and Crittenden County, Arkansas marginal 8-hour ozone nonattainment areas); *see also Sierra Club v. Browner*, 130

Utah requests the EPA to initiate a reconsideration proceeding under 42 U.S.C. § 7607(d)(7)(B), as the pending 179B(b) demonstration constitutes classic grounds for the Clean Air Act's reconsideration. Utah had no opportunity to raise the 179B(b) as an objection to the Final Rule and it is centrally relevant to the Final Rule's outcome.[8]

While the EPA reconsiders or repeals the Final Rule, Utah requests an immediate stay of the Final Rule and all applicable deadlines under 42 U.S.C. § 7607(d)(7)(B) for three months, or under 5 U.S.C. § 705. The Clean Air Act's process for a stay in 42 U.S.C. § 7607(d)(7)(B) does not "by its terms or by logical implication limit" the EPA's authority to issue the Administrative Procedures Act (APA) stay.[9] EPA can exercise its "traditional statutory authority under Section 705 of the APA to stay . . . rules or regulations pending judicial review."[10]

Absent a stay, Utah and its citizens will suffer irreparable harm because of the Final Rule's impact on the state's economy. The Final Rule effective on January 8, 2025, immediately makes the permitting process for new facilities and modifications to existing facilities more challenging, costly, and complicated. The Final Rule also imposes an expensive serious nonattainment area state implementation plan (SIP) preparation burden on Utah, which will take hundreds of hours of staff time and millions of dollars in expenses. Utah will also be required to implement an enhanced motor vehicle inspection and maintenance program with a high price tag and more onerous on-road testing requirements for Utah's citizens living in the Northern Wasatch Front.

---

F. Supp. 2d 78, 90–91 (D.D.C. 2001), *aff'd sub nom. Sierra Club v. Whitman*, 285 F.3d 63 (D.C. Cir. 2002) (the court upholding EPA's position that the process of determination and reclassification of air quality NAAQS areas is equivalent to a rulemaking requiring public comment before finalization).

[8] 42 U.S.C. § 7607(d)(7)(B).

[9] *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 24 (D.D.C. 2012) (rejecting argument that a section 705 stay was unlawful or limited to three months).

[10] *Id.*

While the Final Rule is undergoing judicial review,[11] Utah must immediately begin the work on the serious nonattainment area SIP, permit the sources according to the new and much more stringent requirements, and start developing the enhanced motor vehicle registration and maintenance program. This process will require shifting resources, spending time on a public review process, and preparing and issuing the final permits. If the Court overturns EPA's Final Rule or EPA approves 179B(b) demonstration, Utah will be irreparably harmed without a stay, having devoted time and resources to these unnecessary implementation tasks. "[C]omplying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs."[12]

Utah will also experience irreparable harm from the EPA undercutting "cooperative federalism" inherent in the Clean Air Act's administration.[13] It is an institutional injury to the state that the EPA first cooperated with the state in preparing the 179B(b) demonstration and then chose to ignore it by issuing a reclassification of the Northern Wasatch Front to serious nonattainment without proper notice and comment leaving the state with no opportunity to object.

Finally, there is a substantial likelihood that Utah will succeed in showing that EPA made an error in promulgating the Final Rule without notice and comment by wrongfully relying on the APA's "good cause" exception. Such exceptions can be used only in emergencies or if the rule is ministerial, insignificant, and does not impact the industry and public. The Final Rule here has immediate and significant negative financial impacts on Utah, its economy, and its citizens.

---

[11] Utah will file a petition for review in the Tenth Circuit by the applicable deadline of February 7, 2025.

[12] *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220-21 (1994) (Scalia, J., concurring).

[13] *See Texas v. United States Env't Prot. Agency*, 829 F.3d 405, 434 (5th Cir. 2016) ("the institutional injury to Texas from the inversion of the federalism principles enshrined in the Clean Air Act may constitute irreparable injury").

In sum, EPA engaged Utah in developing a 179B(b) demonstration that materially and substantially impacted the Final Rule, then improperly excluded the demonstration in its determination to issue the Final Rule. Subsequently, EPA erroneously concluded that its highly impactful Final Rule did not merit the attention, input, or objection of Utah and the public. These missteps qualify the Final Rule for EPA's reconsideration and are sufficient grounds for the EPA to issue an administrative stay until its review is complete.

## II.    BACKGROUND

### A.    2015 8-Hour Ozone NAAQS in the Northern Wasatch Front

The Northern Wasatch Front is Utah's most densely populated area—home to approximately two million people, which is two-thirds of the state's population. The area has diverse environments and topography, ranging from high desert, playa, wetlands, semi-arid foothills, sub-alpine forests, and alpine environments. The Oquirrh Mountains bound the Salt Lake Valley (part of the Northern Wasatch Front) to the west, the Great Salt Lake to the north, and the Wasatch Mountains to the east. The valley sits at roughly 4,300 feet above sea level, with the surrounding mountains rising more than 5,000-6,000 feet above the valley floor. This gives the Salt Lake Valley a bathtub or bowl shape, which creates unique and challenging conditions for air quality.

Since the tightening of the 8-hour ozone NAAQS in December 2015, from 75 parts per billion (ppb) to 70 ppb,[14] the North Wasatch Front experienced difficulties with meeting the standard. In June 2018, the EPA designated the Northern Wasatch Front as a marginal nonattainment area.[15] About four years later, the area was reclassified to moderate nonattainment

---

[14] *See* 80 Fed. Reg. 65,292 (Oct. 26, 2015) (codified at 40 C.F.R. pts. 50, 51, 52, 53, 58).
[15] *See* 83 Fed. Reg. 25,776 (June 4, 2018) (codified at 40 C.F.R. pt. 81).

because it did not meet the standard by the marginal attainment date.[16] Notably, this reclassification was made through notice and comment, with EPA proposing the action on April 13, 2022,[17] and finalizing it on October 7, 2022.[18]

Following this reclassification, Utah prepared and submitted a moderate 8-hour ozone SIP to the EPA on September 25, 2023. Utah's SIP-writing process is lengthy and resource-intensive. It first involves drafting the SIP, then submitting it to the Utah Air Quality Board for consideration and proposal for public comment,[19] at least a 30-day public comment period, and final adoption by the Utah Air Quality Board, all before the plan is sent to EPA for approval. After receiving the moderate SIP, the EPA sent a completeness determination to Utah on October 11, 2023. Utah then pursued an additional amendment to the moderate SIP to demonstrate reasonable further progress. This amendment also went through Utah's notice and public comment process with the Utah Air Quality Board adopting the amended moderate SIP. Utah then submitted its amended moderate SIP to the EPA on December 12, 2024. The plan is pending EPA's action.

## B.    UDAQ's 179B(b) Demonstrations

Utah Division of Air Quality (UDAQ)—Utah's agency responsible for implementing the federally delegated Clean Air Act programs in the state—has long supposed, based on scientific data and research, that sources outside the agency's regulatory authority contributed to ozone exceedances in the Northern Wasatch Front. This is so due to meteorology, topography, and

---

[16] *See* 87 Fed. Reg. 60,897 (Oct. 7, 2022) (codified at 40 C.F.R. pts. 52, 81).
[17] *See* 87 Fed. Reg. 21,842 (April 13, 2022) (codified at 40 C.F.R. pts. 52, 81).
[18] *See* 87 Fed. Reg. 60,897.
[19] *See* Utah Code Ann. § 19-2-109 (requirements for public notice and comment for adopting of air quality standards).

significant reductions in ozone precursor emissions that did not have the expected effect on meeting the ozone standard.

In such situations, the Clean Air Act allows for an alternative demonstration under Section 179B[20] to show that the area would have attained the standard but for international emissions. Approval of a 179B demonstration for the Northern Wasatch Front would mean that the area attained the ozone standard and should not be subject to the Clean Air Act's strict permitting and planning requirements for nonattainment areas. A state can prepare either a prospective demonstration where meeting the standard is included as part of the forward-looking SIP (Section 179B(a) demonstration)[21] or a retrospective one made independent of a SIP and showing that the area would have met the NAAQS in the past but for international emissions (Section 179B(b) demonstration).[22]

UDAQ first submitted a retrospective 179B(b) to the EPA in May 2021, demonstrating that the Northern Wasatch Front would have attained the 8-hour ozone NAAQS by the marginal attainment date of August 3, 2021.[23] UDAQ provided three analyses examining international contributions including a synoptic weather analysis, Hybrid Single-Particle Lagrangian Integrated Trajectory (HYSPLIT)[24] backward dispersion modeling, and photochemical modeling results performed by a third party showing that the area would have attained the standard by the marginal attainment date, but for the presence of international contributions. The EPA

---

[20] 42 U.S.C. § 7509a.

[21] *Id.* § 7509a(a); *see also* Guidance on the Preparation of Clean Air Act Section 179B Demonstrations for NAAs Affected by International Transport of Emissions at 12-15 (Dec. 2020) (179B Demonstrations Guidance), https://www.epa.gov/sites/default/files/2020-01/documents/draft_179b_guidance-final_draft_for_posting.pdf.

[22] 42 U.S.C. § 7509a(b)-(d); *see also* 179B Demonstration Guidance at 15-18.

[23] Retrospective 179B(b) Demonstration for Utah's Northern Wasatch Front Ozone NAA (May 28, 2021); DAQP-048-21, Docket Id. No. EPA-HQ-OAR-2021-0742-0019, https://www.regulations.gov/document/EPA-HQ-OAR-2021-0742-0019.

[24] NOAA Air Resources Laboratory, *READY system*, https://www.ready.noaa.gov/HYSPLIT.php (last visited Jan. 8, 2025).

disapproved Utah's demonstration and subsequently reclassified the area as a moderate nonattainment for 8-hour ozone NAAQS.[25] The EPA based its disapproval on the parameters in its guidance—not the criteria in the Clean Air Act.

To continue the efforts and refine its analysis, UDAQ included a prospective 179B(a) demonstration in the moderate ozone SIP revisions for the Northern Wasatch Front submitted to the EPA in September 2023.[26] Utah has addressed the reasoning behind the EPA's earlier disapproval and continues to disagree with the EPA's limited interpretation of the primary importance of international contributions. EPA has not yet acted on this SIP submission and its accompanying 179B(a) demonstration, but if approved, the Northern Wasatch Front should not have been so hastily reclassified to more stringent serious nonattainment.

UDAQ was also communicating with the EPA about submitting a new and revised retrospective 179B(b) demonstration for the Northern Wasatch Front. UDAQ staff cooperated with the EPA staff throughout the demonstration's development. The coordination between EPA and UDAQ includes a meeting on September 12, 2024, when UDAQ staff provided a detailed overview of the draft 179B(b) demonstration results and notified EPA that the final demonstration would be submitted within a month. During this meeting, EPA staff gave feedback that the demonstration would be substantially strengthened if UDAQ conducted additional analysis and examined the performance of the underlying photochemical model. Acting in good faith, the UDAQ took the necessary time to incorporate EPA's recommended analysis in its 179B(b) demonstration, delaying UDAQ's anticipated and timely final submission.

---

[25] 87 Fed. Reg. 60,897.

[26] Utah State Implementation Plan, Section IX.D.11: 2015 Ozone NAAQS Northern Wasatch Front Moderate Nonattainment Area, https://lf-public.deq.utah.gov/WebLink/DocView.aspx?id=385736&eqdocs=DAQ-2023-011344&cr=1 (last visited Jan. 10, 2025).

To keep the EPA apprised of UDAQ's progress, UDAQ staff also shared the near-final draft demonstration with the EPA on November 26, 2024—just fourteen days before the EPA was to issue the Final Rule. EPA did not tell Utah that it had to submit a demonstration by a certain date, and Utah operated with the understanding that EPA would consider the demonstration once submitted. Despite knowing that the 179B(b) demonstration was forthcoming and without warning UDAQ that it would proceed without the 179B(b) demonstration, the EPA issued the Final Rule bumping up the Northern Wasatch Front to serious nonattainment for the 2015 8-hour ozone NAAQS. UDAQ submitted its final 179B(b) retrospective demonstration to the EPA on December 12, 2024—just three days after the reclassification. It is pending before the EPA.

The 179B(b) demonstration considers EPA's prior bases for 179B(b) demonstration disapproval and shows the attainment of the ozone standard by the attainment date. It also shows that international emissions contribute, on average, 6% to 7% of atmospheric ozone present in the Northern Wasatch Front on exceedance days, causing the area to fail the NAAQS. These international emissions are even more significant to the 179B(b) demonstration analysis due to Utah's inability to regulate more than 75% of total ozone levels in the Northern Wasatch Front, attributed to sources beyond the state's regulatory authority or background and natural sources. Just over 20% of total ozone levels come from local anthropogenic emissions.[27]

The analysis is further corroborated by the fact that over the past few decades, Utah has implemented significant measures to reduce ozone precursor emissions. Both precursor nitrogen

---

[27] This illustrates the untenable position that EPA has put Utah and the nonattainment area in through its refusal to consider the impact of international emissions on the nonattainment area. As explained in detail below, the bump-up imposes significant burdens on the agency, the regulated community, and the public at large. Yet, EPA has refused to acknowledge that Utah is limited to regulating a fraction of the emissions that account for the nonattainment problem. In that context, a 6% to 7% contribution from international sources weighs heavily on Utah's ability to demonstrate compliance with the ozone NAAQS and meets the "but for" test of section 179B.

oxides (NOx) and volatile organic compounds (VOCs) decreased by well over 40%. But the Northern Wasatch Front did not experience meaningful change in ozone concentrations with observed concentrations remaining largely stagnant during this period.

### C.    Utah's Pending Request for Boundary Adjustment for the Northern Wasatch Front

Almost two years ago, on February 27, 2023, Utah submitted a request for boundary adjustment for the Northern Wasatch Front to the EPA. EPA received the request on February 28, 2023, but has still failed to act upon it. The request is important to Utah's ozone SIP planning work because it asks to modify the nonattainment area boundary to include US Magnesium. This industrial facility is in Tooele County on the southwestern edge of the Great Salt Lake and emits significant amounts of highly reactive ozone precursors contributing to ozone formation in the Northern Wasatch Front. The inclusion of US Magnesium would help UDAQ identify viable and SIP-creditable emissions reduction for more effective ozone NAAQS compliance planning. US Magnesium contributes to the degradation of the Northern Wasatch Front airshed but is located outside of the existing boundary and outside the ozone SIP regulatory reach.

Utah made this request under Section 107(d)(3)(D) of the Clean Air Act[28] which requires EPA to act on the complete state's redesignation submittal within "18 months of receipt."[29] It has been more than 18 months since Utah submitted a complete boundary adjustment request, and EPA's action on it is past due. This is a violation of the EPA's non-discretionary duty to act on the request timely and is an "unreasonable delay" causing further harm to Utah.[30]

---

[28] 42 U.S.C. § 7407(d)(3)(D).

[29] *Id.*

[30] *Sierra Club v. Thomas*, 828 F.2d 783, 794-95 (D.C. Cir. 1987) (delay is unreasonable when an agency has violated a statutory "right to timely decisionmaking or some other interest that will be irreparably harmed through delay"); *see also Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 553 & n.6 (D.C. Cir. 2015) (noting abrogation of *Sierra Club v. Thomas* in part by statute but reaffirming analytical framework).

**D.     The Final Rule Reclassifying the Northern Wasatch Front to a Serious Nonattainment Area for the 2015 8-Hour Ozone NAAQS and Public Comment Period Exemption**

On December 9, 2024, EPA issued the Final Rule determining that the Northern Wasatch Front area failed to attain the 2015 8-Hour ozone NAAQS. The Final Rule reclassified the area as a serious nonattainment effective on January 8, 2025.[31] The EPA based its decision on the design value calculated from the data collected by the EPA-certified air quality monitors, which showed that the area failed to meet the standard by the moderate area attainment date of August 3, 2024.[32] The design value for 2021 through 2023 was 0.077 parts per million (ppm), which is greater than the required 0.070 ppm.[33] EPA found that under "CAA section 181(b)(2)(A), the effect of this determination is that this area will be reclassified by operation of law as Serious on the effective date of this final rule."[34] The area then becomes subject to all the serious area requirements, including the requirement to attain the standard no later than August 3, 2027.[35]

The EPA did not propose this reclassification for a regular public comment process but relied on the "good cause" exception in the APA.[36] This exception allows an agency to "issue a rule without providing notice and an opportunity for public comment" if an agency "for good cause finds that notice and public procedures are impracticable, unnecessary or contrary to the public interest."[37] The EPA found that the notice was unnecessary for the Northern Wasatch Front reclassification because EPA's "action to determine whether this area has attained the NAAQS by the attainment date [was] governed . . . solely by area

---

[31] *See* 89 Fed. Reg. at 97,545.
[32] *See id.* at 97,546.
[33] *See id.*
[34] *Id.*
[35] *See id.*
[36] *Id.* at 97,548; *see also* 5 U.S.C. § 553(b)(B).
[37] 89 Fed. Reg. at 97,548 (citing 5 U.S.C. § 553(b)(B)).

design values as of that date."[38] Design values are "calculations based on the certified air quality monitoring data governed by EPA's regulations at 40 CFR part 58 and involve no exercise of judgment or discretion."[39] EPA ultimately concluded that this constituted good cause under the APA to dispense with the notice and comment requirements.[40]

## III.     PETITION FOR REPEAL OR RECONSIDERATION

The APA, Section 553(e) requires the EPA to "give an interested person the right to petition for the issuance, amendment, or repeal of a rule."[41] EPA also has broad discretion to reconsider its own rules at any time.[42] Utah petitions for repeal of the Final Rule because the rule is procedurally flawed by failing to follow the APA. EPA hastily issued the Final Rule without proposal and with full knowledge of the forthcoming 179B(b) demonstration, which violates "cooperative federalism." EPA should remedy its error by first repealing the Final Rule and reviewing Utah's 179B(b) demonstration before considering re-proposing the Final Rule.

The Clean Air Act "uses a cooperative-federalism approach to regulate air quality."[43] "EPA determines the . . . standards of air quality—but Congress has given the states the initiative and a broad responsibility regarding the means to achieve those ends through state implementation plans and timetables of compliance . . . ."[44] The states, not the EPA, have the

---

[38] 89 Fed. Reg. at 97,548.

[39] *Id.*

[40] *See id.*

[41] 5 U.S.C. § 553(e).

[42] *See Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Circ. 2017) (EPA must comply with APA when it reconsiders its rules, but it has broad discretion to do so); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (". . . D.C. Circuit correctly read § 2 of the APA to mandate that agencies use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance."); *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (the APA "make[s] no distinction ... between initial agency action and subsequent agency action undoing or revising that action").

[43] *Oklahoma v. U.S. E.P.A.*, 723 F.3d 1201, 1204 (10th Cir. 2013) (quoting *U.S. Magnesium, LLC v. U.S. E.P.A.*, 690 F.3d 1157, 1159 (10th Cir. 2012)); *see also Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1235 (10th Cir. 2021).

[44] *Com. of Va. v. EPA*, 108 F.3d 1397, 1408 (D.C. Cir. 1997) (quoting *Bethlehem Steel Corp. v. Gorsuch*, 742 F.2d 1028, 1036-37 (7th Cir. 1984)).

primary role in regulating air pollution within the state's borders.[45] The structure makes practical sense because the States know an area's specifics including topography, meteorology, emissions inventory, regulated sources, economic and population trends, and available and most effective emission controls. Here, instead of cooperating with Utah on the 179B(b) area-specific scientifically supported solution to the ozone issue, EPA ignored cooperative federalism and issued the Final Rule without notice and comment and with full knowledge of the forthcoming 179B(b) demonstration.

### A. EPA's Failure to Follow the APA's Mandatory Public Notice and Comment Process is a Fatal Procedural Flaw

EPA erred in omitting APA-required public notice and comment mandated in this case. The APA governs administrative rulemaking,[46] outlining a process by which agencies promulgate rules only after notice to interested parties and the opportunity to engage in the rulemaking process by submitting input through comments.[47] In only exceptionally narrow statutorily defined circumstances, an agency may bypass such notice-and-comment procedures, assuming the agency makes express findings justifying the exception.[48] An agency can forego notice-and-comment if it finds that it is "impracticable, unnecessary, or contrary to the public interest" to propose a rule for public comment.[49]

The courts further construe this language narrowly and allow agencies to use it only in emergencies where "delay could result in serious harm."[50] Even if the EPA invoked the

---

[45] *See e.g.*, *Texas v. United States Env't Prot. Agency*, 829 F.3d 405, 411 (5th Cir. 2016) (citing *Luminant Generation Co. v. E.P.A.*, 675 F.3d 917, 921 (5th Cir. 2012).

[46] 5 U.S.C. § 551 *et seq*.

[47] 5 U.S.C. § 553.

[48] The agency must " . . .incorporate the finding [of good cause] and a brief statement of reasons therefor in the rules issued." *Id*. §553(b)(B).

[49] *Id.* § 553(B).

[50] *Jifry v. F.A.A.*, 370 F.3d 1174, 1179 (D.C. Cir. 2004); *see also Nat. Res. Def. Council v. Evans*, 316 F.3d 904, 911 (9th Cir. 2003) (emergencies may not be the only situations where the good cause exception applies, but they are the most common ones).

emergency prong of the APA (which the EPA did not), the Final Rule cannot be justified by an emergency. EPA was well within its statutory deadline to reclassify the Northern Wasatch Front (the deadline would have been in February 2025), was not under a consent decree to act by a certain date, and was aware that it would soon receive a 179B(b) demonstration from Utah directly relevant to the Final Rule. But EPA instead reclassified the area where there was no air quality or public health emergency to do so.

Utah's 179B(b) demonstration shows that Utah has limited control over ozone and its precursor emissions (more than 75% of ozone observed within the nonattainment area comes from sources outside of Utah's regulatory authority) and needs to avail itself of the Clean Air Act exception for international transport under Section 179B. Even if required immediately, Utah cannot address ozone exceedances in the Northern Wasatch Front through commonly available tools and strategies.

The APA notice and comment procedures are not meant to be lightly bypassed. The statute was enacted to ensure meaningful public participation in the rulemaking process. The importance of notice and comment "cannot be overstated."[51] It ensures the agency's ability to make better-informed decisions, incentivizes the public to participate, and allows an agency to remain flexible with rulemaking.[52] For these reasons, the good cause exception is meant to be "narrowly construed and only reluctantly countenanced."[53] "It is *not* an escape clause that may

---

[51] *N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 763 (4th Cir. 2012).
[52] *See id.*
[53] *Util. Solid Waste Activity Grp. v. E.P.A*, 236 F.3d 749, 754 (D.C. Cir. 2001); *see also Louisiana v. Horseracing Integrity & Safety Auth., Inc.*, 617 F. Supp. 3d 478, 495 (W.D. La. 2022) ("[The good cause exception] is a high bar for the agency to overcome.").

be arbitrarily utilized at the agency's whim."[54] The burden of "showing good cause is on the agency."[55]

Here the EPA erroneously used the "good cause" exception[56] to avoid public comment and failed to provide the justification that meets the exception. EPA said that the Final Rule's reclassification was a matter of numbers—design value for the area based on the certified air quality monitoring data—and involved no discretion or judgment, making the public procedures unnecessary.[57] EPA justifies its finding to skip public notice and comment by reasoning that the above impacts could not possibly change the outcome of the Final Rule. Therefore, EPA suggests, comments were useless. This is an incorrect conclusion that violates the APA for at least two reasons. The APA's public notice and comment procedures may only be "unnecessary" where the rule is a "routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public."[58] First, even if a rule is ministerial and only involves numbers input (which the Final Rule was not), notice-and-comment would still be necessary if there are impacts on the industry or the public.[59] The impacts in the instant case are tangible and actual, as described below. Second, the Northern Wasatch Front reclassification to serious nonattainment was not done as a matter of law. The decision should have considered Utah's 179B(b) demonstration and evaluation of international emissions impact on the area attaining the ozone standard.

---

[54] *Tennessee Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1144 (D.C. Cir. 1992) (quoting *Am. Fed'n of Gov't Em., AFL-CIO v. Block*, 655 F.2d 1153, 1156 (D.C. Cir. 1981) (cleaned up) (emphasis in original).
[55] *Louisiana v. Horseracing Integrity & Safety Auth., Inc.*, 617 F.Supp.3d at 154.
[56] *See* 5 U.S.C. § 553(b)(B); 89 Fed. Reg. at 97,548.
[57] *See* 89 Fed. Reg. at 97,548.
[58] *Util. Solid Waste Activity Grp.*, 236 F.3d at 755, (quoting *State of S.C. ex rel. Patrick v. Block*, 558 F. Supp. 1004, 1016 (D.S.C. 1983)).
[59] *Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87, 94 (D.C. Cir. 2012) (Although the EPA claimed the rule was ministerial, involving only the input of numbers without otherwise amended prior regulations, the court found that because the impact to industry was so significant, this rulemaking could not bypass the opportunity for public input that the notice and comment procedure requires.); *see also Tennessee Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1145 (D.C. Cir. 1992) (interim nature of the rule was not sufficient justification for use of the good cause exception).

The Final Rule's reclassification of the Northern Wasatch Front to serious nonattainment imposes new and burdensome requirements and significantly affects Utah, Utah's industry, and the public. The permitting process became much more complicated and challenging starting on January 8, 2025 (the Final Rule's effective date) with the threshold for major sources now at 50 tons per year of VOC or NOx emissions or potential to emit.[60] This means that more sources in the area are subject to major source permitting requirements, and these sources were given no opportunity to comment on the Final Rule. UDAQ currently counts ten potential new major sources that have previously been classified as minor. These sources would require a permit modification to continue to stay under the major source threshold or a new major source permit. If continuing as major, seven of these sources would require a new Title V permit under the Clean Air Act, Chapter 85, Subchapter V.[61] This means permitting fees and consultant fees for the sources to prepare permit modifications or applications and many hours of UDAQ engineers to review these applications, issue proposed permits for public comment (including EPA 45-day public comment period for Title V permits),[62] respond to comments, and issue the final permits. The costs to UDAQ could add up to $375,480 for Title V permitting work and $60,000 for other permitting fees. A typical Title V permit process takes approximately 720 hours of staff time at an average Engineer III hourly rate of $74.50 per hour with each Title V permit costing the agency $53,640. For seven new permits, it adds up to $375,480.

The new *de minimis* rule for VOC emission increases from existing sources undergoing permit modifications will also complicate permitting. This rule requires that increases in VOC emissions resulting from changes at the sources of air pollution "shall not be considered de

---

[60] 42 U.S.C. § 7511a(c) and (f).
[61] Clean Air Act §§ 501-507, 42 U.S.C §§ 7661-7661f.
[62] Utah Admin. Code r. R307-415-8.

minimis for purposes of determining the applicability of permit requirements" unless the increase does not exceed 25 tons "when aggregated with all other net increases in emissions from the source over any period of 5 consecutive calendar years."[63]

Offsetting requirements also tighten significantly in the serious nonattainment area, which means that the new or modified sources will have to buy more emission reduction credits to offset the emissions they will produce, making it more expensive for new businesses to operate in Utah's Northern Wasatch Front.[64] The general offsetting ratio for the serious nonattainment area shall be at least 1.2 (VOC or NOx emissions reduction) to 1 (increase in VOC or NOx emissions).[65] Offsetting ratios for modifications to existing sources also change to a more stringent ratio of 1.3 to 1[66] and an option to use the Best Available Control Technology (BACT) for certain sources. The new offsetting requirements are also effective as of January 8, 2025.

Additional burdens on the industry will come from reasonable further progress that mandates 3% emission reductions in VOCs or NOx averaged over every three years with a total reduction of 9% by the attainment date.[67] Since the reductions are incremental, the pool of available potential emissions shrinks with each passing three-year milestone, making it difficult to find further cuts resulting in increasingly expensive emission controls. UDAQ may require controls for sources costing hundreds of millions of dollars in the aggregate. Similarly, contingency measures if the area fails to meet emission reduction milestones would mean more costly controls for the industry.[68] The state could ask EPA for a reasonable further progress

---

[63] 42 U.S.C. § 7511a(6).
[64] Utah Admin. Code r. R307-403-6.
[65] 42 U.S.C. § 7511a(c)(10).
[66] *Id*. § 7511a(7) (offsetting for sources emitting less than 100 tons of VOCs) and (8) (offsetting for sources emitting more than 100 tons of VOCs).
[67] *Id*. § 7511a(c)(2)(B)(i).
[68] *Id*. § 7511a(9).

percentage less than 3% but the state would have to demonstrate that all feasible measures have been implemented and other measures are not available due to technological achievability.[69] Pursuing this exception would require additional work and poses a potential for disapproval.

Perhaps, the most impactful requirement on the Northern Wasatch Front population and the Utah government would be an enhanced vehicle inspection and maintenance program.[70] This program would cost Utah and the nonattainment area counties an estimated $1.2 million annually—the cost of hiring at least five full-time employees and opening a new section to administer and run the program. UDAQ will also have to enter long-term contracts with third-party vendors and include costs to the current inspection and maintenance programs administered by the counties. The program must demonstrate the achievement of reductions in hydrocarbon and NOx emissions from motor vehicles with periodic reporting of reductions to EPA.[71] Emissions testing and inspections to detect tampering will be required and enforced through denial of vehicle registration[72] and on-road emission testing.[73] More importantly due to the SIP timelines and the duration of maintenance periods following NAAQS attainment,[74] an enhanced program implemented as part of a serious SIP requirement is likely to be in effect for decades to come. This means that the $1.2 million annual expense is likely to be a continuous non-recoverable drain on state resources for many years.

All these impacts are significant and require public notice and comment as EPA did in other similar rulemakings. For example, the EPA reclassified the same area (the Northern Wasatch Front) from marginal to moderate through a proposed rule that collected 93

---

[69] *Id*. § 7511a(c)(2)(B)(ii).
[70] *Id*. § 7511(c)(3).
[71] *Id.*
[72] *Id.*
[73] *Id.* § 7511(c)(3)(B)(i).
[74] *Id.* § 7505a.

comments.[75] EPA also first proposed the reclassification of three nonattainment areas in Utah from moderate to severe for the 2006 24-hour $PM_{2.5}$ NAAQS[76] ultimately reclassifying only two of the areas[77] and granting an extension request for the Logan, Utah-Idaho nonattainment area.[78] Baton Rouge marginal 8-hour ozone nonattainment area in Louisiana[79] and marginal 8-hour ozone nonattainment area in Memphis, Tennessee and Crittenden County, Arkansas[80] were both proposed for reclassification based on design value only and yet EPA thought it important to receive public comments on these rulemakings. Here EPA inexplicably deviated from its own practice and dispensed with the public notice and comment. It should not have. EPA arbitrarily used the good cause exception as an "escape clause"[81] and should remedy this error through the Final Rule's repeal.

Reliance on the good cause exception is also an error because the agency ignored the forthcoming 179B(b) demonstration, which inarguably represents more than a routine set of numbers. EPA was fully aware of it and had the draft demonstration two weeks before issuing the Final Rule. The 179B(b) demonstration would have made the Final Rule unnecessary or at least delayed it until the EPA reviewed the demonstration and public feedback. Consideration of the 179B demonstration is an exercise of discretion and judgment beyond routine ministerial function, and Utah would have commented on this had the Final Rule been proposed for public comment. But Utah was not given the opportunity.

---

[75] Comments to *Air Quality State Implementation Plans; Approvals and Promulgations: Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Marginal for the 2015 Ozone National Ambient Air Quality Standards,* Docket Id. No. EPA-HQ-OAR-2021-0742-0001 (April 13, 2022), https://www.regulations.gov/document/EPA-HQ-OAR-2021-0742-0001/comment; *see also* 87 Fed. Reg. 21,842.
[76] 81 Fed. Reg. 91,088.
[77] 82 Fed. Reg. 21,711 (May 10, 2017) (codified at 40 C.F.R. pts. 52, 81).
[78] 82 Fed. Reg. 42,447 (Sept. 8, 2017) (codified at 40 C.F.R. pt. 52).
[79] 72 Fed. Reg. 61,315.
[80] 72 Fed. Reg. 58,577.
[81] *Tennessee Gas Pipeline Co.*, 969 F.2d at 1144.

An additional reason to repeal the Final Rule is Utah's Northern Wasatch Front boundary adjustment request that the EPA received on February 28, 2023. Utah requested the inclusion of US Magnesium into the area boundaries because of its contribution to the degradation of the Northern Wasatch Front airshed. EPA indicated to Utah on several occasions that it would consider the boundary adjustment request together with the evaluation of attainment. But it has not done so causing unreasonable delay and violating its non-discretionary duty to act on the request within 18 months of submission.[82] Utah must know the boundaries of the nonattainment area before the SIP-writing process begins if the area is ultimately reclassified as serious nonattainment. It is premature and a waste of the agency's resources to require Utah to begin writing a serious area SIP with an undetermined area boundary and a pending 179B demonstration. EPA should repeal the Final Rule for these reasons. In addition, the EPA should act on the boundary adjustment request and propose it for notice and comment under the APA, 5 U.S.C. § 553(e).

### B.    EPA Should Convene a Reconsideration Proceeding under 42 U.S.C. § 7607(d)(7)(B) Because of the Pending 179B(b) Demonstration Centrally Relevant to the Final Rule

In the alternative, the EPA should convene a reconsideration proceeding under 42 U.S.C. § 7607(d)(7)(B) and reconsider the Final Rule. The Clean Air Act requires the EPA Administrator to convene a reconsideration proceeding if "it was impracticable to raise [an] objection" to a final EPA action within the time for public comment or if "the grounds for such objection arose after the period for public comment (but within the time specified for judicial review)" and such objection is "of central relevance to the outcome of the rule."[83] Here, EPA has erroneously used the "good cause" exception in the APA to avoid public comment and to take

---

[82] 42 U.S.C. § 7407(d)(3)(D); *Sierra Club*, 828 F.3d at 794-95.
[83] 42 U.S.C. § 7607(d)(7)(B).

away Utah's opportunity to comment on the proposed reclassification. Had the rule been first proposed as required, Utah would have objected to it as Utah was close to submitting a persuasive and well-supported 179B(b) demonstration. But Utah could not object because there was no public comment period for the Final Rule's promulgation.[84]

Utah submitted its final 179B(b) demonstration to the EPA several days after the Final Rule's publication in the Federal Register. EPA now has a pending 179B(b) demonstration showing that the Northern Wasatch Front would have met the 2015 8-hour ozone NAAQS but for international emissions. This information is of central relevance to the outcome of the Final Rule. "[N]ew information . . . may dictate a revision or modification of any promulgated standard or regulation."[85] Because the EPA received Utah's 179B(b) demonstration after it issued the Final Rule without notice and comment, the EPA did not consider the 179B demonstration and did not determine whether the Northern Wasatch Front area met the relevant NAAQS but for the international emissions. The reconsideration is appropriate here for this reason as it meets the statutory requirement in 42 U.S.C. § 7697(d)(7)(B).

## IV.    REQUEST FOR ADMINISTRATIVE STAY OF THE FINAL RULE

EPA should issue a three-month administrative stay under the Clean Air Act, 42 U.S.C. § 7607(d)(7)(B), or a lengthier stay pending judicial review, under the APA, 5 U.S.C. § 705, because Utah satisfies all administrative stay elements. The legal standard for an administrative stay is even broader than the standard for a judicial stay. The EPA can "postpone the effective date of action taken by it" when "justice so requires."[86] Despite this broad authority to grant stays, administrative agencies often apply the more specific criteria

---

[84] *See e.g. Portland Cement Ass'n v. E.P.A.*, 665 F.2d 177, 189 (D.C. Cir. 2011) (EPA granted industry's request for reconsideration where EPA did not give sufficient notice of the new NESHAP standards).

[85] *Oljato Chapter of Navajo Tribe v. Train*, 515 F.2d 654, 660 (D.C. Cir. 1975) (citing legislative history); *see also Maier v. E.P.A.*, 114 F.3d 1032, 1037 (10th Cir. 1997) (citing *Oljato*).

[86] 5 U.S.C. § 705. Given the burden and harms described above, "justice so requires" that EPA stay the final rule.

akin to preliminary injunction request standards when determining whether a stay should be granted.[87] "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[88]

The Tenth Circuit has adopted a less stringent requirement for proving the likelihood of success.[89] If the last three elements are met, the plaintiff only needs to demonstrate that "questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."[90] This modified requirement to show the likelihood of success applies here, as discussed below.

The most critical factors of this test are the likelihood of success on the merits and irreparable harm.[91] That said, an agency reviewing a request for a stay must review these factors in their totality and not in a rigid or isolated manner. For example, if a party demonstrates that it satisfies the last three factors, a lesser showing may be sufficient for the first factor, the likelihood of success on the merits.[92]

---

[87] *See Affinity Healthcare Servs. v. Sebelius*, 720 F. Supp. 2d 12, 15 n. 4 (D.D.C. 2010) ("Motions to stay agency action pursuant to [5 U.S.C. § 705] are reviewed under the same standards used to evaluate requests for interim injunctive relief.").

[88] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009); *Chamber of Com. of U.S. v. Edmondson,* 594 F.3d 742, 764 (10th Cir. 2010); *Sierra Club v. Jackson,* 833 F. Supp. 2d 11, 30 (D.D.C. 2012).

[89] *See Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002).

[90] *Id.* (citation omitted).

[91] *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

[92] *See Fed. Lands Legal Consortium v. United States,* 195 F.3d 1190, 1195 (10th Cir. 1999) (if the moving party establishes that the last three factors of the test are in its favor, the party may ordinarily satisfy the first factor by "showing that questions going to the merits are so serious, substantial, difficult and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation").

Utah satisfies all these factors. Consequently, the EPA should stay the Final Rule reclassifying the Northern Wasatch Front as a serious nonattainment area for the 2015 8-hour ozone NAAQS and toll its effective date pending judicial review.

### A.    Utah is Likely to Succeed on the Merits

A reviewing court will invalidate EPA action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or without observance of procedure required by law."[93] An agency action could be arbitrary and capricious for several reasons, but relevant here is the "clear error of judgment."[94]

EPA's reliance on a good cause exception in the APA is a clear error of judgment. With the exception construed "narrowly" and used "reluctantly,"[95] only an emergency[96] or insignificant determination "inconsequential to the industry and to the public"[97] would justify bypassing the notice-and-comment process. As explained in detail on pages 14-18 (Section III.A), no emergency exists to justify imposing the Final Rule without information from the public and the Final Rule has substantial consequences for Utah, Utah's industry, and the public.

As a result, Utah is likely to succeed on the merits and will satisfy the Tenth Circuit's more liberal test of showing "that questions going to the merits are so serious, substantial, difficult and doubtful" that they are ripe for litigation and deserve a "more deliberate

---

[93] 42 U.S.C. § 7607(d)(9).

[94] *San Juan Citizens All. v. Stiles,* 654 F.3d 1038, 1045 (10th Cir. 2011) (quoting *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.,* 565 F.3d 683, 704 (10th Cir. 2009) (An agency's action is arbitrary and capricious when an agency "(1) entirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment.").

[95] *Util. Solid Waste Activity Grp.*, 236 F.3d at 754.

[96] *Jifry v. F.A.A.*, 370 F.3d at 1179; *see also Nat. Res. Def. Council v. Evans*, 316 F.3d at 911.

[97] *Util. Solid Waste Activity Grp.*, 236 F.3d at 755.

investigation."[98] Additionally, the burden of proof on a movant to satisfy this element is low.

A movant must only make a *prima facie* case "showing a reasonable probability that he will

ultimately be entitled to the relief sought."[99] Utah satisfies this first and most critical element

of the test.

### B.    Absent an Immediate Stay, Utah will Suffer Irreparable Harm

Three factors are generally considered in evaluating the harm that will occur: (1) the

substantiality and seriousness of the alleged injury; (2) the likelihood of its occurrence (the injury

must be actual and not purely speculative); and (3) the adequacy of the proof provided.[100] More

weight is usually assigned to the irreparability of the injury rather than its magnitude.[101] An

injury is irreparable when any of the following circumstances are present: (1) "[I]t is not

practicable to calculate damages to remedy this kind of harm;"[102] (2) damages would not be

available due to the government's sovereign immunity;[103] (3) expenditures required by the

rule will interfere with the states' sovereign priorities.[104] As discussed below, this petition

and supporting declaration demonstrate that Utah will suffer irreparable harm if the EPA

does not stay the Final Rule and toll the effective date. The costs listed below are not

---

[98] *Fed. Lands Legal Consortium*, 195 F.3d 1190, 1195; *see also Otero Sav. & Loan Ass'n v. Fed. Reserve Bank of Kansas City, Mo.*, 665 F.2d 275, 278 (10th Cir. 1981).

[99] *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir. 1980) (quoting *Crowther v. Seaborg*, 415 F.2d 437, 439 (10th Cir. 1969)).

[100] *See Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 977 (D.C. Cir. 1985); see also *Vill. of Logan v. US. Dep't of Interior*, 577 F. Appx. 760, 766 (10th Cir. 2014) (quoting *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (finding that the injury must be "actual and not theoretical").

[101] *See e.g. Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012); *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) ("Federal courts have long recognized that, when 'the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction.").

[102] *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003).

[103] *See e.g. Chamber of Commerce of U.S. v. Edmondson,* 594 F.3d 742, 770-71 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury"); *Patton v. Dole*, 806 F.2d 24, 28 (2d Cir. 1986) (finding irreparable harm where plaintiff likely would have no damages claim because of the federal government's sovereign immunity).

[104] "Directing a priority expenditure from the state treasury 'may derange the operations of government, and thereby cause serious detriment to the public.'" *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan,* 501 U.S. 1301, 1304 (1991) (Scalia, J., in chambers) (quoting *Dows v. City of Chicago*, 78 U.S. 108, 110 (1870)).

recoverable because of the federal sovereign immunity making Utah's harms irreparable and being able to be redressed monetarily.[105]

Utah will suffer irreparable harm because the EPA issued the Final Rule prematurely before it considered the centrally relevant 179B(b) determination. Utah has poured significant resources into preparing and finalizing the determination. UDAQ spent almost a quarter of a million dollars on staff time and hired a private company, Ramboll, to conduct modeling analysis for the demonstration. Taxpayers' dollars went to this effort through a legislative appropriation. These expenses are entirely wasted and non-recoverable because the EPA ignored the 179B(b) demonstration.

With the Northern Wasatch Front reclassified as serious nonattainment, UDAQ must now prepare a serious nonattainment area SIP. The SIP work must begin immediately to meet the January 1, 2026 deadline.[106] The SIP-writing process is lengthy and involves multiple steps. UDAQ first engages the sources affected by the SIP, prepares and drafts the plan, and then presents it to the Utah Air Quality Board for public comment proposal. Once proposed for public comment, the SIP undergoes at least a 30-day comment period. UDAQ then responds to all public comments, including responses to any legal issues, which require more expenses for legal counsel's time. At the final stages, UDAQ makes the necessary revisions to the SIP to address the public comments and submits the SIP to the Utah Air Quality Board for final adoption.

---

[105] *See Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) ("[N]umerous courts have held that the inability to recover monetary damages because of sovereign immunity renders the harm suffered irreparable."); *Iowa Utils. Bd. v. F.C.C.*, 109 F.3d 418, 426 (8th Cir. 1996); *Kansas v. United States*, 249 F.3d 1213, 1227-28 (10th Cir. 2001); *Thunder Basin Coal Co*., 510 U.S. at 220-21 (Scalia, J concurring).
[106] 90 Fed. Reg. 5,651, 5,652, 5,654 (Jan. 17, 2025) (establishing SIP submittal requirements).

Beyond the costs associated with the SIP-writing process, there are significant costs to the state to fully develop and implement a SIP. These costs included the staff time to design and implement an enhanced inspection and maintenance program, develop and implement Reasonably Available Control Measures (RACT), produce appropriate and accurate emission inventories, develop an attainment demonstration based on a reliable photochemical computer model, as well as the costs associated with reviewing RACT analysis and drafting the permitting conditions into air permits.

Based on its work on the moderate nonattainment SIP for the same area, UDAQ has estimated the costs of writing and developing a nonattainment SIP. Such costs could be up to $1.3 million per year for 23 staff members (including 7 managers), and over the three-year period that it takes to develop and write an attainment SIP for each new classification, upwards of $3.9 million. These costs do not include all the permitting and compliance staff time to implement the work resulting from the inclusion of more sources into the major source category and the SIP-associated rules.

There will also be additional burdens on the Utah industry and economic harm to the state. As part of the serious nonattainment SIP to meet reasonable further progress requirements, UDAQ must impose costly controls on numerous sources with total costs of up to hundreds of millions of dollars. This expenditure of time and resources would be unnecessary if EPA first considered and approved the pending 179B(b) demonstration showing that the Northern Wasatch Front meets the 2015 8-hour ozone NAAQS but for international emissions. Thus, these costs constitute irreparable harm to the state if Utah is forced to begin the SIP work immediately.

Many of the serious nonattainment area Clean Air Act requirements apply on the effective date of the Final Rule, January 8, 2025. These requirements will burden Utah's industry and affect the state's economy. It will be more difficult and costly to open a new business in Utah's Northern Wasatch Front because of the new more stringent offsetting ratios. The permitting process will become more onerous for the greater number of sources with the major source threshold at 50 tons per year and de minimis rule requirements. UDAQ is anticipating ten new major sources that will require either a permit modification to continue as minor sources or a major source permit, including a new Title V permit for at least seven sources. Potential permitting work on these modifications and new permits could cost the state close to $435,480. These are sunk costs that cannot be recovered and constitute an irreparable injury to Utah if EPA does not stay the Final Rule.

An enhanced vehicle inspection and maintenance program must also be implemented as part of the serious nonattainment SIP impacting almost every resident in the four-county nonattainment area. This program will need an additional budget to hire at least five full-time employees to run the program at an annual cost of $1.2 million. There will also be irreparable harm to the public through emissions testing requirements and additional inspections to detect tempering with potential vehicle registration denial. These are irreparable harms to the state and its citizens that the stay of the Final Rule would prevent.

Finally, there are sovereign harms to Utah because EPA displaced "cooperative federalism" through its action in the Final Rule. EPA ignored the forthcoming 179B(b) demonstration and issued the Final Rule without giving Utah a chance to comment on this issue. By doing so, EPA took away Utah's primacy in regulating ozone pollution in the

Northern Wasatch Front. "Institutional injury . . . from the inversion of the federalism principles enshrined in the Clea Air Act may constitute irreparable injury."[107]

### C. The Remaining Factors Strongly Favor a Stay

The third factor looks at whether a stay will "substantially injure the other parties interested in the proceeding."[108] The analysis of this factor likewise supports granting of the stay. There is no harm to the public if the reclassification is stayed while the EPA reconsiders the Final Rule and reviews Utah's 179B(b) demonstration. The demonstration shows that Utah has limited control over ozone precursor emissions. Just over 20% of the precursor emissions come from local anthropogenic sources that the state has regulatory control over with an average of 6% to 7% of ozone on exceedance days contributed by international emissions. If EPA approves this demonstration, the Northern Wasatch Front will attain the 2015 8-hour ozone NAAQS but for the influence of international emissions. Utah has also made significant progress despite the population growth in curtailing the existing precursor emissions that it has control over with a decrease of well over 40% over the past two decades.

The remaining factor looks at "where the public interest lies."[109] In this case, the public interest strongly favors granting the stay due to the Final Rule's negative effects on the State's economy, a more costly and difficult permitting process, and expensive control requirements (with the costs likely passed on to the public). Additionally, the public will be affected by the enhanced vehicle inspection and maintenance program which is likely to entail additional fees and a more burdensome vehicle registration process. All these burdens are unlikely to lead to air quality improvements as the 179B(b) analysis demonstrates.

---

[107] *Texas v. EPA*, 829 F.3d at 434.
[108] *Nken,* 556 U.S. at 426.
[109] *Nken,* 556 U.S. at 426.

There is a broad public interest in maintaining the Clean Air Act's "cooperative federalism."[110] Under this system, state regulators, who have better knowledge of the local issues, economy, and conditions, can design paths towards compliance that both meet federal statutory and regulatory requirements and balance costs. The public certainly has an interest in state agencies enacting policies that meet the needs of the state's population and economy and strike the appropriate balance between competing needs.

## V. CONCLUSION

EPA should grant Utah's petition and repeal the procedurally flawed Final Rule or, in the alternative, grant Utah's petition for reconsideration and stay the Final Rule reclassifying the Northern Wasatch Front to a serious nonattainment area for the 2015 8-hour ozone NAAQS and toll the applicable deadlines.

---

[110] *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 240 (D.C. Cir. 2013).

Dated: January 22, 2025.

<div style="margin-left: 50%;">

DEREK E. BROWN
Utah Attorney General

**Marina V.**   Digitally signed by
**Thomas**   Marina V. Thomas
Date: 2025.01.22
15:40:21 -07'00'

Marina V. Thomas
Braden W. Asper
Assistant Utah Attorneys General
Utah Attorney General's Office
Environment, Health & Human Services
Division
195 North 1950 West, Second Floor
P.O. Box 140873
Salt Lake City, UT 84114-0873
marinathomas@agutah.gov
bradenasper@agutah.gov
*Counsel for the State of Utah, on behalf of*
*the Utah Department of Environmental*
*Quality, Utah Division of Air Quality*

</div>



# A Snapshot of the Fiscal Impact of Utah's Oil & Natural Gas Industry

## Understanding Utah's Natural Gas & Oil Industry Through Its Fiscal Impact

- The Uinta Basin is attracting more interest and activity from producers across the country, which is reflected in the increase of revenue numbers nearly across the board.

- Fees and taxes related to the oil and natural gas industry totaled $5.5 billion from FY 2019 to FY 2023.

- In 2023, total direct employees were 11,555 and total wages were $1.4 billion, up from 10,333 employees and $852 million in wages from 2019.

- From 2019 to 2023, the top counties for taxes paid were Uintah ($1.4 b), Salt Lake ($997 m), and Duchesne ($689 m).

- The revenue from oil and natural gas production funds multiple services we use each and every day such as education, roads, and public safety to name three.

## Oil and Gas Severance Tax, Annual and Total



## Oil and Gas Severance Tax

| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| Uintah | $14.2M | $17.0M | $9.8M | $37.1M | $58.8M | $137.0M |
| Duchesne | $7.6M | $9.6M | $6.2M | $26.2M | $37.1M | $86.7M |
| Carbon | $2.6M | $3.0M | $1.8M | $7.2M | $10.5M | $25.0M |
| San Juan | $1.5M | $2.0M | $1.1M | $3.7M | $6.5M | $14.8M |
| Emery | $0.4M | $0.5M | $0.3M | $1.2M | $1.7M | $4.1M |
| Sevier | $0.4M | $0.4M | $0.2M | $0.7M | $1.2M | $2.9M |
| Grand | $0.3M | $0.3M | $0.2M | $0.6M | $0.9M | $2.2M |
| Summit | $0.2M | $0.2M | $0.1M | $0.3M | $0.7M | $1.4M |
| Sanpete | $0.1M | $0.1M | $0.0M | $0.2M | $0.3M | $0.6M |
| Daggett | $0.1M | $0.1M | $0.0M | $0.2M | $0.3M | $0.6M |
| Garfield | $0.0M | $0.0M | $0.0M | $0.1M | $0.1M | $0.3M |



Source: Tax Commission.                                                                                      August 2024



## Sales Tax Paid on Oil & Gas Inputs, Annual and Total



| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| Uintah | $21.76M | $26.15M | $15.05M | $23.51M | $37.26M | $123.73M |
| Duchesne | $11.71M | $14.72M | $9.49M | $16.60M | $23.51M | $76.03M |
| Carbon | $3.94M | $4.60M | $2.70M | $4.54M | $6.68M | $22.45M |
| San Juan | $2.33M | $3.05M | $1.67M | $2.34M | $4.14M | $13.53M |
| Emery | $0.62M | $0.75M | $0.45M | $0.76M | $1.10M | $3.69M |
| Sevier | $0.56M | $0.67M | $0.30M | $0.46M | $0.75M | $2.74M |
| Grand | $0.40M | $0.43M | $0.24M | $0.36M | $0.59M | $2.01M |
| Summit | $0.24M | $0.31M | $0.18M | $0.17M | $0.44M | $1.34M |
| Sanpete | $0.10M | $0.12M | $0.07M | $0.11M | $0.17M | $0.56M |
| Daggett | $0.09M | $0.09M | $0.07M | $0.11M | $0.17M | $0.52M |
| Garfield | $0.05M | $0.07M | $0.04M | $0.05M | $0.09M | $0.29M |



## Oil and Gas Conservation Fee Revenue, Annual and Total

Chart — Oil & gas conservation fee revenue by year:
- 2019: $4,524,169
- 2020: $3,663,583
- 2021: $2,654,179
- 2022: $6,182,956
- 2023: $10,379,537
- Grand Total: $27,404,424

| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| Uintah | $2.36M | $1.88M | $1.32M | $2.97M | $5.16M | $13.69M |
| Duchesne | $1.27M | $1.06M | $0.83M | $2.09M | $3.26M | $8.51M |
| Carbon | $0.43M | $0.33M | $0.24M | $0.57M | $0.93M | $2.49M |
| San Juan | $0.25M | $0.22M | $0.15M | $0.29M | $0.57M | $1.49M |
| Emery | $0.07M | $0.05M | $0.04M | $0.10M | $0.15M | $0.41M |
| Sevier | $0.06M | $0.05M | $0.03M | $0.06M | $0.10M | $0.30M |
| Grand | $0.04M | $0.03M | $0.02M | $0.05M | $0.08M | $0.22M |
| Summit | $0.03M | $0.02M | $0.02M | $0.02M | $0.06M | $0.15M |
| Sanpete | $0.01M | $0.01M | $0.01M | $0.01M | $0.02M | $0.06M |
| Daggett | $0.01M | $0.01M | $0.01M | $0.01M | $0.02M | $0.06M |
| Garfield | $0.01M | $0.00M | $0.00M | $0.01M | $0.01M | $0.03M |



August 2024

3

# Oil & Gas: Real Property Tax, Annual and Total

Real property tax paid by upstream and downstream providers

| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| | $51,709,832 | $51,376,498 | $53,020,005 | $85,892,408 | $131,277,862 | $373,276,605 |

| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| Uintah | $11.7M | $11.7M | $12.0M | $19.7M | $29.8M | $84.9M |
| Duchesne | $9.0M | $9.0M | $9.2M | $13.6M | $22.9M | $63.7M |
| Salt Lake | $6.1M | $6.0M | $6.2M | $10.6M | $15.4M | $44.4M |
| Utah | $2.8M | $2.8M | $2.9M | $4.9M | $7.1M | $20.5M |
| Box Elder | $2.8M | $2.8M | $2.8M | $4.3M | $7.0M | $19.7M |
| Davis | $2.2M | $2.2M | $2.3M | $3.9M | $5.7M | $16.4M |
| Carbon | $2.2M | $2.2M | $2.3M | $4.0M | $5.6M | $16.3M |
| San Juan | $1.6M | $1.6M | $1.6M | $2.4M | $4.1M | $11.3M |
| Grand | $1.4M | $1.3M | $1.4M | $2.4M | $3.4M | $9.9M |
| Summit | $1.3M | $1.2M | $1.3M | $2.2M | $3.2M | $9.2M |
| Morgan | $1.1M | $1.1M | $1.1M | $2.0M | $2.8M | $8.1M |
| Washington | $1.1M | $1.1M | $1.1M | $1.9M | $2.7M | $7.9M |
| Millard | $1.0M | $1.0M | $1.1M | $1.9M | $2.6M | $7.6M |
| Weber | $1.0M | $1.0M | $1.0M | $1.6M | $2.6M | $7.3M |
| Iron | $1.0M | $1.0M | $1.0M | $1.6M | $2.5M | $7.0M |
| Sevier | $1.0M | $1.0M | $1.0M | $1.0M | $2.6M | $6.6M |
| Cache | $0.9M | $0.9M | $0.9M | $1.7M | $2.2M | $6.5M |
| Tooele | $0.8M | $0.8M | $0.8M | $1.3M | $1.9M | $5.5M |
| Daggett | $0.7M | $0.7M | $0.8M | $1.3M | $1.9M | $5.4M |
| Beaver | $0.5M | $0.5M | $0.5M | $1.0M | $1.3M | $3.9M |
| Juab | $0.5M | $0.5M | $0.5M | $0.8M | $1.2M | $3.3M |
| Rich | $0.4M | $0.4M | $0.4M | $0.7M | $1.1M | $3.1M |
| Sanpete | $0.2M | $0.2M | $0.2M | $0.4M | $0.6M | $1.6M |
| Emery | $0.2M | $0.2M | $0.2M | $0.5M | $0.4M | $1.4M |
| Wasatch | $0.2M | $0.2M | $0.2M | $0.3M | $0.5M | $1.3M |
| Garfield | $0.1M | $0.1M | $0.1M | $0.1M | $0.2M | $0.4M |
| Piute | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.1M |



# Oil & Gas: Personal Property Tax, Annual and Total

| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| | $43,394,998 | $43,335,113 | $42,726,696 | $69,217,247 | $73,370,282 | $272,044,335 |

| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| Uintah | $22.10M | $21.87M | $19.13M | $32.75M | $34.31M | $130.17M |
| Duchesne | $14.27M | $14.90M | $16.19M | $24.88M | $27.82M | $98.06M |
| Carbon | $2.38M | $2.26M | $2.54M | $4.94M | $4.53M | $16.65M |
| San Juan | $1.57M | $1.43M | $1.83M | $2.52M | $2.18M | $9.53M |
| Sevier | $1.40M | $1.51M | $1.76M | $1.67M | $1.95M | $8.29M |
| Summit | $0.55M | $0.49M | $0.50M | $0.83M | $0.31M | $2.68M |
| Grand | $0.50M | $0.33M | $0.25M | $0.47M | $0.96M | $2.52M |
| Emery | $0.21M | $0.17M | $0.21M | $0.66M | $0.73M | $1.98M |
| Sanpete | $0.19M | $0.15M | $0.14M | $0.21M | $0.18M | $0.86M |
| Daggett | $0.09M | $0.10M | $0.09M | $0.19M | $0.31M | $0.78M |
| Garfield | $0.12M | $0.11M | $0.08M | $0.07M | $0.09M | $0.46M |
| Salt Lake | $0.01M | $0.01M | $0.01M | $0.02M | | $0.07M |
| Juab | $0.00M | $0.00M | $0.00M | $0.00M | | $0.00M |
| Utah | $0.00M | $0.00M | $0.00M | $0.00M | | $0.00M |
| Box Elder | $0.00M | $0.00M | | | | $0.00M |



## Royalties Paid to SITLA on Production, Annual and Total

Royalties paid to SITLA on production

| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| (annual total) | $34,934,440 | $23,299,042 | $22,752,273 | $41,480,978 | $79,238,308 | $201,705,041 |

| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| Uintah | $16.8M | $11.2M | $10.9M | $19.9M | $38.0M | $96.8M |
| Duchesne | $11.8M | $7.9M | $7.7M | $14.1M | $26.8M | $68.3M |
| Carbon | $3.2M | $2.2M | $2.1M | $3.8M | $7.3M | $18.7M |
| San Juan | $1.7M | $1.1M | $1.1M | $2.0M | $3.8M | $9.6M |
| Emery | $0.5M | $0.4M | $0.4M | $0.6M | $1.2M | $3.1M |
| Sevier | $0.3M | $0.2M | $0.2M | $0.4M | $0.7M | $1.9M |
| Grand | $0.3M | $0.2M | $0.2M | $0.3M | $0.6M | $1.5M |
| Summit | $0.1M | $0.1M | $0.1M | $0.1M | $0.3M | $0.7M |
| Daggett | $0.1M | $0.1M | $0.1M | $0.1M | $0.2M | $0.4M |
| Sanpete | $0.1M | $0.1M | $0.0M | $0.1M | $0.2M | $0.4M |
| Garfield | $0.0M | $0.0M | $0.0M | $0.0M | $0.1M | $0.2M |





## Gas and Diesel Tax to UDOT Transportation Fund, Annual and Total

Gas and diesel tax paid by downstream providers

Bar chart values:
- 2019: $518,714,166
- 2020: $509,285,656
- 2021: $556,494,279
- 2022: $555,012,357
- 2023: $590,361,243
- Grand Total: $2,729,867,701

| | 2019 | 2020 | 2021 | 2022 | 2023 ⇲ | Grand Total |
|---|---|---|---|---|---|---|
| Salt Lake | $172.4M | $169.3M | $185.0M | $184.5M | $196.3M | $907.5M |
| Utah | $88.0M | $86.4M | $94.4M | $94.1M | $100.1M | $463.0M |
| Davis | $51.2M | $50.3M | $54.9M | $54.8M | $58.3M | $269.5M |
| Weber | $40.4M | $39.7M | $43.4M | $43.3M | $46.0M | $212.8M |
| Washington | $35.9M | $35.3M | $38.5M | $38.4M | $40.9M | $189.0M |
| Cache | $19.9M | $19.5M | $21.3M | $21.3M | $22.6M | $104.7M |
| Tooele | $14.4M | $14.1M | $15.4M | $15.4M | $16.4M | $75.8M |
| Box Elder | $12.5M | $12.2M | $13.4M | $13.3M | $14.2M | $65.6M |
| Iron | $10.9M | $10.7M | $11.7M | $11.7M | $12.4M | $57.6M |
| Summit | $10.8M | $10.6M | $11.6M | $11.6M | $12.3M | $57.0M |
| Uintah | $7.9M | $7.8M | $8.5M | $8.5M | $9.0M | $41.8M |
| Wasatch | $7.6M | $7.5M | $8.2M | $8.1M | $8.7M | $40.0M |
| Sanpete | $6.6M | $6.4M | $7.0M | $7.0M | $7.5M | $34.6M |
| Duchesne | $5.6M | $5.5M | $6.0M | $6.0M | $6.3M | $29.3M |
| Sevier | $5.3M | $5.2M | $5.7M | $5.7M | $6.0M | $27.8M |
| Carbon | $4.5M | $4.4M | $4.8M | $4.8M | $5.1M | $23.7M |
| Millard | $3.4M | $3.3M | $3.6M | $3.6M | $3.8M | $17.6M |
| Juab | $3.2M | $3.2M | $3.4M | $3.4M | $3.7M | $16.9M |
| Morgan | $3.0M | $2.9M | $3.2M | $3.2M | $3.4M | $15.6M |
| Emery | $2.5M | $2.5M | $2.7M | $2.7M | $2.9M | $13.3M |
| Grand | $2.5M | $2.5M | $2.7M | $2.7M | $2.9M | $13.2M |
| San Juan | $2.2M | $2.2M | $2.4M | $2.3M | $2.5M | $11.5M |
| Kane | $2.1M | $2.1M | $2.3M | $2.3M | $2.4M | $11.2M |
| Beaver | $1.8M | $1.7M | $1.9M | $1.9M | $2.0M | $9.3M |
| Garfield | $1.4M | $1.4M | $1.6M | $1.6M | $1.6M | $7.6M |
| Wayne | $0.9M | $0.9M | $1.0M | $1.0M | $1.0M | $4.7M |
| Rich | $0.8M | $0.8M | $0.9M | $0.9M | $0.9M | $4.3M |
| Piute | $0.5M | $0.5M | $0.5M | $0.5M | $0.5M | $2.5M |
| Daggett | $0.5M | $0.5M | $0.5M | $0.5M | $0.5M | $2.4M |



## Federal Royalties, Bonuses, & Other Taxes/Fees Paid on Production, Annual and Total

Federal royalties/other taxes paid on production

- $900M
- $800M
- $700M
- $600M
- $500M
- $400M
- $300M
- $200M
- $100M
- $0M

2019 — $98,398,405
2020 — $67,488,436
2021 — $109,024,324
2022 — $191,599,435
2023 — $209,223,680
Grand Total — $675,734,280

| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| Uintah | $60.5M | $48.0M | $72.5M | $136.4M | $154.1M | $471.6M |
| Duchesne | $13.3M | $6.1M | $11.9M | $17.5M | $17.2M | $66.0M |
| Carbon | $5.3M | $2.9M | $8.7M | $13.6M | $17.2M | $47.8M |
| Sevier | $9.1M | $5.6M | $7.8M | $12.8M | $10.8M | $46.1M |
| San Juan | $3.8M | $1.3M | $2.5M | $3.7M | $2.6M | $13.9M |
| Grand | $2.8M | $1.2M | $2.3M | $2.6M | $2.1M | $10.9M |
| Daggett | $1.2M | $1.0M | $1.1M | $1.4M | $1.5M | $6.0M |
| Emery | $0.9M | $0.4M | $1.0M | $1.3M | $2.0M | $5.6M |
| Garfield | $0.6M | $0.4M | $0.8M | $1.3M | $0.9M | $3.9M |
| Sanpete | $0.5M | $0.4M | $0.5M | $0.6M | $0.5M | $2.5M |
| Summit | $0.2M | $0.2M | $0.3M | $0.4M | $0.3M | $1.3M |
| Juab | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.1M |
| Utah | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.1M |
| Box Elder | $0.1M | $0.0M | $0.0M | $0.0M | $0.0M | $0.1M |



August 2024



## CIB Disbursements from the Federal Government, Annual and Total

Mineral lease funds returned to the state of Utah through CIB (Allocations)

Bar chart values: 2019: $86,843,039; 2020: $65,267,087; 2021: $122,410,725; 2022: $109,092,227; 2023: $127,597,394; Grand Total: $511,210,472

| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| Sevier | $15.8M | $4.8M | $26.7M | $22.1M | $6.6M | $76.0M |
| Uintah | $16.6M | $5.0M | $11.8M | $21.4M | $9.9M | $64.8M |
| Wasatch | $15.9M | $0.0M | $0.0M | $20.5M | $27.1M | $63.5M |
| Kane | $3.1M | $3.0M | $17.4M | $4.0M | $13.8M | $41.3M |
| Washington | $0.4M | $2.7M | $4.1M | $1.1M | $24.0M | $32.2M |
| Carbon | $5.0M | $5.4M | $12.7M | $6.7M | $1.6M | $31.4M |
| Duchesne | $4.2M | $9.2M | $9.2M | $0.9M | $7.1M | $30.6M |
| Cache | $3.9M | $12.6M | $2.2M | $5.0M | $0.0M | $23.8M |
| Sanpete | $4.8M | $0.6M | $8.7M | $6.2M | $1.8M | $22.0M |
| Emery | $2.0M | $2.2M | $10.0M | $2.6M | $4.7M | $21.6M |
| Grand | $1.5M | $6.6M | $0.0M | $2.0M | $7.9M | $18.0M |
| Millard | $3.5M | $0.6M | $1.2M | $0.9M | $10.6M | $16.8M |
| Morgan | $0.0M | $0.0M | $8.0M | $0.0M | $6.0M | $14.0M |
| Beaver | $2.7M | $1.1M | $2.0M | $5.1M | $0.6M | $11.4M |
| Daggett | $4.0M | $0.0M | $0.0M | $5.2M | $0.0M | $9.3M |
| San Juan | $1.0M | $6.1M | $0.0M | $1.3M | $0.4M | $8.7M |
| Wayne | $0.7M | $1.1M | $3.6M | $1.0M | $0.1M | $6.4M |
| Garfield | $1.0M | $2.0M | $1.7M | $1.3M | $0.3M | $6.2M |
| Juab | $0.4M | $0.1M | $2.0M | $0.5M | $2.3M | $5.2M |
| Weber | $0.0M | $0.8M | $0.8M | $0.8M | $0.8M | $3.0M |
| Iron | $0.4M | $1.6M | $0.0M | $0.5M | $0.4M | $2.8M |
| Piute | $0.0M | $0.0M | $0.4M | $0.0M | $1.6M | $1.9M |
| Rich | $0.0M | $0.0M | $0.1M | $0.0M | $0.0M | $0.1M |
| Box Elder | $0.0M | $0.0M | $0.0M | $0.0M | $0.1M | $0.1M |
| Utah | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Tooele | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Summit | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Salt Lake | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Davis | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |



August 2024



## Oil and Gas: Income Tax, Annual and Total

Income tax paid by upstream and downstream providers

| Year | Amount |
|---|---|
| 2019 | $45,424,946 |
| 2020 | $41,049,161 |
| 2021 | $31,720,383 |
| 2022 | $35,272,244 |
| 2023 | $37,459,123 |
| Grand Total | $190,925,857 |

| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| Uintah | $14.8M | $13.1M | $9.3M | $10.6M | $11.1M | $58.8M |
| Duchesne | $10.3M | $9.5M | $7.5M | $7.6M | $8.8M | $43.7M |
| Salt Lake | $3.5M | $3.2M | $2.6M | $3.1M | $3.1M | $15.5M |
| Carbon | $2.1M | $1.9M | $1.5M | $1.9M | $1.8M | $9.2M |
| Utah | $1.6M | $1.5M | $1.2M | $1.4M | $1.4M | $7.2M |
| Box Elder | $1.6M | $1.5M | $1.2M | $1.3M | $1.4M | $6.9M |
| San Juan | $1.5M | $1.3M | $1.1M | $1.1M | $1.1M | $6.1M |
| Davis | $1.3M | $1.2M | $1.0M | $1.1M | $1.2M | $5.7M |
| Sevier | $1.1M | $1.0M | $0.8M | $0.5M | $0.8M | $4.3M |
| Grand | $1.0M | $0.8M | $0.6M | $0.8M | $0.8M | $4.0M |
| Summit | $0.9M | $0.8M | $0.6M | $0.8M | $0.7M | $3.9M |
| Morgan | $0.6M | $0.6M | $0.5M | $0.6M | $0.6M | $2.8M |
| Washington | $0.6M | $0.6M | $0.5M | $0.6M | $0.6M | $2.8M |
| Millard | $0.6M | $0.5M | $0.4M | $0.6M | $0.5M | $2.7M |
| Weber | $0.6M | $0.5M | $0.4M | $0.5M | $0.5M | $2.6M |
| Iron | $0.6M | $0.5M | $0.4M | $0.5M | $0.5M | $2.5M |
| Cache | $0.5M | $0.5M | $0.4M | $0.5M | $0.4M | $2.3M |
| Daggett | $0.5M | $0.4M | $0.3M | $0.4M | $0.4M | $2.0M |
| Tooele | $0.4M | $0.4M | $0.3M | $0.4M | $0.4M | $1.9M |
| Beaver | $0.3M | $0.3M | $0.2M | $0.3M | $0.3M | $1.4M |
| Juab | $0.3M | $0.2M | $0.2M | $0.2M | $0.2M | $1.2M |
| Rich | $0.3M | $0.2M | $0.2M | $0.2M | $0.2M | $1.1M |
| Emery | $0.2M | $0.1M | $0.1M | $0.2M | $0.2M | $0.8M |
| Sanpete | $0.2M | $0.2M | $0.1M | $0.1M | $0.1M | $0.8M |
| Wasatch | $0.1M | $0.1M | $0.1M | $0.1M | $0.1M | $0.5M |
| Garfield | $0.1M | $0.1M | $0.0M | $0.0M | $0.0M | $0.3M |
| Piute | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Kane | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |



August 2024



## Sales Tax Collected by Producers and Service Companies, Annual and Total

| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| Uintah | $21.5M | $19.6M | $17.8M | $20.8M | $20.5M | $100.1M |
| Duchesne | $15.1M | $14.1M | $14.3M | $15.0M | $16.1M | $74.7M |
| Salt Lake | $5.1M | $4.8M | $5.0M | $6.1M | $5.7M | $26.7M |
| Carbon | $3.1M | $2.8M | $2.9M | $3.7M | $3.3M | $15.9M |
| Utah | $2.4M | $2.2M | $2.3M | $2.8M | $2.7M | $12.4M |
| Box Elder | $2.3M | $2.2M | $2.3M | $2.5M | $2.6M | $11.9M |
| San Juan | $2.2M | $1.9M | $2.1M | $2.1M | $2.1M | $10.5M |
| Davis | $1.9M | $1.8M | $1.8M | $2.3M | $2.1M | $9.9M |
| Sevier | $1.6M | $1.5M | $1.6M | $1.1M | $1.5M | $7.2M |
| Grand | $1.4M | $1.2M | $1.2M | $1.5M | $1.5M | $6.9M |
| Summit | $1.3M | $1.2M | $1.2M | $1.5M | $1.3M | $6.6M |
| Morgan | $0.9M | $0.9M | $0.9M | $1.2M | $1.0M | $4.9M |
| Washington | $0.9M | $0.9M | $0.9M | $1.1M | $1.0M | $4.7M |
| Millard | $0.9M | $0.8M | $0.8M | $1.1M | $1.0M | $4.6M |
| Weber | $0.9M | $0.8M | $0.8M | $0.9M | $1.0M | $4.4M |
| Iron | $0.8M | $0.8M | $0.8M | $0.9M | $0.9M | $4.2M |
| Cache | $0.7M | $0.7M | $0.7M | $1.0M | $0.8M | $3.9M |
| Daggett | $0.7M | $0.6M | $0.6M | $0.8M | $0.8M | $3.5M |
| Tooele | $0.6M | $0.6M | $0.6M | $0.7M | $0.7M | $3.3M |
| Beaver | $0.4M | $0.4M | $0.4M | $0.6M | $0.5M | $2.3M |
| Juab | $0.4M | $0.4M | $0.4M | $0.5M | $0.4M | $2.0M |
| Rich | $0.4M | $0.3M | $0.4M | $0.4M | $0.4M | $1.9M |
| Emery | $0.2M | $0.2M | $0.2M | $0.5M | $0.4M | $1.5M |
| Sanpete | $0.3M | $0.2M | $0.2M | $0.3M | $0.3M | $1.3M |
| Wasatch | $0.1M | $0.1M | $0.1M | $0.2M | $0.2M | $0.8M |
| Garfield | $0.1M | $0.1M | $0.1M | $0.1M | $0.1M | $0.4M |
| Piute | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.1M |
| Kane | $0.0M | $0.0M | $0.0M | | $0.0M | $0.0M |

Sales tax paid by upstream and downstream providers

- 2019: $66,066,451
- 2020: $61,383,483
- 2021: $60,667,665
- 2022: $69,426,009
- 2023: $68,970,995
- Grand Total: $326,514,603



August 2024



## Insurance Tax Paid by Upstream and Downstream Providers, Annual and Total

| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| Uintah | $0.8M | $0.8M | $0.9M | $1.0M | $1.2M | $4.8M |
| Duchesne | $0.7M | $0.6M | $0.7M | $0.7M | $0.9M | $3.6M |
| Salt Lake | $0.4M | $0.4M | $0.5M | $0.5M | $0.6M | $2.5M |
| Utah | $0.2M | $0.2M | $0.2M | $0.3M | $0.3M | $1.2M |
| Box Elder | $0.2M | $0.2M | $0.2M | $0.2M | $0.3M | $1.1M |
| Davis | $0.2M | $0.2M | $0.2M | $0.2M | $0.2M | $0.9M |
| Carbon | $0.2M | $0.2M | $0.2M | $0.2M | $0.2M | $0.9M |
| San Juan | $0.1M | $0.1M | $0.1M | $0.1M | $0.2M | $0.6M |
| Grand | $0.1M | $0.1M | $0.1M | $0.1M | $0.1M | $0.6M |
| Summit | $0.1M | $0.1M | $0.1M | $0.1M | $0.1M | $0.5M |
| Morgan | $0.1M | $0.1M | $0.1M | $0.1M | $0.1M | $0.5M |
| Washington | $0.1M | $0.1M | $0.1M | $0.1M | $0.1M | $0.4M |
| Millard | $0.1M | $0.1M | $0.1M | $0.1M | $0.1M | $0.4M |
| Weber | $0.1M | $0.1M | $0.1M | $0.1M | $0.1M | $0.4M |
| Iron | $0.1M | $0.1M | $0.1M | $0.1M | $0.1M | $0.4M |
| Sevier | $0.1M | $0.1M | $0.1M | $0.1M | $0.1M | $0.4M |
| Cache | $0.1M | $0.1M | $0.1M | $0.1M | $0.1M | $0.4M |
| Tooele | $0.1M | $0.1M | $0.1M | $0.1M | $0.1M | $0.3M |
| Daggett | $0.1M | $0.1M | $0.1M | $0.1M | $0.1M | $0.3M |
| Beaver | $0.0M | $0.0M | $0.0M | $0.1M | $0.1M | $0.2M |
| Juab | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.2M |
| Rich | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.2M |
| Sanpete | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.1M |
| Emery | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.1M |
| Wasatch | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.1M |
| Garfield | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Piute | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |

Bar chart — Insurance tax paid by upstream and downstream providers:
- 2019: $3,726,798
- 2020: $3,679,909
- 2021: $3,977,274
- 2022: $4,415,668
- 2023: $5,279,054
- Grand Total: $21,078,704





## Mineral Production Withholding, Annual and Total

| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| Uintah | $14.6M | $13.1M | $7.2M | $19.2M | $30.3M | $84.6M |
| Duchesne | $9.5M | $9.0M | $6.1M | $14.6M | $24.6M | $63.7M |
| Carbon | $1.6M | $1.4M | $1.0M | $2.9M | $4.0M | $10.8M |
| San Juan | $1.0M | $0.9M | $0.7M | $1.5M | $1.9M | $6.0M |
| Sevier | $0.9M | $0.9M | $0.7M | $1.0M | $1.7M | $5.2M |
| Grand | $0.3M | $0.2M | $0.1M | $0.3M | $0.9M | $1.8M |
| Summit | $0.4M | $0.3M | $0.2M | $0.5M | $0.3M | $1.6M |
| Emery | $0.1M | $0.1M | $0.1M | $0.4M | $0.6M | $1.4M |
| Sanpete | $0.1M | $0.1M | $0.1M | $0.1M | $0.2M | $0.5M |
| Daggett | $0.1M | $0.1M | $0.0M | $0.1M | $0.3M | $0.5M |
| Garfield | $0.1M | $0.1M | $0.0M | $0.0M | $0.1M | $0.3M |
| Salt Lake | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Juab | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Utah | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Box Elder | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Weber | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Washington | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Wasatch | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Tooele | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Rich | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Piute | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Morgan | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Millard | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Iron | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Davis | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Cache | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Beaver | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |

Bar chart — Mineral production withholding:
- 2019: $28,752,883
- 2020: $26,034,217
- 2021: $16,097,442
- 2022: $40,672,071
- 2023: $64,857,122
- Grand Total: $176,413,735





# Motor Vehicle Registration Fees, Annual and Total

| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| Uintah | $1.7M | $1.8M | $1.6M | $1.9M | $2.0M | $9.0M |
| Duchesne | $1.1M | $1.2M | $1.4M | $1.4M | $1.6M | $6.8M |
| Carbon | $0.2M | $0.2M | $0.2M | $0.3M | $0.3M | $1.1M |
| San Juan | $0.1M | $0.1M | $0.2M | $0.1M | $0.1M | $0.7M |
| Sevier | $0.1M | $0.1M | $0.2M | $0.1M | $0.1M | $0.6M |
| Summit | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.2M |
| Grand | $0.0M | $0.0M | $0.0M | $0.0M | $0.1M | $0.2M |
| Emery | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.1M |
| Sanpete | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.1M |
| Daggett | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.1M |
| Garfield | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Salt Lake | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Juab | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Utah | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Box Elder | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Weber | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Washington | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Wasatch | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Tooele | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Rich | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Piute | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Morgan | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Millard | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Iron | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Davis | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Cache | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Beaver | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |

Motor vehicle registration fees (bar chart):
- 2019: $3,338,987
- 2020: $3,534,483
- 2021: $3,680,707
- 2022: $4,025,653
- 2023: $4,255,054
- Grand Total: $18,834,883



# Oil & Gas Total, Annual and Five Year Total

| | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
|---|---|---|---|---|---|---|
| Uintah | $211M | $194M | $186M | $334M | $432M | $1,357M |
| Salt Lake | $188M | $184M | $199M | $205M | $221M | $997M |
| Duchesne | $111M | $103M | $98M | $160M | $217M | $689M |
| Utah | $95M | $93M | $101M | $104M | $112M | $504M |
| Davis | $57M | $56M | $60M | $62M | $67M | $302M |
| Weber | $43M | $42M | $46M | $46M | $50M | $227M |
| Carbon | $32M | $28M | $31M | $53M | $68M | $211M |
| Washington | $39M | $38M | $41M | $42M | $45M | $205M |
| Cache | $22M | $22M | $23M | $24M | $26M | $118M |
| Sevier | $22M | $18M | $20M | $25M | $28M | $114M |
| San Juan | $20M | $17M | $16M | $24M | $32M | $110M |
| Box Elder | $19M | $19M | $20M | $22M | $26M | $105M |
| Tooele | $16M | $16M | $17M | $18M | $20M | $87M |
| Summit | $16M | $16M | $16M | $19M | $20M | $87M |
| Iron | $13M | $13M | $14M | $15M | $16M | $72M |
| Grand | $11M | $9M | $9M | $12M | $15M | $56M |
| Sanpete | $8M | $8M | $9M | $9M | $10M | $44M |
| Wasatch | $8M | $8M | $9M | $9M | $9M | $43M |
| Emery | $6M | $5M | $6M | $9M | $12M | $38M |
| Millard | $6M | $6M | $6M | $7M | $8M | $33M |
| Morgan | $6M | $6M | $6M | $7M | $8M | $32M |
| Juab | $4M | $4M | $5M | $5M | $6M | $24M |
| Daggett | $4M | $4M | $4M | $5M | $6M | $23M |
| Beaver | $3M | $3M | $3M | $4M | $4M | $17M |
| Garfield | $3M | $2M | $3M | $3M | $3M | $14M |
| Rich | $2M | $2M | $2M | $2M | $3M | $11M |
| Piute | $1M | $1M | $1M | $1M | $1M | $3M |

Bar chart — Total tax revenue:
- 2019: $968,016,278
- 2020: $918,292,504
- 2021: $952,765,950
- 2022: $1,229,578,064
- 2023: $1,467,832,904
- Grand Total: $5,536,485,701

Note: Excludes CIB disbursements to avoid double counting.



August 2024

## FUNDS IMPACTED BY THE OIL & GAS SECTOR (NON-EXHAUSTIVE), TOTAL, 19-23

General Fund: $829 million

Income Tax Fund: $191 million

Transportation Fund: $2.7 billion

Transportation Investment Fund: $168 million

CIB: $1.2 billion

SITLA: $202 million

Permanent State Trust Fund: $69 million

Schools and other local governments through direct property tax: $645 million



August 2024

16

## Sources

(1) Utah State Tax Commission, Utah Division of Oil, Gas and Mining

(2) Utah State Tax Commission, Office of the Utah Legislative Fiscal Analyst, Utah Division of Oil, Gas and Mining

(3) Utah State Tax Commission, Utah Division of Oil, Gas and Mining

(4) Utah State Tax Commission

(5) Utah State Tax Commission

(6) School and Institutional Trust Lands Administration, Econometric Studios

(7) Utah State Tax Commission, U.S. Census Bureau, Econometric Studios

(8) U.S. Department of the Interior

(9) Department of Workforce Services, Econometric Studios

(10) Utah State Tax Commission, Department of Workforce Services, Governor's Office of Planning and Budget, Econometric Studios

(11) Utah State Tax Commission, Econometric Studios

(12) Utah State Tax Commission, U.S. Census Bureau, Econometric Studios

(13) Utah State Tax Commission, Utah Division of Oil, Gas and Mining

(14) Utah State Tax Commission, U.S. Census Bureau, Econometric Studios

(15) Utah State Tax Commission, Department of Workforce Services, U.S. Census Bureau, Governor's Office of Planning and Budget, Utah Division of Oil, Gas and Mining, School and Institutional Trust Lands Administration, U.S. Department of the Interior, Econometric Studios



Appellate Case: 25-9520      Document: 10-2      Date Filed: 02/24/2025      Page: 74

Exhibit 3

Atmos. Chem. Phys., 25, 263–289, 2025
https://doi.org/10.5194/acp-25-263-2025
© Author(s) 2025. This work is distributed under
the Creative Commons Attribution 4.0 License.



Atmospheric
Chemistry
and Physics



Research article

# Maximum ozone concentrations in the southwestern US and Texas: implications of the growing predominance of the background contribution

**David D. Parrish[1], Ian C. Faloona[2,3], and Richard G. Derwent[4]**

[1]David.D.Parrish, LLC, 4630 MacArthur Ln, Boulder, Colorado, USA
[2]Air Quality Research Center, University of California, Davis, Davis, CA, USA
[3]Department of Land, Air, and Water Resources, University of California, Davis, Davis, CA, USA
[4]rdscientific, Newbury, Berkshire, UK

**Correspondence:** David D. Parrish (david.d.parrish.llc@gmail.com)

Received: 5 February 2024 – Discussion started: 4 March 2024
Revised: 26 October 2024 – Accepted: 30 October 2024 – Published: 9 January 2025

**Abstract.** We utilize a simple, observation-based model to quantitatively estimate the US anthropogenic, background and wildfire contributions to the temporal and spatial distributions of maximum ozone concentrations throughout the southwestern US, including Texas and parts of California. The very different temporal variations in the separate contributions provide the basis for this analysis: over the past 4 decades the anthropogenic contribution has decreased at an approximately exponential rate by a factor of $\sim 6.3$, while the US background concentration rose significantly through the 1980s and 1990s, reached a maximum in the mid-2000s, and has since slowly decreased. We primarily analyze ozone design values (ODVs), the statistic upon which the US National Ambient Air Quality Standards (NAAQS) are based. The ODV is an extreme value statistic that quantifies the relatively rare maximum observed ozone concentrations; thus, ODV time series provide spatially and temporally resolved records of maximum ozone concentrations throughout the country. Recent contributions of US background ozone to ODVs (primarily due to transported baseline ozone) are 64–70 ppb (parts per billion) over most of the southwestern US, and wildfires (also generally considered a background contribution) add further enhancements of 2–6 ppb in southwestern US urban areas. US anthropogenic emissions from urban and industrial sectors now produce only relatively modest enhancements to ODVs (less than $\sim 6$ ppb in 2020) outside of the three largest urban areas considered (Dallas, Houston and Los Angeles), where the 2020 enhancements were in the 17–30 ppb range. As a consequence, US background ozone concentrations now dominate over US anthropogenic contributions in the western US, including the Los Angeles urban basin, where the largest US ozone concentrations are observed. In the southwestern US, this predominance is so pronounced that the US background plus wildfire contributions to ODVs approach or exceed the US NAAQS threshold for ozone of 70 ppb (implemented in 2015) and 75 ppb (implemented in 2008); consequently, NAAQS achievement has been precluded in this region. The large background contribution in this region has led to a pronounced shift in the spatial distribution of maximum US ozone concentrations; once ubiquitous nearly nationwide, ODVs of 75 ppb or greater have nearly disappeared in the eastern US, but such values are still frequent in the southwestern US. By 2021, the trend in maximum ODVs in two of the more highly populated eastern urban areas (i.e., New York City and Atlanta) had decreased to the point that they were smaller than those in significantly less populated southwestern US urban areas and nearly as small as ODVs recorded at isolated rural southwestern US sites. Two implications arise from these findings. First, alternate emission control strategies may provide more effective approaches to ozone air quality improvement; as background ozone makes the dominant contribution to even the highest observed concentrations, an international effort to reduce northern midlatitude baseline ozone concentrations could be pursued, or a standard based on the anthropogenic increment above the regionally varying US

background ozone concentration could be considered to provide a regionally uniform emission reduction challenge. Second, the predominant contribution of US background ozone across the southwestern US presents a profound challenge for air quality modeling, as a manifold of stratospheric and tropospheric processes occurring at small spatial scales but over hemisphere-wide distances must be accurately treated in detail to predict present and future background contributions to daily maximum ozone concentrations at local scales.

## 1   Introduction and background

Elevated ambient ozone (O$_3$) concentrations constitute an air quality issue that has affected many urban areas of the world; in Los Angeles, they reached extreme levels, with maximum 1 h average ozone concentrations exceeding 500 ppb (parts per billion) in the mid-1960s (Parrish and Stockwell, 2015). In the US, large reductions in anthropogenic emissions of photochemical ozone precursors, following the implementation of air quality improvement policies, substantially lowered urban ozone concentrations throughout the country over the past half-century. However, several areas have still not attained the National Ambient Air Quality Standards (NAAQS) threshold value for ozone (see https://www.epa.gov/green-book, last access: 3 February 2024). The NAAQS, most recently lowered in 2015, require that the ozone design value (ODV) at each monitoring site in a region not exceed 70 ppb (where ppb is equal to nanomoles of O$_3$ per mole of air). Notably, the 2008 NAAQS requirement is still in effect; even though this standard allows a higher ODV (75 ppb), there are different sets of nonattainment areas designated under the two standards. The ODV is an extreme value statistic defined as the 3-year average of the annual fourth-highest daily maximum 8 h average (MDA8) ozone concentration. The fourth-highest MDA8 represents the $\sim$ 98th percentile of MDA8 values observed in the warm half of the year, when those four highest values generally occur; thus, a time series of ODVs observed at a particular monitoring site is a smoothed record of the temporal evolution of the maximum ozone concentrations impacting that location. Ozone monitoring within the US began in the early 1970s, so ODVs have been collected over nearly 5 decades at more than 2000 sites throughout the nation. This observational record reflects detailed, spatially and temporally resolved information regarding the variability in ozone sources and sinks that determine the maximum observed ozone concentrations. Our goal in this paper is (1) to analyze this record to quantify the sources of maximum ozone concentrations in the southwestern US and (2) to investigate the implications of the results. This region has not previously been analyzed using our approach, but it is of particular interest because it is impacted by large background ozone concentrations (e.g., Lin et al., 2012a, b; Zhang et al., 2020). Previous work has shown that the background contributions to ODVs in some western US regions exceed 60 ppb (e.g., Langford et al., 2022) and

have even approached 70 ppb, making achievement of the 70 ppb NAAQS threshold quite difficult in those regions (Cooper et al., 2015). The five states – Arizona (AZ), Colorado (CO), Nevada (NV), New Mexico (NM) and Utah (UT) – included in this region have four urban areas – Phoenix AZ, Denver CO, Las Vegas NV and Salt Lake City UT – that are centers of Marginal or Moderate ozone nonattainment areas (see *US EPA Green Book 8-Hour Ozone (2015) Area Information*, https://www.epa.gov/green-book/green-book-8-hour-ozone-2015-area-information, last access: 27 January 2023); additionally, Phoenix AZ and Denver CO are classified as respective Moderate and Severe-15 ozone nonattainment areas under the 2008 ozone NAAQS (see *US EPA Green Book 8-Hour Ozone (2008) Area Information*, https://www.epa.gov/green-book/green-book-8-hour-ozone-2008-area-information, last access: 27 January 2023). We also include Texas in this analysis because it represents a transition region between the southwestern US and the very different Gulf of Mexico region; four Texan urban areas – Dallas, Houston, El Paso and San Antonio – are centers of Marginal to Moderate ozone nonattainment areas designated under the 2015 NAAQS (*US EPA Green Book 8-Hour Ozone (2015) Area Information*, https://www.epa.gov/green-book/green-book-8-hour-ozone-2015-area-information); additionally Houston and Dallas are classified as Severe-15 nonattainment areas under the 2008 ozone NAAQS (*US EPA Green Book 8-Hour Ozone (2008) Area Information*, https://www.epa.gov/green-book/green-book-8-hour-ozone-2008-area-information). We examine the ODV time series recorded in these four urban areas as well as in five other regions in Texas containing smaller cities and vast rural areas.

Our analysis is a simple, observation-based quantification based on a conceptual model of the ozone sources that determine ODVs throughout the US. Notably, this approach is very different from the computer-based chemical transport models (CTMs) that have traditionally been used for such quantifications; this paper concludes with Sect. 5.5 that compares and contrasts these two approaches and discusses how they complement each other. Our analysis has previously been applied in the western US (Parrish et al., 2017, 2022) and the northeastern US (Parrish and Ennis, 2019). It focuses on the two major contributors to ODVs in both urban and rural areas. The first is the *US background ODV* (i.e., the ODV that would be recorded at a site in the absence of any contri-

bution from US anthropogenic emissions); this is the natural and anthropogenic ozone transported from outside the country plus any ozone produced within the US from naturally emitted precursors. This quantity provides a direct quantification of the minimum ODV that could be achieved by reducing US anthropogenic precursor emissions alone. The second is the *US anthropogenic ODV enhancement* (i.e., the enhancement of an actual ODV above the US background ODV due to contributions from US anthropogenic emissions); this enhancement is due to photochemical production from US anthropogenic emissions of ozone precursors. These definitions are consistent with the more general term *US background ozone* (USB), which is defined by the US Environmental Protection Agency (e.g., Dolwick et al., 2015) to represent the influence of all sources other than US anthropogenic emissions on a particular ozone concentration. Importantly, neither the US background ODV nor the USB can be directly measured, as they are theoretical constructs; the measured ozone concentration in air transported to a location without recent local or regional anthropogenic or continental influences is termed baseline ozone, and it may be closely related to USB (as will be discussed later). We separately quantify the US background ODV and the US anthropogenic ODV enhancement based on their very different long-term temporal changes. This quantification process fits time-dependent functions to tabulated ODV time series. As discussed below, these fitted functions have been designed to accurately represent the known temporal changes in the ODV components. The fitting process yields the values of parameters in those functions, and it is these values that quantify the ODV components. The text box (Box 1; which is very similar to that included in Parrish et al., 2022) collects the important terms discussed above (with their definitions) and the parameters included in the time-dependent functions discussed below.

Prevailing westerly winds carry midlatitude Pacific marine air into the western US, and the baseline ozone in that air provides the predominant source of the US background ODV in the aforementioned region (Zhang et al., 2020; Parrish et al., 2022). Parrish et al. (2020) show that the temporal change in baseline ozone at northern midlatitudes from 1978 to 2018 is accurately quantified by a quadratic polynomial, where $t$ represents time:

$$\text{baseline O}_3 = a + bt + ct^2. \qquad (1)$$

We use this same functional form to estimate the temporal variation in the US background ODVs. In this work, the time origin is chosen as the year 2000 (i.e., $t$ equals the year $-$ 2000). Thus, the parameter $a$ (in parts per billion of O$_3$) is the intercept of this function in 2000. The value of this parameter varies with location and quantifies the magnitude of the baseline ozone concentration in that year. The second and third coefficients in Eq. (1) quantify the variability in the baseline ozone before and after 2000. Parrish et al. (2020) derived numerical values for these parameters

$- b = 0.20 \pm 0.06$ ppb yr$^{-1}$ and $c = -0.018 \pm 0.006$ ppb yr$^{-2}$ $-$ that were common to eight northern midlatitude baseline ozone time series measured from surface sites, aircraft and sondes over western Europe and western North America covering altitudes from sea level to 9 km. These same coefficient values well represent 28 published trend analyses of baseline representative data sets collected throughout the western US (Parrish et al., 2021a). We use these same coefficient values in this work. The positive value of $b$ and the negative value of $c$ indicate that baseline ozone concentrations increased before 2000, reached a maximum after 2000 and then decreased at later times. Equation (2) gives the year of the maximum of the fitted curve,

$$\text{year}_{\text{max}} = -b/2c + 2000, \qquad (2)$$

which is $\sim 2006$ for the above parameter values.

Parrish et al. (2017) show that the US anthropogenic ODV enhancement in US urban areas has decreased rapidly over the past 4 decades, a decrease accurately captured by an exponential term with an $e$-folding time of $\sim 22$ years; this corresponds to a decrease of a factor of more than 6 from 1980 to 2020. This behavior contrasts markedly with the much smaller changes that occurred in baseline ozone concentrations. Parrish et al. (2017) and Parrish and Ennis (2019) assumed that baseline ozone remained constant, while Parrish et al. (2022) used Eq. (1) to quantify the changes that have occurred in the US background ODV near the US western coast. Equation (3) defines a simple functional form that captures the physical picture of a US background ODV that slowly varies, similarly to baseline ozone concentrations, plus a rapidly decreasing US anthropogenic ODV enhancement;

$$\begin{aligned} \text{ODV} &= a + bt + ct^2 + A\exp(-t/\tau) \\ &= a + 0.20 \times t - 0.018 \times t^2 + A \times \exp(-t/\tau), \qquad (3) \end{aligned}$$

where the values of the $b$ and $c$ parameters derived by Parrish et al. (2020) have been substituted into the second form of the equation. Here, $A$ is the year 2000 magnitude of the exponential term designed to quantify the rapidly decreasing US anthropogenic ODV enhancement, $\tau$ is the time constant of that exponential decrease and $t$ equals the year $-$ 2000, as in Eq. (1). An exponential function is chosen to quantify the long-term decrease in US anthropogenic ODV enhancements, because it is mathematically as simple as possible (i.e., has the fewest possible unknown parameters) and successfully accounts for a large fraction of the variance in recorded ODV time series throughout the US (see Parrish et al., 2017, 2022; Parrish and Ennis, 2019); this choice is more fully discussed in Sects. S3 and S4 in the Supplement. Regression fits of Eq. (3) to ODV time series are the primary basis for analysis in this work; values are derived for the $a$ and $A$ parameters, which provide quantitative estimates of the year 2000 US background ODV and year 2000 US an-

https://doi.org/10.5194/acp-25-263-2025

Atmos. Chem. Phys., 25, 263–289, 2025

- **MDA8** - Maximum daily 8-hour average ozone concentration at a site on a particular day.
- **Ozone Design Value (ODV)** - 3-year running mean of the annual fourth-highest MDA8 ozone concentration at a site.
- **Baseline ozone** - The ozone concentration measured in air transported to a location without recent local or regional anthropogenic or continental influences, typically derived from observations.
- **US background ozone (USB)** - The ozone concentration that would exist at a time and US location from all sources, except that produced from US anthropogenic emissions, typically derived by zeroing out emissions in chemical transport models.
- **US background ODV** – The ODV that would be recorded at a site in the absence of any contribution from US anthropogenic emissions.
- **US anthropogenic ozone ODV enhancement** – The enhancement of an actual ODV above the US background ODV due to contributions from US anthropogenic emissions.
- *a* – Fit parameter of Eqs. 1, 3 and 4 that estimates the US background ODV in year 2000.
- *A* – Fit parameter of Eq. 3 that estimates the US anthropogenic ODV in year 2000.
- *τ* – Fit parameter of Eq. 3 that estimates the exponential rate of decrease of the US anthropogenic ozone (or ODV) enhancement with time.

**Box 1.** Important quantitative terms and parameters with definitions.

thropogenic ODV enhancement, respectively. The definitions of the three parameters in Eq. (3) are included in Box 1.

Parrish et al. (2022) applied the above-described analysis to the entire western US coastal region; they quantify a small negative latitude gradient ($-0.4$ ppb per degree) and a strong positive vertical gradient ($\sim 10$–$15$ ppb km$^{-1}$) in the US background ODVs at monitoring sites along the US western coast. The latitude gradient is consistent with earlier model and observational analysis (Zhang et al., 2020; Ziemke et al., 2011). The altitude gradient agrees well with that determined by sondes and aircraft profiles along the coast of California (Oltmans et al., 2008; Cooper et al., 2011; Yates et al., 2015; Faloona et al., 2020); however, this vertical gradient is weakened by continental mixing as marine air is advected eastward across the complex terrain of the North American Cordillera. The quantification of such fine-scale variations (on the order of 1–2 ppb) provides a sense of the analysis precision, and the agreement with other analyses is evidence that the results of the observation-based quantification are physically realistic. Nevertheless, it is important to draw a careful distinction between the definitions of US background ODV and US anthropogenic ODV enhancement presented above and their observation-based quantifications that we derive. As those quantifications rely on the observed temporal changes in ODVs, only sources of precursors effectively controlled by regulatory action can contribute to the derived *A*-parameter value, i.e., the estimated US anthropogenic ODV enhancement. The impact of uncontrolled anthropogenic precursor emissions (e.g., those from agricultural soils, livestock operations or volatile chemical products) would potentially contribute to the *a*-parameter value, i.e., the estimated US background ODV. Those drawing conclusions from the derived quantifications must carefully consider this issue and bring in additional considerations to avoid confounding influences. Temporal changes in emissions from wildfires are another potentially confounding influence; Sect. 3.2 discusses our approach to including

these changes in our analysis. Furthermore, the ODVs represent rare events that may occur at any time during the warm season when the combined USB and anthropogenic ozone contributions reach their maximum. This maximum may not occur on the days when the USB contribution is largest (i.e., the days that determine the US background ODV). Thus, for any given extreme ozone episode, the sum of US background ODV and the anthropogenic contribution to that episode may not equal the observed ODV; Sect. S2 in the Supplement discusses the distinction between the US anthropogenic ODV enhancement and the actual anthropogenic contribution to an ODV in detail.

In this work, we extend the observation-based analysis of ODV time series to the southwestern US and Texas; we also survey surrounding states, including an analysis of the distributions of MDA8 ozone concentrations in Californian air basins. This quantification of the spatial and temporal variability in the US background ODV is important to improve our understanding of the magnitude and temporal changes in the primary ozone sources, to quantify how the growing dominance of USB has changed the regional distribution of occurrence of ozone air quality standard exceedances, and to discuss the implications for future efforts to improve US ozone air quality. In the following, Sect. 2 describes the data set that is the basis for this analysis, Sect. 3 discusses details of the analysis approach, Sect. 4 presents the results, and Sect. 5 discusses the conclusions and implications.

## 2   Data sets analyzed

This work examines two data sets: (1) MDA8 ozone concentrations measured during the 1980–2022 period in four coastal Californian air basins and (2) ODVs reported from the beginning of US ozone monitoring through 2021 throughout the US. The California MDA8 ozone concentrations were obtained from the California Air Resources Board data archive (https://www.arb.ca.gov/adam/index.html, last

access: 10 October 2023). The ODVs are computed and published annually by US EPA's Office of Air Quality Planning and Standards. For each year for each ozone monitoring station in the US, an ODV is calculated if the measurements achieve the specified completeness criteria. All values reported in the focus region were downloaded from the EPA data archive (https://www.epa.gov/aqs, last access: 9 November 2023); however, only the ODVs marked as valid were retained for analysis. Exceptional events, such as wildfires or stratospheric ozone intrusions, are included in the data set, although in principle they can be removed from the MDA8 monitoring record through an EPA concurrence process as uncontrollable "Exceptional Events", thereby altering the ODV archive; nevertheless, the analysis presented in this paper is not significantly affected because EPA has only rarely concurred in such removal in the present study region. Section S6 in the Supplement more fully discusses this issue.

Notably, very few sites report continuous MDA8 or ODV records over the entire monitoring period, with some sites operating for only a few years. Generally, we consider all reported values in our analysis, even if only a single ODV was reported from a particular site; any temporal discontinuity associated with initiation and termination of an individual site is assumed to still allow an accurate quantification of temporal trends within the selected region. Sensitivity tests have shown that analyses based on single sites with continuous records over the entire time period agree well with analyses of records combined from multiple sites with shorter-duration records within the same region.

The ozone data considered here include the time period of emission reductions resulting from societal efforts to control the COVID-19 pandemic. Many publications have examined the impacts of those emission reductions on ozone in areas throughout the world, with widely varying findings. No consistent impact has been found for summertime maximum ozone concentrations (e.g., Gkatzelis et al., 2021), which are the focus of this study. We find no apparent systematic deviations in MDA8 concentrations or ODVs reported for 2020 – the year of largest emission reductions – in any of the time series examined, so this issue is not considered further in this analysis.

## 3 Methods

### 3.1 Quantification of temporal changes in ODVs and MDA8 distribution percentiles

Our primary analysis relies on quantifying long-term changes in ODVs recorded during the entire ozone monitoring period in the southwestern US and surrounding states as well as in two contrasting states in the eastern US. As the ODVs are 3-year averages, their time series are insensitive to diurnal and seasonal variations, but they do reflect changes on decadal (systematic long-term changes) and sub-decadal (i.e., interannual variability) timescales. Fits of simple, continuous functional forms to the time series provide objective quantification of the average long-term changes. The parameter values derived from fits of Eq. (3) are the basis for the discussion of regional similarities and differences in ODV time series. The analysis utilized here is the generally the same as that of Parrish et al. (2022), which is reviewed in Sect. 1, with the additional development of an estimate for the average long-term contribution of wildfire emissions to urban ODVs (Sect. 3.2). We also fit Eq. (1) to the ODVs recorded at some isolated rural sites in the western US (Sect. 4.1) to verify that the $b$- and $c$-parameter values quantified by Parrish et al. (2020) are appropriate for general application to southwestern US ODVs.

In addition, we analyze the distribution of MDA8 ozone concentrations recorded in four coastal Californian air basins; these concentrations vary between days and among seasons as well as on the longer timescales that affect the ODVs. As our focus is on maximum ozone concentrations, we only consider the largest MDA8 ozone concentration observed at any of the sites in a given air basin on each day during the ozone season, which we take as May through September. Note that the site recording the largest MDA8 in each basin can vary from day to day. This selection gives 153 MDA8 values in each year in each basin. From these 153 values, we characterize each year's distribution of these values by calculating seven percentiles of the distribution: minimum, 10th, 25th, median, 75th, 90th and maximum. The time series of each of these percentiles can then be fit to the same continuous functional form (i.e., Eq. 3) as fit to the ODV time series. The $a$- and $A$-parameter values derived in these fits then provide estimates of the year 2000 USB contribution and the US anthropogenic enhancement for the respective percentiles. Parrish et al. (2016) utilized a similar approach in their analysis of the largest MDA8 ozone concentrations recorded in the South Coast Air Basin (SoCAB), one of the coastal Californian air basins also considered in this work.

Quantified uncertainties in the parameter values derived from the functional fits are important in our analysis; the 95 % confidence limits are utilized, unless indicated otherwise. These confidence limits are derived from the fitting procedures utilized in the analysis. The confidence limits from the ODV fits are widened to account for the known covariance between the recorded ODVs. Each ODV is a 3-year running mean, so only every third ODV is independent from the others at a given site. Consequently, the number of independent ODVs in each fit is approximately a factor of 3 smaller than the number of reported ODVs, and the fitting routines therefore underestimate the true confidence limits of the derived parameters. All reported confidence limits are increased by a factor of $3^{1/2}$ to account for this covariance (Parrish et al., 2022). Additional sources of covariance (regionally coherent interannual variability, temporal interannual variability, etc.) may exist between values included in any particular fit; we cannot account for the influence of any such additional covariance.

An important issue in the present analysis is the derivation of the value of $\tau$. The time series of urban ODVs investigated here do not allow for the simultaneous derivation of precise values for all three ($a$, $A$ and $\tau$) parameters of Eq. (3). This difficulty is surmounted by assuming that the value of $\tau = 21.8 \pm 0.8$ years derived in earlier work for southern California (Parrish et al., 2022) is also appropriate for all regions considered here. A justification for this assumption is that precursor emission control strategies, particularly for on-road vehicles, implemented throughout the US have been similar to those in California; it is on-road vehicle emissions that have dominated urban ozone production over the past several decades (Nopmongcol et al., 2017). Parrish and Ennis (2019) also made this assumption for the northeastern US and presented several consistency checks showing that this assumption is appropriate for that region, which is further removed from southern California than the southwestern US region considered here. Section S5 in the Supplement further discusses the justification for this assumption in the southwestern US and the uncertainty in the derived value of $\tau$.

### 3.2   Long-term temporal changes in wildfire contributions

ODV contributions from wildfire emissions can affect the results of analysis based on Eq. (3). These emissions have not been systematically reduced; rather, wildfire emissions are increasing as the climate warms (e.g., Westerling et al., 2006; Westerling, 2016). Parrish et al. (2022) discuss three characteristics of the impact of wildfire emissions on ODV time series: first, wildfire emissions alone do not significantly elevate ODVs, but when they mix with local $NO_x$ emissions, such as in central urban areas, their impact can be discerned (e.g., McKeen et al., 2002; Parrish et al., 2022; see Sect. 5.5 for further discussion); second, wildfire impacts have systematically increased over past decades; and, third, wildfires are highly sporadic, both temporally and spatially. Addition of another term to Eq. (3) can account for the systematic, temporally increasing influence of wildfire emissions. Burke et al. (2021) estimate that the wildfire burned area in the US has roughly quadrupled in an approximately linear fashion over the past 4 decades (their Fig. 1a). Similarly, Iglesias et al. (2022) estimate that the annual mean area burned in the western US has risen by 220 %–330 % across a 20-year span within the period from 1984 to 2018 (their Fig. 7a). We represent the decadal-scale average ODV contribution from wildfires by a similar increase; Eq. (4) is Eq. (3) with an added term that increases linearly by a factor of 4 from 1980 to 2020. Here, the parameter WF represents the location-specific ODV enhancement due to wildfires in the year 2000, whereas $A_{WF}$ represents a revised $A$ parameter in locations where enhancements of ODVs due to wildfire emissions are significant.

$$ODV = a + 0.20 \times t - 0.018 \times t^2 + A_{WF} \times \exp(-t/\tau)$$
$$+ WF \times (1 + 0.03 \times t) \tag{4}$$

The linear increase in the wildfire contribution does not account for the sporadic character of wildfires; however, this functional form is appropriate for the 3-year averaging period inherent in ODV time series. There are available databases giving the spatial and temporal distributions of the area burned by wildfires with detail that varies from annual means for the entire country (e.g., https://www.nifc.gov/fire-information/statistics/wildfires, last access: 7 February 2024) to monthly means for individual states (e.g., the monthly area burned in California from 1972 to the present is available from the California Department of Forestry and Fire Protection). However, to incorporate such detailed information into our analysis would require knowledge of the spatial and temporal variability in wildfire impacts on maximum ozone concentrations at individual sampling sites, which is not available without detailed atmospheric transport modeling. Therefore, year-to-year variation in wildfire impacts undoubtedly contributes to the variability in ODVs about the functional fits to the ODV time series discussed in this work; thus, higher ODV variability in an area may be indicative of an important wildfire influence.

In principle, fitting Eq. (4) to an ODV time series would allow for the determination of values for three parameters ($a$, $A_{WF}$ and WF, with $\tau$ already fixed); however, in practice, such fits generally do not allow the precise determination of all three parameters. Nevertheless, if $a$ can be determined from a separate analysis, precise values can be determined for $A_{WF}$ and WF from fits of Eq. (4). We follow this approach in the analysis of time series of maximum ODVs recorded in southwestern US urban areas, which are the only areas in the region with large enough local $NO_x$ emissions to cause significant enhancements of ODVs due to wildfire emissions. Additional complications can arise from ozone contributions produced from agricultural emissions or from other anthropogenic emissions that have not been as effectively controlled (compared with other anthropogenic emissions). Parrish et al. (2017, 2022) discuss such ODV contributions in intense agricultural regions of California; using GEOS-Chem, Geddes et al. (2022) modeled significant $NO_x$ emissions from agricultural soils throughout the southwest, although especially in Texas and California. Parrish and Ennis (2019) discuss possible ODV contributions from volatile chemical products; their emissions history is not well quantified, but emissions are likely increasing (McDonald et al., 2018). Other ODV contributions that have not been controlled include those from oil and gas extraction processes, which are important in some regions of the southwestern US and have increased overall during the past decades; urban areas where such impacts have been studied include Denver–Front Range of Colorado (e.g., McDuffie et al., 2016) and Dallas–Fort Worth (e.g., Ahmadi and John, 2015). Depending upon their specific temporal dependence, ODV contributions from these uncontrolled emission sources could contribute to the "wildfire" term in Eq. (4) if they have been increasing, but none are expected to be doubling in magnitude

every 20 years as the parameterized wildfire source is here. Section S4 in the Supplement further discusses some issues regarding uncontrolled anthropogenic ozone precursor emissions.

## 3.3 Additional analysis considerations

Networks of ozone monitoring sites have operated in all of the largest US urban areas; the ODVs from several of these networks are examined in detail. Where possible, the full time periods of the data records are included in the analyses. However, the analysis based on Eqs. (3) and (4) can only represent the time period over which ODVs consistently decreased. In some urban areas consistent decreases did not begin until after measurements began, or the early data do not appear to accurately represent the overall urban area; in this case, the ODVs selected for analysis begin in a later year. The most extreme example of the latter case is Las Vegas, where several newly established measurement sites began reporting ODVs in 2000; these values were significantly larger than those reported from any other sites in that urban area. Thus, the analysis of the Las Vegas data is limited to 2000–2021 to avoid a discontinuity in the time series of ODVs. In the following section, the figures that illustrate the analyses include all recorded ODVs, so selection of ODVs for analysis can be examined.

The ODV time series fit to Eqs. (3) and (4) are either from single sites or multiple sites that are in reasonably close spatial proximity and exhibit similar temporal changes. There is some subjectivity in this selection of time series, which is guided by maximizing the temporal length of the series, minimizing confidence limits of the derived parameters, and minimizing deviations between the ODVs and the fits.

In addition to the confidence limits for derived parameter values, the quality of the fits of Eqs. (3) and (4) are quantified by root-mean-square deviations (RMSDs) between the fits and the recorded data, which scatter both above and below the fits; these RMSDs are generally in the range of 3–5 ppb (e.g., Tables S1 and S3–S5). These deviations are attributed to quasi-chaotic, varying ODV contributions from factors such as wildfires, stratospheric intrusions and variable meteorological conditions. Our observation-based model does not account for this residual variance.

## 4  Results

In the following sections, we analyze ODV time series recorded throughout the southwestern US and Texas as well as in surrounding and more distant states; moreover, we examine the full distribution of the largest MDA8 ozone concentrations in four Californian coastal air basins. Section 4.1 investigates the appropriateness of applying the $b$ and $c$ coefficients derived by Parrish et al. (2020) to the analysis of ODV time series recorded in the southwestern US. Section 4.2 analyzes the temporal evolution of the distribution of

the MDA8 ozone concentrations in the Californian air basins, and the following three sections present the analysis of ODV time series in the southwestern US (Sect. 4.3), Texan urban and rural areas (Sect. 4.4), and some other US states to provide context (Sect. 4.5).

## 4.1  Long-term ODV changes at isolated rural sites in the western US

Investigation of time series of ODVs at remote, rural sites provides an opportunity to quantify the long-term changes in ODVs in regions where the US anthropogenic ODV enhancements are small. In the limit of zero US anthropogenic ODV enhancement, Eq. (3) is reduced to Eq. (1). Here, we (1) fit Eq. (1) to ODVs from such sites to derive $b$- and $c$-parameter values specific to the western US ODVs and compare those values to the values cited above from Parrish et al. (2020) and (2) fit Eq. (3) to these same time series to determine the small US anthropogenic ODV enhancement at those sites. Figure 1 shows ODV time series recorded at eight such sites included in the Clean Air Status and Trends Network (CASTNET) of the US EPA (https://www.epa.gov/castnet, last access: 9 December 2022); the locations are shown in the inset map. They are chosen to span a wide latitude range (32–48.5° N) and to be as isolated as possible from anthropogenic emission sources. Seven sites are in a relatively narrow longitude band (109.4–114.2° W) located ∼ 750–1100 km east of the US western coast, whereas the other is nearer (∼ 220 km) to the coast (Lassen Volcanic National Park, NP, at 121.6° W). All are at similar elevations (2.0 ± 0.43 km) except Glacier NP at 0.96 km.

Data from most of these same CASTNET sites have been included in previous studies of long-term ozone changes at western US rural and remote sites. Lassen Volcanic NP was investigated by Jaffe et al. (2003), Jaffe and Ray (2007), Parrish et al. (2009, 2012, 2017, 2020), and Cooper et al. (2014), due to the site's location near the US western coast. Another four of the sites (Glacier NP; Yellowstone NP; Craters of the Moon National Monument, NM; and Canyonlands NP) were also considered by Jaffe and Ray (2007). Two of the remaining sites (Great Basin NP and Grand Canyon NP) were included by Cooper et al. (2020) in their analysis of surface ozone trends at globally distributed remote sites. Here, we also consider Chiricahua NM, a more southerly site in Arizona. To our knowledge, these data sets comprise all of the longest, high-quality, relatively isolated rural data sets available in the western continental US.

The CASTNET time series of ODVs are illustrated in Fig. 1a. The curves are regression fits of Eq. (1), which quantify the long-term changes in baseline ozone. Table S1 gives the derived parameter values, along with confidence limits and the root-mean-square deviations (RMSDs) of the ODVs from the fits. The derived $a$-parameter values show that the absolute ODV values exhibit a systematic spatial gradient; there is close agreement among the largest



**Figure 1.** Time series of ODVs recorded at the eight rural western CASTNET sites shown in the inset map. Solid symbols indicate the three sites used for the normalization. Solid curves indicate the fits of Eq. (1) to **(a)** the individual site data (including the black curve fit to all data) and **(b)** all normalized data (black curve). The lower gray curve in panel **(b)** is the Parrish et al. (2020) fit to baseline data, normalized to 68.5 ppb (the $a$-parameter value derived in a fit of Eq. 3 to the normalized CASTNET data) in the year 2000; the dashed line shows an extrapolation of that fit to 2021.

$a$-parameter values at the five southern sites (weighted mean $= 71.5 \pm 0.8$ ppb and standard deviation $= 1.1$ ppb), with values decreasing with increasing latitude and/or decreasing elevation at the three more northern sites, reaching a minimum of $54.9 \pm 1.1$ ppb at Glacier NP, the most northern and lowest-elevation site. In contrast, the derived $b$ and $c$ coefficients at all sites agree within their confidence limits, which indicates the absence of a statistically significant difference in the temporal evolution of the ODVs among these widely separated sites, although substantial uncertainty remains in the determination of the coefficient values.

The similarity of the temporal evolution of these rural ODVs suggests normalizing the ODVs to remove the spatial gradient and to derive a single fit of Eq. (1) to all ODVs from the eight sites; the greater number of ODVs in a single fit then allows more precision in the determination of the de-

rived parameter values. We choose to normalize to 71.4 ppb in the year 2000; this normalization factor is the average of the $a$ parameters derived at Great Basin NP, Canyonlands NP and Grand Canyon NP (solid symbols in Fig. 1), which are chosen to represent the central southwestern US. The 212 normalized ODVs recorded over 32 years at the eight sites are fit within a RMSD of 2.4 ppb (Fig. 1b). This fit gives $b = 0.07 \pm 0.13$ ppb yr$^{-1}$ and $c = -0.015 \pm 0.005$ ppb yr$^{-2}$; Table S1 indicates that all of the $b$ and $c$ parameters derived from the separate site fits agree with these values within their confidence limits. These parameter values indicate that the rural ODVs increased early in the data record, reached a maximum in year$_{\mathrm{max}} = 2002 \pm 4$ and decreased thereafter. A linear fit to all of the normalized ODVs over the 2000–2021 period indicates a statistically significant average negative trend equal to $-0.30 \pm 0.10$ ppb yr$^{-1}$.

The $b$- and $c$-parameter values derived here from the normalized CASTNET ODVs agree (within derived confidence limits; see Table 1) with the parameter values derived for the entire northern midlatitude region (Parrish et al., 2020). This agreement indicates that ODVs recorded at the eight CASTNET sites provide approximate, direct measures of southwestern US background ODVs and strongly support applying Eq. (3) for the analysis of ODV time series. (The derived $d$-parameter values in Table 1 indicate that a cubic term is not justified in the polynomial fit in either the analysis of Parrish et al. (2020) or the CASTNET ODVs.) The fit of Eq. (3), which includes the exponential term, to the normalized CASTNET ODVs is indistinguishable from the fit of Eq. (1) (black curve in Fig. 1b), although it does give a smaller value for the year 2000 US background ODV ($a = 68.5 \pm 1.5$ ppb, compared with $71.3 \pm 0.8$ for the fit to Eq. 1) with a small but significant anthropogenic ODV enhancement ($A = 2.8 \pm 1.9$ ppb). We interpret the final term of Eq. (3) as the mean ODV enhancement due to transport of ozone from US anthropogenic precursors to these isolated rural sites in the western US.

In summary, the second and third terms of Eq. (3) provide an accurate estimate of the long-term change in the mean US background ODV in the western US; these terms added to the derived $a$-parameter value of $68.5 \pm 1.5$ ppb, is plotted as the gray curve in Fig. 1b. Similar curves, normalized to $a$-parameter values derived in other fits, will be included in later graphs to illustrate the purely baseline contributions to ODV time series considered in the following analyses.

## 4.2    Contributions to MDA8 ozone concentration distributions in four coastal Californian air basins

Previous analyses have shown that Eq. (3) (or a closely related equation with a constant US background ODV term, rather than the small changes quantified by the second and third terms of Eq. 3) gives excellent fits to ODV time series (i.e., fits that capture a large fraction of the ODV variance and/or with relatively small RMSDs), not only in urban

**Table 1.** Parameter values (with 95 % confidence limits) derived from fits of Eq. (1) to time series baseline ozone concentrations. The $d$ parameter represents the coefficient of the cubic term in the analogous fits to a third-order polynomial.

| Data set | $b$ (ppb yr$^{-1}$) | $c$ ($10^{-2}$ ppb yr$^{-2}$) | year$_{max}$ | RMSD (ppb) | Reference | $d$ ($10^{-4}$ ppb yr$^{-3}$) |
|---|---|---|---|---|---|---|
| The 2-year means of baseline ozone | $0.20 \pm 0.06$ | $-1.8 \pm 0.6$ | $2005.7 \pm 2.5$ | 1.4 | Parrish et al. (2020) | $+0.6 \pm 5.7$ |
| The CASTNET ODVs – normalized* | $0.07 \pm 0.13$ | $-1.5 \pm 0.8$ | $2002.1 \pm 4.4$ | 2.4 | This work | $+5.8 \pm 10.1$ |

* The $a$-parameter value derived from the fit of Eq. (1) to the normalized CASTNET ODVs is $71.3 \pm 0.8$ ppb, which is consistent with the normalization process utilized here; the corresponding value in the Parrish et al. (2020) analysis was near zero due to the different normalization approach used in that work.

areas (Parrish et al., 2017, 2022; Parrish and Ennis, 2019) but also in relatively isolated northern rural states (Parrish et al., 2022) and at western US rural CASTNET (preceding section) and coastal (Parrish et al., 2022) sites. Here, we examine how well fit the entire distributions of the largest MDA8 ozone concentrations are in four coastal Californian air basins. These basins are selected to span a wide range of environments – the intensely photochemically active, highly urbanized South Coast Air Basin (SoCAB, containing the Los Angeles urban area) and San Diego AB, the highly urbanized but less photochemically active San Francisco Bay AB (SFB AB), and the rural North Coast AB – and to minimize impacts from uncontrolled anthropogenic emission sources, such as agricultural activity. Figure 2 illustrates the temporal evolution of seven percentiles of the MDA8 distributions; fits of Eq. (3) to the time series of each percentile are included, with the derived parameter values given in Table S2. The AB locations are indicated on the map inset in Fig. 3.

The fits of Eq. (3) are limited to the 36-year 1980–2015 period for most of the percentiles in the three urbanized air basins; later years are not included due to clear positive deviations of the higher percentiles of the distributions, most clearly in the SoCAB, whose cause or causes have not been established. One likely cause is the rise of a new regime of wildfire impacts. According to the California Department of Forestry and Fire Protection (CalFire) Fire and Resource Assessment Program (FRAP, https://www.fire.ca.gov/what-we-do/fire-resource-assessment-program, last access: 21 February 2024), 2007 was the first time in recorded history that California lost over $1 \times 10^6$ acres ($4.05 \times 10^3$ km$^2$) in a year to wildfires; however, since then, the 4 highest wildfire years have occurred in 2020, 2021, 2018 and 2017, burning $4.1 \times 10^6$, $2.2 \times 10^6$, $1.8 \times 10^6$ and $1.3 \times 10^6$ acres ($16.6 \times 10^3$, $8.9 \times 10^3$, $7.3 \times 10^3$, and $5.3 \times 10^3$ km$^2$), respectively. Although exact matches cannot be expected without detailed analysis of where each wildfire had its impacts, these years, particularly 2020, generally stand out in the recent maximum values evident in Fig. 2. In contrast, Kim et al. (2022) present a detailed investigation of these deviations in the SoCAB and conclude that they are caused by substantial recent changes in the photochemical regime in the aforementioned region. Note that the fits to the lowest percentile (i.e., the minimum MDA8) in the three urbanized air basins and to all percentiles

in the rural North Coast Air Basin in Fig. 2 include the entire 43-year 1980–2022 period.

Despite the marked differences in the long-term changes between percentiles and basins evident in Fig. 2, the fits of Eq. (3) provide faithful descriptions of the long-term changes for all percentiles in all four basins; all RMSDs of the data about the fits are in the 2.5–9 ppb range (Table S2), except for the maxima, which exhibit larger variability. As expected, the anthropogenic enhancements (quantified by the derived $A$-parameter values) are largest in the SoCAB for all percentiles, except the minimum. The corresponding $A$-parameter values are approximately a factor of $\sim 2$ smaller in the San Diego AB than those in the SoCAB, and they are lower by another factor of $\sim 2$ in the SFB AB. In the North Coast AB region, all derived $A$-parameter values are near zero ($-2.8$ to $4.6$ ppb); a significant negative $A$-parameter value indicates that the reaction of fresh $NO_x$ emissions with USB has lowered observed MDA8 concentrations below those that would result from USB alone. Importantly, the fits to the North Coast AB percentiles are all qualitatively similar to the fits to the CASTNET ODVs in Fig. 1, exhibiting temporal behavior characteristic of baseline ozone; the fits to the minima in all four ABs also show qualitatively similar behavior with small $A$-parameter values ($< \sim 5$ ppb). This similarity indicates that transported baseline ozone concentrations dominate the lowest percentiles of observed MDA8 concentrations in all air basins, even in the SoCAB.

The derived $a$- and $A$-parameter values from the fits in Fig. 2 define the distributions of USB concentrations and US anthropogenic enhancements in the year 2000; Fig. 3a and b show bar graphs illustrating those distributions. By 2015, the distributions of these two ozone contributions had evolved as described by Eq. (3) to those shown in Fig. 3c and d. The US anthropogenic enhancements had decreased by a factor of $2.0 (= \exp\{15/21.8\}$, based on the exponential term in Eq. 3), while the USB had decreased by only 1 ppb (difference in the first three terms of Eq. 3 between 2000 and 2015). Figure 3e illustrates the mean USB distribution, i.e., the average of the five separate USB distribution estimates in Fig. 3c, which is discussed further in Sect. 5.1.

https://doi.org/10.5194/acp-25-263-2025

Atmos. Chem. Phys., 25, 263–289, 2025



**Figure 2.** Temporal evolution of the distribution of MDA8 ozone concentrations in four Californian air basins. Symbols indicate the annotated percentiles of the annual distribution of the largest MDA8 concentration recorded at any monitor within the basin on each day of the May–September ozone season. Solid curves indicate fits of Eq. (3) to the respective percentiles.

## 4.3    ODV contributions in the southwestern US

The map in Fig. 4 shows the ozone monitoring site locations in seven southwestern US urban areas: four larger (Phoenix AZ, Denver CO, Las Vegas NV and Salt Lake City UT) and three smaller (Tucson AZ, Reno NV and the Albuquerque/Santa Fe NM area). Monitoring sites also sparsely cover the rural areas in these five states: 19 in Colorado, 9 in New Mexico, 6 in Utah, 8 in Arizona and 2 in Nevada, as shown on the map in Fig. S1. We examine the ODVs recorded at all of these urban and rural sites.

Figure 5 displays the analysis of the Denver CO urban (panel a) and Colorado rural (panel b) ODV time series. The urban ODVs generally fall above the fit to baseline data (black curve with dashed extension, which is reproduced from the gray curve in Fig. 1). One exception is the Camp site, with some ODVs falling well below the baseline curve; as this site is located at street level in central urban Denver, we attribute these small ODVs to reductions in observed ozone concentrations due to its reaction with fresh NO$_x$ emissions. The rural data generally scatter about the baseline curve. Two rural sites that have received attention in previous work are emphasized as solid symbols. Gothic CO in western central Colorado (location indicated in Fig. S1)

has been considered to be a remote site (Cooper et al., 2020); that ODV time series agrees with the baseline curve within an RMSD of 1.8 ppb. Rocky Mountain NP (location also indicated in Fig. S1) has been considered to be a high-elevation baseline site (Lin et al., 2017). The dashed green curves show fits of Eq. (3) to all ODVs in the urban (excluding the Camp site) and rural (excluding the Rocky Mountain NP site) data sets. The red curve shows the fit of Eq. (4), which includes possible wildfire influences, to the maximum urban ODVs. The parameter values from these fits are annotated in the figure and given to greater precision in Tables S3 and S4.

The derived $a$-parameter values from the analysis of Denver urban (69.0 ± 2.1 ppb) and Colorado rural (69.0 ± 3.1 ppb) ODVs are consistent with each other and agree closely with that from the fit to the normalized CASTNET data (68.5 ± 1.5 ppb). The one exception is the Rocky Mountain NP site; the ODV temporal changes at this site are consistent with those of CASTNET data but give a larger $a$-parameter value (73 ± 5 ppb), which is possibly due to the relatively higher elevation of the Rocky Mountain NP site (2.7 km elevation), compared with the lower elevation of the Denver urban area (∼ 1.8 km elevation), and/or to the influence of Denver area urban pollution, which has been demonstrated to impact this site (Evans and Helmig, 2017). The

Atmos. Chem. Phys., 25, 263–289, 2025                                    https://doi.org/10.5194/acp-25-263-2025



**Figure 3.** Comparisons of estimates of the MDA8 ozone component distributions in four coastal Californian air basins; the inset map identifies the four air basins, with the black lines indicating air basin boundaries. **(a)** Comparison of ozone concentrations measured between 0.6 and 1 km altitude by sondes launched from Trinidad Head (THD) from May through September from 1997 to 2017 and derived *a*-parameter values. **(b)** Comparison of derived *A*-parameter values. **(c)** Comparison of the same sonde ozone measurements and the year 2015 USB distribution. **(d)** Comparison of the year 2015 distributions of US anthropogenic enhancements. **(e)** Comparison of the mean of the 5-year 2015 USB distributions illustrated in panel **(c)** with the distributions of the daily MDA8 USB for April–June 2017 at western US high-elevation sites simulated by two global models; these latter bar graphs were derived from Fig. 17 of Zhang et al. (2020). Error bars on the median and 90th percentile lines indicate estimated uncertainties in the determination of the USB and the US anthropogenic ozone enhancement percentiles as well as the standard deviations of the means from the five USB determinations.

derived *A*-parameter values provide estimates of the US anthropogenic ODV enhancement in the year 2000 averaged over the sites in each group: $8.0 \pm 1.7$ and $-1.9 \pm 4.4$ ppb in Colorado urban and rural areas, respectively; note that this rural value is consistent with zero within the derived confidence limit. The fit of Eq. (4) to the time series of maximum ODVs (with the *a*-parameter value fixed at 69.0 ppb) gives a somewhat larger *A*-parameter value ($A_{WF} = 11.0 \pm 1.7$) and a WF-parameter value of $4.0 \pm 2.5$ ppb; this latter value is an estimate of the ODV enhancement due to wildfire emissions in the year 2000.

An open scientific question is the role of emissions from the oil and natural gas industry and agricultural activities

in elevating ODVs in the Denver urban area. To the extent that emissions from these sectors have increased similarly to wildfires, any such role would contribute to our derived WF-parameter value, which is larger in the Denver urban area than in other urban areas considered here (see Table S4). With a different temporal dependence, they could bias the derived *a*-parameter value; however, the good agreement between that estimate in the Denver urban area, rural Colorado and the CASTNET data indicates no more than a small bias.

Figure 6 shows the results of similar analyses for six other southwestern US urban areas. In these plots (and in Fig. S2), the black, generally lower curves with dashed extensions are the fit to the baseline data from Fig. 1, normalized to the re-



**Figure 4.** Map of southwestern US urban monitoring sites; the symbols are color-coded according to site elevation, as indicated in the annotation. Lines indicate the outlines of southwestern US states (black), urban areas (gold), and interstates and other selected major highways (violet). Seven urban areas, whose sites are analyzed together as separate data sets, are labeled. The locations of five of the isolated rural CASTNET sites are also included.



**Figure 5.** Time series of ODVs recorded in Colorado **(a)** at the urban sites whose locations are shown in Fig. 4 and **(b)** at rural sites (excluding the Four Corners area) whose locations are shown in Fig. S1. Open symbols indicate all ODVs recorded in each area, and solid symbols indicate ODVs from three specific sites and the maximum Denver urban ODVs. As indicated by the annotation in panel **(b)**, dashed green curves indicate fits of Eq. (3) to all plotted ODVs (excluding the Camp and Rocky Mountain NP sites), the blue curve in panel **(b)** indicates the Rocky Mountain NP fit of Eq. (3), and the solid red curve in panel **(a)** indicates fit of Eq. (4) to the maximum Denver urban ODVs; parameters derived in these fits are annotated in the graphs. The solid black curves with dashed extensions indicate the fit to the baseline data included as the gray curve in Fig. 1. The light dashed lines indicate the 70 ppb ozone NAAQS threshold value.

spective $a$-parameter values; thus, these curves indicate the temporal behavior of ODVs in each data set that would have been expected in the absence of US anthropogenic emissions. The derived $a$-parameter values are similar in five of those areas, all falling in the range of 66.2–69.0 ppb, and agree well with the Denver ($69.0 \pm 2.1$ ppb) and CASTNET

($68.5 \pm 1.5$ ppb) results discussed above. Only in Tucson is a significantly smaller $a$-parameter value ($63.9 \pm 1.4$ ppb) derived; this value is also smaller than that found at the nearby Chiricahua NM CASTNET site ($70.1 \pm 1.7$ ppb). The lower elevation of Tucson may contribute to this difference. Fits of Eq. (3) to all of the rural ODV time series (Fig. S2



**Figure 6.** Time series of ODVs recorded in six southwestern US urban areas shown in Fig. 4. Open symbols indicate all ODVs recorded in each area, while solid symbols indicate the maximum ODVs in each year in each area. As in Fig. 5, dashed green curves indicate fits of Eq. (3) to all ODVs, whereas solid red curves indicate fits of Eq. (4) to the maximum ODVs, with the parameters derived in this fit annotated. The solid black curves with dashed extensions indicate the fit to the baseline data from Fig. 1, normalized to the respective $a$-parameter values. The light dashed lines indicate the 70 ppb ozone NAAQS threshold value.

and Table S3) also give similar $a$-parameter values (within 65–69 ppb), with small $A$-parameter values ($-3$ to $+5$ ppb). Fits of Eq. (4) to the maximum urban ODVs (with the $a$-parameter values fixed at the values derived from the ODVs in the entire respective urban area) give $A_{WF}$-parameter values in the range of 6–16 ppb. Small, positive wildfire ODV

enhancements (WF range of 0.6–1.6 ppb) are derived in all six urban areas, although the confidence limits of all include zero.

In summary, analyses of the ODV time series throughout the southwestern US give remarkably consistent results. The weighted average $a$-parameter value, which gives an es-

timate of the US background ODV in the year 2000, derived from 11 urban and rural ODV time series, is $67.4 \pm 0.7$ ppb, with only the low-elevation, most southerly Tucson urban area giving a significantly lower value; this average agrees well with the value derived in the CASTNET site analysis ($68.5 \pm 1.5$ ppb). This overall agreement indicates that an approximately constant, common US background ODV value is found throughout the southwestern US. The mean $A$-parameter value, which gives an estimate of the US anthropogenic ODV enhancement, derived from four rural ODV time series, is $-0.1 \pm 2.9$ ppb, which indicates that ODVs outside of urban areas are little affected by US anthropogenic emissions throughout this entire region. Any area with intense agricultural activity may be an exception to this general finding, due to the influence of uncontrolled anthropogenic emissions from this activity. Within the seven urban areas, the $A_{WF}$ values span the range from 6 to 16 ppb, with the larger values (11–16 ppb) derived in the four nonattainment areas. Wildfire emissions contribute additional ODV enhancements within urban areas: estimated as 0.6–4.0 ppb (mean of $1.6 \pm 0.9$ ppb) in the year 2000 and 1–6.4 ppb (mean of $2.6 \pm 1.4$ ppb) in 2020.



**Figure 7.** Map of monitoring sites within the Texas region; the symbols are color-coded according to state, as indicated in the annotation. Lines indicate outlines of southwestern US states (black), urban areas (gold) and interstates (violet). Nine Texas regions, whose sites are analyzed together as separate data sets, are indicated.

## 4.4    ODV contributions in Texas

The ozone monitoring site locations throughout Texas as well as those in some sites in neighboring states are indicated in Fig. 7, which also identifies the division of these sites among nine Texas regions and the state of Oklahoma; we examine the ODVs recorded in these regions. Figure 8 plots the ODV time series recorded in seven of the nine Texas regions, and Figs. S3 and S4 give similar plots for the other two Texas regions, for Oklahoma and for eight additional surrounding states. The parameter values derived from fits of Eqs. (3) and (4) to all ODV time series are annotated in the figures and given to greater precision in Tables S4 and S5. In Fig. 8 and in the upper graphs of Fig. S3, the ODVs for the entire state of Texas (gray symbols) are included in the plots highlighting the regional ODVs (colored symbols), which are fit to Eq. (3), as indicated by the upper black solid curves. The lower black curves with dashed extensions indicate the fit to the baseline data from Fig. 1, normalized to the respective $a$-parameter values; these curves indicate the temporal behavior of ODVs in each region that would have been expected in the absence of US anthropogenic emissions.

Comparison between Figs. 6 and 8 (note differences in the ordinate scale) indicates that ODVs in Texas were often much larger in earlier decades than those in the southwestern US urban areas, indicating much larger impacts from US anthropogenic emissions in Texas. For example, the maximum US anthropogenic ODV enhancements (i.e., $A_{WF}$-parameter values) in Texan urban areas in the year 2000 were generally > 25 ppb, while they were as high as $54 \pm 3$ ppb in the Houston region, compared with the range of 6–16 ppb found in the southwestern US. However, the ODVs in Texas have

decreased by a larger absolute amount than in the southwestern US; thus, at present, the maximum ODVs in Texas are no larger than those in the Denver and Phoenix urban areas.

The southwestern US is characterized by an approximately constant US background ODV across the entire region; however, there is a pronounced spatial gradient across Texas. The $a$-parameter values of 65 ppb derived for the El Paso and western rural regions are similar to the weighted mean ($67.4 \pm 0.7$ ppb) of the urban and rural southwestern $a$ parameter. However, the US background ODV decreases with distance both east and south across the state, with the smallest values found in southern and eastern Texas – $50 \pm 5$ ppb in southwestern Texas and $54 \pm 3$ ppb in Houston – which is heavily influenced by the transport of maritime air from the Gulf of Mexico (Berlin et al., 2013) during the warm (ozone) season. This broad geographic feature in USB has also been seen in several modeling studies (e.g., Fiore et al., 2014; Zhang et al., 2020).

As expected, the largest Texas US anthropogenic ODV enhancements (27–54 ppb in 2000) have generally been found in the nonattainment areas within the state – Houston, Dallas and San Antonio – although comparably large $A$-parameter values (28–37 ppb) are found throughout southeastern and eastern Texas. It is notable that the El Paso region is anomalous: although the $A$-parameter value ($11 \pm 2$ ppb) is comparatively modest, the $a$-parameter value ($65 \pm 2$ ppb) is so large that even the relatively small US anthropogenic ODV enhancement is sufficient to produce ODVs that routinely exceed the 70 ppb NAAQS threshold value throughout the entire measurement record (upper left graph in Fig. 8).



**Figure 8.** Time series of ODVs recorded in seven of the Texas regions shown in Fig. 7. Gray symbols in each graph indicate all recorded Texas ODVs. Colored symbols indicate the ODVs from each respective region. Upper solid black curves indicate fits of Eq. (3) to all ODVs in the area over the curve's time span; the parameters derived in these fits are annotated in three graphs; dotted curves indicate fits of Eq. (4) to the maximum ODVs in El Paso, Houston and Dallas, with the parameters derived in these fits annotated. Lower solid curves with dashed extensions indicate the fit to the baseline data from Fig. 1, normalized to the respective $a$-parameter values. The light dashed lines indicate the 70 ppb ozone NAAQS threshold value.

There is evidence that the maximum ODVs in Texan urban areas may be elevated by ozone sources that have not yet been effectively controlled by air quality improvement efforts. Such sources could possibly include wildfire emissions, which are approximately quantified by Eq. (4), or emissions from oil and gas exploration and production, which are ubiquitous across Texas. To gauge the possible magnitude of these sources, Eq. (4) is fit to the time series of maximum ODVs in Dallas and Houston (dotted black curves in the middle graphs of Fig. 8). These fits possibly indicate contributions of 2–3 ppb to the maximum ODVs in these urban areas from such growing, uncontrolled anthropogenic sources. Iglesias et al. (2022) show the significant growth in wildfires across all of Texas (their Fig. 2), especially since the turn of the century, and Gong et al. (2017) calculate that wildfires impact Houston on 3.5 % of the days in their May–September 2008–2015 study period, with an average contribution of $\sim$ 8.5 ppb.

## 4.5 ODV contributions in neighboring and more distant states

For context, preliminary analyses have been conducted of the ODV time series recorded in states lying east and north of the region that is the focus of this study. Figures S3 and S4 illustrate the results of these analysis for Oklahoma, Louisiana, Arkansas, Nebraska and Kansas; Eq. (3) is fit to the time series of all ODVs recorded in each state without consideration of intrastate regional differences. Nevertheless, the RMSDs of the ODVs about the fits are similar to the fits to more carefully selected sets of sites discussed in the preceding sections. The results for these states are considered to be adequate for determining boundary conditions for the ODV component determinations in the region that is the focus of this work.

Figure S3 also includes analyses of ODVs recorded in four rural northern states: Montana, North and South Dakota, and Wyoming. A fit to all ODVs recorded in these four states gives a mean $A$-parameter value of $1.3 \pm 1.7$ ppb, which indicates only small US anthropogenic ODV enhancements throughout that region. (Note that the Boulder site in Wyoming – AQS Site ID 56-035-0099 – reports anomalously large ODVs; as this site is in the Upper Green River basin where high ozone concentrations are produced in wintertime from the region's large oil and gas production activities (Schnell et al., 2009), all ODVs from this site have been excluded.) Separate fits of Eq. (3) to the ODV values in each state provide separate $a$-parameter values; there are some small differences in these results: a maximum in Wyoming of 64 ppb, a minimum in Montana of 59 ppb, and intermediate values of 60 and 62 ppb in North and South Dakota, respectively. Parrish and Ennis (2019) and Parrish et al. (2022) present earlier analyses for three of these states and found results consistent with this updated analysis.

Figure S6 includes analyses using fits of Eq. (4) to the time series of maximum ODVs recorded in the New York City and Atlanta urban areas. The New York City time series was originally analyzed by Parrish and Ennis (2019) (see their Fig. S4); here, that time series is extended through 2021. Figure S6 includes separate symbols for the Atlanta, coastal and inland sites.

## 5 Discussion and conclusions

### 5.1 Background ozone dominates observed concentrations throughout the US

Five estimates of the May to September USB distribution derived from the analysis of observations from Californian western coast locations are compared in Fig. 3c. The first bar illustrates the ozone distribution measured between 0.6 and 1.0 km altitude by sondes launched from a coastal site at Trinidad Head (Oltmans et al., 2008), which is located in the North Coast AB shown on the map in Fig. 3; Par-

rish et al. (2022) fully describe this data set. The ozone altitude gradient (see Fig. 1 of Parrish et al., 2022) indicates that this altitude range includes the marine boundary layer–free-troposphere transition, so that it is high enough to avoid continental influences as air is transported ashore and low enough to well-characterize air mixed into the convective boundary layer over the continent (Parrish et al., 2010). Thus, these sonde data provide direct estimates of USB concentrations. The other four bars show estimates of the distribution of USB ozone derived in Sect. 4.2 from the MDA8 distributions in Californian coastal air basins. There is reasonable agreement between the five estimates, although with some notable differences. The two southern estimates (San Diego AB and SoCAB) are somewhat larger than the three more northerly estimates, which is consistent with the systematic decrease in USB with latitude quantified by Parrish et al. (2022). Variation in site elevations also contributes to these differences. The Crestline site at 1.4 km and the Alpine site at 0.6 km are included in the SoCAB and San Diego AB, respectively; they are at higher elevations than other coastal air basin sites and very often record the largest MDA8 ozone concentrations in their respective ABs. Thus, at least some of the quantitative differences in the bars in Fig. 3c represent real atmospheric differences. The mean of all five USB distributions from that graph is included in Fig. 3e; it provides an estimate of the average USB distribution along the Californian coast.

Comparison of the distributions in Fig. 3c, d and e shows that the distribution of USB was larger than the distribution of the US anthropogenic ozone enhancements in all four Californian coastal air basins by 2015. This dominance of background ozone is quite pronounced; only in the SoCAB and San Diego AB do the distributions in Fig. 3d overlap at all with the mean USB distribution in Fig. 3e. In the SoCAB, the 75th percentile of the US anthropogenic ozone enhancement is smaller than the 10th percentile of the mean USB contribution. Comparisons for the separately derived air basin USB distributions between Fig. 3c and d shows that the USB dominance in the SoCAB and San Diego AB comparisons are even more pronounced. This predominance of the background contribution developed relatively recently; Fig. 3a and b show the comparison for the year 2000, when the US anthropogenic enhancements were generally greater than or equivalent to the USB contributions in the SoCAB and more closely comparable in the San Diego AB.

The predominant contribution of USB to maximum ozone concentrations, even in the SoCAB where the largest US ozone concentrations occur, emphasizes the great difficulty of achieving accurate air quality modeling. Traditionally, CTMs have primarily focused on careful, detailed treatment of transport and photochemical processes on local to regional scales, which is required for the accurate simulation of the US anthropogenic ozone enhancements; however, less attention has been paid to the USB contributions, especially the day-to-day variability. Of great importance for present-

day exceedance event modeling or daily air quality forecasts is the accurate simulation of USB on short-term (i.e., daily or even hourly) timescales. As USB is driven by a manifold of processes occurring on small spatial scales but over hemisphere-wide distances, accurate, detailed simulation of the stratospheric and tropospheric contributions to USB and modeling for predictions of future baseline ozone are each beyond the capabilities of current air quality models. These issues are explored in two recent comparisons of estimates of background ozone and their impacts on the simulation of surface ozone across the continental US (Hogrefe et al., 2018; Zhang et al., 2020) where background concentrations were shown to differ by 5–10 ppb in the mean and up to 15 ppb for domain-averaged MDA8 values. Figure 3e illustrates the differences between two different model simulations of the US background MDA8 ozone distributions for April–June 2017 at 12 high-elevation sites in the western US. As Zhang et al. (2020) note, the means of the distributions agree within 6 ppb. However, the larger percentiles of the distribution differ more widely; e.g., the 98th percentiles are $\sim 70$ and $\sim 57$ ppb from the GFDL-AM4 and GEOS-Chem models, respectively. It is notable that the former model indicates that USB alone can exceed the 2015 NAAQS threshold value of 70 ppb, while the latter model finds that USB always remained significantly below the NAAQS threshold.

## 5.2  Pronounced shift in the spatial distribution of maximum US ozone concentrations

Great efforts have been made over the past half-century to reduce anthropogenic precursor emissions throughout the entire country. These efforts have been remarkably successful, yielding substantial reductions in the number and magnitude of US ozone NAAQS exceedances; however, progress has not been spatially uniform over the country. Figure 9 illustrates one measure of this progress. During the 5-year period from 1997 to 2001, the large majority (43) of the 51 US states plus the District of Columbia recorded at least one ODV of 75 ppb or larger; 20 years later, during the 2017–2021 period, the number of such states had been reduced to 20. In the earlier period, 80 % of ODVs across the nation were $\geq 75$ ppb, whereas that percentage had dropped to 10 % in the later period, clearly demonstrating a remarkable improvement in air quality with respect to ozone. However, there are marked regional differences in the percentages of ODVs $\geq 75$ ppb: 88 % and 64 % in the eastern and western regions in the earlier period, respectively, but corresponding values of 2.4 % and 22 % in the later period. In Fig. 9 the solid blue bars in the western region demonstrate that nearly all of the seven total states that recorded more than 7 % of ODVs $\geq 75$ ppb were in the southwestern US, including Texas and California; the single exception is Connecticut, where the maximum ODVs are recorded near the coast of Long Island Sound (Parrish and Ennis, 2019). Similar conclusions are reached if ODVs $> 70$ ppb are considered (Fig. S5). In summary, great

improvement in US ozone concentrations have occurred over past decades, but this improvement has been accompanied by a marked shift in the highest observed ozone concentrations from the eastern to the southwestern US.

The occurrence of only modest ODV decreases in the southwestern US has been noted in other analyses. Simon et al. (2015) found that the upper end of the summertime urban ozone distribution (i.e., representative of ODVs) generally decreased over the 1998–2013 period throughout the US in response to decreasing emissions of NO$_x$ and volatile organic compounds (VOCs). They interpreted those results as demonstrating the large-scale success of US control strategies. However, their Fig. S12 shows that the Denver urban area was an exception to this generality, with all sites exhibiting either positive or insignificant trends. Similarly, Abeleira and Farmer (2017) found that ozone in the Denver urban area was either stagnant or increasing between 2000 and 2015, despite substantial reductions in NO$_x$ emissions. In Colorado Springs, approximately 100 km south of Denver, Flynn et al. (2021) found that summertime MDA8 ozone shows no significant trend throughout its distribution over the past 20 years. Further, they found little evidence of local photochemical production or ozone transport from Denver, consistent with our classification of this area as rural. The results of these three studies are consistent with the long-term ODV changes in urban and rural Colorado shown in Fig. 5 and with our conclusion that the US background ODV is the dominant contributor to ODVs.

## 5.3  Spatial and temporal distribution of ODV contributions

The derived spatial distributions of the two major ODV components – the US background ODV and the US anthropogenic ODV enhancement – are illustrated for the year 2000 as contour maps in Figs. 10 and 11, respectively. In Fig. 10, the estimated US background ODVs are at a maximum – greater than 64 ppb (see violet contour) – throughout the entire southwestern US, including western Texas and Wyoming, and above 68 ppb in some areas, including most of Colorado. We attribute these large values to baseline air at higher altitudes flowing over the inland mountain ranges and mixing into the convective boundary layer over the continent (Langford et al., 2017). The overall spatial pattern is similar to those simulated for surface impacts of ozone transport from Asia (see Fig. 9 of Lin et al., 2012a), stratospheric intrusions (see Fig. 11 of Lin et al., 2012b) and USB distributions (see Fig. 1 of Zhang et al., 2020). Previous studies of reanalysis data sets (Sprenger and Wernli, 2003; Škerlak et al., 2014) have described the southwestern US as being prone to high rates of transport from the deep stratosphere to the troposphere. These events tend to cross the tropopause at high latitudes (40–60° N) near the end of the North Pacific storm track but make their surface impacts felt most acutely after quasi-isentropic subsiding transport to the southeast (in

https://doi.org/10.5194/acp-25-263-2025    Atmos. Chem. Phys., 25, 263–289, 2025



**Figure 9.** Comparison of the percentage of ODVs greater than or equal to 75 ppb recorded at all sites in individual states over two 5-year periods: 2017–2021 (hatched and dark-blue bars) and a period 20 years earlier – 1997–2001 (light-colored bars). Individual states are indicated by their two-letter abbreviations (defined in Table S6). States are arbitrarily divided between eastern and western regions. Southwestern states, Texas and California are indicated by solid dark-blue bars. Eight rural states, all in the western region, reported no ODVs greater than or equal to 75 ppb in either period.

the lee of the Pacific High). While the peak of this effect occurs in the spring, it does continue into the summer (Škerlak et al., 2014), when it can more strongly couple with the surface because of the very deep convective boundary layers that develop in the arid, high terrain of the southwestern US. With such large US background ODV values, even relatively small anthropogenic enhancements in the regional urban areas raise ODVs above the 70 ppb ozone NAAQS threshold, thereby leading to their designation as nonattainment areas. Were the NAAQS threshold to be lowered further, for example, to 65 ppb, as has been considered in the past (e.g., Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone), Fig. 10 indicates that NAAQS achievement would be precluded over the vast southwestern US region inside the 64 ppb contour (unless regulatory efforts could reduce the US background ODV). A striking feature of the contour map in Fig. 10 is the significant spatial gradient in the US background ODV over the continent. Increases occur inland from the western coast as surface elevations increase (Parrish et al., 2022), with decreases to the north and east of the broad maximum in the southwestern US and to the east and south within Texas. These smaller values in eastern Texas (e.g., $54 \pm 3$ ppb in Houston) allow for larger anthropogenic ODV enhancements there before the NAAQS threshold is exceeded.

CTMs have been extensively utilized to estimate US background ODVs. Figure 10 compares our observation-derived results with a portion of Fig. 3 of Jaffe et al. (2018), who presents the results of a simulation by the GFDL-AM3 model

of a statistic comparable to the US background ODV. The broad spatial features are similar in both plots; the maximum in the southwestern US is the dominant feature in each. The maximum observation-derived values (68–70 ppb) are consistent with the model-simulated maximum (60–70 ppb). All of the observation-derived values, except for a narrow band along the Pacific coast, are in the 50–70 ppb range, as are the model-derived values, with the exception of the values in the southeast corner of that map. Both results show general south-to-north and west-to-east decreases in inland US background ODVs. However, it is apparent that the observation-based estimate has substantially greater precision and spatial resolution compared with the low-resolution ($200 \times 200$ km$^2$) model estimate. Jaffe et al. (2018) estimate that the model uncertainty in the seasonal mean USB is $\sim \pm 10$ ppb, although it is larger for individual days, such as is required for the determination of US background ODVs. The magnitudes of the model- and observation-derived results in Fig. 10 agree within this estimated uncertainty in the model simulations. The US background ODV estimated from the GFDL-AM4-simulated ozone distribution (approximated by the 98th percentile) shown in Fig. 3 is also consistent with the contour map in Fig. 10, indicating that US background ODVs above 68 ppb over the southwestern US are indeed physically realistic.

The NO$_2$ column measurements from the Ozone Monitoring Instrument (OMI) satellite (Lu et al., 2015) are included in Fig. 11 for comparison with the US anthropogenic ODV enhancements, which, outside of California, are generally elevated in the larger southwestern US and Texan ur-

Atmos. Chem. Phys., 25, 263–289, 2025                          https://doi.org/10.5194/acp-25-263-2025



**Figure 10.** Two estimates of the spatial variability in US background ODVs over the western US. **(a)** Contour map of estimated US background ODV for year 2000. The US background ODV excludes estimated wildfire contributions. The 64 ppb contour is colored violet to indicate the extensive area of the largest values. Symbols in the contour map indicate individual monitoring sites included in the analysis with the same color coding as the contour map. Results from Parrish et al. (2017, 2022) and estimates for California's Central Valley (Faloona et al., 2025) are included. **(b)** Annual fourth-highest MDA8 ozone concentration averaged over 2010–2014, from a GFDL-AM3 model simulation with North American anthropogenic emissions zeroed out (figure reproduced from a section of Fig. 3 of Jaffe et al., 2018).



**Figure 11.** US anthropogenic ODV enhancement over the western US compared to mean summertime OMI NO$_2$ columns. **(a)** Contour map of estimated US anthropogenic ODV enhancement for the year 2000 over the western US. Symbols on the contour map indicate individual monitoring sites included in the analysis with the same color coding as the contour map. A second color scale is included for interpretation of the colors as the year 2020 US anthropogenic ODV enhancement. Results from Parrish et al. (2017, 2022) and estimates for California's Central Valley (Faloona et al., 2025) are included. **(b)** The OMI NO$_2$ columns measured in April–September 2005–2014 are reproduced from Fig. 1a of Lu et al. (2015) by cropping and changing the aspect ratio of that figure to approximate that of the contour map.

ban areas. There is general correlation of the NO$_2$ columns within these urban areas, which supports our interpretation of the derived $A$-parameter value as quantifying the US anthropogenic ODV enhancement. However, some areas of clear differences between these ODV enhancements and the OMI

NO$_2$ column measurements are evident in Fig. 11. Most clearly, emissions from the large coal-fired power plants in the Four Corners region (location identified in Fig. S1) give a strong elevation in the NO$_2$ column that is not reflected in US anthropogenic ODV enhancements. This lack of corre-

https://doi.org/10.5194/acp-25-263-2025    Atmos. Chem. Phys., 25, 263–289, 2025

lation is consistent with the ODV time series for this region (Fig. S2), which indicates that the US anthropogenic ODV enhancement is near zero. Mesa Verde NP is in this region; it has been considered a high-elevation site representing baseline $O_3$, at least in the spring, by Lin et al. (2017). This site records ODVs generally consistent with all other sites in this region. The co-location of the large $NO_2$ enhancement with an indiscernible US anthropogenic ODV enhancement indicates that the large $NO_2$ emissions from the power plants have only a negligible effect on the regional ODVs. The Denver urban area, with $A$-parameter values in the 8–11 ppb range (Fig. 5), does not stand out in Fig. 11, although that area does have a clear signature in the OMI $NO_2$ column data.

Figure 12 compares the long-term changes in the ODV components between the Crestline site in the Los Angeles urban area with those in the four larger southwestern US urban areas and three Texan urban areas. Since ∼ 1990, the Crestline site has usually recorded the largest ODV in the SoCAB. Overall, decreases in ODVs have been recorded in each of the eight cities; this decrease is primarily driven by a decrease in the US anthropogenic ODV enhancement. The final term in Eq. (3) indicates that this contribution decreased by a factor of 6.3 between 1980 and 2020. In contrast, the first three terms of Eq. (3) indicate that the US background ODV increased by ∼ 11 ppb over the entire western US region from 1980 to the mid-2000s and has since slowly decreased. The relatively minor but increasing (up to ∼ 6 ppb in Denver in the year 2020) mean ODV enhancements due to wildfire emissions are separately indicated. Two conclusions emerge from Fig. 12. First, throughout the monitoring record, the US background ODV has been, by far, the largest ODV contribution in the four southwestern US urban areas; moreover, by 2000, it had become the predominant ODV contribution in all cities, even within the Los Angeles urban area exemplified by the Crestline site. This conclusion is consistent with the discussion in Sect. 5.1. Second, the increase in the US background ODV between 1980 and the mid-2000s and the increasing wildfire contribution through the entire period partially offset the reduction in the US anthropogenic ODV enhancement, so that ODVs have not changed greatly in the southwestern US urban areas and El Paso, Texas.

There are some notable deviations from the overall picture described above. First, the results shown in Fig. 12 and all fitted curves in all figures represent the average behavior of the fitted ODVs; there is significant scatter about those fits as quantified by the RMSDs (generally < 5 ppb) annotated in the figures and given in Tables 1, S1 and S3–S5; this scatter appears to be predominately year-to-year variability. However, one systematic deviation – the recent anomaly of the El Paso nonattainment area and nearby rural New Mexico (see graphs in Figs. 8 and S3) – is particularly relevant; the ODVs in the last few years are as much as 15 ppb larger than expected from the fits to Eq. (3). It is notable that, in the most recent year included in this analysis (2021), the largest ODV

(80 ppb) in the two-state region of Texas and New Mexico was not recorded in either of the traditional urban ozone hot spots of Houston or Dallas; rather, it was recorded at the rural Desert View site in New Mexico, which is included in the El Paso region in Fig. 8. Only a single site in Phoenix within the entire southwestern US and Texas region (excluding California) equaled that ODV. ODVs nearly as high were recorded at rural New Mexico sites that are included in the western rural Texas region in Fig. S2. The cause of these high ODVs is presently unexplained, although it may be important to note that these regions are in the Permian oil and gas basin (Karle et al., 2021).

## 5.4   Implications for US air quality policies

This spatial difference in the success of air quality policies aimed at ODV reduction has resulted in a pronounced regional shift in the occurrence of ODVs of 75 ppb and above (and above 70 ppb; Fig. S6), with a growing preponderance of the nation's largest ODVs recorded in the southwestern US (see discussion in Sect. 5.2). The cause of this change is clear in Fig. 10: the southwestern US suffers from large US background ODVs that closely approach the NAAQS threshold values. In Fig. 12, it can be seen that the US anthropogenic ODV enhancements in the southwestern US urban areas and El Paso, Texas, have been reduced in magnitude to such an extent that all were smaller than 6 ppb by 2020. However, even these remaining enhancements are large enough to raise the recorded ODVs above the 70 ppb 2015 NAAQS threshold as well as the 75 ppb 2008 NAAQS threshold. This conclusion is further illustrated in Fig. 13, where fits of Eq. (4) to time series of maximum ODVs in three southwestern US urban areas are compared to similar fits in three of the largest US urban areas; additionally, the fit of Eq. (3) to the time series of CASTNET ODVs and the temporal evolution of the corresponding baseline ozone concentrations from Fig. 1 are included. In Atlanta and New York City, with substantially lower year 2000 maximum US background ODVs of 49 and 52 ppb, respectively, the fits to the urban maximum ODVs dropped below the Phoenix and Denver fits in the early 2010s; they have now dropped below the 70 ppb NAAQS threshold and are approaching the Reno, CASTNET and baseline fits. Interestingly, by 2021, the fit to the maximum ODVs recorded at all locations in Fig. 13, from the isolated rural CASTNET sites in the western US to the major metropolitan areas of Atlanta and New York City (excluding the Los Angeles), were in the 66–76 ppb range, with the southwestern US urban areas defining the upper limit. Importantly, all curves included in Fig. 13 are direct fits to measured concentrations; they do not depend upon accurate differentiation between the separate ODV contributions.

The spatial shift in the nation's highest ozone concentrations to the southwestern US emphasizes a long-standing concern with US policies for improving ozone air quality: a single standard is applied to the entire



**Figure 12.** Derived apportionment of maximum ODVs for 3 years at 20-year intervals for the Crestline site in Los Angeles, four southwestern US regions and three Texan urban areas. The lower, solid blue bars indicate the US background ODV; they exclude estimated wildfire contributions, which are separately indicated by the middle, cross-hatched green bar segments. The top, patterned brown bars indicate the estimated US anthropogenic ODV enhancements, again excluding the wildfire contribution. For four cities, the US anthropogenic ODV enhancements and wildfire contributions are missing in 1980, as the tabulated ODVs are inadequate to estimate that parameter that early in the monitoring record. The 2020 populations of the urban areas are annotated in millions. The circles indicate the actual maximum ODVs recorded in the respective years in each area.

country without regard for the USB; this background cannot be addressed by local or regional reductions in ozone precursors. This policy contrasts with those addressing another environmental hazard – exposure to ionizing radiation. The US Nuclear Regulatory Commission (NRC, https://www.nrc.gov/about-nrc/radiation/around-us/doses-daily-lives.html, last access: 7 October 2022) estimates that about half of the average American radiation dose is due to natural background radiation that, similar to ozone, is higher in the high-altitude southwestern US. Health and safety standards for ionizing radiation are based on the additional exposure that comes from anthropogenic sources of radiation, not on the overall radiation exposure. A similar approach for ozone would require that the ozone standard be based on the anthropogenic increment of ozone above the USB within a region, rather than on the total ambient ozone concentration; alternatively, a regionally varying ambient concentration standard that accounted for the regionally varying USB could serve that purpose. Of course, such an approach would introduce additional complexity, as ozone is a secondary air pollutant that can cross state lines, making it difficult to define a suitable boundary for any particular region, such as the southwestern US. However, as of 2020, we estimate that the US anthropogenic ODV enhancement in eight southwestern US urban areas (the seven in Fig. 4 plus

El Paso TX) has been reduced to the range of 2.4–6.4 ppb; however, the US background ODVs plus the relatively small wildfire contributions are so large that five of these eight cities are the centers of ozone nonattainment areas. Importantly, it is only the small US anthropogenic ODV enhancement that can possibly be directly reduced through further controls on urban and industrial emissions, although the small wildfire contributions can also possibly be reduced indirectly through decreased NO$_x$ emissions in VOC-poor urban areas. In Denver in 2020, we estimate that the US anthropogenic ODV enhancement had been reduced to 4.4 ppb, but the US EPA has recently downgraded the Denver urban area from a Serious to Severe-15 nonattainment area under the 2008 ozone NAAQS (https://www.govinfo.gov/content/pkg/FR-2022-10-07/pdf/2022-20458.pdf, last access: 7 February 2024). This redesignation will require further reductions in local and regional precursor emissions, even though the US anthropogenic ODV enhancement is already so small that such additional emission control efforts can be expected to have little impact on future ODVs.

Importantly, it is estimated that baseline ozone concentrations at northern midlatitudes increased by a factor of 2.1 ± 0.2 between 1950 and 2000 (Parrish et al., 2021b). These baseline concentrations, which largely account for the US background ODV, reached a maximum in the mid-2000s



**Figure 13.** Comparison of fits of Eq. (4) to time series of maximum ODVs recorded in three of the nation's largest urban areas and three southwestern urban areas, with the fits to normalized rural western CASTNET ODVs and baseline ozone from Fig. 1. The fitted urban curves are taken from Fig. 2 of Parrish et al. (2022) for Los Angeles, Fig. S6 for New York City (i.e., NYC) and Atlanta GA, Fig. 5 for Denver CO, Fig. 6 for Phoenix AZ and Reno NV, and Fig. 1 for CASTNET and baseline ozone.

and have since slowly decreased at a mean rate of $\sim 1$ ppb per decade (Parrish et al., 2020). This decrease results from decreasing anthropogenic ozone precursor emissions throughout northern midlatitudes due to the implementation of effective emission controls in North America, Europe and (more recently) East Asia. Given the large increase in baseline ozone that occurred as anthropogenic emissions increased in the 20th century, it can be expected that a significant decrease in baseline ozone can be achieved by further reducing total zonal precursor emissions. Cooperative, international emission control efforts aimed at continuing (or even accelerating) the current decrease in baseline ozone concentrations (and thereby the US background ODV) may be an effective alternative policy approach to further reducing US ODVs. It should be noted that this expectation relies on the assumption that the background will continue to decrease; however, that expectation could be compromised by the changing climate. For example, stratosphere–troposphere exchange rates could increase due to acceleration of the Brewer–Dobson circulation; modeling work by Abalos et al. (2020) points toward a 10 %–15 % rise in the stratosphere–troposphere O$_3$ source by the end of this century.

We should step back from the comparison of air quality policy approaches to note that there is evidence that further reductions in ambient ozone concentrations throughout the US will provide significant health benefits (e.g., Zhang et al., 2019). This applies to both attainment and nonattainment areas and to the entire concentration distribution of ozone, not just the few days of highest concentrations that determine the ODVs that are the focus of NAAQS attainment. Thus, all reductions in ozone precursor emissions will be beneficial and, if carried out in all northern midlatitude countries, will serve to further reduce baseline ozone concentrations, thereby easing the attainment of air quality standards based on ODVs or other statistics designed to quantify ozone concentrations of concern. Moreover, control measures that reduce VOC and NO$_x$ emissions have the added benefits of reducing other criteria air pollutants, air toxics, co-emitted greenhouse gases and precursors to fine-particle formation, which contribute to haze and visibility reduction; further air quality improvement is desirable from multiple perspectives.

## 5.5   A required modeling hierarchy

Derwent et al. (2023) emphasize the need for a widely accepted, simple, conceptual "model" that intuitively explains the broad features of how ozone sources, sinks and transport processes all interact to establish the observed local, regional and larger-scale spatial distributions; seasonal cycles; and long-term temporal changes in ozone. Broadly speaking, this conceptual model envisages background air containing ozone and other baseline trace species entering an urban area or rural region. Urban emissions, other anthropogenic emissions and biogenic precursor emissions drive local- and regional-scale photochemical ozone production, which elevates ozone concentrations above the global baseline levels, leading to human health effects and crop and vegetation damage. After 1 to several days travel downwind, the regionally polluted air with elevated levels of ozone, other photochemical products and unreacted precursors is lofted from the continental boundary layer and rejoins the global circulation. However, neither a conceptual model nor our observation-based model applied in this paper can alone provide a quantitative understanding of tropospheric ozone; rather, a robust hierarchy of models is required.

In this regard, we believe that two key points made by Held (2005) are particularly important:

> It is fair to say that we typically gain some understanding of a complex system by relating its behavior to that of other, especially simpler, systems. For sufficiently complex systems, we need a model hierarchy on which to base our understanding, describing how the dynamics change as key sources of complexity are added or subtracted.

> Elegance versus Elaboration. An elegant model is only as elaborate as it needs to be to capture the essence of a particular source of complexity, but it is no more elaborate.

Emanuel (2020) makes similar points from a somewhat different perspective:

> As it becomes easier to undertake complex computer simulations of climate and weather, … it is tempting to use computers to simulate, rather than understand, nature.
>
> It is sometimes perceived as easier to run the model than to develop a comprehensive and satisfying understanding of the phenomena in question.

In addition to the conceptual model and the simple mathematical model that we apply here, comprehensive numerical models (i.e., CTMs) that aim to simulate (in full detail) as much of the atmospheric chemistry and dynamics as possible are essential to provide the beautifully detailed results that are presently available to the atmospheric community. CTMs require great "elaboration" to adequately treat the manifold of important processes, while our observation-based model is focused much more on "elegance", although it does indeed "capture the essence of a particular source of complexity". In the present work, that complexity is the interaction of USB with US anthropogenic contributions to establish observed ozone concentrations. The simplicity of our model allows a direct, conceptual understanding of the phenomena that underlie the observed ozone distribution, and this understanding provides context for the detailed results provided by CTM simulations.

From the "elaborate" perspective, it is well understood that the temporal and spatial distribution of ozone in the troposphere results from the interactions of a great many chemical and physical processes driving ozone sources, sinks and transport; fully understanding this distribution requires that the impacts of each of those processes be accurately simulated and the results be fully integrated with each other. CTMs approach this challenging task through computational parameterizations of each process in concert, with the intention of reproducing observed characteristics of the ozone distribution. It is only through successful implementations of such global CTM simulations that a full understanding of the complex reality of tropospheric ozone distribution can be achieved. However, biases in present CTM results are quite often found to be in the range of 5–20 ppb (Hu et al., 2017; Zhang et al., 2020), particularly in the extreme wings of the ozone distribution where the ODVs lie. Comparison of results between different models demonstrates that large uncertainties remain in our understanding; Sect. S1 in the Supplement briefly discusses some model result comparisons. Such comparisons have led to the increasing recognition that CTMs are not yet able to provide accurate estimates of atmospheric ozone concentrations without imposing additional constraints directly from observations. For example, Skipper et al. (2021) present a method to fuse ozone observations with USB simulated by a regional CTM in order to correct model bias, and Hosseinpour et al. (2024) present a machine learning technique that gives larger, more accurate CTM estimates of US background ODVs; this approach led to improved agreement with the Parrish et al. (2017) estimate for

Los Angeles and the Parrish and Ennis (2019) estimate for New York City. Our much simpler, observation-based model takes a contrasting approach; it avoids detailed process simulation by analyzing the measured ozone distribution, which necessarily reflects the accurately integrated impacts of all relevant processes, because the atmosphere itself has performed that integration. Results of our simpler model also have significant uncertainty, which arises from the underlying assumptions required to interpret observations so as to extract information regarding the processes that produced the observed ozone distribution. In this regard, the simplicity of this model is helpful, because impacts of the model assumptions can be readily evaluated; Sects. S2–S6 in the Supplement discuss some of these evaluations. In contrast, the manifold of parameterizations that CTMs require to simulate the many relevant chemical and physical processes are generally embedded within the model computer code, rendering it extremely difficult to evaluate the uncertainty that arises from any specific parameterization. For example, evaluations by Derwent et al. (2016, 2018, 2021) identify important uncertainties in CTM results, but the determination of avenues to correct the model deficiencies was not possible. However, of course, our simple observation-based model, which does not attempt to simulate the relevant processes in detail, cannot provide a detailed understanding of the chemical or physical processes that contribute to ozone formation, such as that available from CTMs. Consequently, its applications are quite limited, preventing it from performing many of the tasks for which detailed CTMs are utilized. In summary, neither CTMs nor our simpler approach alone can give the desired full understanding of the tropospheric ozone distribution – hence the need for a robust modeling hierarchy.

Continuing to guide US ozone air quality policy development requires this modeling hierarchy to address new challenges. For more than 5 decades, policies have primarily focused on urban ozone produced from precursors emitted by mobile and industrial sources; the contributions from transported background ozone and photochemical production driven by other emission sources have received much less attention. However, as we demonstrate in this and earlier papers, this original anthropogenic contribution has been so effectively reduced (a decrease of more than a factor of 6 from 1980 to 2020) that the background contribution now predominates throughout the US. Accordingly, increased attention must now be placed on a variety of additional, less well-quantified anthropogenic sources, notably including emissions from wildfires, oil and gas production, and agricultural activities. Present-day CTMs simulate ozone production from these additional sources, but the results have substantial uncertainties arising from the necessity of developing and incorporating a manifold of additional parameterizations for their treatment. Observation-based modeling can also give insights into the influences of these additional sources without the need for such parameterizations; these insights arise from temporal and spatial correlations

between observed ozone concentrations and emissions from these sources. For example, in this work, we quantify small but significant ODV contributions from wildfires in central urban areas of the southwestern US; similar analyses for urban areas of the Pacific Northwest are given by Parrish et al. (2022). In previous papers (Parrish et al., 2017, 2022), we have identified indications that soil emissions of nitrogen oxides in California's regions of intense, fertilized agricultural activity (i.e., the Imperial, San Joaquin and Salinas valleys) increase ODVs by 5–15 ppb, which has been substantiated by further empirical studies (Wang et al., 2023). We conclude that a robust understanding of the spatial and temporal distribution of US ozone concentrations requires a model hierarchy that includes both CTMs and observation-based models as well as, hopefully, other modeling approaches. We can have confidence in that understanding only when all of the models can converge to a consistent quantification of that distribution, and only then can reliable policy guidance be provided.

**Data availability.** The California MDA8 ozone concentrations were obtained from the California Air Resources Board archive (https://www.arb.ca.gov/adam/index.html, California Air Resources Board, 2023). The ODVs were obtained from EPA's Air Quality System (AQS) data archive (https://www.epa.gov/aqs, U.S. EPA, 2023).

**Supplement.** The supplement related to this article is available online at: https://doi.org/10.5194/acp-25-263-2025-supplement.

**Author contributions.** DDP was responsible for the overall design. ICF provided analysis. DDP wrote the paper with input from ICF and RGD. All authors edited and revised the manuscript.

**Competing interests.** The contact author received financial support from the Coordinating Research Council, Inc. (CRC). The CRC is a non-profit corporation supported by the petroleum and automotive equipment industries. CRC operates via committees made up of technical experts from industry and government who voluntarily participate. The four main areas of research within CRC are as follows: air pollution (atmospheric and engineering studies); aviation fuels, lubricants and equipment performance; heavy-duty vehicle fuels, lubricants and equipment performance (e.g., diesel trucks); and light-duty vehicle fuels, lubricants and equipment performance (e.g., passenger cars). CRC's function is to provide the mechanism for joint research conducted by the two industries that will help to determine the optimum combination of petroleum products and automotive equipment. CRC's work is limited to research that is mutually beneficial to the two industries involved. The contact author has declared that none of the authors has any other competing interests.

**Disclaimer.** Publisher's note: Copernicus Publications remains neutral with regard to jurisdictional claims made in the text, published maps, institutional affiliations, or any other geographical representation in this paper. While Copernicus Publications makes every effort to include appropriate place names, the final responsibility lies with the authors.

**Acknowledgements.** David D. Parrish's effort was supported by the CRC through contract no. A-129. Ian C. Faloona's effort was supported by the USDA National Institute of Food and Agriculture (Hatch project CA-D-LAW-2481-H, "Understanding Background Atmospheric Composition, Regional Emissions, and Transport Patterns Across CA"). Richard G. Derwent's efforts were pro bono.

**Financial support.** This research has been supported by the Coordinating Research Council, Inc. (contract no. A-129) and the US Department of Agriculture (grant no. CA-D-LAW-2481-H).

**Review statement.** This paper was edited by Anne Perring and reviewed by three anonymous referees.

## References

Abalos, M., Orbe, C., Kinnison, D. E., Plummer, D., Oman, L. D., Jöckel, P., Morgenstern, O., Garcia, R. R., Zeng, G., Stone, K. A., and Dameris, M.: Future trends in stratosphere-to-troposphere transport in CCMI models, Atmos. Chem. Phys., 20, 6883–6901, https://doi.org/10.5194/acp-20-6883-2020, 2020.

Abeleira, A. J. and Farmer, D. K.: Summer ozone in the northern Front Range metropolitan area: weekend–weekday effects, temperature dependences, and the impact of drought, Atmos. Chem. Phys., 17, 6517–6529, https://doi.org/10.5194/acp-17-6517-2017, 2017.

Ahmadi, M. and John, K.: Statistical evaluation of the impact of shale gas activities on ozone pollution in North Texas, Sci. Total Environ., 536, 457–467, 2015.

Berlin, S. R., Langford, A. O., Estes, M., Dong, M., and Parrish, D. D.: Magnitude, decadal changes and impact of regional background ozone transported into the greater Houston, Texas area, Environ. Sci. Technol., 47, 13985–13992, https://doi.org/10.1021/es4037644, 2013.

Burke, M., Driscoll, A., Heft-Neal, S., Xue, J., Burney, J., and Wara, M.: The changing risk and burden of wildfire in the United States, P. Natl. Acad. Sci. USA, 118, e2011048118, https://doi.org/10.1073/pnas.2011048118, 2021.

California Air Resources Board: Air Quality Data Statistics, California Air Resources Board data archive, https://www.arb.ca.gov/adam/index.html, last access: 10 October 2023.

Cooper, O. R., Oltmans, S. J., Johnson, B. J., Brioude, J., Angevine, W., Trainer, M., Parrish, D. D., Ryerson, T. R., Pollack, I., Cullis, P. D., Ives, M. A., Tarasick, D. W., Al-Saadi, J., and Stajner, I.: Measurement of western U.S. baseline ozone from the surface to the tropopause and assessment of downwind impact regions, J. Geophys. Res., 116, D00V03, https://doi.org/10.1029/2011JD016095, 2011.

Cooper, O. R., Parrish, D. D., Ziemke, J., Balashov, N. V., Cupeiro, M., Galbally, I. E., Gilge, S., Horowitz, L., Jensen, N. R., Lamarque, J.-F., Naik, V., Oltmans, S. J., Schwab, J., Shindell, D. T., Thompson, A. M., Thouret, V., Wang, Y., and Zbinden, R. M.: Global distribution and trends of tropospheric ozone: An observation-based review, Elem. Sci. Anth., 2, 000029, https://doi.org/10.12952/journal.elementa.000029, 2014.

Cooper, O. R., Langford, A. O., Parrish, D. D., and Fahey, D. W.: Challenges of a lowered US ozone standard, Science, 348, 1096–1097, https://doi.org/10.1126/science.aaa5748, 2015.

Cooper, O. R., Schultz, M. G., Schröder, S., Chang, K.-L., Gaudel, A., Benítez, G. C., Cuevas, E., Fröhlich, M., Galbally, I. E., Molloy, S., Kubistin, D., Lu, X., McClure-Begley, A., Nédélec, P., O'Brien, J., Oltmans, S. J., Petropavlovskikh, I., Ries, L., Senik, I., Sjöberg, K., Solberg, S., Spain, G. T., Spangl, W., Steinbacher, M., Tarasick, D., Thouret, V., and Xu, X.: Multi-decadal surface ozone trends at globally distributed remote locations, Elem. Sci. Anth., 8, 23, https://doi.org/10.1525/elementa.420, 2020.

Derwent, R. G., Parrish, D. D., Galbally, I. E., Stevenson, D. S., Doherty, R. M., Young, P. J., and Shallcross, D. E.: Interhemispheric differences in seasonal cycles of tropospheric ozone in the marine boundary layer: Observation-model comparisons, J. Geophys. Res.-Atmos., 121, 11075–11085, https://doi.org/10.1002/2016JD024836, 2016.

Derwent, R. G., Parrish, D. D., Galbally, I. E., Stevenson, D. S., Doherty, R. M., Naik, V., and Young, P. J.: Uncertainties in models of tropospheric ozone based on Monte Carlo analysis: Tropospheric ozone burdens, atmospheric lifetimes and surface distributions, Atmos. Environ., 180, 93–102, https://doi.org/10.1016/j.atmosenv.2018.02.047, 2018.

Derwent, R. G., Parrish, D. D., Archibald, A. T., Deushi, M., Bauer, S. E., Tsigaridis, K., Shindell, D., Horowitz, L. W., Anwar, M., Khan, H., and Shallcross D. E.: Intercomparison of the representations of the atmospheric chemistry of pre-industrial methane and ozone in earth system and other global chemistry-transport models, Atmos. Environ., 248, 118248, https://doi.org/10.1016/j.atmosenv.2021.118248, 2021.

Derwent, R. G., Parrish, D. D., and Faloona, I. C.: Opinion: Establishing a science-into-policy process for tropospheric ozone assessment, Atmos. Chem. Phys., 23, 13613–13623, https://doi.org/10.5194/acp-23-13613-2023, 2023.

Dolwick, P., Akhtar, F., Baker, K. R., Possiel, N., Simon, H., and Tonnesen, G.: Comparison of background ozone estimates over the western United States based on two separate model methodologies, Atmos. Environ., 109, 282–296, https://doi.org/10.1016/j.atmosenv.2015.01.005, 2015.

Emanuel, K.: The Relevance of Theory for Contemporary Research in Atmospheres, Oceans, and Climate, AGU Advances, 1, e2019AV000129, https://doi.org/10.1029/2019AV000129, 2020.

Evans, J. M. and Helmig, D.: Investigation of the influence of transport from oil and natural gas regions on elevated ozone levels in the northern Colorado front range, J. Air Waste Manage., 67, 196–211, https://doi.org/10.1080/10962247.2016.1226989, 2017.

Faloona, I. C., Chiao, S., Eiserloh, A. J., Alvarez II, R. J., Kirgis, G., Langford, A. O., Senff, C. J., Caputi, D., Hu, A., Iraci, L. T., Yates E. L., Marrero, J. E., Ryoo, J.-M., Conley, S., Tanrikulu, S., Xu, J., and Kuwayama, T.: The California baseline ozone transport study (CABOTS), B. Am. Meteorol. Soc., 101, E427–E445, https://doi.org/10.1175/BAMS-D-18-0302.1, 2020.

Faloona, I. C., Wang, Y., Derwent, R. G., and Parrish, D. D.: Maximum Ozone Concentrations in Inland California: Contributions from Background Ozone, Urban Ozone Transport, Agriculture and Wildfires, in preparation, 2025.

Fiore, A. M., Oberman, J. T., Lin, M. Y., Zhang, L., Clifton, O. E., Jacob, D. J., Naik, V., Horowitz, L. W., Pinto, J. P., and Milly, G. P.:Estimating North American background ozone in U.S. surface air with two independent global models: Variability, uncertainties, and recommendations, Atmos. Environ., 96, 284–300, https://doi.org/10.1016/j.atmosenv.2014.07.045, 2014.

Flynn, M. T., Mattson, E. J., Jaffe, D. A., and Gratz, L. E.: Spatial patterns in summertime surface ozone in the Southern Front Range of the U.S. Rocky Mountains, Elem. Sci. Anth., 9, 1, https://doi.org/10.1525/elementa.2020.00104, 2021.

Geddes, J. A., Pusede, S. E., and Wong, A. Y. H.: Changes in the relative importance of biogenic isoprene and soil NO$_x$ emissions on ozone concentrations in nonattainment areas of the United States, J. Geophys. Res.-Atmos., 127, e2021JD036361, https://doi.org/10.1029/2021JD036361, 2022.

Gkatzelis, G. I., Gilman, J. B., Brown, S. S., Eskes, H., Gomes, A. R., Lange, A. C., and Kiendler-Scharr, A.: The global impacts of COVID-19 lockdowns on urban air pollution: A critical review and recommendations, Elem. Sci. Anth., 9, 00176, https://doi.org/10.1525/elementa.2021.00176, 2021.

Gong, X., Kaulfus, A., Nair, U., and Jaffe, D. A.: Quantifying O$_3$ impacts in urban areas due to wildfires using a generalized additive model, Environ. Sci. Technol., 51, 22, 13216–13223, https://doi.org/10.1021/acs.est.7b03130, 2017.

Held, I. M.: The gap between simulation and understanding in climate modeling, B. Am. Meteorol. Soc., 86, 1609–1614, https://doi.org/10.1175/Bams-86-11-1609, 2005.

Hogrefe, C., Liu, P., Pouliot, G., Mathur, R., Roselle, S., Flemming, J., Lin, M., and Park, R. J.: Impacts of different characterizations of large-scale background on simulated regional-scale ozone over the continental United States, Atmos. Chem. Phys., 18, 3839–3864, https://doi.org/10.5194/acp-18-3839-2018, 2018.

Hosseinpour, F., Kumar, N., Tran, T., and Knipping, E.: Using machine learning to improve the estimate of U.S. background ozone, Atmos. Environ., 316, 120145, https://doi.org/10.1016/j.atmosenv.2023.120145, 2024.

Hu, L., Jacob, D. J., Liu, X., Zhang, Y., Zhang, L., Kim, P. S., Sulprizio, M. P., and Yantosca R. M.: Global budget of tropospheric ozone: Evaluating recent model advances with satellite (OMI), aircraft (IAGOS), and ozonesonde observations, Atmos. Environ., 167, 323–334, 2017.

Iglesias, V., Balch, J. K., and Travis, W. R.: U.S. fires became larger, more frequent, and more widespread in the 2000s, Sci. Adv., 8, eabc0020, https://doi.org/10.1126/sciadv.abc0020, 2022.

Jaffe, D., Price, H., Parrish, D. D., Goldstein, A., and Harris, J.: Increasing background ozone during spring on the west coast of North America, Geophys. Res. Lett., 30, 1613, https://doi.org/10.1029/2003GL017024, 2003.

Jaffe, D. A. and Ray, J.: Increase in Ozone at Rural Sites in the Western U.S., Atmos. Environ., 41, 5452–5463, 2007.

Jaffe, D. A., Cooper, O. R., Fiore, A. M., Henderson, B. H., Tonneson, G. S., Russell, A. G., Henze, D. K., Langford, A. O., Lin, M., and Moore, T.: Scientific assessment of background ozone

over the U.S.: Implications for air quality management, Elem. Sci. Anth., 6, 56, https://doi.org/10.1525/elementa.309, 2018.

Karle, N. N., Fitzgerald, R. M., Sakai, R. K., Sullivan, D. W., and Stockwell, W. R.: Multi-Scale Atmospheric Emissions, Circulation and Meteorological Drivers of Ozone Episodes in El Paso-Juarez Airshed, Atmosphere, 12, 1575, https://doi.org/10.3390/atmos12121575, 2021.

Kim, S.-W., McDonald, B. C., Seo, S., Kim, K.-M., and Trainer, M.: Understanding the paths of surface ozone abatement in the Los Angeles Basin, J. Geophys. Res.-Atmos., 127, e2021JD035606, https://doi.org/10.1029/2021JD035606, 2022.

Langford, A. O., Alvarez II, R. J., Brioude, J., Fine, R., Gustin, M. S., Lin, M. Y., Marchbanks, R. D., Pierce, R. B., Sandberg, S. P., Senff, C. J., Weickmann, A. M., and Williams, E. J.: Entrainment of stratospheric air and Asian pollution by the convective boundary layer in the southwestern U.S, J. Geophys. Res., 122, 1312–1337, https://doi.org/10.1002/2016JD025987, 2017.

Langford, A. O., Senff, C. J., Alvarez II, R. J., Aikin, K. C., Baidar, S., Bonin, T. A., Brewer, W. A., Brioude, J., Brown, S. S., Burley, J. D., Caputi, D. J., Conley, S. A., Cullis, P. D., Decker, Z. C. J., Evan, S., Kirgis, G., Lin, M., Pagowski, M., Peischl, J., Petropavlovskikh, I., Pierce, R. B., Ryerson, T. B., Sandberg, S. P., Sterling, C. W., Weickmann, A. M., and Zhang, L.: The *Fires, Asian, and Stratospheric Transport*–Las Vegas Ozone Study (*FAST*-LVOS), Atmos. Chem. Phys., 22, 1707–1737, https://doi.org/10.5194/acp-22-1707-2022, 2022.

Lin, M., Fiore, A. M., Horowitz, L. W., Cooper, O. R., Naik, V., Holloway, J., Johnson, B. J., Middlebrook, A. M., Oltmans, S. J., Pollack, I. B., Ryerson, T. B., Warner, J. X., Wiedinmyer, C., Wilson, J., and Wyman, B.: Transport of Asian ozone pollution into surface air over the western United States in spring, J. Geophys. Res., 117, D00V07, https://doi.org/10.1029/2011jd016961, 2012a.

Lin, M., Fiore, A. M., Cooper, O. R., Horowitz, L. W., Langford, A. O., Levy, H., Johnson, B. J., Naik, V., Oltmans, S. J., and Senff, C. J.: Springtime high surface ozone events over the western United States: Quantifying the role of stratospheric intrusions, J. Geophys. Res., 117, D00V22, https://doi.org/10.1029/2012jd018151, 2012b.

Lin, M., Horowitz, L. W., Payton, R., Fiore, A. M., and Tonnesen, G.: US surface ozone trends and extremes from 1980 to 2014: quantifying the roles of rising Asian emissions, domestic controls, wildfires, and climate, Atmos. Chem. Phys., 17, 2943–2970, https://doi.org/10.5194/acp-17-2943-2017, 2017.

Lu, Z., Streets, D. G., de Foy, B., Lamsal, L. N., Duncan, B. N., and Xing, J.: Emissions of nitrogen oxides from US urban areas: estimation from Ozone Monitoring Instrument retrievals for 2005–2014, Atmos. Chem. Phys., 15, 10367–10383, https://doi.org/10.5194/acp-15-10367-2015, 2015.

McDonald, B. C., de Gouw, J. A., Gilman, J. B., Jathar, S. H., Akherati, A., Cappa, C. D., Jimenez, J. L., Lee-Taylor, J., Hayes, P. L., McKeen, S. A., Cui, Y. Y., Kim, S.-W., Gentner, D. R., Isaacman-VanWertz, G., Goldstein, A. H., Harley, R. A., Frost, G. J., Roberts, J. M., Ryerson, T. B., and Trainer, M.: Volatile chemical products emerging as largest petrochemical source of urban organic emissions, Science, 359, 760–764, 2018.

McDuffie, E. E., Edwards, P. M., Gilman, J. B., Lerner, B. M., Dubé, W. P., Trainer, M., Wolfe, D. E., Angevine, W. M., deGouw, J., Williams, E. J., Tevlin, A. G., Murphy, J. G., Fischer, E. V.,

McKeen, S., Ryerson, T. B., Peischl, J., Holloway, J. S., Aikin, K., Langford, A. O., Senff, C. J., Alvarez, R. J., Hall, S. R., Ullmann, K., Lantz, K. O., and Brown, S. S.: Influence of oil and gas emissions on summertime ozone in the Colorado Northern Front Range, J. Geophys. Res.-Atmos., 121, 8712–8729, 2016.

McKeen, S. A., Wotawa, G., Parrish, D. D., Holloway, J. S., Burh, M. P., Hübler, G., Fehsenfeld, F. C., and Meagher, J. F.: Ozone production from Canadian wildfires during June and July of 1995, J. Geophys. Res., 107, 4192, https://doi.org/10.1029/2001JD000697, 2002.

Nopmongcol, U., Alvarez, Y., Jung, J., Grant, J., Kumar, N., and Yarwood, G.: Source contributions to United States ozone and particulate matter over five decades from 1970 to 2020, Atmos. Environ., 167, 116–128, 2017.

Oltmans, S. J., Lefohn, A. S., Harris, J. M., and Shadwick, D. S.: Background ozone levels of air entering the west coast of the U.S., and assessment of longer-term changes, Atmos. Environ., 42, 6020–6038, https://doi.org/10.1016/j.atmosenv.2008.03.034, 2008.

Parrish, D. D. and Ennis, C. A.: Estimating background contributions and US anthropogenic enhancements to maximum ozone concentrations in the northern US, Atmos. Chem. Phys., 19, 12587–12605, https://doi.org/10.5194/acp-19-12587-2019, 2019.

Parrish, D. D. and Stockwell, W. R.: Urbanization and air pollution: Then and now, Eos: Earth & Space Science News, 96, 10–15, 2015.

Parrish, D. D., Millet, D. B., and Goldstein, A. H.: Increasing ozone in marine boundary layer inflow at the west coasts of North America and Europe, Atmos. Chem. Phys., 9, 1303–1323, https://doi.org/10.5194/acp-9-1303-2009, 2009.

Parrish, D. D., Aikin, K. C., Oltmans, S. J., Johnson, B. J., Ives, M., and Sweeny, C.: Impact of transported background ozone inflow on summertime air quality in a California ozone exceedance area, Atmos. Chem. Phys., 10, 10093–10109, https://doi.org/10.5194/acp-10-10093-2010, 2010.

Parrish, D. D., Law, K. S., Staehelin, J., Derwent, R., Cooper, O. R., Tanimoto, H., Volz-Thomas, A., Gilge, S., Scheel, H.-E., Steinbacher, M., and Chan, E.: Long-term changes in lower tropospheric baseline ozone concentrations at northern mid-latitudes, Atmos. Chem. Phys., 12, 11485–11504, https://doi.org/10.5194/acp-12-11485-2012, 2012.

Parrish, D. D., Xu, J,. Croes, B., and Shao, M.: Air Quality Improvement in Los Angeles - Perspectives for Developing Cities, Front. Environ. Sci. Eng., 10, 11, https://doi.org/10.1007/s11783-016-0859-5, 2016.

Parrish, D. D., Young, L. M., Newman, M. H., Aikin, K. C., and Ryerson, T. B.: Ozone design values in southern California's air basins: Temporal evolution and U.S. background contribution, J. Geophys. Res., 122, 11166–11182, 2017.

Parrish, D. D., Derwent, R. G., Steinbrecht, W., Stübi, R., VanMalderen, R., Steinbacher, M., Trickl, T., Ries, L., and Xu, X.: Zonal similarity of long-term changes and seasonal cycles of baseline ozone at northern midlatitudes, J. Geophys. Res.-Atmos., 125, e2019JD031908, https://doi.org/10.1029/2019JD031908, 2020.

Parrish, D. D., Derwent, R. G., and Faloona, I. C.: Longterm baseline ozone changes in the Western US: A syn-

thesis of analyses, J. Air Waste Manage., 71, 1397–1406, https://doi.org/10.1080/10962247.2021.1945706, 2021a.

Parrish, D. D., Derwent, R. G., and Staehelin, J.: Long-term changes in northern mid-latitude tropospheric ozone concentrations: Synthesis of two recent analyses, Atmos. Environ., 248, 118227, https://doi.org/10.1016/j.atmosenv.2021.118227, 2021b.

Parrish, D. D., Derwent, R. G., and Faloona, I. C.: Observational-based assessment of contributions to maximum ozone concentrations in the western US, J. Air Waste Manage., 72, 434–454, https://doi.org/10.1080/10962247.2022.2050962, 2022.

Schnell, R. C., Oltmans, S. J., Neely, R. R., Endres, M. S., Molenar, J. V., and White, A. B.: Rapid photochemical production of ozone at high concentrations in a rural site during winter, Nat. Geosci., 2, 120–122, 2009.

Simon, H., Reff, A., Wells, B., Xing, J., and Frank, N.: Ozone trends across the United States over a period of decreasing NO$_x$ and VOC emissions, Environ. Sci. Technol., 49, 186–195, https://doi.org/10.1021/es504514z, 2015.

Škerlak, B., Sprenger, M., and Wernli, H.: A global climatology of stratosphere–troposphere exchange using the ERA-Interim data set from 1979 to 2011, Atmos. Chem. Phys., 14, 913–937, https://doi.org/10.5194/acp-14-913-2014, 2014.

Skipper, T. N., Hu, Y., Odman, M. T., Henderson, B. H., Hogrefe, C., Mathur, R., and Russell, A. G.: Estimating US Background Ozone Using Data Fusion, Environ. Sci. Technol., 55, 4504–4512, https://doi.org/10.1021/acs.est.0c08625, 2021.

Sprenger, M. and Wernli, H.: A northern hemisphere climatology of cross-tropopause exchange for the ERA15 time period (1979–1993), J. Geophys. Res., 108, 8521, https://doi.org/10.1029/2002JD002636, 2003.

U.S. EPA: Ambient Air Pollution Data, EPA's Air Quality System (AQS) data archive, https://www.epa.gov/aqs, last access: 9 November 2023.

Wang, Y., Faloona, I. C., and Houlton, B. Z.: Satellite NO$_2$ trends reveal pervasive impacts of wildfire and soil emissions across California landscapes, Environ. Res. Lett., 18, 094032, https://doi.org/10.1088/1748-9326/acec5f, 2023.

Westerling, A. L.: Increasing western US forest wildfire activity: sensitivity to changes in the timing of spring, Philos. Trans. R. Soc. Lond. B Biol. Sci., 371, 20150178, https://doi.org/10.1098/rstb.2015.0178, 2016.

Westerling, A. L., Hidalgo, H. G., Cayan, D. R., and Swetnam, T. W.: Warming and earlier spring increase western US forest wildfire activity, Science, 313, 940–943, 2006.

Yates, E. L., Iraci, L. T., Austerberry, D., Pierce, R. B., Roby, M. C., Tadić, J. M., Loewenstein, M., and Gore, W.: Characterizing the impacts of vertical transport and photochemical ozone production on an exceedance area, Atmos. Environ., 109, 342–350, 2015.

Zhang, J., Yongjie, W., and Zhangfu, F.: Ozone Pollution: A Major Health Hazard Worldwide, Front. Immunol., 10, 2518, https://doi.org/10.3389/fimmu.2019.02518, 2019.

Zhang, L., Lin, M., Langford, A. O., Horowitz, L. W., Senff, C. J., Klovenski, E., Wang, Y., Alvarez II, R. J., Petropavlovskikh, I., Cullis, P., Sterling, C. W., Peischl, J., Ryerson, T. B., Brown, S. S., Decker, Z. C. J., Kirgis, G., and Conley, S.: Characterizing sources of high surface ozone events in the southwestern US with intensive field measurements and two global models, Atmos. Chem. Phys., 20, 10379–10400, https://doi.org/10.5194/acp-20-10379-2020, 2020.

Ziemke, J. R., Chandra, S., Labow, G. J., Bhartia, P. K., Froidevaux, L., and Witte, J. C.: A global climatology of tropospheric and stratospheric ozone derived from Aura OMI and MLS measurements, Atmos. Chem. Phys., 11, 9237–9251, https://doi.org/10.5194/acp-11-9237-2011, 2011.

# CRC Report No. A-124

# EVALUATION OF OZONE PATTERNS AND TRENDS IN 8 MAJOR METROPOLITAN AREAS IN THE U.S.

## Final Report

## March 2021



# COORDINATING RESEARCH COUNCIL, INC.

**5755 NORTH POINT PARKWAY • SUITE 265 • ALPHARETTA, GA 30022**

The Coordinating Research Council, Inc. (CRC) is a non-profit corporation supported by the petroleum and automotive equipment industries. CRC operates through the committees made up of technical experts from industry and government who voluntarily participate. The four main areas of research within CRC are: air pollution (atmospheric and engineering studies); aviation fuels, lubricants, and equipment performance; heavy-duty vehicle fuels, lubricants, and equipment performance (e.g., diesel trucks); and light-duty vehicle fuels, lubricants, and equipment performance (e.g., passenger cars). CRC's function is to provide the mechanism for joint research conducted by the two industries that will help in determining the optimum combination of petroleum products and automotive equipment. CRC's work is limited to research that is mutually beneficial to the two industries involved. The final results of the research conducted by, or under the auspices of, CRC are available to the public.

CRC makes no warranty expressed or implied on the application of information contained in this report. In formulating and approving reports, the appropriate committee of the Coordinating Research Council, Inc. has not investigated or considered patents which may apply to the subject matter. Prospective users of the report are responsible for protecting themselves against liability for infringement of patents.

## Table of Contents

Executive Summary ........................................................................................... 6

1.  Introduction and project goals ................................................................... 7

2.  Data sources ............................................................................................... 8

3.  Results ...................................................................................................... 10

    3a.  Recent changes in $O_3$ and the role of $NO_x$ ...................................... 10

    3b.  Role of temperature on $O_3$ .............................................................. 12

    3c.  Identification of smoke days ............................................................ 13

    3d.  Generalized Additive Modeling (GAM) for each region ............... 14

    3e.  GAM Results .................................................................................... 20

    3f.  Influence of smoke ........................................................................... 21

    3g.  Estimated influence of smoke on design values .............................. 23

4.  Summary for each city .............................................................................. 25

    4a. Atlanta ............................................................................................... 25

    4b. Chicago .............................................................................................. 25

    4c. Dallas ................................................................................................. 25

    4d. Detroit ................................................................................................ 26

    4e. New York City ................................................................................... 26

    4f. Phoenix ............................................................................................... 27

    4g. Salt Lake City .................................................................................... 28

    4h. San Francisco ..................................................................................... 29

5.  References ................................................................................................. 30

**List of Figures**

Figure 1.  Spline fit from GAM for Trajectory direction vs MDA8 for DET New Haven site.... 19
Figure 2. Observed MDA8 vs trajectory direction for DET New Haven site. ............................ 19
Figure 3. MDA8 O$_3$ vs daily max temperature for the SLC-Bountiful site for non-smoke cases. 22
Figure 4. GAM residuals for SLC-Bountiful site for non-smoke cases.  The black dots show the individual points and the red circles and bars show the mean and one s.d., respectively, segregated into 5°F bins. ................................................................................................ 22
Figure 5.  O$_3$ temperature relationship for smoke and non-smoke days. .................................... 23
Figure 6.  Distribution of MDA8 values (ppb) by deciles for all sites in this study.  .................. 28

**List of Tables**

Table 1. List of sites used in each CSA and data sources. ............................................................. 9
Table 2.  Change in annual May-September 1 hour daily maximum NO$_2$ and annual fourth highest O$_3$ MDA8 from 2006-2019. ......................................................................................... 10
Table 3. Parameters for linear fit between annual averaged (May-Sept) daily 1-hour max NO$_2$ concentration and fourth highest O$_3$ MDA8. ................................................................................. 11
Table 4. Estimated NO$_x$ reductions needed to reach an annual fourth highest O$_3$ MDA8 of 68 ppb.................................................................................................................................................. 12
Table 5.  Relationship between the MDA8 and daily max temperature for May-September data using Reduced Major Axis regression. ........................................................................................... 12
Table 6. Variables considered for the GAM. .............................................................................. 14
Table 7.  Variables included in each GAM by site. ...................................................................... 17
Table 8.  R$^2$ for observed vs GAM predicted MDA8 for each site............................................... 20
Table 9.  Summary of 2016-2018 O$_3$ design values using the existing data and using various hypothetical assumptions to exclude data................................................................................... 24

5

**Note on report organization and statistics**

The goals, methods, results and conclusions for the 8 metropolitan regions considered are discussed in the main report.   The appendix includes a series of graphs and tables that are presented in a consistent way for each of the regions studied.   Figures and tables in the Appendix are numbered as S1, S2, etc.  Page numbers in the Appendix are listed as A1, A2, etc.

Statistical parameters were calculated using a combination of Excel (Office 2019 version) and IBM SPSS, version 27.   Generalized Additive Modeling was completed using R software, version 4.03.   For this report, a statistically significant result implies a p value <0.05.   For the correlation coefficient (R) we use the Pearson correlation coefficient.  This provides a measure of association between two variables.  Positive values of R represent a direct correlation, whereas negative values of R are inversely correlated.  Note that the $R^2$ can be interpreted as to the degree to which the x variable explains the variance in the y variable.   While there is no universal definition of "strong" or "weak" correlation,  I consider correlations with an absolute value of R <0.5 to be "weak."   Finally, it should be noted that even weak correlations can still be statistically significant, if there is a sufficient number of observations.

**Executive Summary**

In this project, I examined $O_3$ and related data in 8 U.S. metropolitan regions for 2006-2018. These 8 regions currently do not meet the U.S. National Ambient Air Quality Standards (NAAQS) for $O_3$ and progress in the past decade has been slow.   To understand the reasons for this, I evaluated the role of $NO_x$, temperature and smoke influence on these 8 regions.   The primary conclusions from this work are:

1.  $NO_x$ remains one of the most important controls on the Maximum Daily 8-hour Average (MDA8) $O_3$ concentration at most locations considered.  The long-term trend in annual mean $NO_2$ is well correlated with surface $O_3$ for most sites.  In addition, $NO_2$ concentrations and the frequency of $O_3$ exceedances are lower on weekend days in 5 of the 8 cities considered. In most regions, daily variations in $NO_2$ are significantly correlated with the MDA8.  As $NO_2$ concentrations have declined, the annual fourth highest MDA8 $O_3$ values have also declined in most regions.  However the relationship with $NO_x$ is not uniform across all metropolitan areas and in some regions, the concentrations of $NO_2$ appear to be only weakly linked to the highest $O_3$ days.

2.  Smoke days are identified through a combination of the NOAA HMS Fire and Smoke Product and enhanced surface $PM_{2.5}$.   For each region, the average number of identified smoke days per year for 2006-2018 ranges from 5-9 per year.  For Salt Lake City and San Francisco, the number of smoke days per year in the 2016-2018 was ~17, much higher than the average for the entire period.

3.  Using surface and radiosonde meteorological data, and satellite observations, I have used Generalized Additive Modeling (GAM) for sites in each Combined Statistical Area (CSA) to predict the MDA8 for May-Sept.  The GAM results are trained using 90% of the non-smoke data and tested against the remaining 10%.  These yield $R^2$ (observed compared with predicted) values between 0.52-0.77.

4.  Smoke days have an average MDA8 that is 15 ppb higher than non-smoke days, but some of this effect is due to higher temperature on smoke days.   Since the GAM calculations take into account temperature variations and the residuals are unbiased against temperature, the residuals are indicative of the smoke contribution to the MDA8.   Based on the GAM results, the presence of smoke increases the <u>mean</u> MDA8 value by between 2-8 ppb, depending on the site.

5.  If smoke days are excluded from the calculation, the 2016-2018 $O_3$ Design Value (ODV) would be reduced by up to 10 ppb for some locations.  The largest impacts are seen for sites in San Francisco, Salt Lake City and, to a lesser extent, sites in New York and Detroit.  **Air quality managers in these regions may wish to investigate these smoke days more thoroughly, so as to decide if these cases have policy relevance.**

6.  In two of the cities considered, Phoenix and Salt Lake City, background $O_3$ has a much stronger contribution to the MDA8, compared to other locations.   This is evident from the high MDA8 values seen in these cities, even on the cleanest days and is consistent with other published work.

# 1. Introduction and project goals

Surface ozone ($O_3$) is a criteria air pollutant that is formed from reactions of nitrogen oxides ($NO_x = NO+NO_2$) and volatile organic compounds (VOCs) in the presence of sunlight. $O_3$ has serious health impacts up to and including premature mortality.  In the U.S., reductions in the precursor emissions, $NO_x$ and VOCs, over the past several decades have reduced peak $O_3$ concentrations considerably (Simon et al., 2015), but at present, there are still more than 40 regions in the U.S. that exceed the current 8-hour $O_3$ standard, so more than 130 million Americans live in areas that do not meet the U.S. National Ambient Air Quality Standards (NAAQS).   The current standard is met when the $O_3$ design value (ODV), defined as the annual fourth highest maximum daily 8-hour average (MDA8) averaged over 3 years, is 0.070 ppm or less.   This standard has become stricter several times over the last few decades.

The chemistry of $O_3$ production is complex and non-linear.  While both $NO_x$ and VOCs are required for $O_3$ production, VOCs have significant biogenic sources that cannot be controlled.  As a result there is strong evidence that most high $O_3$ regions in the U.S. are now or are close to being "$NO_x$ limited" (see discussion in Nussbaumer and Cohen 2020).  This means that we would expect $O_3$ production to decline in a nearly linear fashion with $NO_x$ reductions.   I will explore this concept further in the results.

In addition to urban photochemistry, $O_3$ can also come from background and uncontrollable sources, such as stratospheric intrusions, wildfire emissions or transported from international sources.   In general, elevated regions in the Western U.S. are exposed to higher levels of background $O_3$ (Jaffe et al 2018).   In addition, due to the increase in large wildfires in California and the intermountain west in recent years (Jaffe et al 2020), sites in the western U.S. have likely experienced greater contributions from background $O_3$ sources.   Along with the significant variability due to meteorology, these factors given rise to substantial year-to-year variations in $O_3$ concentrations that are not directly related to emissions.

Given that $NO_x$ and VOC emissions have declined in the last 3 decades, we want to evaluate if the changes in $O_3$ are consistent with the observed  emission trends.    Many areas of the country have shown little or no change in annual fourth highest $O_3$ in the last 5 years and it is not clear if these are random variations, influence from smoke or evidence of a more systematic effect that we need to understand.  In general terms, the goals of this project are to understand the relationship between $O_3$, $NO_x$, smoke and temperature in each of the 8 metropolitan regions considered.  Specific goals are:

1. Evaluate the relationship between daily MDA8 $O_3$, temperature, $NO_x$ and the presence/absence of smoke for 8 large metropolitan areas in the U.S. that have a high ODV.
2. Develop Generalized Additive Models to understand the relationship between daily MDA8 values and key meteorological predictors for these 8 large metropolitan areas in the U.S.
3. Examine patterns and trends in the GAM results to evaluate the causes for trends or lack of trends at each of the 8 regions.  In particular, I will  examine the role that smoke, temperature and $NO_x$ play on long term $O_3$ changes.

## 2.  Data sources

In this project I examined the trend and controlling factors on $O_3$ in 8 U.S. metropolitan areas. Our region focus is set by the Combined Statistical Areas (CSAs) in these 8 regions, as defined by the United States Office of Management and Budget (OMB).  These regions often include multiple adjoining cities.   For example, for the analysis of $O_3$ in the New York City region, I use observations from the New York-Newark, NY-NJ-CT-PA CSA.  Note that some of the highest $O_3$ concentrations in the region are seen at the Fairfield CT and Leonia NJ monitoring locations, and these are clearly associated with the NY metropolitan area.   This is evident in the plot of $O_3$ concentrations vs transport direction (Figure S6 for the Fairfield site).  Throughout this report, I use the city name or a 2 or 3 digit letter abbreviation to be synonymous with the CSA.

I integrated data from a wide variety of data sources.  This includes surface pollution data from the Environmental Protection Agency's Air Quality System (AQS), surface and radiosonde meteorological data from NOAA, and several products from NASA, including the Modern-Era Retrospective analysis for Research and Applications, Version 2 (MERRA-2) global assimilation model and UV and $NO_2$ tropospheric column observations from the Ozone Monitoring Instrument (OMI) onboard the Aura satellite.   Specific sites used and coordinates for the MERRA-2 and OMI products are given in Table 1.  Note that the coordinates for the NASA products (MERRA-2 and OMI) that are used to define each region, are given in the specific format needed for the Giovanni data access platform (see https://giovanni.gsfc.nasa.gov/ for more details).  Note that while NO and $NO_2$ are in rapid photochemical equilibrium, most urban areas only have long-term  observations of $NO_2$, since it is the criteria pollutant.  This should not have any bearing on our study, since $NO_2$ is usually the dominant form.

Table 1. List of sites used in each CSA and data sources.

| Region | $O_3$ sites (name and AQS id) | $NO_2$ site (AQS id) | Surface met site | Radiosonde site (station id, code) | MERRA-2 coordinates | OMI coordinates (UV and $NO_2$) |
|---|---|---|---|---|---|---|
| Atlanta CSA (ATL) | United Avenue (UA)-131210055 | 130890002 | Hartsfield Airport | Peachtree City (72215, FFC) | -84.46,33.62, -84.26,33.82 | -84.61, 33.47, -84.11, 33.97 |
| Chicago CSA (CHI) | Chiwaukee (CHIW) 550590019 | 170310063 170310072 170310076 170313103 170314002 170314201 171971011 180890022 | Midway Airport | Davenport (74455, DVN) | -87.91, 42.40, -87.71, 42.60, | -88.06, 42.25, -87.56, 42.75, |
| Dallas CSA (DAL) | Grapevine Fairway (GRP)- 484393009 | 481130069 481130075 481130087 481210034 481390016 482311006 482570005 484391002 484393009 484393011 | Dallas Love Field Airport | Ft. Worth (72249, FWD) | -97.16, 32.88, -96.96, 33.08 | -97.31, 32.73, -96.81, 33.23 |
| Detroit CSA (DET) | New Haven (NEW) 260990009 Oak Park (OAK) 261250001 Port Huron (PORT) 261470005 East 7 Mile (EAST 261630019 | 261630019 261630094 | Pontiac Oakland Airport | White Lake (72632, DTX) | -82.89, 42.63, -82.69,42.83 | -83.04, 42.48, -82.54, 42.98 |
| NY-NJ-CT-PA CSA (NYC) | Leonia (LEO) 340030006 Fairfield (FAIR) 090019003 | 360050133 360810124 | NY Central Park | Upton (72501, OKX) | -74.09, 40.77, -73.89, 40.97 | -74.24, 40.62, -73.74, 41.12 |
| Phoenix CSA (PHX) | North Phoenix-(NP) 040131004 | 40130019 40133002 40133003 40133010 40139997 | Deer Valley Airport | Flagstaff (72376, FGZ) | -112.17, 33.46, -111.97, 33.66 | -112.32, 33.31, -111.82,33.81 |
| Salt Lake City CSA (SLC) | Hawthorne-(HAW) 490353006 Herriman (HERR) 490353013 Erda-490450004 Bountiful (Bountiful) 490110004 | 490353006 | SLC Intl Airport | Salt Lake City (72572, SLC) | -111.97, 40.63, -111.77, 40.83 | -112.12, 40.48, -111.62, 40.98 |
| San Francisco CSA (SF) | Livermore-(LIV) 060010007 | 060010007 | Livermore Munic. Airport | Oakland (72493, OAK) | -121.88, 37.59, -121.68, 37.79 | -122.03, 37.44, -121.53, 37.94 |

## 3. Results

### 3a. Recent changes in $O_3$ and the role of $NO_x$

For most regions of the country, $NO_x$ and $O_3$ concentrations have continued to go down, although the rate of reduction has slowed. Table 2 shows these changes for the 8 cities in this study. Nationally, $NO_2$ emissions have declined by 53% since 2006, the observed 1-hour daily max $NO_2$ for May-September has declined by 44% and the fourth highest MDA8 values have declined by 14% in the 40 U.S. metropolitan regions that exceed the standard (D.Jaffe, unpublished analysis of EPA data). Table 2 shows the changes for the 8 cities in this study for both 2006-2019 and 2010-2019. For some regions, like Salt Lake City, the fourth highest MDA8 has barely moved in the past decade. Figures S1 and S2 show these changes for each of the 8 metropolitan regions considered.

Table 2. Change in annual May-September 1-hour daily maximum $NO_2$ and annual fourth highest $O_3$ MDA8 for 2006-2019 and 2010-2019.

| Metro region | % reduction in annual fourth highest $O_3$ MDA8 2006-2019. | % reduction in observed $NO_2$ 2006-2019. | % reduction in annual fourth highest $O_3$ MDA8 2010-2019. | % reduction in observed $NO_2$ 2010-2019. |
|---|---|---|---|---|
| Atlanta | 18.5 | 35.8 | 6.3 | 21.9 |
| Chicago | 15.2 | 42.5 | 17.3 | 25.2 |
| Dallas | 25.3 | 49.3 | 14.5 | 29.3 |
| Detroit | 12.8 | 37.7 | 10.0 | 0.6 |
| New York | 12.0 | 40.1 | 7.6 | 20.5 |
| Phoenix | 2.6 | 35.1 | 7.6 | 26.9 |
| Salt Lake City (Hawthorne) | 11.0 | 50.3 | 0.0 | 30.7 |
| San Francisco | 19.1 | 46.8 | 2.7 | 32.0 |

But despite this slowing trend, Figures S3 and S4 in the appendix show that for most regions, there is an approximately linear relationship between the annual observed $NO_2$ and the annual fourth highest MDA8 in each city. Table 3 below shows the slope, intercept and $R^2$ for the linear fits between the observed annual May-September average 1-hour daily maximum $NO_2$ and the annual fourth highest MDA8. The slopes range from 0.3 to 2.3 ppb $O_3$ per ppb of $NO_2$. SLC and San Francisco have weaker correlations, a higher intercept and, for SLC, a much lower slope. These are all connected to the influence of smoke on $O_3$, which was especially strong in these two cities for 2016-2018, as described in a later section of this report.

Table 3. Parameters for linear fit between annual averaged (May-Sept) daily 1-hour max $NO_2$ concentration and fourth highest $O_3$ MDA8.

|  | Slope (ppb $O_3$ per ppb NO2) | Intercept | $R^2$ |
|---|---|---|---|
| **Atlanta** | 2.29 | 30.1 | 0.73 |
| **Chicago** | 0.9 | 49.7 | 0.47 |
| **Dallas** | 1.38 | 58.9 | 0.60 |
| **Detroit (East 7th site)** | 0.84 | 56.8 | 0.55 |
| **New York (two sites)** | 1.04 | 55.5 | 0.84 |
| **Phoenix** | 0.69 | 55.7 | 0.74 |
| **Salt Lake City (Hawthorne site)** | 0.32 | 67.7 | 0.28 |
| **San Francisco** | 0.92 | 62.3 | 0.36 |

I can evaluate the hypothesis that these regions are experiencing $NO_x$-limited chemistry, by examining the day of week pattern for $O_3$ exceedances.   Figure S11 shows the daily pattern of average $NO_2$ concentrations and probability of an $O_3$ exceedance by day of week for each city. For all cities, the lowest observed $NO_2$ concentrations are  on Sunday, with Saturday usually the second lowest.   At the same time, Sunday has the lowest probability of an   $O_3$ exceedance days (defined as a day with an MDA8>70 ppb) for 5 of the 8 regions considered (Atlanta, Dallas, NYC, Phoenix and SF).    This pattern is not seen for Chicago, Detroit or SLC.   At least for SLC, this is likely due to frequent smoke influence and enhanced background $O_3$ (discussed later in this report).

The relationships between annual $NO_2$ concentrations and the fourth highest MDA8 $O_3$ values shown in Table 3 suggest that we can use this relationship to estimate at what $NO_2$ concentration the $O_3$ standard would be reached.   This is done by extrapolation of the linear function to an $O_3$ concentration of 70 ppb.  The results are shown in Table 4.  But importantly for some regions the results are not realistic.  For example, SLC has a very low slope and the highest intercept.  Both of these relate to the fact that SLC has some of the strongest influence from wildfire emissions and significant background $O_3$ influence, which acts to decouple the relationship between $O_3$ and local $NO_2$ concentrations.

I note that the $NO_2$ concentrations shown in Table 4 cover a wide range from 9.8 ppb (SF) to 25.4 ppb (Phoenix).   We should not read too much into to the differences between cities. This is because each city uses a different number of $NO_2$ monitors and over different time periods.   Because my goal was to evaluate the long term relationships, I chose the monitors in each region that gave the most consistent dataset over the timeframe of 2006-2018.  In some cases, this includes only a single monitor (like Atlanta), whereas in other cities, such as Chicago, Phoenix and Detroit, multiple $NO_2$ datasets are available from around the metropolitan region.

But given that I found that the percent reductions across all monitors in each CSA were similar, the exact number of monitors used does not seem to have had an impact on this analysis.

Table 4. Estimated $NO_x$ reductions needed to reach an annual fourth highest $O_3$ MDA8 of 70 ppb.

|  | 2019 NO₂ (ppb) | Predicted NO₂ to meet O₃ standard (ppb) | % NO₂ reductions needed |
|---|---|---|---|
| **Atlanta** | 21.3 | 17.4 | 18.2 |
| **Chicago** | 25.0 | 22.6 | 9.8 |
| **Dallas** | 12.0 | 8.0 | 33.0 |
| **Detroit (East 7ᵗʰ site)** | 23.0 | 15.7 | 31.3 |
| **New York (two sites)** | 18.9 | 13.9 | 26.2 |
| **Phoenix** | 25.4 | 20.7 | 18.4 |
| **Salt Lake City\* (Hawthorne site)** | 17.8 | 7.2 | 59.6 |
| **San Francisco\*** | 9.8 | 8.4 | 14.6 |

**\***The calculated reductions for SF and SLC are influenced by recent wildfire smoke (see text).

### 3b. Role of temperature on O₃

It is well known that $O_3$ concentrations are higher on warmer days (Pusede et al 2015), although at extreme temperatures (above approximately 40°C), $O_3$ concentrations may be suppressed (Steiner et al 2010).  Table 5 shows the Reduced Major Axis (RMA) slope for the MDA8 $O_3$-temperature relationship.  In all cases the relationship is positive and statistically significant, although the $R^2$ values for some locations are rather weak.  This is especially true for the warmer cities in our study; Phoenix, Dallas and Atlanta.  For these locations, daily variations in daily maximum temperature have a weak relationship to variations in MDA8 values.

Table 5.  Relationship between the MDA8 and daily max temperature for May-September data using Reduced Major Axis regression.

|  | RMA Slope (MDA8 ppb/°C) | $R^2$ |
|---|---|---|
| **ATL** | 1.39 | 0.20 |
| **CHI** | 0.80 | 0.35 |
| **DAL** | 1.09 | 0.13 |
| **DET-NEW** | 0.83 | 0.39 |
| **NYC-FAIR** | 1.01 | 0.42 |
| **PHX** | 0.74 | 0.07 |
| **SLC-Bountiful** | 0.49 | 0.32 |
| **SF** | 0.71 | 0.43 |

Figures S12 shows the annual 98th percentile daily max temperature (DMT) for each city along with the fourth highest MDA8 value.   For some regions there is a clear enhancement and statistically significant relationship between the 98th percentile of DMT and the fourth highest MDA8 (Atlanta, Chicago, Detroit and SLC).  For the other cities, no relationship is apparent at the seasonal level.

Given the role of temperature, it is important to examine whether systematic changes in temperature, due to climate change, may be making it more difficult to achieve the $O_3$ standard. Using the data shown in Figure S12 (98th percentile of DMT), we see no significant trends in any of the 8 cities considered.  This is not surprising given the large year-to-year variability.  Keep in mind that global climate change is currently pushing land surface temperatures higher by about 0.04°C per year, so over the 13 years considered in this study (2006-2018) this equates to a change of $0.52°\,C$.   (See for example the NASA-GISS temperature records at https://data.giss.nasa.gov/gistemp/.) Given that the year-to-year variability in these cities is much larger, the change due to global climate change is not apparent in these short records.  So while temperature is an important control on the daily and inter-annual patterns of $O_3$, there is no evidence that current temperature trends are increasing the frequency of high $O_3$ days in these 8 cities at this time.

### 3c. Identification of smoke days

Since there are no clear markers for smoke in the EPA database, I have developed my own method to identify smoke days.  This is based on a combination of the NOAA-HMS Fire and Smoke Product (hereafter simply HMS) and surface $PM_{2.5}$ data.  This approach has been successfully used in a number of analyses concerning the smoke influence on $O_3$ (Gong et al 2017; Jaffe et al 2020; Jaffe 2020a).  It is essential to use both the HMS satellite product and surface $PM_{2.5}$ data, as neither provides a clear signature of **surface** smoke by themselves.

A day is considered a smoke day if there was both identified overhead HMS smoke and the observed surface $PM_{2.5}$ was greater than a defined threshold.  To identify the $PM_{2.5}$ threshold, first the data were segregated based on the HMS data.   Then I calculate the monthly mean $PM_{2.5}$ for non-HMS days for all months in the study and determine if there is a significant trend with year (2006-2018), in the monthly means.  If there is no trend, the $PM_{2.5}$ threshold is set to the average monthly mean plus one standard deviation of the daily values.   If there is a significant trend, I apply a linear correlation to the monthly means $PM_{2.5}$ concentration vs year, and use the linear fit plus one standard deviation of the daily means as the threshold.   Removing the impact of a trend is important since if this is not done and there is a significant trend due to local emission reductions, then we would be incorrectly identifying smoke days.  The procedure described above sets a conservative threshold to use for identifying smoke days.  It is possible that some smoke days will be missed if they have a $PM_{2.5}$ concentration that is enhanced, but not as high as the threshold.  This is discussed further in section 3g.  Table S1 shows the monthly means, trends and standard deviation of the daily data for each city.

14

### 3d. Generalized Additive Modeling (GAM) for each region

Generalized Additive Modeling (GAM) is powerful tool that can incorporate linear, non-linear and categorical variables (Wood 2017). I have previously used GAM results to predict the MDA8 $O_3$ concentrations based on daily variations in meteorology (Gong et al 2017; 2018; McClure and Jaffe 2018; Jaffe et al 2018) and this method was also successfully used in our 2019 CRC project A-118 (Jaffe 2020a). Typical GAM results demonstrate an ability to predict MDA8 $O_3$ values with an $R^2$ of between 0.5-0.8. This is a type of "machine learning" which uses a training dataset to understand the complex and inter-related patterns in the data. The difference between the GAM statistical prediction and the observed value is called the residual. For more background on GAM, please see our final report for CRC project A-118 (Jaffe 2020a) or our earlier scientific publications. For GAM, I use the "mgcv" package in R software.

GAM results were computed on the MDA8 for the primary $O_3$ season May-September, 2006-2018. For each site, I examined a large number of predictor variables for inclusion in the GAM (see Table 6 for a list of the variables considered). Each predictor was evaluated based on the degree to which it had explanatory power for the MDA8 and the degree to which it improved the overall model fit, without overfitting. To evaluate this, I used the Akaike information criterion (AIC), as described by Wood (2017). Lower values of the AIC represent a superior model. Individual predictors were also evaluated using the approximate p-value as computed by the mgcv program. Correlation between meteorological variables is acceptable and nearly impossible to avoid. For example, the daily maximum surface temperature and afternoon radiosonde temperature typically show a strong positive correlation. Inclusion of both variables in a GAM is acceptable and may improve the model performance, as each variable could potentially explain different aspects of the $O_3$ relationship. For every site, at least one variable related to daily max temperature was included in the GAM. On the other hand, inclusion of essentially duplicate variables (e.g. daily max temperature from two nearby stations) is not likely to improve model performance. If two nearly identical variables are included, one variable will typically show a high p-value and the AIC will increase, compared to inclusion of just one of these. Ultimately the goal is to find the optimum combination of the fewest variables that can explain the greatest amount of variance in the predicted variable.

Table 6. Variables considered for the GAM calculations

| Variable name | Details | Source |
|---|---|---|
| Surf_NO2 | See specific sites for each CSA in Table 1 | AQS |
| Merra_tmax | See coordinates used for each CSA in Table 1 | NASA Giovanni |
| Merra_tavg | See coordinates used for each CSA in Table 1 | NASA Giovanni |
| OMI UV (filled) | OMI measured UV flux. Missing data are filled with long term monthly mean. See coordinates used for each CSA in Table 1. | NASA Giovanni |

| Variable name | Details | Source |
|---|---|---|
| OMI NO2 (filled) | OMI measured UV flux. Missing data are filled with monthly mean from same year. See coordinates used for each CSA in Table 1 | NASA Giovanni |
| Surface Tmin | Local met data, see station i.d. in Table 1 | NOAA-CDO |
| Surface Tmax | Local met data, see station i.d. in Table 1 | NOAA-CDO |
| Traj distance | Point to point distance from 12-hour HYSPLIT back-trajectories with GDAS 1º x 1º met data. | NOAA Hysplit |
| Traj direction | Point to point direction from 12-hour HYSPLIT back-trajectories with GDAS 1º x1º met data. | NOAA Hysplit |
| 850 Hpa temp-morning | From nearest radiosonde location (see Table 1). Morning sondes are launched at 12 GMT, which is between 4-7 am local standard time, depending on the time zone. Afternoon sondes are launched at 0 GMT, which is 4-7 pm local standard time, depending on the time zone. | University of Wyoming website |
| 700 Hpa temp-morning | From nearest radiosonde location (see Table 1). | University of Wyoming website |
| 1000 Hpa temp-morning | From nearest radiosonde location (see Table 1). | University of Wyoming website |
| WD-morning | Wind direction in lowest 1000 meters above sonde site. From nearest radiosonde location (see Table 1). | University of Wyoming website |
| WS-morning | Wind speed in lowest 1000 meters above sonde site. From nearest radiosonde location (see Table 1). | University of Wyoming website |
| RH-1000 -morning | Relative humidity (RH) in lowest 1000 meters above sonde site. From nearest radiosonde location (see Table 1). | University of Wyoming website |
| Surface mixing ratio-morning | Water vapor mixing ratio in lowest 1000 meters above sonde site. From nearest radiosonde location (see Table 1). | University of Wyoming website |
| Cape-morning | Calculated Convective Available Potential Energy (CAPE) from nearest radiosonde location (see Table 1). | University of Wyoming website |
| 1000 Hpa temp-afternoon | Temperature in lowest 1000 meters above sonde site. From nearest radiosonde location (see Table 1). | University of Wyoming website |
| WD-afternoon | Wind direction in lowest 1000 meters above sonde site. From nearest radiosonde location (see Table 1). | University of Wyoming website |
| WS-afternoon | Wind speed in lowest 1000 meters above sonde site. From nearest radiosonde location (see Table 1). | University of Wyoming website |

| Variable name | Details | Source |
|---|---|---|
| RH-1000 Hpa-afternoon | RH in lowest 1000 meters above sonde site. From nearest radiosonde location (see Table 1). | University of Wyoming website |
| Surface mixing ratio-afternoon | Water vapor mixing ratio in lowest 1000 meters above sonde site. From nearest radiosonde location (see Table 1). | University of Wyoming website |
| Day of week | Calculated variable | |

For fitting and testing the GAM, I used the following steps:

1. Using the non-smoke days, I randomly selected 90% as the training data and 10% to be used as the cross validation data.
2. The models were run and optimized using the training dataset.
3. The optimized GAM for each city was then rerun and used to predict both the cross-validation dataset and the smoke day dataset.

The variables selected for the GAM for each site are shown in Table 7 and Table S22 gives the GAM equations that were used in the R program.

Table 7. Variables included in each GAM by site.

| | ATL | CHI | DAL | DET | | | | NYC | | PHX | SLC | | | | SF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Site | UA | CHIW | GRP | EAST | PORT | OAK | NEW | LEO | FAIR | NP | HAW | HERR | ERDA | Bountiful | LIV |
| DOY | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| Surf NO2* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | | | Y | | Y |
| Merra_tmax | | Y | Y | | | | | Y | Y | | | | | Y | Y |
| Merra_tavg | | Y | | | | | | Y | | | | | | | |
| OMI UV (filled) | | Y | | Y | Y | Y | Y | | | Y | | | | | |
| OMI NO2 (filled) | Y | Y | Y | | | | | | | Y | Y | Y | Y | | |
| Surface Tmin | | | | | | | | | | | | | | Y | Y |
| Surface Tmax | Y | Y | | Y | | Y | Y | Y | Y | Y | | Y | Y | | Y |
| Traj distance | Y | | Y | Y | | Y | Y | Y | Y | Y | Y | Y | | | Y |
| Traj direction | | Y | | Y | Y | | Y | Y | Y | | Y | Y | Y | Y | Y |
| 850 Hpa temp-morning | | | | | | | | | Y | | | | | | |
| 700 Hpa temp-morning | | | | | | | | | | Y | | | | Y | |
| 1000 Hpa temp-morning | | | Y | | | | | | | Y | Y | | | Y | |
| WD-morning | Y | | Y | Y | Y | Y | | | Y | Y | Y | | | | |
| WS-morning | Y | | | | | | | | | Y | | Y | | | |
| RH-1000 Hpa-morning | | | | | | | | | | | | | | Y | |
| Surface mixing ratio-morning | Y | | | Y | Y | Y | Y | | Y | | Y | | | | |
| Cape-morning | | Y | | | | | | | | | | | | | |
| 1000 Hpa temp-afternoon | | | | Y | Y | | | | | | Y | | | | Y |

| | ATL | CHI | DAL | DET | | | | NYC | | PHX | SLC | | | | SF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WD-afternoon | | Y | Y | | | | Y | Y | | Y | | | | | |
| WS-afternoon | Y | | | Y | | Y | | Y | | | Y | Y | | Y | Y |
| RH-1000 Hpa-afternoon | Y | | Y | | | Y | | Y | Y | | Y | Y | | Y | Y |
| Surface mixing ratio-afternoon | | | | | | | Y | | | | Y | | | Y | |
| Day of week | Y | | Y | | | Y | | | | Y | Y | | | Y | Y |
| # Variables in final model | 11 | 10 | 10 | 10 | 7 | 10 | 9 | 9 | 11 | 11 | 13 | 7 | 5 | 11 | 11 |

*For the Detroit sites, I used an interaction term between surface $NO_2$ and year. This was found to give a slight improvement in the model predictions.

GAM works by fitting spline functions to the observations using the training dataset. Figure 1 shows an example of the spline fit for the Detroit New Haven site for back trajectory direction (0-360°).   Figure 2 shows the observations for the MDA8 vs back trajectory direction. Since the New Haven site is northeast of downtown Detroit and north of the major emission sources in the region, it is not surprising that the MDA8 is highest when trajectories are from the southeast direction (210°).   Figures S6 and S7 show similar plots of observed MDA8 vs trajectory distance and direction for all sites.  This is a good example of one of the key advantages of GAM; incorporation of non-linear and categorical variables.



Figure 1.  Spline fit from GAM for Trajectory direction vs MDA8 for DET New Haven site.



Figure 2. Observed MDA8 vs trajectory direction for DET New Haven site.

As with any model, it is important to evaluate the underlying assumptions and fidelity of the model predictions.  To examine the quality of the model, I looked at a number of factors:

1. The residuals (observed value minus fit value) should be normally distributed and not exhibit heteroscedasticity (non-uniform variance relative to the predictor variables).
2. The residuals should not show bias with respect to any of the model predictors.
3. The cross-validation predictions should demonstrate similar skill at predictions as the training dataset and should have no bias with $O_3$ or any of the predictors.

I used the gam.check code in R software to check the QQ plots (sample quantiles against theoretical quantiles), scatterplots of the observed  versus the predicted values and the residual versus the predicted values.

### 3e. GAM Results

Table 8 show the $R^2$ values for the correlation of the observed and predicted MDA8 for each site using the training, cross-validation and smoke datasets. The $R^2$ values range from 0.52-0.77 using the training datasets and are fairly similar using the cross-validation datasets. The $R^2$ for the smoke datasets tend to be significantly lower. This arises both because there are far fewer smoke cases (see Table S5) and because of the greater variability associated with the influence of smoke (see for example Jaffe and Wigder 2012).

The detailed GAM results for each site are shown in Figures S8-S10 and Tables S2-S6. Table S6 shows the residuals (observed – GAM predicted) by year and separated by training, cross-val and smoke datasets. Figures S8 and S9 show the residuals vs the predicted MDA8 values. For all sites, the training and cross-val datasets have a mean residual that is very close to zero, whereas the smoke datasets have a mean that ranges from 1.7 ppb (Phoenix) to 7.3 ppb (SF-Livermore). This residual is the average contribution to the MDA8 due to smoke. I conducted a t-test to compare the residuals for the cross validation and smoke datasets. In all cases, with the exception of Phoenix, the differences were significant with a P value of <0.01. For Phoenix, the average smoke influence is relatively small and the number of identified smoke days is low, partly due to the fact that $PM_{2.5}$ are not available until 2011.

Table 8. $R^2$ for observed vs GAM predicted MDA8 for each site.

| CSA | Site | $R^2$-training | $R^2$-cross val | $R^2$-smoke days |
|---|---|---|---|---|
| Atlanta | United Ave | 0.73 | 0.70 | 0.60 |
| Chicago | Chiwaukee Prairie | 0.68 | 0.68 | 0.49 |
| Dallas | Grapevine Fairway | 0.71 | 0.72 | 0.72 |
| Detroit | East 7 Mile | 0.74 | 0.73 | 0.52 |
| | Port Huron | 0.69 | 0.69 | 0.50 |
| | Oak Park | 0.76 | 0.75 | 0.54 |
| | New Haven | 0.76 | 0.73 | 0.54 |
| NY/NJ/CT | Leonia | 0.68 | 0.69 | 0.54 |
| | Fairfield | 0.72 | 0.72 | 0.46 |
| Phoenix | North Phoenix | 0.52 | 0.44 | 0.19 |
| SLC | Hawthorne | 0.65 | 0.63 | 0.23 |
| | Herriman | 0.59 | 0.50 | 0.35 |
| | Erda | 0.52 | 0.49 | 0.11 |
| | Bountiful | 0.62 | 0.64 | 0.52 |
| SF | Livermore | 0.77 | 0.75 | 0.55 |

### 3f. Influence of smoke

The daily max temperature is a good predictor for the MDA8 in 5 of the 8 cities (see Table 5). Figure 3 shows the relationship between MDA8 and surface tmax for the SLC Bountiful site. Table S3 shows that smoke days have substantially higher MDA8 values compared to non-smoke days at all sites, in some cases by up to 25 ppb. But in all cases, the average temperatures on smoke days are also higher. It is important to recognize that the GAM for each site incorporate some measure of daily high temperatures. This could be any one of the variables Merra_Tmax, Surface_tmax or the 1000 Hpa temp-afternoon. These three variables are highly correlated at all sites (e.g. $R^2$ of 0.8-0.9). Thus, the GAM residuals should show no bias with respect to daily maximum temperature. Figure 4 shows the GAM residuals vs temperature for the SLC Bountiful site, where the temperature is segregated into 5°F bins. The mean residuals for each bin are all around 0 and the standard deviations are 6-7 ppb. This confirms that the GAM are adequately accounting for temperature and therefore the residual must be due to another factor.

Figure 5 compares the temperature-$O_3$ relationship for smoke and non-smoke days for the SLC Bountiful site. There are two points to be made with this figure. First, it is clear that smoke days have a higher daily max temperature, compared to non-smoke days. This pattern holds independently within each month (May-September). Second, it is apparent is that on smoke days, there is a stronger impact of temperature compared to non-smoke days. In other words, photochemical processes that generate $O_3$ are operating more efficiently on hotter smoke days, likely due to the greater abundance of $O_3$ precursors. Taken together, this analysis indicates that while smoke days are warmer than non-smoke days, the GAM results correctly account for temperature, so that the GAM residual is indicating the additional contribution to the MDA8 from smoke chemistry alone.



Figure 3. MDA8 $O_3$ vs daily max temperature for the SLC-Bountiful site for non-smoke cases.



Figure 4. GAM residuals for SLC-Bountiful site for non-smoke cases. The black dots show the individual points and the red circles and bars show the mean and one s.d., respectively, segregated into 5°F bins.



Figure 5. O$_3$ temperature relationship for smoke and non-smoke days.

## 3g. Estimated influence of smoke on design values

The ODV is calculated by averaging the fourth highest value from the three previous years in ppm and truncating the result to 3 decimals. Since smoke days have a higher probability of leading to an exceedance day (MDA8>70 ppb), these can significantly influence the ODV. For example, using the SLC Bountiful site data, I find that 16% of smoke days have an MDA8 >70 ppb, compared to 5% for non-smoke days. This is true even if I examine the data within each temperature bin. Smoke influenced days may be considered for exclusion from the design value calculation under the EPA's "Exceptional events" rule. However, the process is complex. To help guide air quality managers in this process, I examine the possible influence of smoke days on the 2016-2018 design values for each site considered in our study. I do this using several different assumptions:

1. I calculate the ODV for the 2016-2018 period using all available observations at each site.
2. I calculate the ODV using only non-smoke days, as defined by **both** the HMS overhead smoke data and the surface PM$_{2.5}$ data (above the threshold, as described in Section 3c).
3. I calculate the ODV using non-smoke days, as defined by **only** the HMS overhead smoke product, without regard to the surface PM$_{2.5}$ concentrations.

While this last definition for smoke is a looser definition for smoke days, it does provide some indication of the importance of smoke days and our ability to accurately identify these with the available data. Because I use a 24-hour average PM$_{2.5}$ concentration, it is possible that we have

missed a smoke day with the more stringent requirement.  For example, a day might have very low $PM_{2.5}$ during the evening and morning hours, and then have elevated $PM_{2.5}$ during the afternoon, when smoke moved into the region.   Thus smoke might have still increased $O_3$ concentrations in the afternoon, even if the 24-hour daily $PM_{2.5}$ average concentration did not reach the threshold.  The use of this "HMS only" smoke day definition allows us to identify days that warrant further investigation, if they turn out to be policy relevant.

Table 9 shows the ODV calculation for 2016-2018 and Figures S13 (and S14-S16 for additional sites) show how the annual fourth highest MDA8 changes under each assumption.  Again, it is important to emphasize that this is only an example calculation.   Exclusion of monitoring data as an exceptional event requires additional evaluation and EPA concurrence.  But nonetheless, these calculations give an idea of the implications of the magnitude due to smoke influence on the ODV for each monitoring site.

Table 9.  Summary of 2016-2018 $O_3$ design values using the existing data and using various hypothetical assumptions to exclude data.

| Metro region | Site | Avg # smoke days per year (2016-2018) | 2016-2018 Design Value | 2016-2018 Design Value if "smoke days" excluded | 2016-2018 Design Value if all HMS days excluded |
|---|---|---|---|---|---|
| ATL | UA | 4.7 | 73 | 73 | 73 |
| CHI | CHIW | 4.7 | 79 | 79 | 77 |
| DAL | GRP | 4.0 | 76 | 76 | 73 |
| DET | EAST | 5.0 | 74 | 73 | 71 |
| | PORT | 5.0 | 72 | 68 | 68 |
| | OAK | 5.0 | 73 | 72 | 72 |
| | NEW | 5.0 | 72 | 71 | 71 |
| NYC | LEO | 5.0 | 76 | 74 | 74 |
| | FAIR | 5.0 | 84 | 80 | 80 |
| PHX | NP | 4.0 | 76 | 75 | 75 |
| SLC | HAW | 16.7 | 76 | 75 | 72 |
| | HERR | 16.7 | 77 | 74 | 72 |
| | ERDA | 16.7 | 74 | 72 | 70 |
| | Bountiful | 16.7 | 80 | 76 | 70 |
| SF | LIV | 18.3 | 73 | 67 | 64 |

Sites that show the strongest impact of smoke days on the ODV include Port Huron (DET), Fairfield (NYC), Herriman and Bountiful Valley (SLC), and Livermore (SF).  In some cases, the ODV would drop below 70 ppb if these smoke days were excluded.   SLC and SF were particularly hard hit by smoke days in 2016-2018 with an average number of smoke days per year of ~17-18.   As such, air quality managers in these regions especially, should consider additional work to identify smoke days and possible exceptional event designations.

## 4. Summary for each city

### 4a. Atlanta

Atlanta data show a good relationship between MDA8 and the observed $NO_2$ concentration. The $R^2$ value for the correlation between the annual fourth highest MDA8 and annual averaged May-September daily maximum $NO_2$ is 0.73 and the correlation for the daily data is 0.43. The probability of an exceedance day and $NO_2$ concentrations are both lowest on weekend days (Figure S11). All of these are consistent with a NOx-limited regime, where further reductions in NOx will lead to significant lowering of the highest MDA8 values. Based on the 2019 May-September mean daily maximum $NO_2$ value of 21.3 ppb, I estimate that an 18% reduction in $NO_2$ concentrations will bring Atlanta into compliance with the $O_3$ NAAQS (see Table 4 and Figure S4).

The GAM results for Atlanta are good, with an $R^2$ value of 0.73 for the correlation of the observed and GAM predicted MDA8. The average GAM residual on smoke days is 5.0 ppb, suggesting a contribution of this amount to the MDA8 on smoke days (on average). However, the contribution to the 2016-2018 ODV due to smoke in Atlanta appears to be rather minimal (Table 9 and Figure S13).

### 4b. Chicago

Chicago data show a moderate relationship between MDA8 and the observed $NO_2$ concentration. The $R^2$ value for the correlation between the annual fourth highest MDA8 and annual averaged May-September daily maximum $NO_2$ is 0.47 and the correlation for the daily data is 0.19. While the $NO_2$ concentrations are lowest on the weekends, the probability of an exceedance day does not follow this pattern (Figure S11). Thus, at least as of the 2013-2018 time period, Chicago does not appear to be in a clear NOx-limited regime. However, they are probably very close, so it is likely that as $NO_x$ is further reduced, this will occur. Based on the 2019 May-September mean daily maximum $NO_2$ value of 25.0 ppb, I estimate that a 10% reduction in $NO_2$ concentrations will bring Chicago into compliance with the $O_3$ NAAQS (see Table 4 and Figure S4).

The GAM results for Chicago are good, with an $R^2$ value of 0.68 for the correlation of the observed and GAM predicted MDA8. The average GAM residual on smoke days is 4.8 ppb, suggesting a contribution of this amount to the MDA8 on smoke days (on average). I estimate the contribution to the 2016-2018 ODV due to smoke in Chicago is 0-2 ppb. (Table 9 and Figure S13).

### 4c. Dallas

Dallas data show a moderate relationship between MDA8 and the observed $NO_2$ concentration. The $R^2$ value for the correlation between the annual fourth highest MDA8 and annual averaged May-September daily maximum $NO_2$ is 0.60 and the correlation for the daily data is 0.35. The probability of an exceedance day and $NO_2$ concentrations are both lowest on weekend days (Figure S11). All of these are consistent with a NOx-limited regime, where further reductions in NOx will lead to significant lowering of the highest MDA8 values. Based on the 2019 May-September mean daily maximum $NO_2$ value of 12.0 ppb, I estimate that a 33% reduction in $NO_2$ concentrations will bring Dallas into compliance with the $O_3$ NAAQS (see Table 4 and Figure S4).

The GAM results for Dallas are good, with an $R^2$ value of 0.71 for the correlation of the observed and GAM predicted MDA8.   The average GAM residual on smoke days is 5.6 ppb, suggesting a contribution of this amount to the MDA8 on smoke days (on average).  I estimate the contribution to the 2016-2018 ODV due to smoke in Dallas is 0-3 ppb. (Table 9 and Figure S13).

### 4d.  Detroit

Detroit data show a moderate relationship between MDA8 and the observed $NO_2$ concentration.  The $R^2$ value for the correlation between the annual fourth highest MDA8 and annual averaged May-September daily maximum $NO_2$ is 0.59 and the correlation for the daily data is 0.21 (both for the East 7 Mile site).   While the $NO_2$ concentrations are lowest on the weekends, the probability of an exceedance day does not follow this pattern (Figure S11).  Thus, at least as of the 2013-2018 time period, Detroit does not appear to be in a clear NOx-limited regime.  However, they are probably very close, so it is likely that as $NO_x$ is further reduced, this will occur.  Based on the 2019 May-September mean daily maximum $NO_2$ value of 23.0 ppb, I estimate that a 31% reduction in $NO_2$ concentrations will bring Detroit into compliance with the $O_3$ NAAQS (see Table 4 and Figure S4).

The GAM results for Detroit are good, with an $R^2$ value of 0.76 for the correlation of the observed and GAM predicted MDA8 (New Haven site).   The average GAM residual on smoke days is very similar at all sites, ranging from 5.1-5.7 ppb, suggesting a contribution of this amount to the MDA8 on smoke days (on average).  I estimate the contribution to the 2016-2018 ODV due to smoke in Detroit is 1-4 ppb, depending on the site and assumptions made (Table 9 and Figure S13).

### 4e.  New York City

NYC data show a good relationship between MDA8 and the observed $NO_2$ concentration.  The $R^2$ value for the correlation between the annual fourth highest MDA8 and annual averaged May-September daily maximum $NO_2$ is 0.84 (Fairfield site) and the correlation for the daily data is 0.17.  The probability of an exceedance day and $NO_2$ concentrations are both lowest on Sunday (Figure S11).   All of these are consistent with a NOx-limited regime, where further reductions in NOx will lead to significant lowering of the highest MDA8 values.   Based on the 2019 May-September mean daily maximum $NO_2$ value of 18.9 ppb, I estimate that an 26% reduction in $NO_2$ concentrations will bring NYC into compliance with the $O_3$ NAAQS (see Table 4 and Figure S4).

The GAM results for NYC are good, with an $R^2$ value of 0.72 (Fairfield site) for the correlation of the observed and GAM predicted MDA8.   The average GAM residual on smoke days is 5.6 ppb, suggesting a contribution of this amount to the MDA8 on smoke days (on average).  The contribution to the 2016-2018 ODV due to smoke in NYC are modest at around 2-4 ppb (Table 9 and Figure S13).

**4f. Phoenix**

Phoenix data show a good relationship between MDA8 and the observed $NO_2$ concentration. The $R^2$ value for the correlation between the annual fourth highest MDA8 and annual averaged May-September daily maximum $NO_2$ is 0.74 and the correlation for the daily data is 0.15. The probability of an exceedance day and $NO_2$ concentrations are both lowest on weekends (Figure S11). All of these are consistent with a NOx-limited regime, where further reductions in NOx will lead to significant lowering of the highest MDA8 values. Based on the 2019 May-September mean daily maximum $NO_2$ value of 25.4 ppb, I estimate that an 18.4% reduction in $NO_2$ concentrations will bring PHOENIX into compliance with the $O_3$ NAAQS (see Table 4 and Figure S4).

The GAM results for PHOENIX are good, with an $R^2$ value of 0.52 for the correlation of the observed and GAM predicted MDA8. The average GAM residual on smoke days is 1.7 ppb, suggesting a contribution of this amount to the MDA8 on smoke days (on average). The contribution to the 2016-2018 ODV due to smoke in PHOENIX is very modest at around 1 ppb (Table 9 and Figure S13).

Phoenix and Salt Lake City also appears to be strongly influenced by background $O_3$, where background $O_3$ is defined as any source that is not from local or regional photochemical production. While background $O_3$ is present everywhere, certain regions are exposed to higher concentrations of background due to elevation, wildfire smoke, long-range transport of pollutants from domestic or international sources, or due to influence from upper tropospheric/lower stratospheric (UTLS) $O_3$. Langford et al (2017) describe several events of strong background $O_3$ influence in the southwestern U.S. in May 2013. These events led to elevated $O_3$ (MDA8 >70 ppb) at several monitoring sites in Clark County, NV. Using the NOAA Geophysical Fluid Dynamics Laboratory AM3 model, they further show that these events typically incorporate both stratospheric air and $O_3$ from anthropogenic sources in Asia. In particular, the southwestern U.S. is most strongly influenced by these events due to the persistence of deep convective boundary layers. The AM3 model, suggests that the combined background influence from the UTLS and Asian sources can add up to 25 ppb to the monthly mean $O_3$ concentrations in the southwestern U.S. This results in what is, probably, the highest background $O_3$ (non-local) concentration seen anywhere in the U.S. Based on the AM3 model results (shown in Langford et al 2017), both Phoenix and SLC are strongly influenced by these sources. Phoenix, and to a lesser extent SLC, may also be influenced by $O_3$ from non-local domestic sources, particularly emissions from California.

Figure 6 shows the MDA8 distribution by decile cut points (10-evenly spaced groups) for May-September, 2015-2018. Both Phoenix and SLC have very high MDA8 values for the lowest decile. In other words, in the cleanest air, these regions have MDA8 values that are 10-15 higher than any other location in our study. This is consistent with the strong influence due to background $O_3$ for these locations as described in Langford et al (2017). Jaffe et al (2020b) show two examples of how background $O_3$ impacts high $O_3$ days for sites in EPA regions 2 (NY and NJ) and Region 8 (CO, MT, ND, SD, UT, WY). What is clear from Figure 6 and these prior published analyses is that sites in the southwestern U.S. and the intermountain west, experience a much higher level of background $O_3$, compared to most other parts of the U.S. Local photochemical production of $O_3$ is then added to this higher background level.



Figure 6.  Distribution of MDA8 values (ppb) by deciles for all sites in this study.  The y-axis shows the MDA8 for the decile indicated on the x-axis.   This plot uses MDA8 data for May-September, 2015-2018.

**4g. Salt Lake City**

   SLC data show a poor relationship between MDA8 and the observed $NO_2$ concentration.  The $R^2$ value for the correlation between the annual fourth highest MDA8 and annual averaged May-September daily maximum $NO_2$ is 0.28 and the correlation for the daily data is 0.04.  The $NO_2$ concentrations are lowest on weekends, but the probability of an exceedance day is not clearly lower on weekends (Figure S11).   This raises questions about whether SLC is $NO_x$ limited or not.  Nonetheless, I did estimate the $NO_2$ concentration that would bring SLC into compliance with the $O_3$ standard using the same approach as the other cities.  Based on the 2019 May-September mean daily maximum $NO_2$ value of 17.8 ppb, I estimate that a 59.6% reduction in $NO_2$ concentrations will bring SLC into compliance with the $O_3$ NAAQS (see Table 4 and Figure S4).  However this value should be viewed with some skepticism due to a number of uncertainties (described below).

   The GAM results for SLC are good, with an $R^2$ value of 0.65 (Hawthorne site) for the correlation of the observed and GAM predicted MDA8.   The average GAM residual on smoke days are 3.2-5.6 ppb for the four sites, suggesting contributions of this amount to the MDA8 on smoke days (on average).  The contribution to the 2016-2018 ODV due to smoke in SLC is significant and ranges from 2-10 ppb, depending on the site and assumptions (Table 9 and Figure S13).

   As described above, Phoenix and Salt Lake City also appear to be strongly influenced by background $O_3$, where background $O_3$ is defined as any source that is not from local or regional photochemical production.   See the discussion in the previous section (Phoenix) for more information and evidence concerning the strong background $O_3$ influence in SLC.

   Data from SLC are unique among the 8 cities considered due to:

1.   The weak observed relationship between $O_3$ and $NO_2$.

2. The strong influence from smoke on the ODV in SLC.
3. The strong influence from background $O_3$ in SLC.

While it is expected that further reductions in $NO_2$ would decrease $O_3$ in SLC, the combined contributions from background $O_3$ and smoke mean that this region must overcome significant challenges to meet the standard. Given the ambiguity on the role of $NO_x$ in SLC, further research on photochemistry in the region, both smoke and non-smoke conditions, would provide a better understanding of the conditions that will be required to achieve the $O_3$ standard.

**4h. San Francisco**

San Francisco data show a modest relationship between MDA8 and the observed $NO_2$ concentration. The $R^2$ value for the correlation between the annual fourth highest MDA8 and annual averaged May-September daily maximum $NO_2$ is 0.36 and the correlation for the daily data is 0.35. The probability of an exceedance day and $NO_2$ concentrations are both lowest on Sunday (Figure S11). All of these are consistent with a NOx-limited regime, where further reductions in NOx will lead to significant lowering of the highest MDA8 values. Based on the 2019 May-September mean daily maximum $NO_2$ value of 9.8 ppb, I estimate that an 14.6% reduction in $NO_2$ concentrations will bring SF into compliance with the $O_3$ NAAQS (see Table 4 and Figure S4).

The GAM results for SF are good, with an $R^2$ value of 0.77 for the correlation of the observed and GAM predicted MDA8. The average GAM residual on smoke days is 7.3 ppb, suggesting a contribution of this amount to the MDA8 on smoke days (on average). The contribution to the 2016-2018 ODV due to smoke in SF is significant at around 6-9 ppb (Table 9 and Figure S13).

## 5. References

Gong X., Kaulfus A., Nair U. and Jaffe D.A. Quantifying $O_3$ impacts in urban areas due to wildfires using a Generalized Additive Model. Envir. Sci. Tech.   DOI: 10.1021/acs.est.7b03130, 2017.

Gong X., Hong S. Jaffe D.A. Ozone in China: Spatial distribution and leading meteorological factors controlling $O_3$ in 16 Chinese cities.  Aer. Air Qual. Res, DOI: 10.4209/aaqr.2017.10.0368, 2018.

Jaffe D. Role of Meteorology, Emissions and Smoke on Ozone in the South Coast Air Basin. Final project report for CRC Project A-118, Coordinating Research Council, Alpharetta, GA, January 2020.  Available at: http://crcao.org/wp-content/uploads/2020/01/CRC-Project-A-118-Final-Report_Jan2020.pdf, 2020a.

Jaffe D.A., Fiore A.M. and Keating, T.J., Importance of Background $O_3$ for Air Quality Management. EM November 2020, 2020b.

Jaffe D.A., O'Neill S.M., Larkin N.K., Holder A.L, Peterson D.L., Halofsky J.E. and Rappold A.G. Wildfire and prescribed burning impacts on air quality in the United States, J.  Air and Waste Mgt. Assn., DOI: 10.1080/10962247.2020.1749731, 2020.

Jaffe DA, Cooper OR, Fiore AM, Henderson BH, Tonneson GS, Russell AG, Henze DK, Langford AO, Lin M and Moore T. Scientific assessment of background ozone over the U.S.: Implications for air quality management. Elem Sci Anth. 2018;6(1):56. doi:http://doi.org/10.1525/elementa.309, 2018.

Jaffe, D.A. and Wigder, N.L., Ozone production from wildfires: A critical review.  Atmos, Envir., doi:10.1016/j.atmosenv.2011.11.063, 2012.

Langford, A. O., et al. (2016), Entrainment of stratospheric air and Asian pollution by the convective boundary layer in the southwestern U.S., J. Geophys. Res. Atmos., 122, doi:10.1002/ 2016JD025987.

McClure C.D. and Jaffe D.A. Investigation of High Ozone Events due to Wildfire Smoke in an Urban Area.  Atmos. Envir. https://doi.org/10.1016/j.atmosenv.2018.09.021, 2018.

Nussbaumer C.M. and Cohen R.C.  The Role of Temperature and NOx in Ozone Trends in the Los Angeles Basin.   Envir. Sci.Tech. 54 (24), 15652-15659 DOI: 10.1021/acs.est.0c04910, 2020.

Simon, H, Reff, A, Wells, B, Xing, J and Frank, N. Ozone trends across the United States over a period of decreasing NOx and VOC emissions. *Environ Sci Technol* 49(1): 186–195. DOI: https://doi. org/10.1021/es504514z, 2015.

Wood, S.N. Generalized Additive Models, An Introduction with R, Second Edition. Chapman and Hall/CRC, Boca Raton, FL 2017.

**CRC-A-124: Appendix**

In this appendix, I show a number of common graphs and tables for each region and each site considered in the project. For ease of viewing, the tables and graphs all use a consistent formatting and are organized by geographic region. Note that most plots include data for 2006-2018, except for Figures S3 and S4, which use data for 1995-2019.

**Figures**

S1. Trend in 4th highest $O_3$ for each site.

   *This plot only shows the data from $O_3$ monitors considered in our analysis.*

S2. Trend in $NO_2$ surface daily max and OMI column, 2006-2018.

   *This plot compares the May-Sept.$NO_2$ trends as observed by the surface monitors and the OMI satellite. One plot per CSA.*

S3. Trend in 4th highest $O_3$ and daily max $NO_2$, 1995-2019.

   *This plot compares the May-Sept surface $NO_2$ trends with the annual 4th highest MDA8 $O_3$*

S4. $O_3$ vs $NO_2$, 1995-2019.

   *This plot shows an X-Y scatterplot of the data in the previous figure.*

S5. MDA8 vs daily max $NO_2$ using May-Sept data for one site in the CSA.

   *This plot shows how the $O_3$ MDA8 responds to the daily max surface $NO_2$ value for one site in the CSA.*

S6. MDA8 vs trajectory direction for one site in the CSA.

   *This plot shows the relationship of the MDA8 to daily trajectory direction.*

S7. MDA8 vs trajectory distance for one site in the CSA.

   *This plot shows the relationship of the MDA8 to daily trajectory distance.*

S8. GAM predicted vs Observed MDA8 using the training dataset only.

*S9.* GAM residuals vs the predicted MDA8 using the training dataset (blue points) and the cross-validation dataset (red points). *Statistics on the residuals are shown in Table S6.*

S10. GAM residuals vs predicted, training dataset (blue points) and smoke dataset (red points). *Statistics on the residuals are shown in Table S6.*

S11. Probability (P) of an $O_3$ exceedance day (MDA8>70 ppb) across all sites that we considered and averaged surface $NO_2$ concentrations both as a function of day of week (Sunday=1, Monday =2, etc). Both are calculated using data from May-September 2013-2018 data. The probabilities are computed by summing the number of exceedance days for all sites and dividing by the number of observations.

S12. Annual 98th percentile of daily maximum temperature (DMT, $^oF$) and fourth highest MDA8.

S13. Annual fourth highest for all data (blue), smoke days excluded (red) and HMS days excluded (black).

   *This figure shows how the annual fourth highest MDA8 would change with different assumptions. For this analysis a "smoke day" requires that there be both overhead HMS smoke <u>and </u>elevated $PM_{2.5}$. Thus the smoke day criteria is a more stringent requirement than excluding HMS smoke days alone. As such, the "HMS days excluded fourth highest" will always be similar or lower than the other fourth highest values. It's important to keep in mind that EPA would require a rigorous evaluation to designate a day as an exceptional event. But nonetheless, this analysis gives us some idea as to how important that might be for each CSA.*

A2

***Figures S14-S16:  Same as Figure S12, but for other sites that were considered in each CSA.***

**Tables:**

S1. Average ($\mu$g m$^{-3}$), trend (slope, $\mu$g m$^{-3}$-yr$^{-1}$) and standard deviation ($\mu$g m$^{-3}$) of daily PM$_{2.5}$ by month for days without overhead HMS smoke for 2006-2018.   If the trend is not statistically significant, the slope is set to zero.  The 2016-2018 monthly mean PM$_{2.5}$ concentration plus one standard deviation of the daily means or the linear fit to the trend in PM$_{2.5}$ (if the trend is significant) plus one standard deviation of the daily values, is used as a criterion to determine if a day qualifies as a smoke day.

S2. Number of days in each category (training, cross-validation, smoke).

S3. Average MDA8 (ppb) in each category(training, cross-validation, smoke).

S4. Averages surface daily maximum temperature ($^o$F) in each category (training, cross-validation, smoke).

S5. Number of days in each category for the GAM analysis (training, cross-validation, smoke).

S6. Average residual from the GAM analysis (training, cross-validation, smoke).  Note that some days can not be included due to some missing data.

S7-S21: *Same as Tables S2-6, but for each additional site in the CSA.*

S22.  R code GAM equations for each site.

**Table of contents for appendix**

Atlanta CSA Figures S1-S13, Tables 1-6, pages A4-A12.
Chicago CSA Figures S1-S13, Tables 1-6, pages A13-A21.
Dallas CSA Figures S1-S13, Tables 1-6, pages A22-A30.
Detroit CSA Figures S1-S16, Tables 1-21, pages A31-A44.
New York CSA Figures S1- S14, Tables 1-11, pages A45-A55.
Phoenix CSA Figures S1-S14, Tables 1-6, pages A56-A64.
Salt Lake City CSA Figures S1-S16, Tables 1-21, pages A65-A78.
San Francisco CSA Figures S1-S13, Tables 1-6, pages A79-A87.
Table S22:   R GAM equations for each site, page A88.

A4

# Atlanta CSA



**Figure S1. Trend in 4th highest MDA8 $O_3$ for each site.**

**Figure S2. Trend in surface $NO_2$ daily max and OMI column, 2006-2018.**



Figure S3. Trend in 4th highest O$_3$ and daily max NO$_2$, 1995-2019.  For this plot and the next, we use NO$_2$ data from site 130890002.

Figure S4. O$_3$ vs NO$_2$, 1995-2019.



**Figure S5. MDA8 vs daily max NO₂ for United Avenue site.**

**Figure S6. MDA8 vs trajectory direction for United Avenue site.**



**Figure S7. MDA8 vs trajectory distance for United Avenue site.**

**Figure S8. GAM predicted vs Observed, training data only for United Avenue site.**



**Figure S9. GAM residuals vs predicted, training and cross-validation data for United Avenue site.**

**Figure S10. GAM residuals vs predicted, training and smoke data for United Avenue site.**



**Figure S11. Probability (P) of an O$_3$ exceedance day (MDA8>70 ppb) across all sites that we considered and averaged surface NO$_2$ concentrations as a function of day of week (Sunday=1, Monday =2, etc).  Both are calculated using May-September 2013-2018 data.**



**Figure S12. Annual 98th percentile of daily maximum temperature ($^o$F) and fourth highest MDA8 (ppb).**



**Figure S13. Annual fourth highest for all data, smoke days excluded, and HMS days excluded for United Avenue site.**

**Table S1. Average, standard deviation and trend in PM$_{2.5}$ for ATL by month for 2006-2018 ($\mu$g m$^{-3}$). Only statistically significant trends are shown. If the trend is not statistically significant, the slope is set to 0. The standard deviation is based on the variation in daily PM$_{2.5}$ observations.**

| Month | Avg | Slope | SD |
|---|---|---|---|
| 1 | 8.6 | -0.1 | 3.7 |
| 2 | 9.3 | -0.3 | 4.3 |
| 3 | 10.6 | -0.5 | 5.2 |
| 4 | 10.3 | -0.4 | 4.4 |
| 5 | 11.3 | -0.6 | 5.4 |
| 6 | 13.2 | -0.9 | 6.0 |
| 7 | 13.5 | -1.0 | 6.1 |
| 8 | 13.0 | -1.0 | 6.0 |
| 9 | 11.5 | -0.7 | 5.3 |
| 10 | 9.9 | -0.3 | 4.5 |
| 11 | 10.5 | 0.0 | 4.4 |
| 12 | 9.4 | 0.0 | 4.5 |

**Table S2. Number of days in each category by year, May-September only.**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 136 | 116 | 132 | 135 | 135 | 121 | 131 | 137 | 134 | 136 | 133 | 130 | 130 | 1706 |
| Cross-val | 15 | 13 | 14 | 16 | 13 | 13 | 15 | 15 | 14 | 16 | 15 | 14 | 15 | 188 |
| Smoke | 2 | 11 | 3 |  | 2 | 18 | 3 |  | 1 | 1 | 2 | 2 | 5 | 50 |

**Table S3. Average MDA8 in each category (ppb)**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 57.6 | 58.6 | 54.0 | 46.6 | 52.1 | 54.3 | 51.4 | 42.1 | 45.1 | 48.2 | 48.8 | 46.3 | 45.0 | 49.9 |
| Cross-val | 57.3 | 57.4 | 47.1 | 45.0 | 53.3 | 52.8 | 50.5 | 42.7 | 49.0 | 53.0 | 44.7 | 49.1 | 44.1 | 49.5 |
| Smoke | 74.5 | 69.9 | 61.7 |  | 62.5 | 70.2 | 73.0 |  | 61.0 | 53.0 | 61.5 | 43.0 | 60.8 | 66.8 |

**Table S4. Average surface Tmax (ºF) in each category**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 85.5 | 87.2 | 85.5 | 84.3 | 88.8 | 87.8 | 87.1 | 83.3 | 85.1 | 86.2 | 89.0 | 85.1 | 88.0 | 86.3 |
| Cross-val | 85.8 | 88.1 | 85.1 | 84.1 | 90.1 | 87.5 | 86.5 | 81.9 | 86.9 | 86.6 | 89.7 | 85.3 | 87.0 | 86.5 |
| Smoke | 93.0 | 92.8 | 92.0 |  | 86.0 | 92.7 | 96.0 |  | 90.0 | 94.0 | 96.0 | 82.5 | 90.4 | 92.1 |

**Table S5. Number of days included in the GAM**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 125 | 97 | 106 | 132 | 127 | 120 | 131 | 133 | 125 | 120 | 132 | 117 | 119 | 1584 |
| Cross-val | 15 | 10 | 12 | 16 | 13 | 12 | 14 | 15 | 14 | 14 | 15 | 10 | 14 | 174 |
| Smoke | 2 | 8 | 3 |  | 2 | 17 | 3 |  | 1 |  | 2 | 2 | 4 | 44 |

**Table S6. Average of residuals from the GAM**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 0.11 | -0.87 | 0.77 | 0.42 | -0.41 | 0.03 | -0.37 | 0.95 | -0.61 | 1.07 | -2.63 | 0.86 | 0.81 | 0.00 |
| Cross-val | 0.01 | -2.82 | -0.12 | -0.74 | -2.47 | -2.60 | -2.46 | 3.30 | -0.43 | 3.41 | -4.11 | 3.96 | -0.61 | -0.45 |
| Smoke | 9.57 | 3.91 | 2.57 |  | 5.60 | 8.42 | 0.18 |  | -2.11 |  | -3.72 | 4.87 | 1.43 | 4.98 |

# Chicago CSA



**Figure S1. Trend in 4th highest MDA8 O$_3$ for each site.**



**Figure S2. Trend in surface NO$_2$ daily max and OMI column, 2006-2018.**



**Figure S3. Trend in 4th highest O$_3$ and daily max NO$_2$, 1995-2019.  For this plot and the next one, I use NO$_2$ data from AQS sites 170310063, 170313103, 170314002 and 180890022.**



**Figure S4. O$_3$ vs NO$_{2,}$ 1995-2019.**



**Figure S5. MDA8 vs daily max NO₂ for Chiwaukee Prairie Stateline site.**



**Figure S6. MDA8 vs trajectory direction for Chiwaukee Prairie Stateline site.**



**Figure S7. MDA8 vs trajectory distance for Chiwaukee Prairie Stateline site.**



**Figure S8. GAM predicted vs Observed, training data only for Chiwaukee Prairie Stateline site.**



**Figure S9. GAM residuals vs predicted, training and cross-validation data for Chiwaukee Prairie Stateline site.**



**Figure S10. GAM residuals vs predicted, training and smoke data for Chiwaukee Prairie Stateline site.**



**Figure S11. Probability (P) of an O₃ exceedance day (MDA8>70 ppb) across all sites that we considered and averaged surface NO₂ concentrations as a function of day of week (Sunday=1, Monday =2, etc). Both are calculated using May-September 2013-2018 data.**



**Figure S12. Annual 98ᵗʰ percentile of daily maximum temperature (ᵒF) and fourth highest MDA8 (ppb).**



**Figure S13. Annual fourth highest for all data, smoke days excluded, and HMS days excluded for Chiwaukee Prairie Stateline site.**

Table S1. Average, standard deviation and trend in $PM_{2.5}$ for CHI by month for 2006-2018 ($\mu g\ m^{-3}$). Only statistically significant trends are shown. If the trend is not statistically significant, the slope is set to 0. The standard deviation is based on the variation in daily $PM_{2.5}$ observations.

| Month | Avg | Slope | SD |
|-------|------|-------|-----|
| 1 | 12.1 | -0.4 | 5.4 |
| 2 | 12.6 | -0.4 | 6.5 |
| 3 | 10.8 | -0.4 | 5.3 |
| 4 | 9.7 | -0.4 | 4.7 |
| 5 | 10.1 | -0.4 | 4.9 |
| 6 | 10.7 | -0.4 | 4.8 |
| 7 | 11.9 | -0.5 | 5.1 |
| 8 | 10.8 | -0.4 | 5.6 |
| 9 | 9.7 | -0.4 | 4.6 |
| 10 | 8.7 | -0.4 | 3.8 |
| 11 | 11.4 | -0.5 | 5.8 |
| 12 | 11.8 | -0.5 | 5.9 |

**Table S2. Number of days in each category by year, May-September only.**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 133 | 129 | 132 | 120 | 133 | 119 | 121 | 132 | 123 | 123 | 137 | 136 | 129 | 1667 |
| Cross-val | 13 | 15 | 14 | 15 | 14 | 13 | 14 | 15 | 14 | 15 | 15 | 14 | 13 | 184 |
| Smoke | 5 | 9 | 7 | 13 | 6 | 18 | 17 | 6 | 16 | 12 |  | 3 | 11 | 123 |

**Table S3. Average MDA8 in each category**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 45.8 | 50.7 | 47.2 | 40.3 | 49.4 | 43.4 | 52.6 | 46.7 | 45.4 | 45.5 | 49.1 | 49.1 | 47.9 | 47.2 |
| Cross-val | 49.7 | 56.1 | 43.4 | 37.3 | 46.9 | 43.2 | 50.4 | 52.1 | 43.6 | 44.3 | 48.7 | 52.4 | 51.5 | 47.6 |
| Smoke | 59.6 | 70.3 | 58.1 | 52.3 | 55.7 | 67.8 | 76.5 | 63.8 | 57.9 | 59.8 |  | 58.3 | 52.5 | 62.2 |

**Table S4. Average surface Tmax (°F) in each category**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 77.0 | 79.8 | 77.7 | 75.7 | 79.7 | 76.7 | 80.9 | 78.4 | 78.8 | 79.4 | 80.8 | 78.8 | 80.7 | 78.8 |
| Cross-val | 79.5 | 81.3 | 76.2 | 75.1 | 76.6 | 75.5 | 78.6 | 81.3 | 74.9 | 76.9 | 81.3 | 80.0 | 84.2 | 78.6 |
| Smoke | 84.5 | 88.0 | 82.4 | 80.4 | 87.7 | 90.1 | 94.2 | 86.3 | 83.5 | 85.0 |  | 89.0 | 89.5 | 87.1 |

**Table S5. Number of days included in the GAM**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 127 | 124 | 131 | 120 | 131 | 117 | 117 | 128 | 119 | 121 | 135 | 133 | 128 | 1631 |
| Cross-val | 12 | 13 | 14 | 15 | 14 | 13 | 14 | 15 | 14 | 15 | 15 | 14 | 13 | 181 |
| Smoke | 5 | 9 | 7 | 13 | 6 | 18 | 16 | 6 | 16 | 12 | 0 | 3 | 10 | 121 |

**Table S6. Average of residuals from the GAM**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | -1.04 | 0.43 | -0.44 | -3.27 | 1.46 | -1.68 | 0.76 | 0.18 | 0.20 | 0.42 | -0.03 | 3.24 | -0.62 | 0.00 |
| Cross-val | 2.44 | 3.77 | -2.15 | -4.91 | 0.19 | -1.54 | 2.61 | 2.59 | 0.33 | -0.16 | -1.12 | 4.83 | -0.42 | 0.44 |
| Smoke | 3.20 | 7.85 | 4.49 | 1.70 | -4.15 | 5.60 | 10.4 | 6.76 | 6.56 | 7.34 |  | 2.69 | -3.74 | 4.84 |

A22

# Dallas CSA



**Figure S1. Trend in 4th highest MDA8 O₃ for each site.**

**Figure S2. Trend in surface NO₂ daily max and OMI column, 2006-2018.**



**Figure S3. Trend in 4th highest O₃ and daily max NO₂, 1995-2019. For this plot and the next one, I use NO₂ data from AQS sites 481130069, 481130075, 481130087, 481210034 and 484391002.**



**Figure S4. O₃ vs NO₂, 1995-2019.**



**Figure S5. MDA8 vs daily max NO₂ for Grapevine Fairway site.**



**Figure S6. MDA8 vs trajectory direction for Grapevine Fairway site.**



**Figure S7. MDA8 vs trajectory distance for Grapevine Fairway site.**



**Figure S8. GAM predicted vs Observed, training data only for Grapevine Fairway site.**



**Figure S9. GAM residuals vs predicted, training and cross-validation data for Grapevine Fairway site.**

**Figure S10. GAM residuals vs predicted, training and smoke data for Grapevine Fairway site.**

A28



**Figure S11. Probability (P) of an $O_3$ exceedance day (MDA8>70 ppb) across all sites that we considered and averaged surface $NO_2$ concentrations as a function of day of week (Sunday=1, Monday =2, etc). Both are calculated using May-September 2013-2018 data.**



**Figure S12. Annual 98th percentile of daily maximum temperature (ºF) and fourth highest MDA8 (ppb).**

**Figure S13. Annual fourth highest for all data, smoke days excluded, and HMS days excluded for Grapevine Fairway site.**

**Table S1. Average, standard deviation and trend in $PM_{2.5}$ for DAL by month for 2006-2018 ($\mu g\ m^{-3}$). Only statistically significant trends are shown. If the trend is not statistically significant, the slope is set to 0. The standard deviation is based on the variation in daily $PM_{2.5}$ observations.**

| Month | Avg | Slope | SD |
|---|---|---|---|
| 1 | 7.3 | 0.0 | 2.7 |
| 2 | 8.2 | 0.0 | 3.3 |
| 3 | 8.5 | -0.2 | 3.3 |
| 4 | 9.1 | -0.3 | 3.9 |
| 5 | 9.2 | -0.3 | 4.0 |
| 6 | 10.1 | 0.0 | 4.4 |
| 7 | 12.3 | 0.0 | 5.0 |
| 8 | 11.3 | 0.0 | 4.3 |
| 9 | 10.0 | -0.3 | 4.5 |
| 10 | 8.2 | 0.0 | 3.2 |
| 11 | 8.1 | 0.0 | 3.3 |
| 12 | 8.1 | 0.0 | 3.2 |

**Table S2. Number of days in each category by year, May-September only.**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 133 | 131 | 136 | 130 | 130 | 108 | 123 | 116 | 133 | 130 | 134 | 135 | 132 | 1671 |
| Cross-val | 14 | 15 | 14 | 15 | 15 | 14 | 16 | 13 | 14 | 16 | 13 | 12 | 14 | 185 |
| Smoke | 3 | 6 | 3 | 5 | 4 | 18 | 10 | 20 | 4 | 5 | 2 | 4 | 6 | 90 |

**Table S3. Average MDA8 in each category**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 57.2 | 44.2 | 46.2 | 51.8 | 47.2 | 56.5 | 53.9 | 51.1 | 46.5 | 46.7 | 44.9 | 47.6 | 45.8 | 49.1 |
| Cross-val | 57.6 | 47.9 | 45.1 | 45.9 | 50.9 | 57.1 | 59.1 | 51.3 | 50.5 | 45.0 | 48.6 | 49.1 | 45.7 | 50.3 |
| Smoke | 70.0 | 75.3 | 39.3 | 66.4 | 60.3 | 54.9 | 73.8 | 60.9 | 63.8 | 68.6 | 41.0 | 50.5 | 58.2 | 61.4 |

**Table S4. Average surface Tmax (ºF) in each category**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 94.0 | 89.0 | 91.4 | 90.8 | 93.7 | 96.7 | 94.0 | 93.0 | 91.0 | 92.7 | 91.6 | 90.9 | 94.2 | 92.5 |
| Cross-val | 92.9 | 88.5 | 92.9 | 89.9 | 93.8 | 95.9 | 92.4 | 93.5 | 90.1 | 91.9 | 92.1 | 93.5 | 93.0 | 92.3 |
| Smoke | 98.0 | 90.5 | 93.3 | 97.8 | 96.0 | 94.7 | 97.9 | 98.4 | 94.3 | 90.6 | 90.5 | 94.3 | 101.8 | 96.0 |

**Table S5. Number of days included in the GAM**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 125 | 128 | 130 | 128 | 128 | 108 | 121 | 116 | 133 | 127 | 133 | 134 | 131 | 1642 |
| Cross-val | 12 | 13 | 14 | 15 | 15 | 14 | 16 | 13 | 14 | 16 | 12 | 12 | 14 | 180 |
| Smoke | 2 | 6 | 2 | 5 | 4 | 18 | 10 | 20 | 4 | 5 | 2 | 4 | 6 | 88 |

**Table S6. Average of residuals from the GAM**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 0.44 | 0.25 | -2.67 | 3.15 | -1.03 | -1.03 | 1.49 | -0.75 | -0.08 | 0.25 | -0.49 | 0.74 | -0.36 | 0.00 |
| Cross-val | -0.64 | 0.86 | -5.72 | 0.21 | -0.96 | -1.73 | 4.98 | -1.44 | 3.38 | 0.66 | 0.11 | 3.34 | 0.59 | 0.31 |
| Smoke | 3.87 | 13.22 | -2.95 | 6.31 | 2.06 | 1.22 | 9.35 | 4.16 | 7.39 | 16.33 | 6.90 | 7.66 | 2.23 | 5.55 |

A31

# Detroit CSA



**Figure S1. Trend in 4th highest MDA8 O₃ for each site.**



**Figure S2. Trend in surface NO₂ daily max and OMI column, 2006-2018.**



**Figure S3. Trend in 4th highest $O_3$ (East 7 mile site) and daily max $NO_2$, 1995-2019. For $NO_2$, we use a combination of sites as East 7 mile was not available for 2019 at this time. The sites used were: AQS ids: 261630015, 261630016, 261630019, 261630093, 261630094, 261630095, 261630098, 261630099, 261630100, 261631010, 261631011.**



**Figure S4. $O_3$ vs $NO_2$, 1995-2019 using same data as in previous figure.**



**Figure S5. MDA8 vs daily max NO₂ for New Haven site.**



**Figure S6. MDA8 vs trajectory direction for New Haven site.**



**Figure S7. MDA8 vs trajectory distance for New Haven site.**



**Figure S8. GAM predicted vs Observed, training data only for New Haven site.**



**Figure S9. GAM residuals vs predicted, training and cross-validation data for New Haven site.**

**Figure S10. GAM residuals vs predicted, training and smoke data for New Haven site.**



**Figure S11. Probability (P) of an $O_3$ exceedance day (MDA8>70 ppb) across all sites that we considered and averaged surface $NO_2$ concentrations as a function of day of week (Sunday=1, Monday =2, etc). Both are calculated using May-September 2013-2018 data.**



**Figure S12. Annual 98th percentile of daily maximum temperature (ºF) and fourth highest MDA8 (ppb) for New Haven site.**



**Figure S13. Annual fourth highest for all data, smoke days excluded, and HMS days excluded for New Haven site.**



**Figure S14. Annual fourth highest for all data, smoke days excluded, and HMS days excluded for Oak Park site.**



**Figure S15. Annual fourth highest for all data, smoke days excluded, and HMS days excluded for East 7 Mile site.**



**Figure S16. Annual fourth highest for all data, smoke days excluded, and HMS days excluded for Port Huron site.**

A40

**Table S1. Average, standard deviation and trend in $PM_{2.5}$ for DET by month for 2006-2018 (µg m$^{-3}$). Only statistically significant trends are shown. If the trend is not statistically significant, the slope is set to 0. The standard deviation is based on the variation in daily $PM_{2.5}$ observations.**

| Month | Avg | Slope | SD |
|---|---|---|---|
| 1 | 11.8 | -0.3 | 6.0 |
| 2 | 11.7 | -0.5 | 6.5 |
| 3 | 10.2 | -0.5 | 6.4 |
| 4 | 8.3 | -0.2 | 4.1 |
| 5 | 9.2 | 0.0 | 4.8 |
| 6 | 9.7 | -0.3 | 4.4 |
| 7 | 11.9 | -0.4 | 5.5 |
| 8 | 10.8 | -0.3 | 5.7 |
| 9 | 9.5 | 0.0 | 5.2 |
| 10 | 8.4 | 0.0 | 4.4 |
| 11 | 11.2 | -0.5 | 7.0 |
| 12 | 11.4 | -0.5 | 6.4 |

**Detroit CSA -New Haven**
**Table S2. Number of days in each category by year, May-September only.**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 135 | 124 | 131 | 131 | 130 | 128 | 124 | 127 | 128 | 130 | 135 | 135 | 125 | 1683 |
| Cross-val | 15 | 13 | 15 | 16 | 14 | 13 | 16 | 13 | 14 | 13 | 14 | 15 | 13 | 184 |
| Smoke | 2 | 15 | 6 | 5 | 5 | 10 | 9 | 11 | 7 | 9 | 3 | 1 | 11 | 94 |

**Table S3. Average MDA8 in each category (ppb)**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 45.2 | 47.1 | 45.7 | 42.2 | 47.6 | 44.7 | 50.7 | 43.3 | 44.7 | 46.5 | 46.8 | 44.5 | 44.8 | 45.7 |
| Cross-val | 48.3 | 49.9 | 40.4 | 44.2 | 47.7 | 43.5 | 48.6 | 46.1 | 43.6 | 45.1 | 42.3 | 46.9 | 48.8 | 45.8 |
| Smoke | 62.5 | 74.9 | 57.2 | 54.6 | 69.0 | 73.0 | 68.1 | 64.0 | 58.9 | 62.3 | 73.0 | 56.0 | 56.3 | 65.1 |

**Table S4. Average surface Tmax (ºF) in each category**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 75.6 | 78.1 | 75.7 | 74.2 | 77.7 | 75.9 | 78.9 | 75.1 | 74.9 | 77.0 | 78.7 | 76.1 | 78.3 | 76.6 |
| Cross-val | 78.6 | 76.3 | 75.1 | 73.7 | 75.4 | 74.5 | 76.8 | 76.5 | 71.9 | 73.7 | 77.1 | 77.5 | 80.6 | 76.0 |
| Smoke | 85.5 | 87.5 | 82.2 | 81.2 | 87.6 | 90.4 | 92.1 | 85.0 | 83.3 | 83.2 | 86.7 | 91.0 | 88.5 | 86.7 |

**Table S5. Number of days included in the GAM**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 125 | 111 | 124 | 120 | 114 | 125 | 124 | 127 | 124 | 129 | 135 | 133 | 125 | 1616 |
| Cross-val | 13 | 10 | 15 | 15 | 13 | 13 | 16 | 12 | 14 | 13 | 14 | 15 | 13 | 176 |
| Smoke | 2 | 15 | 6 | 5 | 4 | 10 | 9 | 11 | 7 | 9 | 3 | 1 | 11 | 93 |

**Table S6. Average of residuals**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 0.22 | -1.15 | 0.81 | -0.89 | 0.99 | -0.40 | 0.01 | -0.09 | 0.96 | 0.53 | -0.63 | 0.19 | -0.59 | 0.00 |
| Cross-val | 0.97 | 1.62 | -2.46 | 1.13 | 4.50 | 0.16 | 1.58 | 0.60 | 1.90 | 0.92 | -0.88 | 1.09 | -1.08 | 0.74 |
| Smoke | -0.76 | 10.54 | 6.09 | 6.91 | 9.34 | 9.09 | -1.11 | 3.26 | 5.97 | 6.30 | 3.41 | 0.06 | -0.46 | 5.22 |

**Detroit CSA -Oak Park**
**Table S7. Number of days in each category by year, May-September only.**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 131 | 124 | 131 | 131 | 131 | 125 | 122 | 123 | 128 | 123 | 135 | 136 | 121 | 1661 |
| Cross-val | 15 | 13 | 15 | 16 | 15 | 13 | 15 | 14 | 14 | 11 | 14 | 14 | 13 | 182 |
| Smoke | 2 | 15 | 6 | 5 | 5 | 10 | 9 | 11 | 6 | 8 | 3 | 1 | 8 | 89 |

**Table S8. Average MDA8 in each category (ppb)**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 43.5 | 46.5 | 45.3 | 43.3 | 46.3 | 45.5 | 51.8 | 42.6 | 43.3 | 44.7 | 46.3 | 44.4 | 45.7 | 45.3 |
| Cross-val | 47.2 | 45.5 | 40.1 | 44.1 | 46.2 | 45.7 | 48.3 | 42.6 | 43.9 | 46.1 | 42.3 | 48.8 | 49.2 | 45.3 |
| Smoke | 59.0 | 72.1 | 57.0 | 56.0 | 64.4 | 70.4 | 65.9 | 62.4 | 57.5 | 60.9 | 72.3 | 59.0 | 56.8 | 63.9 |

**Table S9. Average surface Tmax (ºF) in each category**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 75.6 | 78.1 | 75.7 | 74.2 | 77.7 | 75.9 | 78.9 | 75.1 | 74.9 | 77.0 | 78.7 | 76.1 | 78.3 | 76.6 |
| Cross-val | 78.6 | 76.3 | 75.1 | 73.7 | 75.4 | 74.5 | 76.8 | 76.5 | 71.9 | 73.7 | 77.1 | 77.5 | 80.6 | 76.0 |
| Smoke | 85.5 | 87.5 | 82.2 | 81.2 | 87.6 | 90.4 | 92.1 | 85.0 | 83.3 | 83.2 | 86.7 | 91.0 | 88.5 | 86.7 |

**Table S10. Number of days included in the GAM**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 122 | 111 | 124 | 120 | 115 | 122 | 122 | 123 | 124 | 122 | 135 | 134 | 121 | 1595 |
| Cross-val | 13 | 10 | 15 | 15 | 14 | 13 | 15 | 13 | 14 | 11 | 14 | 14 | 13 | 174 |
| Smoke | 2 | 15 | 6 | 5 | 4 | 10 | 9 | 11 | 6 | 8 | 3 | 1 | 8 | 88 |

**Table S11. Average of residuals**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 0.44 | -1.53 | 0.86 | -0.14 | -0.16 | 0.68 | 0.13 | -0.41 | 0.47 | 0.00 | -0.82 | 0.16 | 0.22 | 0.00 |
| Cross-val | 1.74 | -0.01 | -2.44 | 1.51 | 0.84 | 1.50 | 0.10 | -1.64 | 2.80 | 0.22 | -1.48 | 1.83 | 0.19 | 0.40 |
| Smoke | -3.51 | 10.15 | 5.81 | 7.70 | 3.54 | 8.18 | -1.72 | 4.35 | 5.10 | 7.09 | 5.17 | 2.70 | 0.28 | 5.17 |

**Detroit CSA -East 7 Mile**
**Table S12. Number of days in each category by year, May-September only.**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 132 | 124 | 124 | 130 | 122 | 126 | 124 | 122 | 126 | 127 | 128 | 131 | 125 | 1641 |
| Cross-val | 14 | 13 | 14 | 16 | 14 | 13 | 16 | 14 | 13 | 12 | 14 | 14 | 13 | 180 |
| Smoke | 2 | 15 | 6 | 5 | 3 | 10 | 8 | 11 | 7 | 9 | 2 |  | 11 | 89 |

**Table S13. Average MDA8 in each category (ppb)**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 45.5 | 48.3 | 46.3 | 42.5 | 48.4 | 45.9 | 52.0 | 43.9 | 46.0 | 47.5 | 48.4 | 49.3 | 44.2 | 46.8 |
| Cross-val | 48.6 | 48.3 | 41.3 | 43.1 | 47.7 | 45.5 | 48.4 | 44.2 | 45.8 | 47.8 | 45.9 | 51.9 | 48.0 | 46.6 |
| Smoke | 63.5 | 77.1 | 60.5 | 53.4 | 73.7 | 73.7 | 67.9 | 64.7 | 65.1 | 64.0 | 77.0 |  | 55.3 | 66.5 |

**Table S14. Average surface Tmax (ºF) in each category**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 75.6 | 78.1 | 75.7 | 74.2 | 77.7 | 75.9 | 78.9 | 75.1 | 74.9 | 77.0 | 78.7 | 76.1 | 78.3 | 76.6 |
| Cross-val | 78.6 | 76.3 | 75.1 | 73.7 | 75.4 | 74.5 | 76.8 | 76.5 | 71.9 | 73.7 | 77.1 | 77.5 | 80.6 | 76.0 |
| Smoke | 85.5 | 87.5 | 82.2 | 81.2 | 87.6 | 90.4 | 92.1 | 85.0 | 83.3 | 83.2 | 86.7 | 91.0 | 88.5 | 86.7 |

**Table S15. Number of days included in the GAM**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 123 | 111 | 118 | 119 | 113 | 124 | 124 | 122 | 122 | 126 | 128 | 130 | 125 | 1585 |
| Cross-val | 12 | 10 | 14 | 15 | 13 | 13 | 16 | 13 | 13 | 12 | 14 | 14 | 13 | 172 |
| Smoke | 2 | 15 | 6 | 5 | 3 | 10 | 8 | 11 | 7 | 9 | 2 |  | 11 | 89 |

**Table S16. Average of residuals**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 0.35 | -0.93 | 0.50 | -1.53 | 1.21 | 0.31 | 0.20 | -0.94 | 0.56 | 0.41 | -0.63 | 3.51 | -3.18 | 0.00 |
| Cross-val | 2.62 | -0.29 | -2.79 | -1.22 | 2.15 | 1.24 | 0.06 | -2.45 | 2.13 | 1.26 | 0.09 | 4.39 | -3.30 | 0.27 |
| Smoke | -1.95 | 11.45 | 5.92 | 4.34 | 9.81 | 9.61 | -2.90 | 3.87 | 8.97 | 6.54 | 4.17 |  | -4.38 | 5.08 |

**Detroit CSA–Port Huron**
**Table S17. Number of days in each category by year, May-September only.**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 135 | 124 | 130 | 131 | 132 | 127 | 127 | 126 | 131 | 127 | 134 | 137 | 128 | 1689 |
| Cross-val | 15 | 13 | 15 | 16 | 15 | 13 | 16 | 14 | 14 | 13 | 14 | 15 | 14 | 187 |
| Smoke | 2 | 15 | 6 | 5 | 5 | 10 | 9 | 11 | 7 | 9 | 3 | 1 | 11 | 94 |

**Table S18. Average MDA8 in each category (ppb)**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 41.4 | 43.2 | 42.5 | 39.0 | 44.5 | 40.9 | 46.9 | 39.9 | 41.8 | 46.4 | 43.1 | 43.0 | 43.0 | 42.7 |
| Cross-val | 45.7 | 47.1 | 36.6 | 40.8 | 41.9 | 40.2 | 44.2 | 44.3 | 42.4 | 42.8 | 36.8 | 46.2 | 48.3 | 42.8 |
| Smoke | 67.0 | 70.5 | 48.7 | 52.0 | 64.6 | 70.4 | 62.6 | 62.4 | 58.7 | 64.2 | 70.7 | 46.0 | 56.2 | 62.6 |

**Table S19. Average surface Tmax (°F) in each category**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 75.6 | 78.1 | 75.7 | 74.2 | 77.7 | 75.9 | 78.9 | 75.1 | 74.9 | 77.0 | 78.7 | 76.1 | 78.3 | 76.6 |
| Cross-val | 78.6 | 76.3 | 75.1 | 73.7 | 75.4 | 74.5 | 76.8 | 76.5 | 71.9 | 73.7 | 77.1 | 77.5 | 80.6 | 76.0 |
| Smoke | 85.5 | 87.5 | 82.2 | 81.2 | 87.6 | 90.4 | 92.1 | 85.0 | 83.3 | 83.2 | 86.7 | 91.0 | 88.5 | 86.7 |

**Table S20. Number of days included in the GAM**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 125 | 111 | 123 | 120 | 116 | 125 | 127 | 126 | 127 | 126 | 134 | 136 | 128 | 1624 |
| Cross-val | 13 | 11 | 15 | 15 | 14 | 13 | 16 | 14 | 14 | 13 | 14 | 15 | 14 | 181 |
| Smoke | 2 | 15 | 6 | 5 | 4 | 10 | 9 | 11 | 7 | 9 | 3 | 1 | 11 | 93 |

**Table S21. Average of residuals**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 0.15 | -0.42 | 0.64 | -1.14 | 1.07 | -0.67 | 0.45 | -0.94 | 0.04 | 2.32 | -1.26 | 0.16 | -0.32 | 0.00 |
| Cross-val | 1.32 | 3.54 | -2.64 | -0.90 | -0.09 | -0.11 | 0.93 | 1.26 | 1.45 | 0.07 | -3.93 | 1.30 | 1.74 | 0.24 |
| Smoke | 3.01 | 10.36 | -1.19 | 7.94 | 7.34 | 10.13 | -2.20 | 4.11 | 9.15 | 12.69 | 2.72 | -2.12 | -0.65 | 5.67 |

# NY/NJ CSA



**Figure S1. Trend in 4th highest MDA8 $O_3$ for each site.**

**Figure S2. Trend in surface $NO_2$ daily max and OMI column, 2006-2018.**



**Figure S3. Trend in 4th highest O3 (two sites) and daily max NO2, 1995-2019. For this plot and the next I use fourth highest MDA8 averaged from two sites; Fairfield CT and Flemington NJ (AQS i.d. 340190001). For NO2, I use data from AQS sites: 340131003, 340170006, 340230011, 340273001 and 340390004.**



**Figure S4. O3 vs NO2, 1995-2019.**



**Figure S5. MDA8 vs daily max NO₂ for Fairfield site.**



**Figure S6. MDA8 vs trajectory direction for Fairfield site.**



**Figure S7. MDA8 vs trajectory distance for Fairfield site.**



**Figure S8. GAM predicted vs Observed, training data only for Fairfield site.**



**Figure S9. GAM residuals vs predicted, training and cross-validation data for Fairfield site.**



**Figure S10. GAM residuals vs predicted, training and smoke data for Fairfield site.**



**Figure S11. Probability (P) of an O₃ exceedance day (MDA8>70 ppb) across all sites that we considered and averaged surface NO₂ concentrations as a function of day of week (Sunday=1, Monday =2, etc). Both are calculated using May-September 2013-2018 data.**



**Figure S12. Annual 98th percentile of daily maximum temperature (ºF) and fourth highest MDA8 (ppb) for Fairfield site.**



**Figure S13. Annual fourth highest for all data, smoke days excluded, and HMS days excluded for Leonia site.**



**Figure S14. Annual fourth highest for all data, smoke days excluded, and HMS days excluded for Fairfield site.**

**Table S1. Average, standard deviation and trend in PM$_{2.5}$ for NY by month for 2006-2018 (µg m$^{-3}$). Only statistically significant trends are shown. If the trend is not statistically significant, the slope is set to 0. The standard deviation is based on the variation in daily PM$_{2.5}$ observations.**

| Month | Avg | Slope | SD |
|---|---|---|---|
| 1 | 11.8 | -0.3 | 5.1 |
| 2 | 10.8 | -0.4 | 5.2 |
| 3 | 8.5 | -0.4 | 4.8 |
| 4 | 7.5 | -0.3 | 4.0 |
| 5 | 8.3 | -0.4 | 4.9 |
| 6 | 9.2 | -0.7 | 6.3 |
| 7 | 11.5 | -1.0 | 7.2 |
| 8 | 9.1 | -0.5 | 5.7 |
| 9 | 7.3 | -0.4 | 4.7 |
| 10 | 7.6 | -0.4 | 4.4 |
| 11 | 9.0 | -0.5 | 5.2 |
| 12 | 10.3 | -0.3 | 5.0 |

A54

**NY/NJ/CT CSA -Leonia\***
**Table S2. Number of days in each category by year, May-September only.**

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 128 | 134 | 136 | 127 | 57 | 132 | 133 | 124 | 136 | 134 | 127 | 1368 |
| Cross-val | 14 | 16 | 14 | 15 | 7 | 15 | 14 | 14 | 15 | 15 | 15 | 154 |
| Smoke | 3 | 2 | 3 | 11 | 4 | 4 |  | 10 | 2 | 3 | 10 | 52 |

**Table S3. Average MDA8 in each category (ppb)**

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 45.2 | 38.1 | 45.8 | 44.5 | 44.2 | 44.8 | 40.5 | 46.4 | 45.6 | 43.0 | 43.1 | 43.7 |
| Cross-val | 46.8 | 40.4 | 42.6 | 41.9 | 41.4 | 45.0 | 35.6 | 39.9 | 44.5 | 39.3 | 40.7 | 41.7 |
| Smoke | 78.0 | 70.0 | 66.0 | 68.4 | 74.0 | 72.3 |  | 62.6 | 85.5 | 56.3 | 66.9 | 68.2 |

**Table S4. Average surface Tmax (ºF) in each category**

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 78.9 | 76.0 | 82.3 | 79.6 | 79.1 | 78.8 | 79.3 | 82.2 | 80.7 | 78.0 | 79.5 | 79.3 |
| Cross-val | 79.9 | 76.9 | 81.4 | 79.1 | 76.1 | 79.1 | 78.8 | 79.3 | 79.9 | 76.3 | 78.7 | 78.9 |
| Smoke | 91.3 | 87.0 | 91.0 | 87.6 | 90.6 | 91.8 |  | 90.5 | 89.0 | 84.7 | 90.4 | 89.0 |

**Table S5. Number of days included in the GAM**

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 123 | 118 | 134 | 126 | 56 | 131 | 132 | 123 | 134 | 134 | 125 | 1336 |
| Cross-val | 13 | 15 | 13 | 15 | 7 | 15 | 14 | 14 | 15 | 15 | 15 | 151 |
| Smoke | 3 | 1 | 3 | 10 | 4 | 4 |  | 10 | 2 | 3 | 10 | 50 |

**Table S6. Average of residuals**

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | -0.60 | -1.15 | -1.88 | 1.47 | 1.58 | 2.10 | -2.46 | -1.03 | -0.19 | 1.09 | 1.95 | 0.00 |
| Cross-val | 2.65 | -0.63 | -2.92 | -1.10 | 1.65 | 1.22 | -4.49 | 0.83 | 1.98 | -0.35 | 2.42 | 0.07 |
| Smoke | 8.94 | 18.76 | 1.54 | 10.44 | 9.74 | 2.92 |  | 3.59 | 21.84 | 4.92 | 7.85 | 7.56 |

\*Data for Leonia site start in 2008.  There is also a significant amount of missing data in 2012.

**NY/NJ/CT CSA-Fairfield**
**Table S7. Number of days in each category by year, May-September only.**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 132 | 125 | 126 | 132 | 130 | 123 | 125 | 127 | 135 | 122 | 113 | 132 | 126 | 1648 |
| Cross-val | 14 | 14 | 14 | 16 | 13 | 15 | 15 | 15 | 14 | 13 | 13 | 15 | 15 | 186 |
| Smoke | 3 | 13 | 3 | 2 | 3 | 11 | 12 | 4 |  | 10 | 2 | 3 | 8 | 74 |

**Table S8. Average MDA8 in each category (ppb)**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 47.9 | 45.5 | 49.3 | 43.2 | 49.1 | 46.2 | 48.3 | 49.2 | 47.9 | 49.6 | 49.8 | 45.2 | 43.8 | 47.3 |
| Cross-val | 51.3 | 49.5 | 46.0 | 42.6 | 47.8 | 44.3 | 44.8 | 49.6 | 42.1 | 41.5 | 46.9 | 42.5 | 40.5 | 45.3 |
| Smoke | 72.3 | 67.0 | 78.3 | 72.5 | 68.7 | 65.5 | 75.7 | 83.3 |  | 67.6 | 88.5 | 56.7 | 67.3 | 70.2 |

**Table S9. Average surface Tmax (ºF) in each category**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 77.6 | 78.5 | 78.9 | 76.0 | 82.3 | 79.6 | 79.1 | 78.8 | 79.3 | 82.2 | 80.7 | 78.0 | 79.5 | 79.3 |
| Cross-val | 80.5 | 80.2 | 79.9 | 76.9 | 81.4 | 79.1 | 76.1 | 79.1 | 78.8 | 79.3 | 79.9 | 76.3 | 78.7 | 78.9 |
| Smoke | 87.3 | 86.5 | 91.3 | 87.0 | 91.0 | 87.6 | 90.6 | 91.8 |  | 90.5 | 89.0 | 84.7 | 90.4 | 89.0 |

**Table S10. Number of days included in the GAM**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 105 | 112 | 118 | 113 | 127 | 122 | 123 | 126 | 134 | 120 | 109 | 131 | 123 | 1563 |
| Cross-val | 12 | 13 | 13 | 15 | 12 | 15 | 15 | 15 | 14 | 13 | 13 | 15 | 15 | 180 |
| Smoke | 3 | 11 | 3 | 1 | 3 | 10 | 12 | 4 |  | 10 | 2 | 3 | 8 | 70 |

**Table S11. Average of residuals**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 1.54 | -2.74 | -1.01 | 0.22 | -2.15 | -0.53 | 1.02 | 2.35 | 1.04 | -0.90 | 0.94 | 0.51 | -0.37 | 0.00 |
| Cross-val | 3.92 | -0.72 | -0.91 | -3.21 | -2.69 | -2.17 | 3.66 | 2.25 | -1.12 | -2.30 | -1.33 | -1.58 | -2.54 | -0.69 |
| Smoke | 6.34 | 5.03 | 2.15 | 13.61 | -4.50 | 5.50 | 10.56 | 9.38 |  | 3.76 | 22.38 | 0.46 | 5.58 | 6.12 |

A56

# Phoenix CSA



**Figure S1. Trend in 4th highest MDA8 O3 for each site.**



**Figure S2. Trend in surface NO₂ daily max and OMI column, 2006-2018.**



**Figure S3. Trend in 4th highest O$_3$ and daily max NO$_2$, 1995-2019.**

**Figure S4. O$_3$ vs NO$_2$, 1995-2019.**



**Figure S5. MDA8 vs daily max NO₂ for North Phoenix site.**



**Figure S6. MDA8 vs trajectory direction for North Phoenix site.**



**Figure S7. MDA8 vs trajectory distance for North Phoenix site.**



**Figure S8. GAM predicted vs Observed, training data only for North Phoenix site.**



**Figure S9. GAM residuals vs predicted, training and cross-validation data for North Phoenix site.**



**Figure S10. GAM residuals vs predicted, training and smoke data for North Phoenix site.**



**Figure S11. Probability (P) of an O$_3$ exceedance day (MDA8>70 ppb) across all sites that we considered and averaged surface NO$_2$ concentrations as a function of day of week (Sunday=1, Monday =2, etc). Both are calculated using May-September 2013-2018 data.**



**Figure S12. Annual 98th percentile of daily maximum temperature (ºF) and fourth highest MDA8 (ppb).**



**Figure S13. Annual fourth highest for all data, smoke days excluded, and HMS days excluded for North Phoenix site.**

**Table S1. Average, standard deviation and trend in $PM_{2.5}$ for PHX by month for 2006-2018 ($\mu g\ m^{-3}$).   Only statistically significant trends are shown. If the trend is not statistically significant, the slope is set to 0. The standard deviation is based on the variation in daily $PM_{2.5}$ observations.**

| Month | Avg | Slope | SD |
|---|---|---|---|
| 1 | 11.5 | 0.0 | 8.9 |
| 2 | 8.6 | 0.0 | 3.4 |
| 3 | 7.5 | 0.0 | 2.4 |
| 4 | 7.9 | 0.0 | 2.7 |
| 5 | 8.0 | -0.3 | 2.6 |
| 6 | 8.4 | 0.0 | 2.7 |
| 7 | 7.9 | 0.0 | 4.2 |
| 8 | 7.1 | 0.0 | 2.9 |
| 9 | 7.2 | 0.0 | 2.5 |
| 10 | 8.4 | 0.0 | 2.4 |
| 11 | 10.9 | -0.3 | 3.7 |
| 12 | 13.5 | 0.0 | 6.4 |

**Table S2. Number of days in each category by year, May-September only\*.**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 136 | 137 | 136 | 137 | 138 | 133 | 132 | 134 | 138 | 137 | 136 | 130 | 133 | 1757 |
| Cross-val | 15 | 15 | 15 | 16 | 15 | 15 | 15 | 15 | 15 | 16 | 14 | 15 | 14 | 195 |
| Smoke |  |  |  |  |  | 5 | 6 | 4 |  |  |  | 7 | 4 | 26 |

For Phoenix, PM$_{2.5}$ data is not available before 2011, thus smoke days can not be identified before then.

**Table S3. Average MDA8 in each category (ppb)**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 62.7 | 59.2 | 59.9 | 55.8 | 60.2 | 60.4 | 60.0 | 59.2 | 57.7 | 55.6 | 56.5 | 59.5 | 58.8 | 58.9 |
| Cross-val | 64.1 | 63.7 | 59.1 | 54.1 | 57.7 | 59.4 | 64.1 | 61.9 | 59.9 | 56.9 | 57.3 | 55.2 | 57.1 | 59.3 |
| Smoke |  |  |  |  |  | 55.8 | 76.3 | 61.3 |  |  |  | 72.4 | 69.5 | 68.0 |

**Table S4. Average surface Tmax (ºF) in each category**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 100.2 | 100.7 | 99.1 | 100.3 | 98.8 | 99.3 | 99.2 | 98.5 | 98.6 | 98.7 | 99.0 | 99.9 | 100.6 | 99.4 |
| Cross-val | 101.7 | 99.1 | 97.6 | 99.5 | 100.5 | 100.3 | 100.6 | 101.8 | 99.3 | 98.4 | 100.1 | 98.5 | 101.7 | 99.9 |
| Smoke |  |  |  |  |  | 100.4 | 103.0 | 110.0 |  |  |  | 110.9 | 101.5 | 105.5 |

**Table S5. Number of days included in the GAM**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 132 | 131 | 132 | 137 | 137 | 132 | 129 | 133 | 136 | 136 | 136 | 128 | 132 | 1731 |
| Cross-val | 13 | 13 | 15 | 16 | 15 | 15 | 15 | 14 | 15 | 16 | 14 | 15 | 14 | 190 |
| Smoke |  |  |  |  |  | 5 | 6 | 4 |  |  |  | 7 | 4 | 26 |

**Table S6. Average of residuals**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 0.12 | -0.47 | 1.11 | -1.33 | 0.43 | 0.11 | 0.32 | -0.39 | 1.10 | -1.42 | -0.04 | 0.81 | -0.27 | 0.00 |
| Cross-val | 0.69 | 4.47 | 1.03 | -3.98 | -1.73 | -2.08 | 2.34 | 0.42 | 0.81 | 0.64 | 0.94 | -1.57 | -3.16 | -0.15 |
| Smoke |  |  |  |  |  | -3.78 | 3.67 | -1.24 |  |  |  | 2.78 | 6.59 | 1.69 |

# Salt Lake City CSA



**Figure S1. Trend in 4th highest MDA8 O3 for each site.**



**Figure S2. Trend in surface NO2 daily max and OMI column, 2006-2018.**



**Figure S3. Trend in 4th highest O₃ and daily max NO₂, 1995-2019 for Hawthorne site.**



**Figure S4. O$_3$ vs NO$_2$, 1995-2019.**



**Figure S5. MDA8 vs daily max NO$_2$ for Hawthorne site.**



**Figure S6. MDA8 vs trajectory direction for Hawthorne site.**



**Figure S7. MDA8 vs trajectory distance for Hawthorne site.**

**Figure S8. GAM predicted vs Observed, training data only for Bountiful site.**



**Figure S9. GAM residuals vs predicted, training and cross-validation data for Bountiful site.**



**Figure S10. GAM residuals vs predicted, training and smoke data for Bountiful site.**



**Figure S11. Probability (P) of an O₃ exceedance day (MDA8>70 ppb) across all sites that we considered and averaged surface NO₂ concentrations as a function of day of week (Sunday=1, Monday =2, etc). Both are calculated using May-September 2013-2018 data.**



**Figure S12. Annual 98th percentile of daily maximum temperature (°F) and fourth highest MDA8 (ppb) for Hawthorne site.**



**Figure S13. Annual fourth highest for all data, smoke days excluded, and HMS days excluded for Bountiful site.**



**Figure S14. Annual fourth highest for all data, smoke days excluded, and HMS days excluded for Erda site.**



**Figure S15. Annual fourth highest for all data, smoke days excluded, and HMS days excluded for Herriman site.**



**Figure S16. Annual fourth highest for all data, smoke days excluded, and HMS days excluded for Hawthorne site.**

A74

**Table S1. Average, standard deviation and trend in $PM_{2.5}$ for SLC by month for 2006-2018 ($\mu g\ m^{-3}$). Only statistically significant trends are shown. If the trend is not statistically significant, the slope is set to 0. The standard deviation is based on the variation in daily $PM_{2.5}$ observations.**

| Month | Avg | Slope | SD |
|-------|------|-------|------|
| 1 | 22.0 | 0.0 | 17.7 |
| 2 | 10.7 | 0.0 | 10.6 |
| 3 | 5.8 | -0.3 | 4.5 |
| 4 | 5.3 | -0.3 | 3.8 |
| 5 | 5.3 | -0.3 | 2.3 |
| 6 | 6.0 | 0.0 | 2.2 |
| 7 | 7.8 | -0.3 | 3.4 |
| 8 | 7.2 | 0.0 | 3.0 |
| 9 | 7.3 | 0.0 | 3.9 |
| 10 | 6.5 | -0.4 | 3.8 |
| 11 | 9.2 | -0.5 | 6.3 |
| 12 | 15.9 | 0.0 | 12.6 |

**Salt Lake City CSA-Bountiful**
**Table S2. Number of days in each category by year, May-September only.**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 132 | 122 | 119 | 128 | 136 | 133 | 119 | 87 | 134 | 73 | 132 | 127 | 108 | 1550 |
| Cross-val | 12 | 14 | 13 | 16 | 15 | 14 | 13 | 9 | 14 | 8 | 15 | 13 | 13 | 169 |
| Smoke | 8 | 16 | 16 | 7 |  | 1 | 17 | 1 | 3 | 1 | 5 | 12 | 31 | 118 |

**Table S3. Average MDA8 in each category (ppb)**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 57.0 | 55.1 | 52.1 | 51.1 | 50.4 | 49.2 | 49.9 | 48.8 | 53.3 | 53.0 | 52.8 | 58.2 | 56.1 | 52.9 |
| Cross-val | 58.2 | 56.9 | 52.2 | 51.9 | 49.3 | 49.9 | 51.9 | 48.0 | 55.1 | 52.3 | 53.2 | 59.0 | 59.1 | 53.7 |
| Smoke | 64.4 | 63.6 | 63.9 | 56.0 |  | 61.0 | 57.6 | 55.0 | 57.0 | 59.0 | 65.0 | 66.5 | 64.4 | 62.6 |

**Table S4. Average surface Tmax (ºF) in each category**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 84.9 | 86.8 | 83.3 | 83.5 | 82.1 | 81.2 | 85.8 | 87.3 | 83.3 | 83.8 | 86.0 | 85.7 | 85.0 | 84.5 |
| Cross-val | 81.7 | 86.4 | 79.3 | 82.8 | 83.9 | 83.9 | 87.6 | 87.1 | 85.1 | 85.3 | 88.2 | 84.4 | 86.2 | 84.8 |
| Smoke | 94.6 | 91.1 | 94.3 | 87.9 |  | 86.0 | 93.5 | 101.5 | 93.7 | 91.0 | 97.6 | 95.6 | 93.1 | 93.2 |

**Table S5. Number of days included in the GAM**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 125 | 119 | 117 | 128 | 136 | 131 | 117 | 87 | 134 | 72 | 130 | 127 | 108 | 1531 |
| Cross-val | 11 | 12 | 13 | 16 | 15 | 13 | 13 | 9 | 14 | 8 | 14 | 13 | 13 | 164 |
| Smoke | 7 | 15 | 16 | 7 |  | 1 | 17 | 1 | 3 | 1 | 5 | 12 | 31 | 116 |

**Table S6. Average of residuals**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 0.70 | -0.82 | -0.11 | 0.12 | 0.10 | 0.55 | -0.66 | -2.22 | 1.40 | 1.68 | -2.25 | 2.25 | -1.03 | 0.00 |
| Cross-val | 2.99 | 0.53 | 0.90 | 1.11 | -0.98 | -0.93 | -0.48 | -1.71 | 1.91 | 0.22 | -2.50 | 2.92 | 0.03 | 0.32 |
| Smoke | 1.74 | 4.77 | 3.68 | 5.43 |  | 6.32 | 4.43 | -5.97 | -4.48 | 5.67 | 0.68 | 4.64 | 2.07 | 3.21 |

**Salt Lake City CSA-Erda***
**Table S7. Number of days in each category by year, May-September only.**

|  | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|
| Training | 62 | 133 | 125 | 107 | 427 |
| Cross-val | 9 | 15 | 14 | 12 | 50 |
| Smoke | 3 | 5 | 12 | 32 | 52 |

**Table S8. Average MDA8 in each category (ppb)**

|  | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|
| Training | 54.7 | 51.9 | 56.4 | 54.8 | 54.4 |
| Cross-val | 50.7 | 50.9 | 54.3 | 57.8 | 53.5 |
| Smoke | 61.0 | 60.8 | 61.6 | 62.0 | 61.7 |

**Table S9. Average surface Tmax (ºF) in each category**

|  | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|
| Training | 83.8 | 86.0 | 85.7 | 85.0 | 84.5 |
| Cross-val | 85.3 | 88.2 | 84.4 | 86.2 | 84.8 |
| Smoke | 91.0 | 97.6 | 95.6 | 93.1 | 93.2 |

**Table S10. Number of days included in the GAM**

|  | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|
| Training | 62 | 73 | 119 | 101 | 355 |
| Cross-val | 9 | 7 | 14 | 12 | 42 |
| Smoke | 3 | 2 | 11 | 32 | 48 |

**Table S11. Average of residuals**

|  | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|
| Training | -1.18 | -1.90 | 1.13 | 0.77 | 0.00 |
| Cross-val | -5.34 | -3.26 | -0.53 | 3.10 | -0.98 |
| Smoke | 0.55 | -3.08 | 0.72 | 4.99 | 3.40 |

*Data for Erda site start in 2015.

**Salt Lake City CSA-Herriman***
**Table S12. Number of days in each category by year, May-September only.**

|  | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|
| Training | 128 | 130 | 125 | 101 | 484 |
| Cross-val | 15 | 15 | 14 | 12 | 56 |
| Smoke | 10 | 5 | 12 | 32 | 59 |

**Table S13. Average MDA8 in each category (ppb)**

|  | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|
| Training | 55.1 | 55.7 | 59.4 | 58.2 | 57.0 |
| Cross-val | 55.3 | 56.5 | 56.8 | 58.7 | 56.7 |
| Smoke | 64.2 | 67.0 | 66.8 | 66.4 | 66.1 |

**Table S14. Average surface Tmax (°F) in each category**

|  | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|
| Training | 83.8 | 86.0 | 85.7 | 85.0 | 84.5 |
| Cross-val | 85.3 | 88.2 | 84.4 | 86.2 | 84.8 |
| Smoke | 91.0 | 97.6 | 95.6 | 93.1 | 93.2 |

**Table S15. Number of days included in the GAM**

|  | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|
| Training | 127 | 128 | 125 | 101 | 481 |
| Cross-val | 15 | 14 | 14 | 12 | 55 |
| Smoke | 10 | 5 | 12 | 32 | 59 |

**Table S16. Average of residuals**

|  | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|
| Training | -1.00 | -0.81 | 1.48 | 0.45 | 0.00 |
| Cross-val | -2.85 | -1.17 | 2.13 | 0.68 | -0.64 |
| Smoke | 4.83 | 5.25 | 5.65 | 6.47 | 5.65 |

*Data for Herriman site start in 2015.

**Salt Lake City CSA-Hawthorne**
**Table S17. Number of days in each category by year, May-September only.**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 133 | 119 | 123 | 127 | 87 | 126 | 120 | 136 | 136 | 127 | 112 | 123 | 102 | 1571 |
| Cross-val | 12 | 13 | 13 | 15 | 10 | 15 | 14 | 15 | 13 | 14 | 12 | 14 | 12 | 172 |
| Smoke | 8 | 16 | 16 | 7 |  | 1 | 18 | 2 | 3 | 10 | 4 | 12 | 26 | 123 |

**Table S18. Average MDA8 in each category (ppb)**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 56.5 | 55.0 | 50.2 | 54.1 | 51.2 | 54.8 | 57.5 | 53.7 | 51.7 | 55.2 | 52.0 | 57.5 | 57.2 | 54.4 |
| Cross-val | 57.0 | 58.1 | 51.4 | 53.7 | 51.3 | 55.5 | 57.9 | 54.1 | 53.3 | 54.7 | 51.2 | 56.1 | 60.3 | 55.0 |
| Smoke | 63.4 | 63.9 | 59.2 | 53.6 |  | 73.0 | 65.4 | 67.0 | 56.7 | 68.1 | 63.5 | 68.3 | 57.7 | 62.3 |

**Table S19. Average surface Tmax (°F) in each category**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 84.9 | 86.8 | 83.3 | 83.5 | 82.1 | 81.2 | 85.8 | 87.3 | 83.3 | 83.8 | 86.0 | 85.7 | 85.0 | 84.5 |
| Cross-val | 81.7 | 86.4 | 79.3 | 82.8 | 83.9 | 83.9 | 87.6 | 87.1 | 85.1 | 85.3 | 88.2 | 84.4 | 86.2 | 84.8 |
| Smoke | 94.6 | 91.1 | 94.3 | 87.9 |  | 86.0 | 93.5 | 101.5 | 93.7 | 91.0 | 97.6 | 95.6 | 93.1 | 93.2 |

**Table S20. Number of days included in the GAM**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 126 | 115 | 121 | 127 | 87 | 125 | 118 | 136 | 136 | 126 | 110 | 123 | 102 | 1552 |
| Cross-val | 11 | 11 | 13 | 15 | 10 | 14 | 14 | 15 | 13 | 14 | 11 | 14 | 12 | 167 |
| Smoke | 7 | 15 | 16 | 7 |  | 1 | 18 | 2 | 3 | 10 | 4 | 12 | 26 | 121 |

**Table S21. Average of residuals**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 0.40 | 0.17 | -1.53 | 1.39 | -1.95 | 0.58 | 1.44 | -0.64 | -1.32 | 1.89 | -1.58 | 0.57 | -0.01 | 0.00 |
| Cross-val | 0.12 | 3.45 | 0.35 | 1.84 | -1.16 | 1.14 | 0.23 | 3.09 | -2.98 | 0.78 | -4.77 | 1.78 | 1.89 | 0.55 |
| Smoke | 1.97 | 6.93 | -1.73 | 4.56 |  | 13.95 | 7.62 | 7.50 | -4.62 | 11.18 | 1.95 | 7.32 | -3.92 | 3.14 |

# San Francisco CSA



**Figure S1. Trend in 4th highest MDA8 O₃ for each site.**

**Figure S2. Trend in surface NO₂ daily max and OMI column, 2006-2018.**



**Figure S3. Trend in 4th highest O₃ and daily max NO₂, 1995-2019.  For NO₂ I use data from these sites: 060010007, 060130002, 060131002, 060811001, 060750005 and 060410001.**



**Figure S4. O₃ vs NO₂, 1995-2019.**



**Figure S5. MDA8 vs daily max NO₂ for Livermore site.**



**Figure S6. MDA8 vs trajectory direction for Livermore site.**



**Figure S7. MDA8 vs trajectory distance for Livermore site.**



**Figure S8. GAM predicted vs Observed, training data only for Livermore site.**



**Figure S9. GAM residuals vs predicted, training and cross-validation data for Livermore site.**



**Figure S10. GAM residuals vs predicted, training and smoke data for Livermore site.**



**Figure S11. Probability (P) of an $O_3$ exceedance day (MDA8>70 ppb) across all sites that we considered and averaged surface $NO_2$ concentrations as a function of day of week (Sunday=1, Monday =2, etc). Both are calculated using May-September 2013-2018 data.**



**Figure S12. Annual 98th percentile of daily maximum temperature (ºF) and fourth highest MDA8 (ppb).**



**Figure S13. Annual fourth highest for all data, smoke days excluded, and HMS days excluded for Livermore site.**

**Table S1. Average, standard deviation and trend in $PM_{2.5}$ for SF by month for 2006-2018 ($\mu g \ m^{-3}$). Only statistically significant trends are shown. If the trend is not statistically significant, the slope is set to 0. The standard deviation is based on the variation in daily $PM_{2.5}$ observations.**

| Month | Avg | Slope | SD |
|---|---|---|---|
| 1 | 13.2 | 0.0 | 7.7 |
| 2 | 8.5 | 0.0 | 5.3 |
| 3 | 6.4 | 0.0 | 2.5 |
| 4 | 7.3 | 0.0 | 2.9 |
| 5 | 8.2 | 0.0 | 3.6 |
| 6 | 8.4 | 0.0 | 3.8 |
| 7 | 7.5 | 0.0 | 3.6 |
| 8 | 8.0 | 0.0 | 3.8 |
| 9 | 8.5 | 0.0 | 3.0 |
| 10 | 8.5 | 0.0 | 3.6 |
| 11 | 10.1 | 0.0 | 5.4 |
| 12 | 12.7 | 0.0 | 7.9 |

**Table S2. Number of days in each category by year, May–September only.**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 131 | 133 | 113 | 131 | 137 | 136 | 135 | 129 | 133 | 135 | 132 | 116 | 118 | 1679 |
| Cross-val | 14 | 15 | 11 | 15 | 15 | 15 | 16 | 15 | 15 | 16 | 13 | 14 | 12 | 186 |
| Smoke | 7 | 4 | 29 | 7 |  |  |  | 6 | 3 | 1 | 5 | 21 | 21 | 104 |

**Table S3. Average MDA8 in each category (ppb)**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 47.6 | 39.9 | 43.5 | 42.0 | 40.9 | 42.5 | 44.0 | 38.5 | 43.0 | 43.3 | 44.2 | 39.6 | 43.4 | 42.5 |
| Cross-val | 46.9 | 36.5 | 40.6 | 39.5 | 41.7 | 48.7 | 48.1 | 39.5 | 43.4 | 41.8 | 42.9 | 38.7 | 47.2 | 42.7 |
| Smoke | 51.0 | 49.5 | 57.4 | 63.3 |  |  |  | 55.3 | 55.7 | 63.0 | 51.4 | 58.7 | 49.9 | 55.4 |

**Table S4. Average surface Tmax (ºF) in each category**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 84.7 | 83.1 | 84.6 | 84.6 | 81.5 | 81.9 | 84.8 | 84.5 | 86.1 | 86.1 | 85.1 | 84.4 | 83.5 | 84.2 |
| Cross-val | 86.8 | 79.9 | 82.5 | 82.7 | 83.3 | 83.9 | 87.2 | 86.0 | 86.8 | 84.8 | 86.5 | 84.0 | 87.1 | 84.7 |
| Smoke | 92.3 | 87.5 | 89.6 | 96.3 |  |  |  | 90.2 | 95.0 | 101.0 | 93.6 | 94.8 | 85.9 | 90.9 |

**Table S5. Number of days included in the GAM**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 128 | 130 | 110 | 130 | 134 | 132 | 135 | 128 | 133 | 134 | 131 | 115 | 115 | 1655 |
| Cross-val | 14 | 15 | 11 | 15 | 15 | 15 | 16 | 14 | 15 | 16 | 13 | 14 | 12 | 185 |
| Smoke | 7 | 4 | 28 | 7 |  |  |  | 6 | 3 | 1 | 5 | 20 | 20 | 101 |

**Table S6. Average of residuals**

|  | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training | 0.51 | -0.96 | 0.31 | 0.66 | -0.81 | 0.26 | 0.65 | -0.99 | 0.45 | -0.26 | 0.96 | -1.45 | 0.60 | 0.00 |
| Cross-val | -1.19 | -0.16 | 0.17 | -0.05 | -1.94 | 1.68 | 1.58 | -1.81 | 0.60 | -1.01 | -1.47 | -2.85 | -0.15 | -0.48 |
| Smoke | -6.96 | 5.68 | 13.09 | 6.95 |  |  |  | 6.68 | -0.77 | -1.48 | -2.18 | 8.48 | 7.45 | 7.26 |

**Table S22:   R code GAM equations for each site.**

| Site | GAM equation (R code) |
|---|---|
| Atlanta-UA | Oz = gam(O3~s(DOY,bs="cr",k=10)+s(NO2surf, bs = "cr", k = 10)+s(OMINO2,bs="cr",k=10)+s(Tmaxsurf,bs="cr",k=10)+s(Dist,bs="cr",k=10)+ +s(WD1000M,bs="cr",k=10)+s(WS1000M,bs="cr",k=10)+s(MIX1000M,bs="cr",k=10)+ +s(WS1000A,bs="cr",k=10)+s(RH1000A,bs="cr",k=10)+ s(DOW,y),data=dat1,action=na.exclude) |
| Chicago-CHIW | Oz = gam(O3~s(DOY,bs="cr",k=10)+s(NO2surf, bs = "cr", k=10)+s(Merratmax,bs="cr",k=10) +s(Merratavg,bs="cr", k=3)+s(OmiUV,bs="cr",k=10)+s(OMINO2,bs="cr",k=10)+ s(Tmaxsurf,bs="cr",k=10) +s(Dir,bs="cr",k=10)+ s(CAPEM,bs="cr",k=10)+s(WD1000A,bs="cr",k=10),data=dat1,action=na.exclude) |
| Dallas-GRP | Oz = gam(O3~s(DOY,bs="cr",k=10)+s(NO2surf, bs = "cr", k = 10)+s(Merratmax,bs="cr",k=10) +s(OMINO2,bs="cr",k=10)+s(Dist,bs="cr",k=10)+s(T1000M,bs="cr",k=10)+s(WD1000M,bs="cr",k=10)+ s(WD1000A,bs="cr",k=10)+s(RH1000A,bs="cr",k=10)+s(DOW,y),data=dat1,action=na.exclude) |
| Detroit-EAST | Oz = gam(O3~s(DOY,bs="cr",k=10)+s(NO2surf, y)+s(OmiUV,bs="cr",k=10)+s(Tmaxsurf,bs="cr",k=10) +s(Dist,bs="cr",k=10)+s(Dir,bs="cr",k=10)+ s(WD1000M,bs="cr",k=10)+ s(MIX1000M,bs="cr",k=10)+ s(T1000A,bs="cr",k=10)+s(WS1000A,bs="cr",k=10),data=dat1,action=na.exclude) |
| Detroit-PORT | Oz = gam(O3~s(DOY,bs="cr",k=10)+s(NO2surf, y)+s(OmiUV,bs="cr",k=10)+s(Dir,bs="cr",k=10)+ s(WD1000M,bs="cr",k=10)+s(MIX1000M,bs="cr",k=10)+ s(T1000A,bs="cr",k=10),data= dat1,action=na.exclude) |
| Detroit-OAK | Oz = gam(O3~s(DOY,bs="cr",k=10)+s(NO2surf,y)+s(OmiUV,bs="cr",k=10)+s(Tmaxsurf,bs="cr", k=10)+s(Dist,bs="cr",k=10)+ s(WD1000M,bs="cr",k=10)+s(MIX1000M,bs="cr",k=10)+         s(WS1000A, bs="cr",k=10)+ s(RH1000A,bs="cr",k=10)+ s(DOW,y),data=dat1,action=na.exclude) |
| Detroit-NEW | Oz = gam(O3~s(DOY,bs="cr",k=10)+s(NO2surf, y)+s(OmiUV,bs="cr",k=10)+s(Tmaxsurf,bs="cr",k=10) +s(Dist,bs="cr",k=10)+s(Dir,bs="cr",k=10)+ s(MIX1000M,bs="cr",k=10)+         s(WD1000A,bs="cr",k=10)+ s(MIX1000A,bs="cr",k=10) ,data=dat1,action=na.exclude) |
| NYC-LEO | Oz = gam(O3~s(DOY,bs="cr",k=10)+s(NO2surf, bs = "cr", k = 10)+s(Merratmax,bs="cr",k=10)+ s(Merratavg,bs="cr",   k=3)+s(Tmaxsurf,bs="cr",k=10)+s(Dist,bs="cr",k=10)+s(Dir,bs="cr",k=10)+ s(WS1000A,bs="cr",k=10)+s(RH1000A,bs="cr",k=10),data=dat1,action=na.exclude) |
| NYC-FAIR | Oz = gam(O3~s(DOY,bs="cr",k=10)+s(NO2surf, bs = "cr", k = 10)+s(Merratmax,bs="cr",k=10) +s(Tmaxsurf,bs="cr",k=10)+s(Dist,bs="cr",k=10)+s(Dir,bs="cr",k=10)+         s(T850M,bs="cr",k=10)+ s(WD1000M, bs="cr",k=10)+s(MIX1000M,bs="cr",k=10)+     s(WD1000A,bs="cr",k=10)+ s(RH1000A,bs="cr",k=10),data=dat1,action=na.exclude) |
| PHX-NP | Oz = gam(O3~s(DOY,bs="cr",k=10)+s(NO2surf, bs = "cr", k = 10)+s(OmiUV,bs= "cr",k=10) +s(OMINO2, bs="cr",k=10)+s(Tmaxsurf,bs="cr",k=10)+s(Dist,bs="cr",k=10)+ s(T700M,bs= "cr",k=10)+s(T1000M, bs="cr",k=10)+s(WD1000M,bs="cr",k=10)+s(WS1000M,bs="cr",k=10)+s(DOW,y),data=dat1,action=na.exclude) |
| SLC-HAW | Oz = gam(O3~s(DOY,bs="cr",k=10)+s(OMINO2,bs="cr",k=10)+s(Dist,bs="cr",k=10)+s(Dir,bs="cr",k=10)+ s(T1000M,bs="cr",k=10)+s(WD1000M,bs="cr",k=10)+s(MIX1000M,bs="cr",k=10)+s(T1000A,bs="cr",k=10) +s(WD1000A,bs="cr",k=10)+s(WS1000A,bs="cr",k=10)+s(RH1000A,bs="cr",k=10)+s(MIX1000A,bs="cr",k=10 )+s(DOW,y),data=dat1,action=na.exclude) |
| SLC-HERR | Oz =gam(O3~s(DOY,bs="cr",k=10)+s(OMINO2,bs="cr",k=10)+s(Dist,bs="cr",k=10)+s(Dir,bs= "cr",k=10)+ s(WS1000M,bs="cr",k=10)+s(WS1000A,bs="cr",k=10)+s(RH1000A,bs="cr",k=10) ,data=dat1,action=na.exclude) |
| SLC-ERDA | Oz = gam(O3~s(DOY,bs="cr",k=10)+s(NO2surf, bs = "cr", k = 10)+s(OMINO2,bs="cr",k=10)+ s(Tmaxsurf,bs="cr",k=10)+s(Dir,bs="cr",k=10) ,data=dat1,action=na.exclude) |
| SLC-Bountiful | Oz = gam(O3~s(DOY,bs="cr",k=10)+s(Merratmax,bs="cr",k=10)+s(Tminsurf,bs="cr",k=10)+ s(Dir, bs="cr",k=10)+ s(T700M,bs="cr",k=10)+s(T1000M,bs="cr",k=10)+s(RH1000M,bs="cr",k=10)+s(WS1000A,bs= "cr", k=10)+s(RH1000A,bs="cr",k=10)+s(MIX1000A,bs="cr",k=10)+     s(DOW,y),data=dat1,action=na.exclude) |
| SF-LIV | Oz = gam(O3~s(DOY,bs="cr",k=10)+s(NO2surf, bs = "cr", k = 10)+s(Merratmax,bs="cr",k=10)+ s(Tminsurf,bs="cr",k=10)+s(Tmaxsurf,bs="cr",k=10)+s(Dist,bs="cr",k=10)+s(Dir,bs="cr",k=10)+s(T1000A,bs= "cr", k=10)+s(WS1000A,bs="cr",k=10)+s(RH1000A,bs="cr",k=10)+ s(DOW,y),data=dat1,action=na.exclude) |

Exhibit 5

## APPENDIX I: 179B(b) Modeling Demonstration

Prepared for:

Utah Department of Environmental Quality
Division of Air Quality
195 N 1950 W
Salt Lake City, UT 84116

Prepared by:

Ramboll
7250 Redwood Blvd., Suite 105
Novato, California 94945

November 2024
1940107280

# Clean Air Act §179B Demonstration for the Northern Wasatch Front Ozone Nonattainment Area



Ramboll – Clean Air Act §179B Demonstration for the Northern Wasatch Front Ozone Nonattainment Area

# 3.0 Precursor and Ozone Trends

Table 1 lists the two most recent annual anthropogenic NOx and VOC emissions inventories by major sector over the entirety of the four NAA Counties (Salt Lake, Davis, Weber and Tooele) as reported by UDAQ (2024a,b).  The largest contributors to NOx emissions include on-road and nonroad vehicles and point sources.  The largest contributors to VOC emissions include area (non-point) sectors and on-road vehicles.  Remarkable emission reductions are estimated to have occurred in the intervening three years   between these inventories (-23% and -33% for NOx and VOC, respectively) across all sectors except for area source NOx. Vehicle and area emissions are the largest drivers of these reductions.

**Table 1.       2017 and 2020 annual anthropogenic emissions inventory by major sector over Salt Lake, Davis, Weber and Tooele Counties.**

|  | 2017 | | 2020 | | % Difference | |
| --- | --- | --- | --- | --- | --- | --- |
|  | NOx (tpy) | VOC (ty) | NOx (tpy) | VOC (tpy) | NOx | VOC |
| Area | 2,621 | 21,143 | 5,320 | 12,438 | 103% | -41% |
| Nonroad | 8,381 | 4,730 | 4,287 | 3,895 | -49% | -18% |
| On-road | 19,576 | 9,043 | 12,187 | 6,356 | -38% | -30% |
| Point Source | 8,691 | 4,228 | 8,254 | 3,367 | -5% | -20% |
| **Total** | **39,270** | **39,145** | **30,048** | **26,057** | **-23%** | **-33%** |

Figure 17 compares trends in anthropogenic precursor emissions and the NWF maximum DV over the past decade.  Annual NOx and VOC emissions represent sums over the entirety of the four NAA counties as reported by UDAQ for the triennial National Emissions Inventories (NEI; EPA, 2024a) in 2011, 2014, 2017, and 2020.  Reductions in anthropogenic NOx and VOC have followed each other in lockstep over this period, with an overall reduction of roughly half (46% for NOx, 55% for VOC) or ~3000 TPY per year.  Reductions have been primarily achieved among the motor vehicle sectors.  Over the same period, the maximum DV has increased from the low 70's to upper 70's ppb at a rate of just under a half ppb per year.  As mentioned in Section 2.2, the large number of ozone exceedances recorded in 2021 may have been related to wildfire influences and may have impacted recent DVs and the overall trendline.  However, when removing 2021 4th high MDA8 values entirely from the running 3-year DV calculations, the 2010-2023 DV trend remains positive at 0.2 ppb/year (Figure 18).

Ramboll – Clean Air Act §179B Demonstration for the Northern Wasatch Front Ozone Nonattainment Area



**Figure 17.    Comparison of NWF peak ozone DV trend and triennial anthropogenic NOx and VOC precursor emissions over the four NAA counties from 2011 to 2020 (emission years are centered on 3-year design value periods).**



**Figure 18.    As in Figure 17, but with a revised ozone DV trendline reflecting the removal of the 2021 4th high MDA8 ozone from the 3-year DV calculations due to the large frequency of possible wildfire impacts during that year.**

Besides increased wildfire activity related to the western US "megadrought" over the past decade, another possible cause for increasing ozone may involve the transition from locally VOC-limited (relatively NOx-rich) conditions in the basin to more NOx-limited conditions. Under VOC-limited conditions, daily ozone production efficiency can be inhibited by NOx.  As

NOx emissions decrease, the ozone inhibition relaxes and ozone production efficiency increases (a "NOx disbenefit" response). This may have been a contributing factor to the ozone trend over the past decade. Further NOx reductions will ultimately lead to NOx-limited conditions and reverse the positive ozone trend. The effect of transitioning from a predominantly VOC-limited to NOx-limited environment is supported by recent monitoring at Hawthorne that shows ozone production in central Salt Lake City area forming in a VOC-limited chemical environment with evidence for a transition to NOx-limited conditions during high ozone events, especially when influenced by VOC from wildfires (Jaffe et al., 2023, 2024). Definitive observational evidence on current NWF ozone sensitivity is confounded by the complex mix of emission sources and meteorology that lead to site-to-site differences in ozone levels and response to reductions.

Periodic area-wide anthropogenic emission inventories do not necessarily reflect ambient conditions at specific exceeding monitors because they represent best estimates at the time of their development yet are subject to large uncertainty. Inventories are developed somewhat independently year-to-year and estimates often change substantially with the use of updated models and methodologies, emission factors, activity profiles, and assumptions. Furthermore, biogenic emissions and sources outside the nonattainment area (e.g., fires) can contribute substantially to ambient concentrations. Therefore, it is also important to evaluate trends in measured ambient NOx and VOC concentrations.

Figure 19 shows 2011-2023 trends for summer (June-August) 1-hour NOx percentiles at Hawthorne and Bountiful monitoring sites, as well as for every-sixth day daily measurements of non-methane organic compounds (NMOC, similar to VOC) at Bountiful. NMOC concentrations are presented as parts per billion as carbon (ppbC). The analysis focuses on the 90th percentile trends as representative of poor air quality episodes, recognizing that high precursor concentrations over the entire summer may not be entirely associated with high ozone events.

At Hawthorne, the 90th percentile NOx decreased by 15 ppb over the 2011-2023 period (54%) with a linear trendline of -1.2 ppb/year (not shown). At Bountiful, the 90th percentile NOx exhibits a more variable pattern with a period of higher NOx during 2013-2017 and lower NOx afterwards. The trendline is nearly flat over the entire period but since 2014 90th percentile NOx has reduced 9 ppb (39%, linear trend line of -0.9 ppb/year). These ambient NOx reductions are consistent with the four-county anthropogenic emission trend of 46% shown in Figure 17. The NMOC percentiles at Bountiful exhibit a variable pattern over the period ranging mostly within 100-250 ppbC, but with shallow decreasing trendlines for all three percentiles ranging from -3.5 to -7.6 ppbC/year (20-35% over 2011-2023). The NMOC concentration trendlines partially reflect the downward 4-county VOC emission trends over the same period (55%). It is important to note that biogenic emissions set a VOC floor above zero but at a small fraction of concentrations shown in Figure 19.

Ozone represents a unique challenge in the Intermountain West. Despite years of success in reducing precursor emissions and ambient concentrations of NOx and VOCs, the region still faces significant and unique challenges in meeting ambient ozone concentration health-based standards. These regionally specific challenges include significantly elevated background ozone levels (Jaffe et al., 2018) related to increasing instances and contributions of emissions from wildfire events (Jaffe et al., 2023, 2024) as well as both interstate and international transport (Langford et al., 2017).

Ramboll – Clean Air Act §179B Demonstration for the Northern Wasatch Front Ozone Nonattainment Area



**Figure 19.     Trends in 2011-2023 June-August percentiles for 1-hour NOx concentration at Hawthorne (top left) and Bountiful (top right), and for daily non-methane organic compound (NMOC) concentrations at Bountiful (bottom).**

24

Ramboll – Clean Air Act §179B Demonstration for the Northern Wasatch Front Ozone Nonattainment Area



**Figure 24.    Time series of simulated contributions to MDA8 ozone at the Hawthorne monitor site (top panel), and average contributions on all days and high ozone days.**

34

Ramboll – Clean Air Act §179B Demonstration for the Northern Wasatch Front Ozone Nonattainment Area



**Figure 25.    Time series of simulated contributions to MDA8 ozone at the Bountiful Viewmont monitor site (top panel), and average contributions on all days and high ozone days.**

35



http://pubs.acs.org/journal/aesccq

Article

# Investigation of Ozone Formation Chemistry during the Salt Lake Regional Smoke, Ozone, and Aerosol Study (SAMOZA)

Matthew Ninneman,* Seth Lyman, Lu Hu, Emily Cope, Damien Ketcherside, and Daniel Jaffe

 Cite This: https://doi.org/10.1021/acsearthspacechem.3c00235

 Read Online

| ACCESS | Metrics & More | Article Recommendations | Supporting Information |

Downloaded via UTAH STATE UNIV on November 29, 2023 at 22:38:32 (UTC).
See https://pubs.acs.org/sharingguidelines for options on how to legitimately share published articles.

**ABSTRACT:** Salt Lake City (SLC), UT, is an urban area where ozone ($O_3$) concentrations frequently exceed health standards. This study uses an observationally constrained photochemical box model to investigate the drivers of $O_3$ production during the Salt Lake Regional Smoke, Ozone, and Aerosol Study (SAMOZA), which took place from August to September 2022 in SLC. During SAMOZA, a suite of volatile organic compounds (VOCs), oxides of nitrogen ($NO_x$), and other parameters were measured at the Utah Technical Center, a high-$NO_x$ site in the urban core. We examined four high-$O_3$ cases: 4 August and 3, 11, and 12 September, which were classified as a nonsmoky weekday, a weekend day with minimal smoke influence, a smoky weekend day, and a smoky weekday, respectively. The modeled $O_3$ production on 4 August and 3 September was highly sensitive to VOCs and insensitive to $NO_x$ reductions of ≤50%. Box model results suggest that the directly emitted formaldehyde contributed to the rapid increase in morning $O_3$ concentrations on 3 September. Model sensitivity tests for September 11−12 indicated that smoke-emitted VOCs, especially aldehydes, had a much larger impact on $O_3$ production than $NO_x$ and/or anthropogenic VOCs. On 11 and 12 September, smoke-emitted VOCs enhanced model-predicted maximum daily 8 h average $O_3$ concentrations by 21 and 13 parts per billion (ppb), respectively. Overall, our results suggest that regionwide VOC reductions of at least 30−50% or $NO_x$ reductions of at least 60% are needed to bring SLC into compliance with the national $O_3$ standard of 70 ppb.



**KEYWORDS:** *wildfires, smoke, ozone, volatile organic compounds, nitrogen oxides, box model*

## 1. INTRODUCTION

Ground-level ozone ($O_3$) formation occurs due to photochemical reactions involving volatile organic compounds (VOCs) and oxides of nitrogen ($NO_x$ = nitric oxide (NO) + nitrogen dioxide ($NO_2$)). High $O_3$ levels negatively affect human and ecosystem health.[1−3] Therefore, $O_3$ is one of the air pollutants regulated by the U.S. Environmental Protection Agency (EPA). The U.S. EPA lowered the national $O_3$ standard to 70 ppb in 2015.[4] To meet this standard, the three year average of the annual fourth-highest maximum daily 8 h average (MDA8) $O_3$ concentration cannot exceed 70 ppb. The successes and challenges that different regions of the U.S. have experienced when trying to comply with the national $O_3$ standard have been well-documented.[5−8] Since $O_3$ has significant health and regulatory implications at high concentrations, it is essential to understand the chemical and meteorological factors impacting $O_3$ levels.

Over the past few decades, wildfires in the western United States have increased in frequency, intensity, and duration.[9−17] Due to the effects of climate change (e.g., higher temperatures and drier conditions), forest management practices, and human ignitions, increases in wildfire activity are expected to continue.[10,16−26] Since wildfires emit hundreds of VOCs,[27] it is likely that they will frequently enhance $O_3$ concentrations in $NO_x$-rich urban areas in the western United States, where $O_3$ production is typically sensitive to VOCs. This will make it

even more challenging for those areas to meet the national $O_3$ standard of 70 ppb, especially if future $O_3$ pollution control strategies do not focus on greatly reducing urban $NO_x$ concentrations. It is important to note that $NO_x$ is also emitted from fires. However, recent work has shown that $NO_x$ enhancements in urban areas during smoky periods are highly variable and often insignificant.[28]

Historically, three-dimensional (3-D) chemical transport models (CTMs) poorly simulate the impact of wildfire smoke on $O_3$ production due to uncertainties in the emissions, injection heights, and chemistry of smoke plumes.[29,30] Typical CTMs cannot fully account for the complex and rapid photochemistry characteristic of wildfire smoke plumes. Previous studies have suggested that the main issue with using CTMs to investigate the influence of wildfires on $O_3$ is the significant overprediction of $O_3$ resulting from an insufficient chemical mechanism or excessively rapid plume dilution into the model grid space.[31−33] Other studies have found that CTMs underpredict $O_3$ concentrations during

**Received:** August 11, 2023
**Revised:** October 13, 2023
**Accepted:** November 13, 2023



© XXXX The Authors. Published by American Chemical Society

https://doi.org/10.1021/acsearthspacechem.3c00235
*ACS Earth Space Chem.* XXXX, XXX, XXX−XXX

smoke-influenced periods.[34,35] Such underpredictions have been attributed to insufficient wildfire emissions or insufficient transport of wildfire smoke to locations downwind. Due to the above challenges of using CTMs to examine how wildfires affect $O_3$ formation, a number of studies have applied field observations, statistical models, and/or photochemical box models to this problem, as described below.

Analyses using field observations or statistical modeling have been more successful in assessing the effect of wildfires on ambient $O_3$ concentrations.[28,33,36−43] Lindaas et al.[37] used field observations to investigate how much wildfire smoke enhanced $O_3$ concentrations at the Boulder Atmospheric Observatory (BAO) in Erie, CO, during the summer of 2015. After accounting for the dependence of $O_3$ on temperature, the authors found that the average $O_3$ concentrations at BAO were about 10 ppb higher during smoky periods compared to those of nonsmoky periods. Pan and Faloona[42] examined the impact of wildfire smoke on $O_3$ production from June to September 2016−2020 in California's Central Valley using data collected at 10 surface monitoring sites. The authors found that, on average, MDA8 $O_3$ concentrations across the entire valley were approximately 5.5 ppb higher during smoky periods. They also reported that nearly half of the total number of days when MDA8 $O_3$ exceeded the national $O_3$ standard of 70 ppb was affected by smoke.

Statistical models determine the dependence of $O_3$ on meteorological parameters (i.e., water vapor mixing ratio, temperature, wind speed and direction, etc.) for smoke-free days.[44] Then, statistical models use those relationships to examine observed concentrations of $O_3$ on smoky and nonsmoky days. Several previous studies have used a statistical model called a generalized additive model (GAM) to determine how much of the observed $O_3$ on smoky days was due to $O_3$ precursors emitted by wildfires.[33,39−41,43] For example, McClure and Jaffe[43] used a GAM to quantify the contribution of wildfire smoke to the observed MDA8 $O_3$ concentrations at a site near Boise, ID, from May to September 2007−2017. The authors found that, on average, smoke enhanced MDA8 $O_3$ concentrations by approximately 5 ppb. It needs to be noted that statistical models such as GAMs can only estimate $O_3$ enhancements due to smoke. They do not give any information about the chemistry that leads to higher concentrations of $O_3$ on smoky days.

Numerous studies have demonstrated that photochemical box models are useful tools for investigating $O_3$ formation in smoke plumes affecting rural areas.[20,45−52] Critical to the success of these studies has been their ability to include observations of the key chemical species in the model and use a chemical mechanism that sufficiently accounts for the complex chemistry that occurs under smoky conditions. However, only two studies—Ninneman and Jaffe[53] and Rickly et al.[54]—have used an observationally constrained box model to examine the sensitivity of urban $O_3$ to its precursors (i.e., VOCs and $NO_x$) for smoky and nonsmoky conditions. This is noteworthy because such analyses help inform pollution control strategies aimed at reducing $O_3$ concentrations in urban areas impacted by wildfire smoke. Ninneman and Jaffe[53] investigated how smoke influenced $O_3$ production in Bakersfield, CA, during the summer of 2018. Their box model analysis showed that $O_3$ production was sensitive to (1) VOCs on smoke-free days and (2) both VOCs and $NO_x$ on smoky days. These findings indicated that smoke-emitted VOCs increased the sensitivity of $O_3$ production to $NO_x$. Rickly et

al.[54] examined $O_3$ production in the summer of 2020 at an urban site in Boulder, CO, when the site was influenced by no smoke, local smoke, and long-range transported smoke. For all three periods, their box model results showed that local $O_3$ production was sensitive to $NO_x$. As a result, locally produced $O_3$ was largely unaffected by smoke-emitted VOCs, although the concentrations of $O_3$ were still higher on smoke-impacted days due to transported $O_3$ from the fire region.

This study used an observationally constrained photochemical box model to investigate $O_3$ formation chemistry during the Salt Lake Regional Smoke, Ozone, and Aerosol Study (SAMOZA). SAMOZA took place from August to September 2022 in Salt Lake City (SLC), UT, which is in an $O_3$ nonattainment area.[55] The goals of this work are to (1) examine $O_3$ chemistry on days that were either strongly influenced, minimally influenced, or uninfluenced by smoke and (2) investigate the sensitivity of $O_3$ production to anthropogenic VOCs and $NO_x$ on high-$O_3$ days in the SLC metropolitan area.

## 2. MATERIALS AND METHODS

Measurements for the SAMOZA project were made at the Utah Technical Center (UTC; 40.78°N, 111.95°W, 1286 m a.s.l.; AQS ID 490353015). UTC is in the SLC metropolitan area. The site is about 50 m to the west of Interstate 215, about 1600 m to the north of Interstate 80, and about 3300 m to the west of Interstate 15. As a result, the $NO_x$ concentrations at the UTC site are higher than the regional mean (Figure S1). The implications of this will be discussed in the next section. $O_3$, NO, $NO_2$, particulate matter with diameters less than 2.5 $\mu$m ($PM_{2.5}$), surface pressure ($P$), air temperature ($T_{air}$), relative humidity (RH), and solar radiation (SR) are routinely measured at UTC. Hourly data for these parameters were obtained from EPA AirNow-Tech (https://www.airnowtech.org). $O_3$ and $NO_x$ measurements at the UTC site were made by the Utah Division of Air Quality using standard instruments and calibration procedures for regulatory measurements. $O_3$ measurements were made using ultraviolet (UV) absorption (Teledyne API T400). $NO_x$ measurements were made by using a trace-level chemiluminescence analyzer with an external molybdenum converter (Teledyne API T200U). Both the $O_3$ and $NO_x$ measurements at UTC are federal equivalent methods (FEMs). In addition, $PM_{2.5}$ measurements were made by using a $\beta$-attenuation instrument (Thermo Fisher Scientific model 5030i).

Previous studies have shown that there are artifacts on $O_3$ and $NO_x$ measurements made by the above methods due to biomass burning VOCs and periods of high reactive oxidized nitrogen ($NO_y$) concentrations, respectively.[56−58] As a result, additional measurements of $O_3$ and $NO_x$ were made using a "scrubber-less" UV instrument from 2B Technologies (model 211) and a FEM Cavity-Attenuated Phase-Shift (CAPS) spectroscopy instrument (Teledyne N500), respectively. Model 211 of the "scrubber-less" UV $O_3$ instrument from 2B Technologies has been shown to have low bias in smoke.[56] During SAMOZA, the $O_3$ measurements made by the Teledyne API T400 and the "scrubber-less" UV instrument from 2B Technologies (model 211) were well-correlated even during smoky periods.[59] Thus, we conclude that there is no evidence for bias in the $O_3$ measurements made by the Teledyne API T400. The Teledyne N500 uses a more specific measurement method for $NO_2$. We evaluated simultaneous hourly $NO_2$ measurements with this instrument and the

https://doi.org/10.1021/acsearthspacechem.3c00235
ACS Earth Space Chem. XXXX, XXX, XXX−XXX

standard chemiluminescence analyzer with an external molybdenum converter (i.e., Teledyne API T200U) to investigate whether the latter $NO_2$ measurements were biased high. We found that the $NO_2$ data for the Teledyne API T200U were 2.3% higher than the $NO_2$ data for the Teledyne N500 during August−September 2022 (comparison not shown). Since this bias is much smaller than the possible $NO_x$ reductions evaluated in the next section, it likely had a negligible effect on our results.

Other field measurements that were made during SAMOZA included carbon monoxide (CO) and a suite of 19 VOCs. CO measurements were made by gas chromatography with a reducing compound photometer, and the 19 VOCs were measured using a Proton Transfer Reaction Mass Spectrometer (PTR-MS; Table S1).[27,60] We note that a suite of 13 aldehydes and other carbonyls were also measured using the dinitrophenylhydrazine (DNPH) cartridge method (Text S1).[61] Three 3 h samples of these parameters were collected on each day during the campaign from 9:30 to 12:30, 12:30 to 15:30, and 22:30 to 1:30 LST. In this work, we chose to include the VOCs measured by the PTR-MS since those measurements had a higher temporal resolution of 1 min. Our decision to use the VOCs measured by the PTR-MS instead of the VOCs measured via the DNPH cartridge method did not impact our conclusions (Text S1 and Figure S2).

Hour-averaged measurements for most of the parameters listed above were used to help examine morning (6:00−11:00 LST) and afternoon (11:00−17:00 LST) $O_3$ formation chemistry on four case study days during SAMOZA. The four selected days were 4 August, 3 September, 11 September, and 12 September. 4 August was classified as a nonsmoky weekday; 3 September was classified as a weekend day with minimal smoke influence; 11 September was a smoky weekend day; and 12 September was a smoky weekday. According to imagery from the NOAA Hazard Mapping System Fire and Smoke Product (HMS FSP; https://www.ospo.noaa.gov), the smoke affecting the UTC site on 3 and 11−12 September was aged, likely coming from numerous wildfires in central Idaho. The 4 days listed above were selected for analysis because they were high-$O_3$ days for the SLC area (Table S2) and they allowed us to investigate the production of $O_3$ on weekdays versus weekend days that were either strongly impacted, minimally impacted, or unimpacted by smoke. This was important because differences in $NO_x$ and anthropogenic VOC concentrations on weekdays versus weekends affect $O_3$ production.[62−64] Consequently, the influence of smoke on $O_3$ concentrations may differ on weekdays versus weekends.

Smoke and nonsmoke days during SAMOZA were determined using surface $PM_{2.5}$ measurements, surface CO measurements, and imagery from the NOAA HMS FSP. Distinguishing between smoke and nonsmoke days during SAMOZA was needed to complete our box model analyses for 11−12 September, as discussed in the next section. Imagery from the NOAA HMS FSP indicated that there were 13 weekdays and 6 weekend days with overhead smoke at UTC during August−September 2022. The 13 weekdays with overhead smoke were August 1 to 3, 17, 18, and 23 and September 1 to 2, 7 to 9, 12, and 16. The 6 weekend days with overhead smoke were August 7 and 21 and September 3, 10−11, and 17. To make sure that the observations of smoke from August−September 2022 at UTC were in line with other urban areas, we calculated the $\Delta PM_{2.5}/\Delta CO$ normalized enhancement ratio (NER) using eq 1:[53]

$$\Delta PM_{2.5}/\Delta CO = (PM_{2.5,S} - PM_{2.5,NS})/(CO_S - CO_{NS})$$

(1)

where $PM_{2.5,S}$ and $PM_{2.5,NS}$ are the daytime (6:00−17:00 LST) average $PM_{2.5}$ concentrations across the smoke and nonsmoke days, respectively, and $CO_S$ and $CO_{NS}$ are the daytime average CO concentrations across the smoke and nonsmoke days, respectively. $\Delta PM_{2.5}/\Delta CO$ NERs were calculated separately for weekdays and weekend days (Table 1). The $\Delta PM_{2.5}/\Delta CO$

Table 1. $\Delta PM_{2.5}/\Delta CO$ Normalized Enhancement Ratios (NERs) and Related Variables for Weekdays and Weekend Days during SAMOZA

| type of day | $PM_{2.5,S}$ ($\mu g\ m^{-3}$)[a] | $PM_{2.5,NS}$ ($\mu g\ m^{-3}$)[b] | $CO_S$ (ppb)[a] | $CO_{NS}$ (ppb)[b] | $\Delta PM_{2.5}/\Delta CO$ NER ($\mu g\ m^{-3}\ ppb^{-1}$) |
|---|---|---|---|---|---|
| weekday[c] | 11.5 | 6.9 | 339 | 281 | 0.079 |
| weekend day[d] | 14.5 | 5.5 | 330 | 213 | 0.077 |

[a]Values are daytime (6:00−17:00 LST) averages across smoky weekdays or smoky weekend days. [b]Values are daytime (6:00−17:00 LST) averages across nonsmoky weekdays or nonsmoky weekend days. [c]There were 13 smoky weekdays and 32 nonsmoky weekdays during SAMOZA. [d]There were 6 smoky weekend days and 10 nonsmoky weekend days during SAMOZA.

NERs shown in Table 1 are in the range of those calculated by Laing et al.,[65] who found that the $\Delta PM_{2.5}/\Delta CO$ NERs for 25 smoky periods in eight western U.S. cities varied from 0.057 to 0.228 $\mu g\ m^{-3}\ ppb^{-1}$.

The hourly NO, $NO_2$, speciated VOCs, $P$, $T_{air}$, and RH data collected on the four case study days were used to constrain the Framework for 0-D Atmospheric Modeling (F0AM) photochemical box model.[66] We used version 3.3.1 of the Master Chemical Mechanism (MCM v3.3.1; http://mcm.york.ac.uk) along with additional oxidation of several biomass burning compounds (e.g., furan, 2-methylfuran, methylfurfural, etc.) to drive the chemistry in the model.[20,67−71] For each case study day, one 24 h simulation was completed to investigate photochemical $O_3$ production at UTC. Each model time step had an integration time of 10 min. Prior to the model runs, a 2 day model spin-up was conducted to make sure that the initial conditions had a negligible impact on the model results. F0AM was fully constrained to the measured VOCs listed in Table S1. Total methylfurans were assumed to consist entirely of 2-methylfuran, consistent with Coggon et al.[48] Since the PTR-MS measured only the total concentrations of butenes, C8−C10 aromatics, and monoterpenes, speciated concentrations of those parameters were estimated using data collected at the UTC and Hawthorne sites (Text S2). The Hawthorne site (40.74°N, 111.87°W, 1306 m a.s.l.; AQS ID 490353006) is approximately 8 km SE of UTC. In addition, F0AM was constrained to observed total $NO_x$ concentrations at each time step, while the model chemistry determined the $NO/NO_2$ ratio. For all simulations, $O_3$ was unconstrained and initialized with the concentrations measured at 0:00 LST.

On each case study day, we used the daily 25th-percentile concentration for odd oxygen ($O_x = NO_2 + O_3$) to prescribe fixed background $O_3$ concentrations in the model. Since UTC is a high-$NO_x$ site, $O_x$ was used instead of $O_3$ to determine background $O_3$ concentrations because $O_x$ is unaffected by NO titration.[72] The resulting daily 25th-percentile $O_x$ values were 49.0, 42.8, 49.8, and 52.8 ppb on 4 August and 3, 11, and 12 September, respectively. These values are consistent with

https://doi.org/10.1021/acsearthspacechem.3c00235
ACS Earth Space Chem. XXXX, XXX, XXX−XXX

ACS Earth and Space Chemistry                    http://pubs.acs.org/journal/aesccq                    Article



**Figure 1.** Hour-averaged observations of (a) $O_3$ (ppb), (b) $PM_{2.5}$ ($\mu$g m$^{-3}$), (c) $NO_x$ (ppb), and (d) $\sum$VOCs (ppb) on 4 August (nonsmoky weekday), 3 September (weekend day with minimal smoke influence), 11 September (smoky weekend day), and 12 September (smoky weekday). For comparison, hour-averaged observations of the $O_3$, $PM_{2.5}$, $NO_x$, and $\sum$VOCs across the 32 nonsmoky weekdays and 10 nonsmoky weekend days during SAMOZA are also shown.

background $O_3$ concentrations reported for other parts of the western United States.[73,74]

$NO_2$ photolysis rates ($J_{NO_2}$) were estimated using an equation developed by Trebs et al.[75] (eq 2):

$$J_{NO_2} = (1 + \alpha) \times ((B_1 \times SR) + (B_2 \times SR^2)) \tag{2}$$

where $J_{NO_2}$ has units of s$^{-1}$, $\alpha$ is the surface albedo, $B_1$ and $B_2$ are polynomial coefficients with values of $1.47 \times 10^{-5}$ W$^{-1}$ m$^2$ s$^{-1}$ and $-4.84 \times 10^{-9}$ W$^{-2}$ m$^4$ s$^{-1}$, respectively, and SR is the measured solar radiation in W m$^{-2}$. We assumed an $\alpha$ of 0.15, which is a typical value for an urban area.[76] Photolysis rates for all other parameters were computed as a function of the overhead $O_3$ column (300 DU), $\alpha$ (0.15), elevation of UTC (1286 m a.s.l.), and solar zenith angle using model-provided lookup tables that are described elsewhere.[77] Then, the model-calculated photolysis rates were scaled in reference to the $J_{NO_2}$ values calculated from eq 2.

The heterogeneous uptake of hydroxyl radical (OH) and hydroperoxyl radical (HO$_2$) onto aerosols was included based on previous studies (eq 3):[78,79]

$$dX/dt = -0.25 \times \gamma \times c(X) \times PM_{2.5} \times SA_{specific} \times X_g$$
$$\times 10^{-6} \tag{3}$$

where $dX/dt$ is the heterogeneous loss rate of OH or HO$_2$ in ppb s$^{-1}$, $\gamma$ is the aerosol uptake coefficient, $c(X)$ is the average molecular speed of OH or HO$_2$ in m s$^{-1}$, $PM_{2.5}$ has units of $\mu$g m$^{-3}$, $SA_{specific}$ is the specific aerosol surface area in m$^2$ g$^{-1}$, and $X_g$ is the concentration of OH or HO$_2$ in ppb that is in the gas phase. $\gamma$ was assumed to be 0.2, following Jacob[80] and Slade and Knopf.[81] Molecular weight and temperature were used to determine $c(X)$. $SA_{specific}$ was assumed to be 4 m$^2$ g$^{-1}$, following Lindsay et al.[79] Collectively, our treatment of photolysis rates and heterogeneous uptake of OH and HO$_2$ onto aerosols had an important effect on model-predicted $O_3$, which will be discussed in the next section.

A first-order dilution rate ($K_{dil}$) was used to account for mixing of background $O_3$ into the model domain. This was done by varying $K_{dil}$ until the best fit between modeled and observed afternoon $O_3$ was achieved, consistent with previous

work.[53,54,82,83] The $K_{dil}$ values that led to the best fit between modeled and measured afternoon $O_3$ on 4 August and 3, 11, and 12 September were $1.3 \times 10^{-4}$, $1.5 \times 10^{-4}$, $9.0 \times 10^{-5}$, and $1.6 \times 10^{-4}$ s$^{-1}$, respectively.

Model-calculated instantaneous $O_3$ production rates ($P_{O_3}$) were used to investigate the formation of $O_3$ at UTC on the case study days. $P_{O_3}$ was calculated using eq 4:[84]

$$P_{O_3} = k_{HO_2+NO}[HO_2][NO] + \sum_i k_{R_iO_2+NO}[R_iO_2][NO] \tag{4}$$

where $k_{HO_2+NO}$ and $k_{R_iO_2+NO}$ are the rate constants for the reactions of HO$_2$ with NO and speciated organic peroxy radicals (R$_i$O$_2$) with NO, respectively. Unlike the net $O_3$ production rate, $P_{O_3}$ does not consider processes that lead to $O_3$ loss such as chemical loss, dry and wet depositions, and advection. A series of model sensitivity tests were completed to examine the impact of anthropogenic VOCs, $NO_x$, and/or temperature on $P_{O_3}$ and $O_3$ at UTC. On the days with little to no smoke influence (4 August and 3 September), all measured VOCs except isoprene and monoterpenes were considered to be anthropogenic. The same assumption was made for the two smoky days (September 11−12) after we removed the fraction of VOCs attributable to smoke. The caveats associated with this assumption and our approach for removing the fraction of VOCs due to smoke are discussed in the next section. For the sensitivity tests, we only varied the constrained values for anthropogenic VOCs, $NO_x$, and/or temperature. The other model inputs were left unchanged.

## 3. RESULTS AND DISCUSSION

Figure 1 and Table S3 compare the key observations on the four case study days to those on the 32 nonsmoky weekdays and the 10 nonsmoky weekend days during SAMOZA. As expected, daytime concentrations of $O_3$, $PM_{2.5}$, $NO_x$, and $\sum$VOCs were generally higher on the four high-$O_3$ days compared to typical nonsmoky conditions. On three out of the four case study days—4 August, 3 September, and 11 September—MDA8 $O_3$ concentrations exceeded the national $O_3$ standard of 70 ppb. Observed and modeled afternoon $O_3$

https://doi.org/10.1021/acsearthspacechem.3c00235
ACS Earth Space Chem. XXXX, XXX, XXX−XXX

ACS Earth and Space Chemistry                    http://pubs.acs.org/journal/aesccq                    Article

concentrations were in reasonable agreement on each case study day, which contributed to modeled MDA8 $O_3$ differing from the observed MDA8 $O_3$ by no more than 7 ppb (Figure S3). Such agreement was likely due in part to our approach for prescribing the $K_{dil}$ values, which was discussed in the previous section. We note that the model generally overpredicted $O_3$ concentrations during the nighttime and early morning hours on each case study day. This was likely due to the constant mixing of background $O_3$ into the model domain at the $K_{dil}$ values listed in the previous section. Even though there was smoke overhead on September 3, the observed 24 h $PM_{2.5}$ concentration was only 8.5 $\mu$g m$^{-3}$. As a result, we conclude that smoke negligibly impacted surface concentrations on 3 September. Hourly measurements of $O_3$ and $PM_{2.5}$ were uncorrelated on 11−12 September when morning $O_3$ concentrations rapidly increased from 15 to 84 ppb and 13 to 66 ppb on 11 and 12 September, respectively. This indicates that the observed $O_3$ was mainly due to in situ photochemical production rather than transport from the smoke plume. Observed daytime median $NO_x$ concentrations were 4.6−6.7 ppb higher on 12 September. We conclude that the higher daytime median $NO_x$ concentrations on 12 September were not due to smoke for four reasons. First, 12 September was a weekday, and there was more traffic on weekdays than on weekends. Second, as stated previously, UTC is located near three major roadways; therefore, the site is greatly affected by $NO_x$ emissions from vehicular traffic. Third, the observed daytime median $NO_x$ concentrations on 11 September (i.e., the smoky weekend day) were similar to those on 4 August and 3 September, the two nonsmoke days. Fourth, if the smoke plume impacting the SLC area on 12 September was an important source of $NO_x$, the diurnal variability in observed $NO_x$ concentrations across the region should be similar. However, Figure S4 shows that this was not the case. These four reasons suggest that $NO_x$ enhancements due to smoke are minimal at the UTC site, which is in line with the findings of Buysse et al.[28] for 18 urban areas in the western United States during July−September 2013−2017. Observed daytime median concentrations of $\sum$VOCs were similar on all 4 days, indicating that emissions unrelated to biomass burning were an important contributor to VOC concentrations at UTC. Meteorological conditions were favorable for $O_3$ production on the case study days, with observed daily maximum temperatures ($T_{max}$) exceeding 30 °C (Table S3).

Daytime values of modeled $P_{O_3}$ and $O_3$ for the base simulations are shown in Figure 2. Across the 4 days, peak afternoon $P_{O_3}$ and $O_3$ ranged from approximately 16 to 23 ppb h$^{-1}$ and 82 to 95 ppb, respectively. Two items in Figure 2 are particularly important to discuss. First, $P_{O_3}$ and $O_3$ increased more rapidly on the morning of 3 September, compared to the other three cases. This was likely due in part to higher morning concentrations of reactive VOCs on September 3 (Figure 3). Specifically, the average measured concentration of aldehydes from 6:00 to 11:00 LST on 3 September was 19.7 ppb, which was 5.6−10.0 ppb greater than on the other 3 days for the same time frame. In addition, the observed rapid increase in morning $O_3$ concentrations on September 3 coincided with an observed rapid increase in morning formaldehyde (HCHO) concentrations (Figure S5). This suggests that HCHO contributed to $P_{O_3}$ peaking earlier in the day on 3 September compared to the other three case study days (Figure 2a). To investigate the potential sources of HCHO, we performed an



**Figure 2.** Model-predicted (a) $O_3$ production rate ($P_{O_3}$; ppb h$^{-1}$) and (b) $O_3$ (ppb) at Utah Technical Center on 4 August (nonsmoky weekday), 3 September (weekend day with minimal smoke influence), 11 September (smoky weekend day), and 12 September (smoky weekday).

additional model simulation that examined the HCHO concentrations on 3 September after we (1) initialized HCHO at 0 ppb, (2) let HCHO vary freely for the rest of the simulation, and (3) left the rest of the model configuration unchanged (Figure S6). Figure S6 demonstrates that most of the observed HCHO on the morning of September 3 was likely attributable to primary sources. This result is consistent with the findings of Bhardwaj et al.,[85] who found that primary sources (i.e., oil refineries, mobile emissions, and industrial emissions) were non-negligible contributors to the observed HCHO at a site in the north SLC area from 2004 to 2015.

The second important feature of Figure 2 is that afternoon $O_3$ concentrations on 4 August and 3 September were similar to those on 11−12 September. This result was unexpected because previous studies have reported that $O_3$ concentrations in western U.S. cities are typically higher on smoke-influenced days.[40,41,43] We hypothesize that temperature was a major reason why afternoon $O_3$ levels were similar on the four case study days. Table S3 shows that $T_{max}$ was 34.9, 37.3, 30.1, and 32.5 °C on 4 August and 3, 11, and 12 September, respectively, and Figure S7 shows that temperatures were higher throughout the day on 4 August and 3 September. Four model sensitivity tests were conducted to examine the impact of temperature on $O_3$ production (Figure S8). For 4 August and 3 September, model-predicted $P_{O_3}$ and $O_3$ noticeably decreased after we set the hourly temperature equal to the lower values observed on 12 September. For 11−12 September, model-predicted $P_{O_3}$ and $O_3$ noticeably increased after we set the hourly temperature equal to the higher values observed on 4 August. The results shown in Figure S8 are consistent with more $O_3$ production at higher temperature.[86] They also indicate that temperature differences had an important effect on modeled $O_3$ for the case study days.

Several $NO_x$ and/or anthropogenic VOC model sensitivity tests were completed to investigate the sensitivity of $O_3$ to its precursors (Figures 4−7). On 4 August (Figure 4) and 3 September (Figure 5), $O_3$ was highly sensitive to changes in anthropogenic VOCs. Reducing anthropogenic VOCs by 50%

https://doi.org/10.1021/acsearthspacechem.3c00235
ACS Earth Space Chem. XXXX, XXX, XXX−XXX



**Figure 3.** Hour-averaged observations of speciated VOCs on (a) 4 August (nonsmoky weekday), (b) 3 September (weekend day with minimal smoke influence), (c) 11 September (smoky weekend day), and (d) 12 September (smoky weekday).



**Figure 4.** Model-predicted sensitivity of $P_{O_3}$ (top row; panels (a)−(c)) and $O_3$ (bottom row; panels (d)−(f)) on 4 August (i.e., the nonsmoky weekday) to changes in anthropogenic VOCs (leftmost column; panels (a) and (d)), $NO_x$ (middle column; panels (b) and (e)), and anthropogenic VOCs and $NO_x$ (rightmost column; panels (c) and (f)). For the model sensitivity tests, the constrained values of anthropogenic VOCs, $NO_x$, or both anthropogenic VOCs and $NO_x$ were the only model inputs that were changed. Except for isoprene and monoterpenes, all VOCs used as model constraints were classified as anthropogenic.

led to model-predicted MDA8 $O_3$ concentrations decreasing from 80 to 67 ppb on 4 August (Table 2). Reducing anthropogenic VOCs by 30% or more led to MDA8 $O_3$ concentrations decreasing to values below the national $O_3$ standard of 70 ppb on September 3 (Table 2). Meanwhile, the concentration of $O_3$ on 4 August and 3 September was only sensitive to changes in $NO_x$ when $NO_x$ concentrations were reduced by at least 75%. $NO_x$ reductions exceeding 75% and $NO_x$ reductions of at least 75% were needed to bring UTC into compliance with the national $O_3$ standard on 4 August and 3 September, respectively (Table 2). Since $O_3$ on 4 August and 3 September was insensitive to $NO_x$ reductions of 20−50%, only reducing anthropogenic VOCs was more effective at reducing $O_3$ than simultaneously reducing $NO_x$ and anthropogenic VOCs. Simultaneous reductions in $NO_x$ and

anthropogenic VOCs of 50% led to model-predicted MDA8 $O_3$ concentrations decreasing from 80 to 69 ppb on 4 August (Table 2). Simultaneously reducing $NO_x$ and anthropogenic VOCs by at least 40% reduced MDA8 $O_3$ concentrations to values below the 70 ppb national $O_3$ standard on September 3 (Table 2).

Prior to completing the $NO_x$ and/or anthropogenic VOC model sensitivity tests for 11 and 12 September, all VOCs were set equal to their hour-averaged values across the 10 nonsmoky weekend days (11 September) and the 32 nonsmoky weekdays (12 September) at UTC from August to September 2022 (Figure 1d). We downscaled the VOCs on 11−12 September to (1) remove the impact of smoke-emitted VOCs on modeled $O_3$, (2) estimate the effect of smoke-emitted VOCs on modeled $O_3$, and (3) estimate the influence of VOCs not

https://doi.org/10.1021/acsearthspacechem.3c00235
ACS Earth Space Chem. XXXX, XXX, XXX−XXX

ACS Earth and Space Chemistry    http://pubs.acs.org/journal/aesccq    Article



**Figure 5.** Model-predicted sensitivity of $P_{O_3}$ (top row; panels (a)−(c)) and $O_3$ (bottom row; panels (d)−(f)) on 3 September (i.e., the weekend day with minimal smoke influence) to changes in anthropogenic VOCs (leftmost column; panels (a) and (d)), $NO_x$ (middle column; panels (b) and (e)), and anthropogenic VOCs and $NO_x$ (rightmost column; panels (c) and (f)). For the model sensitivity tests, the constrained values of anthropogenic VOCs, $NO_x$, or both anthropogenic VOCs and $NO_x$ were the only model inputs that were changed. Except for isoprene and monoterpenes, all VOCs used as model constraints were classified as anthropogenic.

**Table 2. Summary of the Observed (OBS) and Modeled MDA8 $O_3$ Concentrations on the Case Study Days**

| parameter name or simulation type | MDA8 $O_3$: 4 August[a,b] | MDA8 $O_3$: 3 September[a,b] | MDA8 $O_3$: 11 September[a,b] | MDA8 $O_3$: 12 September[a,b] |
|---|---|---|---|---|
| OBS | 75 | 76 | 80 | 68 |
| base | 80 | 78 | 85 | 75 |
| all VOCs = typical nonsmoke levels | N/A | N/A | 64[c] | 62[d] |
| $\Delta$VOCs = −20% | 75 | 71 | 61 | 60 |
| $\Delta$VOCs = −30% | 72 | 68 | 59 | 59 |
| $\Delta$VOCs = −40% | 70 | 64 | 58 | 58 |
| $\Delta$VOCs = −50% | 67 | 61 | 57 | 58 |
| $\Delta NO_x$ = −20% | 81 | 79 | 66 | 63 |
| $\Delta NO_x$ = −30% | 81 | 79 | 67 | 64 |
| $\Delta NO_x$ = −40% | 80 | 78 | 68 | 64 |
| $\Delta NO_x$ = −50% | 79 | 77 | 68 | 65 |
| $\Delta NO_x$ = −75% | 71 | 68 | 67 | 66 |
| $\Delta NO_x$ = −90% | 60 | 55 | 60 | 63 |
| $\Delta$VOCs and $\Delta NO_x$ = −20% | 76 | 72 | 62 | 61 |
| $\Delta$VOCs and $\Delta NO_x$ = −30% | 74 | 70 | 62 | 60 |
| $\Delta$VOCs and $\Delta NO_x$ = −40% | 71 | 67 | 61 | 60 |
| $\Delta$VOCs and $\Delta NO_x$ = −50% | 69 | 63 | 60 | 59 |

[a]Units are in ppb. [b]4 August was classified as a nonsmoky weekday; 3 September was classified as a weekend day with minimal smoke influence; 11 September was a smoky weekend day; and 12 September was a smoky weekday. [c]All VOCs were set equal to their hour-averaged values across the nonsmoky weekend days during SAMOZA. [d]All VOCs were set equal to their hour-averaged values across the nonsmoky weekdays during SAMOZA.

emitted by wildfire smoke on modeled $O_3$. Since many of the measured VOCs have a strong temperature dependence, we compared $T_{max}$ across the nonsmoky weekend days and nonsmoky weekdays to $T_{max}$ on 11 and 12 September, respectively. This was done to check if our downscaling of the VOCs on September 11−12 was reasonable. The median $T_{max}$ across the nonsmoky weekend days was 30.4 °C, which was comparable to the $T_{max}$ of 30.1 °C on 11 September (Table S3). Similarly, the median $T_{max}$ across the nonsmoky weekdays was 32.2 °C, which was comparable to the $T_{max}$ of 32.5 °C on 12 September (Table S3). Therefore, we conclude that we did not excessively downscale the VOCs on September

11−12 prior to completing the $NO_x$ and/or anthropogenic VOC sensitivity tests on those days.

Table 2 shows that model-predicted MDA8 $O_3$ on 11 September decreased from 85 to 64 ppb after we downscaled the VOCs to values characteristic of nonsmoky weekend days. On 12 September, model-predicted MDA8 $O_3$ decreased from 75 to 62 ppb after we downscaled the VOCs to values characteristic of nonsmoky weekdays (Table 2). These results show that smoke-emitted VOCs greatly enhanced the concentrations of $O_3$ on 11−12 September. We also note that the above $O_3$ enhancements are consistent with those reported by ▬▬▬▬▬ who found using a generalized additive model (GAM) that, on average, smoke

https://doi.org/10.1021/acsearthspacechem.3c00235
ACS Earth Space Chem. XXXX, XXX, XXX−XXX



**Figure 6.** Model-predicted sensitivity of $P_{O_3}$ (top row; panels (a)−(c)) and $O_3$ (bottom row; panels (d)−(f)) on 11 September (i.e., the smoky weekend day) to changes in anthropogenic VOCs (leftmost column; panels (a) and (d)), $NO_x$ (middle column; panels (b) and (e)), and anthropogenic VOCs and $NO_x$ (rightmost column; panels (c) and (f)). Before completing the sensitivity tests, all VOCs were set equal to hour-averaged values on nonsmoky weekend days from August to September 2022 at the Utah Technical Center, as described in the text. The resulting $P_{O_3}$ and $O_3$ values are shown in the green lines. Except for isoprene and monoterpenes, all VOCs used as model constraints were classified as anthropogenic after the fraction of VOCs attributable to smoke was removed. For the model sensitivity tests, the constrained values of anthropogenic VOCs, $NO_x$, or both anthropogenic VOCs and $NO_x$ were the only model inputs that were changed.



**Figure 7.** Model-predicted sensitivity of $P_{O_3}$ (top row; panels (a)−(c)) and $O_3$ (bottom row; panels (d)−(f)) on 12 September (i.e., the smoky weekday) to changes in anthropogenic VOCs (leftmost column; panels (a) and (d)), $NO_x$ (middle column; panels (b) and (e)), and anthropogenic VOCs and $NO_x$ (rightmost column; panels (c) and (f)). Before completing the sensitivity tests, all VOCs were set equal to hour-averaged values on nonsmoky weekdays from August to September 2022 at the Utah Technical Center, as described in the text. The resulting $P_{O_3}$ and $O_3$ values are shown in the green lines. Except for isoprene and monoterpenes, all VOCs used as model constraints were classified as anthropogenic after the fraction of VOCs attributable to smoke was removed. For the model sensitivity tests, the constrained values of anthropogenic VOCs, $NO_x$, or both anthropogenic VOCs and $NO_x$ were the only model inputs that were changed.

contributed 16 and 11 ppb to the MDA8 $O_3$ concentrations in the SLC area on 11 and 12 September, respectively. Of the smoke-emitted VOCs, it is likely that aldehydes were the greatest contributor to the $O_3$ enhancements on 11−12 September. On average, observed daytime aldehyde concentrations on September 11−12 were approximately 5−6 ppb higher compared to nonsmoke days (Figure S9). To assess the effect of aldehydes from smoke, we compared the $P_{O_3}$ and $O_3$

for the base simulations to the $P_{O_3}$ and $O_3$ resulting from (1) reducing all VOCs except aldehydes to the values seen on nonsmoky weekend days (11 September) or nonsmoky weekdays (12 September) and (2) reducing all VOCs, including aldehydes, to the values seen on nonsmoky weekend days (11 September) or nonsmoky weekdays (12 September). The results of these comparisons are shown in Figure S10. According to Figure S10, aldehydes from smoke enhanced model-predicted MDA8 $O_3$ concentrations by 14 and 6 ppb on



**Figure 8.** Observed daytime VOC reactivity on (a) 4 August (nonsmoky weekday), (b) 3 September (weekend day with minimal smoke influence), (c) 11 September (smoky weekend day), and (d) 12 September (smoky weekday).

11 and 12 September, respectively. This suggests that 67 and 46% of the enhancement in modeled MDA8 $O_3$ on September 11 and 12, respectively, was due to aldehydes resulting from wildfire smoke. The results shown in Figure S10 are consistent with the findings of Ninneman and Jaffe,[53] who reported that aldehydes greatly influenced urban $O_3$ production in Bakersfield, CA, on smoky days in summer 2018. Furthermore, model-predicted $O_3$ concentrations on 11−12 September were not much greater than the prescribed background $O_3$ concentrations of 49.8 and 52.8 ppb on 11 and 12 September, respectively, after the VOCs were reduced to values typical of nonsmoky conditions (Figures 6 and 7). This was likely why reducing $NO_x$ and/or anthropogenic VOCs had a much smaller effect on modeled $O_3$ than the VOCs emitted by wildfire smoke.

Overall, the results presented in Figures 4−7 and Table 2 show that $O_3$ is highly sensitive to VOCs at UTC. Consequently, it is important to determine which VOCs had the greatest impact on $O_3$ production. To do this, we calculated the observed daytime VOC reactivity for each VOC class (VOCR$_{class}$; s$^{-1}$) using eq 5:[88]

$$\text{VOCR}_{class} = \sum_i \left( k_{\text{OH}+\text{VOC}_i} \times [\text{VOC}_i] \right)$$
(5)

where $k_{\text{OH}+\text{VOC}_i}$ is the reaction rate coefficient with respect to OH in units of molecule$^{-1}$ cm$^3$ s$^{-1}$ and $[\text{VOC}_i]$ is the concentration of the individual VOCs in molecules cm$^{-3}$. The $k_{\text{OH}+\text{VOCi}}$ values used in eq 5 are listed in Table S4. Figure 8 demonstrates that aldehydes, alkenes, aromatics, and biogenic VOCs (BVOCs) accounted for most of the observed daytime VOC reactivity on the case study days. Thus, those four VOC classes greatly influenced $O_3$ formation at UTC, and reducing anthropogenic emissions of aldehydes, alkenes, and aromatics would likely lead to lower $O_3$ concentrations for the SLC metropolitan area.

Several additional items need to be discussed. First, as stated previously, the $NO_x$ levels at the UTC site are noticeably greater than the regional mean (Figure S1). During August−September 2022, the observed mean 24 h average $NO_2$ concentration at UTC was 13.4 ppb, which was 56% greater

than the observed regional mean of 8.6 ppb (Table S5). On the two case study days with little to no smoke influence—4 August and 3 September—the $NO_x$ sensitivity tests indicated that $NO_x$ reductions of 75% or greater were needed to noticeably reduce $O_3$ concentrations at UTC (Figures 4 and 5). Based on the observed mean 24 h average $NO_2$ concentrations at UTC versus the entire region from August to September 2022, a 75% reduction in $NO_x$ at UTC corresponds to an approximately 60% reduction in $NO_x$ regionwide. In addition, the higher daytime $NO_x$ concentrations measured on 12 September (i.e., the smoky weekday; Figure 1c) likely contributed to the lower observed MDA8 $O_3$ concentration on that day compared to the other three case study days (Table S3).

Second, observed $\sum$VOCs and daytime $\sum$VOC reactivity on the case study days were generally higher compared to typical nonsmoke days at UTC during August−September 2022 (Figures 1d and S11). However, it is important to note that our box model was not constrained with any measurements of alkanes or alkenes other than total butenes. So, the VOCs used as model inputs do not fully account for all VOCs. Nonetheless, we believe that this does not affect our conclusions. This is because the observed daytime HCHO/$NO_2$ ratios at UTC on the four case study days were all less than 1.8 (Figure S12). Using the HCHO measurements made via the DNPH cartridge method yielded daytime HCHO/$NO_2$ ratios similar to those shown in Figure S12, with values of 1.3 or smaller (Table S6). Recent work has shown that the $O_3$ production regime in urban areas throughout the United States transitions from VOC-sensitive to $NO_x$-sensitive at HCHO/$NO_2$ ratios of 3−4.[89] Therefore, the observed daytime HCHO/$NO_2$ ratios shown in Figure S12 and Table S6 are indicative of a VOC-sensitive $O_3$ production regime, consistent with our box model results.

In addition, two other model simulations were completed for the nonsmoky weekday (4 August) to test the response of model-predicted $O_3$ to alkanes and additional alkenes. Specifically, we ran the model assuming (1) a constant hourly propane concentration of 5.3 ppb and (2) hourly ethene concentrations in ppb equal to half of the hourly concen-

trations of total butenes at UTC in parts per billion carbon (ppbC). For simulation (1), a constant hourly propane concentration of 5.3 ppb was prescribed because the average total concentration of alkanes across nonsmoky days at the Hawthorne site from July to September 2021−2022 was 15.9 ppbC (data not shown). For simulation (2), we also reduced the hourly concentrations of the butenes listed in Table S1 by 50%. This was done because the average total concentrations of (a) butenes at UTC on nonsmoke days during SAMOZA and (b) alkenes at the Hawthorne site on nonsmoke days during July−September 2021−2022 were similar, with values of 3.8 and 2.3 ppbC, respectively (data not shown). Hence, we did not want to constrain the model with concentrations of alkenes greater than the values typically observed in the SLC metropolitan area. The results of the two additional model simulations are presented in Figures S13 and S14. These two figures show that modeled $O_3$ was insensitive to propane and ethene, suggesting that our model was sufficiently constrained to the more reactive VOCs that were measured.

Third, our treatment of photolysis rates and heterogeneous chemistry significantly decreased the model-predicted $P_{O_3}$ and $O_3$. An example of this is shown in Figure S15 for September 11 (i.e., the smoky weekend day). Lower $P_{O_3}$ and $O_3$ values were expected after (1) estimating $J_{NO_2}$ values using eq 2, (2) scaling the model-calculated photolysis rates in reference to the estimated $J_{NO_2}$ values, and (3) including the heterogeneous uptake of OH and $HO_2$ onto aerosols using eq 3. We were expecting this result because smoke or clouds decrease solar radiation and photolysis rates, leading to less favorable conditions for $O_3$ formation. Additionally, OH and $HO_2$ initiate and propagate $O_3$ formation, respectively. Consequently, the removal of OH and $HO_2$ via heterogeneous uptake onto aerosols also leads to conditions less conducive to $O_3$ production. It is noteworthy that scaling the model-calculated photolysis rates in reference to the estimated $J_{NO_2}$ values had a much greater effect on modeled $P_{O_3}$ and $O_3$ than including the heterogeneous uptake of OH and $HO_2$ onto aerosols. This was likely due in part to the observed 24 h $PM_{2.5}$ concentration on 11 September being relatively low for a smoke-influenced day (i.e., 26.0 $\mu$g m$^{-3}$; Table S3), and previous work has suggested that 24 h $PM_{2.5}$ concentrations exceeding 60 $\mu$g m$^{-3}$ are needed to noticeably decrease $O_3$ on smoky days.[28] Although the results shown in Figure S15 are in line with what we expected, it must be emphasized that the $J_{NO_2}$ values used in this analysis were not directly measured. Thus, direct measurements of photolysis rates for key parameters (e.g., $NO_2$, $O_3$, etc.) during smoky and nonsmoky conditions should be the focus of future studies investigating the impact of wildfire smoke on urban $O_3$ production using an observationally constrained photochemical box model. Such measurements would reduce the model uncertainty.

Finally, we acknowledge that several of the VOCs listed in Table S1—such as HCHO, acetaldehyde, methanol, ethanol, and isoprene—are known to have anthropogenic and biogenic sources.[90−94] As mentioned previously, we assumed that all measured VOCs except isoprene and monoterpenes were anthropogenic on (1) the 2 days with little to no smoke impact (4 August and 3 September) and (2) the two smoke-impacted days (11−12 September) after removing the fraction of VOCs coming from smoke. As a result, it is possible that we underestimated the anthropogenic VOC reductions needed for

the UTC site to be in compliance with the 70 ppb national $O_3$ standard on 4 August and 3 September (Figures 4d and 5d and Table 2). Future studies are needed to quantify how much speciated VOCs in the SLC metropolitan area are attributable to anthropogenic versus biogenic sources. This will further inform $O_3$ pollution control strategies for the region.

## 4. CONCLUSIONS

This study examined $O_3$ formation chemistry on 4 days during SAMOZA, which took place at the UTC site in summer 2022. The four case study days were 4 August and 3, 11, and 12 September. 4 August was a nonsmoky weekday; 3 September was a weekend day with little to no smoke influence; 11 September was a smoky weekend day; and 12 September was a smoky weekday. Except for 12 September, MDA8 $O_3$ concentrations exceeded the national $O_3$ standard of 70 ppb on the case study days. Box model results for UTC on 4 August and 3 September indicated that (1) high $O_3$ levels were due to high temperatures and high concentrations of $O_3$ precursors, (2) $O_3$ production was highly sensitive to VOCs, and (3) $O_3$ production was only sensitive to $NO_x$ when $NO_x$ concentrations were reduced by 75% or more. Box model results for UTC on September 11−12 showed that (1) $O_3$ was greatly affected by smoke-emitted VOCs and (2) reductions in $NO_x$ and/or anthropogenic VOCs had a much smaller impact on $O_3$ than the smoke-emitted VOCs.

Overall, our results demonstrate that there are three ways to reduce $O_3$ concentrations in the SLC metropolitan area:

1. Decrease anthropogenic VOCs by at least 30−50% regionwide.
2. Simultaneously decrease the concentrations of anthropogenic VOCs and $NO_x$ in the region by at least 40−50%.
3. Reduce $NO_x$ concentrations by at least 75 and 60% for UTC and the entire region, respectively.

Option (2) is likely the best long-term approach for lowering $O_3$ concentrations in the SLC metropolitan area. Simultaneously decreasing $NO_x$ and anthropogenic VOCs should minimize the impact of smoke-emitted VOCs on ambient $O_3$ concentrations and reduce $O_3$ concentrations on nonsmoke days.

## ■ ASSOCIATED CONTENT

### Data Availability Statement

The data used in this paper are available from a web-accessible data archive that is cited in the References.[95] The link to the data archive is http://hdl.handle.net/1773/50049.

### ⓈⒾ Supporting Information

The Supporting Information is available free of charge at https://pubs.acs.org/doi/10.1021/acsearthspacechem.3c00235

Dinitrophenylhydrazine (DNPH) cartridge method details; description of how speciated concentrations of butenes, C8−C10 aromatics, and monoterpenes were estimated; observed $NO_x$ concentrations in the SLC area during August−September 2022; results for DNPH sensitivity tests; observed versus modeled $O_3$; observed $NO_x$ concentrations on 12 September for the SLC area; observed concentrations of $O_3$ and HCHO on 3 September; investigation of the potential sources of HCHO on 3 September; hour-averaged observations of temperature; results for temperature sensitivity tests;

hour-averaged observations of aldehydes; impact of VOCs on modeled $P_{O_3}$ and $O_3$ on 11−12 September; observed daytime $\sum$VOC reactivity; daytime observations of PTR-MS HCHO, $NO_2$, and PTR-MS HCHO/$NO_2$; model-predicted sensitivity of $P_{O_3}$ and $O_3$ on 4 August to propane; model-predicted sensitivity of $P_{O_3}$ and $O_3$ on 4 August to ethene; impact of our treatment of heterogeneous chemistry and photolysis rates on modeled $P_{O_3}$ and $O_3$ for 11 September; list of VOCs used to constrain the model; observed MDA8 $O_3$ concentrations in the SLC area on the case study days; observed values of key parameters measured at the UTC site; list of $k_{OH+VOC_i}$ values used to calculate the observed daytime VOC reactivity for each VOC class; observed mean values of the 24 h average $NO_2$ concentrations in the SLC area during August−September 2022; and daytime observations of DNPH HCHO, $NO_2$, and DNPH HCHO/$NO_2$ (PDF)

## ■ AUTHOR INFORMATION

### Corresponding Author

**Matthew Ninneman** − *School of Science, Technology, Engineering and Mathematics, University of Washington Bothell, Bothell, Washington 98011, United States;* Present Address: Division of Air Resources, New York State Department of Environmental Conservation, 625 Broadway, Albany, New York 12233, United States; ● orcid.org/0000-0001-5001-6439; Email: mn77@uw.edu, mninneman563@bellsouth.net

### Authors

**Seth Lyman** − *Bingham Research Center, Utah State University, Vernal, Utah 84078, United States; Department of Chemistry and Biochemistry, Utah State University, Logan, Utah 84322, United States;* ● orcid.org/0000-0001-8493-9522

**Lu Hu** − *Department of Chemistry and Biochemistry, University of Montana, Missoula, Montana 59812, United States*

**Emily Cope** − *Department of Chemistry and Biochemistry, University of Montana, Missoula, Montana 59812, United States;* ● orcid.org/0000-0002-1539-6656

**Damien Ketcherside** − *Department of Chemistry and Biochemistry, University of Montana, Missoula, Montana 59812, United States;* ● orcid.org/0000-0002-2149-9133

**Daniel Jaffe** − *School of Science, Technology, Engineering and Mathematics, University of Washington Bothell, Bothell, Washington 98011, United States; Department of Atmospheric Sciences, University of Washington, Seattle, Washington 98195, United States;* ● orcid.org/0000-0003-1965-9051

Complete contact information is available at:
https://pubs.acs.org/10.1021/acsearthspacechem.3c00235

### Notes

The authors declare no competing financial interest.

## ■ ACKNOWLEDGMENTS

SAMOZA was funded by the Utah Division of Air Quality through a Science for Solutions grant. The authors further acknowledge financial support from several industry partners: Rio Tinto Kennecott Utah Copper LLC, Tesoro Refining and Marketing Company, Holly Frontier Woods Cross Refining LLC, Big West Oil LLC, and Chevron USA, Inc. The University of Washington group was also supported on this work by a grant from the National Oceanic and Atmospheric Administration (grant number NA22OAR4310203). The University of Montana group acknowledges additional support from the National Science Foundation (AGS # 2144896).

## ■ REFERENCES

(1) Laurence, J. A. Ecological effects of ozone: Integrating exposure and response with ecosystem dynamics and function. *Environ. Sci. Policy* **1998**, *1*, 179−184.

(2) Lippmann, M. Health effects of tropospheric ozone. *Environ. Sci. Technol.* **1991**, *25*, 1954−1962.

(3) Zhang, J. J.; Wei, Y.; Fang, Z. Ozone Pollution: A Major Health Hazard Worldwide. *Front. Immunol.* **2019**, *10*, No. 2518.

(4) U.S. Environmental Protection Agency (EPA). *Ozone National Ambient Air Quality Standards (NAAQS)*; 2023. Retrieved from https://www.epa.gov/ground-level-ozone-pollution/ozone-national-ambient-air-quality-standards-naaqs.

(5) Jaffe, D. A.; Ninneman, M.; Chan, H. C. $NO_x$ and $O_3$ Trends at U.S. Non-Attainment Areas for 1995−2020: Influence of COVID-19 Reductions and Wildland Fires on Policy-Relevant Concentrations. *J. Geophys. Res.: Atmos.* **2022**, *127*, No. e2021JD036385.

(6) Langford, A. O.; Alvarez, R. J., II; Brioude, J.; Fine, R.; Gustin, M. S.; Lin, M. Y.; Marchbanks, R. D.; Pierce, R. B.; Sandberg, S. P.; Senff, C. J.; Weickmann, A. M.; Williams, E. J. Entrainment of stratospheric air and Asian pollution by the convective boundary layer in the southwestern U.S. *J. Geophys. Res.: Atmos.* **2017**, *122*, 1312−1337.

(7) Nussbaumer, C. M.; Cohen, R. C. The Role of Temperature and $NO_x$ in Ozone Trends in the Los Angeles Basin. *Environ. Sci. Technol.* **2020**, *54*, 15652−15659.

(8) Simon, H.; Reff, A.; Wells, B.; Xing, J.; Frank, N. Ozone Trends Across the United States over a Period of Decreasing NOx and VOC Emissions. *Environ. Sci. Technol.* **2015**, *49*, 186−195.

(9) Abatzoglou, J. T.; Williams, A. P. Impact of anthropogenic climate change on wildfire across western US forests. *Proc. Natl. Acad. Sci. U.S.A.* **2016**, *113*, 11770−11775.

(10) Dennison, P. E.; Brewer, S. C.; Arnold, J. D.; Moritz, M. A. Large wildfire trends in the western United States, 1984−2011. *Geophys. Res. Lett.* **2014**, *41*, 2928−2933.

(11) Gutierrez, A. A.; Hantson, S.; Langenbrunner, B.; Chen, B.; Jin, Y.; Goulden, M. L.; Randerson, J. T. Wildfire response to changing daily temperature extremes in California's Sierra Nevada. *Sci. Adv.* **2021**, *7*, No. eabe6417.

(12) Higuera, P. E.; Shuman, B. N.; Wolf, K. D. Rocky Mountain subalpine forests now burning more than any time in recent millennia. *Proc. Natl. Acad. Sci. U.S.A.* **2021**, *118*, No. e2103135118.

(13) Iglesias, V.; Balch, J. K.; Travis, W. R. US fires became larger, more frequent, and more widespread in the 2000s. *Sci. Adv.* **2022**, *8*, No. eabc0020.

(14) Jain, P.; Castellanos-Acuna, D.; Coogan, S. C. P.; Abatzoglou, J. T.; Flannigan, M. D. Observed increases in extreme fire weather driven by atmospheric humidity and temperature. *Nat. Clim. Change* **2022**, *12*, 63−70.

(15) Juang, C. S.; Williams, A. P.; Abatzoglou, J. T.; Balch, J. K.; Hurteau, M. D.; Moritz, M. A. Rapid Growth of Large Forest Fires Drives the Exponential Response of Annual Forest-Fire Area to Aridity in the Western United States. *Geophys. Res. Lett.* **2022**, *49*, No. e2021GL097131.

(16) Pechony, O.; Shindell, D. T. Driving forces of global wildfires over the past millennium and the forthcoming century. *Proc. Natl. Acad. Sci. U.S.A.* **2010**, *107*, 19167−19170.

(17) Westerling, A. L.; Hidalgo, H. G.; Cayan, D. R.; Swetnam, T. W. Warming and Earlier Spring Increase Western U.S. Forest Wildfire Activity. *Science* **2006**, *313*, 940−943.

(18) Aldersley, A.; Murray, S. J.; Cornell, S. E. Global and regional analysis of climate and human drivers of wildfire. *Sci. Total Environ.* **2011**, *409*, 3472−3481.

(19) Balch, J. K.; Bradley, B. A.; Abatzoglou, J. T.; Nagy, R. C.; Fusco, E. J.; Mahood, A. L. Human-started wildfires expand the fire niche across the United States. *Proc. Natl. Acad. Sci. U.S.A.* **2017**, *114*, 2946−2951.

(20) Decker, Z. C. J.; Zarzana, K. J.; Coggon, M.; Min, K.-E.; Pollack, I.; Ryerson, T. B.; Peischl, J.; Edwards, P.; Dubé, W. P.; Markovic, M. Z.; Roberts, J. M.; Veres, P. R.; Graus, M.; Warneke, C.; de Gouw, J.; Hatch, L. E.; Barsanti, K. C.; Brown, S. S. Nighttime Chemical Transformation in Biomass Burning Plumes: A Box Model Analysis Initialized with Aircraft Observations. *Environ. Sci. Technol.* **2019**, *53*, 2529−2538.

(21) Kitzberger, T.; Brown, P. M.; Heyerdahl, E. K.; Swetnam, T. W.; Veblen, T. T. Contingent Pacific-Atlantic Ocean influence on multicentury wildfire synchrony over western North America. *Proc. Natl. Acad. Sci. U.S.A.* **2007**, *104*, 543−548.

(22) Littell, J. S.; McKenzie, D.; Peterson, D. L.; Westerling, A. L. Climate and wildfire area burned in western U.S. ecoprovinces, 1916−2003. *Ecol. Appl.* **2009**, *19*, 1003−1021.

(23) Miller, J. D.; Safford, H. Trends in Wildfire Severity: 1984 to 2010 in the Sierra Nevada, Modoc Plateau, and Southern Cascades, California, USA. *Fire Ecol.* **2012**, *8*, 41−57.

(24) Moritz, M. A.; Parisien, M.-A.; Batllori, E.; Krawchuk, M. A.; Van Dorn, J.; Ganz, D. J.; Hayhoe, K. Climate change and disruptions to global fire activity. *Ecosphere* **2012**, *3*, 1−22.

(25) Spracklen, D. V.; Mickley, L. J.; Logan, J. A.; Hudman, R. C.; Yevich, R.; Flannigan, M. D.; Westerling, A. L. Impacts of climate change from 2000 to 2050 on wildfire activity and carbonaceous aerosol concentrations in the western United States. *J. Geophys. Res.: Atmos.* **2009**, *114*, No. D20301.

(26) Val Martin, M.; Heald, C. L.; Lamarque, J.-F.; Tilmes, S.; Emmons, L. K.; Schichtel, B. A. How emissions, climate, and land use change will impact mid-century air quality over the United States: a focus on effects at national parks. *Atmos. Chem. Phys.* **2015**, *15*, 2805−2823.

(27) Permar, W.; Wang, Q.; Selimovic, V.; Wielgasz, C.; Yokelson, R. J.; Hornbrook, R. S.; Hills, A. J.; Apel, E. C.; Ku, I.-T.; Zhou, Y.; Sive, B. C.; Sullivan, A. P.; Collett, J. L., Jr; Campos, T. L.; Palm, B. B.; Peng, Q.; Thornton, J. A.; Garofalo, L. A.; Farmer, D. K.; Kreidenweis, S. M.; Levin, E. J. T.; DeMott, P. J.; Flocke, F.; Fischer, E. V.; Hu, L. Emissions of Trace Organic Gases From Western U.S. Wildfires Based on WE-CAN Aircraft Measurements. *J. Geophys. Res.: Atmos.* **2021**, *126*, No. e2020JD033838.

(28) Buysse, C. E.; Kaulfus, A.; Nair, U.; Jaffe, D. A. Relationships between Particulate Matter, Ozone, and Nitrogen Oxides during Urban Smoke Events in the Western US. *Environ. Sci. Technol.* **2019**, *53*, 12519−12528.

(29) Jin, L.; Permar, W.; Selimovic, V.; Ketcherside, D.; Yokelson, R. J.; Hornbrook, R. S.; Apel, E. C.; Ku, I.-T.; Collett, J. L., Jr.; Sullivan, A. P.; Jaffe, D. A.; Pierce, J. R.; Fried, A.; Coggon, M. M.; Gkatzelis, G. I.; Warneke, C.; Fischer, E. V.; Hu, L. Constraining emissions of volatile organic compounds from western US wildfires with WE-CAN and FIREX-AQ airborne observations. *Atmos. Chem. Phys.* **2023**, *23*, 5969−5991.

(30) Permar, W.; Jin, L.; Peng, Q.; O'Dell, K.; Lill, E.; Selimovic, V.; Yokelson, R. J.; Hornbrook, R. S.; Hills, A. J.; Apel, E. C.; Ku, I.-T.; Zhou, Y.; Sive, B. C.; Sullivan, A. P.; Collett, J. L., Jr; Palm, B. B.; Thornton, J. A.; Flocke, F.; Fischer, E. V.; Hu, L. Atmospheric OH reactivity in the western United States determined from comprehensive gas-phase measurements during WE-CAN. *Environ. Sci.: Atmos.* **2023**, *3*, 97−114.

(31) Zhang, L.; Jacob, D. J.; Yue, X.; Downey, N. V.; Wood, D. A.; Blewitt, D. Sources contributing to background surface ozone in the US Intermountain West. *Atmos. Chem. Phys.* **2014**, *14*, 5295−5309.

(32) Baker, K. R.; Woody, M. C.; Tonnesen, G. S.; Hutzell, W.; Pye, H. O. T.; Beaver, M. R.; Pouliot, G.; Pierce, T. Contribution of regional-scale fire events to ozone and PM$_{2.5}$ air quality estimated by photochemical modeling approaches. *Atmos. Environ.* **2016**, *140*, 539−554.

(33) Lu, X.; Zhang, L.; Yue, X.; Zhang, J.; Jaffe, D. A.; Stohl, A.; Zhao, Y.; Shao, J. Wildfire influences on the variability and trend of summer surface ozone in the mountainous western United States. *Atmos. Chem. Phys.* **2016**, *16*, 14687−14702.

(34) Singh, H. B.; Cai, C.; Kaduwela, A.; Weinheimer, A.; Wisthaler, A. Interactions of fire emissions and urban pollution over California: Ozone formation and air quality simulations. *Atmos. Environ.* **2012**, *56*, 45−51.

(35) Cai, C.; Kulkarni, S.; Zhao, Z.; Kaduwela, A. P.; Avise, J. C.; DaMassa, J. A.; Singh, H. B.; Weinheimer, A. J.; Cohen, R. C.; Diskin, G. S.; Wennberg, P.; Dibb, J. E.; Huey, G.; Wisthaler, A.; Jimenez, J. L.; Cubison, M. J. Simulating reactive nitrogen, carbon monoxide, and ozone in California during ARCTAS-CARB 2008 with high wildfire activity. *Atmos. Environ.* **2016**, *128*, 28−44.

(36) Dreessen, J.; Sullivan, J.; Delgado, R. Observations and impacts of transported Canadian wildfire smoke on ozone and aerosol air quality in the Maryland region on June 9−12, 2015. *J. Air Waste Manage. Assoc.* **2016**, *66*, 842−862.

(37) Lindaas, J.; Farmer, D. K.; Pollack, I. B.; Abeleira, A.; Flocke, F.; Roscioli, R.; Herndon, S.; Fischer, E. V. Changes in ozone and precursors during two aged wildfire smoke events in the Colorado Front Range in summer 2015. *Atmos. Chem. Phys.* **2017**, *17*, 10691−10707.

(38) Rubio, M. A.; Lissi, E.; Gramsch, E.; Garreaud, R. Effect of Nearby Forest Fires on Ground Level Ozone Concentrations in Santiago, Chile. *Atmosphere* **2015**, *6*, 1926−1938.

(39) Jaffe, D.; Bertschi, I.; Jaeglé, L.; Novelli, P.; Reid, J. S.; Tanimoto, H.; Vingarzan, R.; Westphal, D. L. Long-range transport of Siberian biomass burning emissions and impact on surface ozone in western North America. *Geophys. Res. Lett.* **2004**, *31*, No. L16106.

(40) Jaffe, D. A.; Wigder, N.; Downey, N.; Pfister, G.; Boynard, A.; Reid, S. B. Impact of Wildfires on Ozone Exceptional Events in the Western U.S. *Environ. Sci. Technol.* **2013**, *47*, 11065−11072.

(41) Gong, X.; Kaulfus, A.; Nair, U.; Jaffe, D. A. Quantifying O$_3$ Impacts in Urban Areas Due to Wildfires Using a Generalized Additive Model. *Environ. Sci. Technol.* **2017**, *51*, 13216−13223.

(42) Pan, K.; Faloona, I. C. The impacts of wildfires on ozone production and boundary layer dynamics in California's Central Valley. *Atmos. Chem. Phys.* **2022**, *22*, 9681−9702.

(43) McClure, C. D.; Jaffe, D. A. Investigation of high ozone events due to wildfire smoke in an urban area. *Atmos. Environ.* **2018**, *194*, 146−157.

(44) Camalier, L.; Cox, W.; Dolwick, P. The effects of meteorology on ozone in urban areas and their use in assessing ozone trends. *Atmos. Environ.* **2007**, *41*, 7127−7137.

(45) Mason, S. A.; Trentmann, J.; Winterrath, T.; Yokelson, R. J.; Christian, T. J.; Carlson, L. J.; Warner, T. R.; Wolfe, L. C.; Andreae, M. O. Intercomparison of Two Box Models of the Chemical Evolution in Biomass-Burning Smoke Plumes. *J. Atmos. Chem.* **2006**, *55*, 273−297.

(46) Alvarado, M. J.; Lonsdale, C. R.; Yokelson, R. J.; Akagi, S. K.; Coe, H.; Craven, J. S.; Fischer, E. V.; McMeeking, G. R.; Seinfeld, J. H.; Soni, T.; Taylor, J. W.; Weise, D. R.; Wold, C. E. Investigating the links between ozone and organic aerosol chemistry in a biomass burning plume from a prescribed fire in California chaparral. *Atmos. Chem. Phys.* **2015**, *15*, 6667−6688.

(47) Müller, M.; Anderson, B. E.; Beyersdorf, A. J.; Crawford, J. H.; Diskin, G. S.; Eichler, P.; Fried, A.; Keutsch, F. N.; Mikoviny, T.; Thornhill, K. L.; Walega, J. G.; Weinheimer, A. J.; Yang, M.; Yokelson, R. J.; Wisthaler, A. In situ measurements and modeling of reactive trace gases in a small biomass burning plume. *Atmos. Chem. Phys.* **2016**, *16*, 3813−3824.

(48) Coggon, M. M.; Lim, C. Y.; Koss, A. R.; Sekimoto, K.; Yuan, B.; Gilman, J. B.; Hagan, D. H.; Selimovic, V.; Zarzana, K. J.; Brown, S. S.; Roberts, J. M.; Müller, M.; Yokelson, R.; Wisthaler, A.; Krechmer, J. E.; Jimenez, J. L.; Cappa, C.; Kroll, J. H.; de Gouw, J.; Warneke, C. OH chemistry of non-methane organic gases (NMOGs) emitted from

https://doi.org/10.1021/acsearthspacechem.3c00235
*ACS Earth Space Chem.* XXXX, XXX, XXX−XXX

ACS Earth and Space Chemistry    http://pubs.acs.org/journal/aesccq    Article

laboratory and ambient biomass burning smoke: evaluating the influence of furans and oxygenated aromatics on ozone and secondary NMOG formation. *Atmos. Chem. Phys.* **2019**, *19*, 14875−14899.

(49) Trentmann, J.; Yokelson, R. J.; Hobbs, P. V.; Winterrath, T.; Christian, T. J.; Andreae, M. O.; Mason, S. A. An analysis of the chemical processes in the smoke plume from a savanna fire. *J. Geophys. Res.: Atmos.* **2005**, *110*, No. D12301.

(50) Robinson, M. A.; Decker, Z. C. J.; Barsanti, K. C.; Coggon, M. M.; Flocke, F. M.; Franchin, A.; Fredrickson, C. D.; Gilman, J. B.; Gkatzelis, G. I.; Holmes, C. D.; Lamplugh, A.; Lavi, A.; Middlebrook, A. M.; Montzka, D. M.; Palm, B. B.; Peischl, J.; Pierce, B.; Schwantes, R. H.; Sekimoto, K.; Selimovic, V.; Tyndall, G. S.; Thornton, J. A.; Van Rooy, P.; Warneke, C.; Weinheimer, A. J.; Brown, S. S. Variability and Time of Day Dependence of Ozone Photochemistry in Western Wildfire Plumes. *Environ. Sci. Technol.* **2021**, *55*, 10280−10290.

(51) Lee, J. D.; Squires, F. A.; Sherwen, T.; Wilde, S. E.; Cliff, S. J.; Carpenter, L. J.; Hopkins, J. R.; Bauguitte, S. J.; Reed, C.; Barker, P.; Allen, G.; Bannan, T. J.; Matthews, E.; Mehra, A.; Percival, C.; Heard, D. E.; Whalley, L. K.; Ronnie, G. V.; Seldon, S.; Ingham, T.; Keller, C. A.; Knowland, K. E.; Nisbet, E. G.; Andrews, S. Ozone production and precursor emission from wildfires in Africa. *Environ. Sci.: Atmos.* **2021**, *1*, 524.

(52) Wolfe, G. M.; Hanisco, T. F.; Arkinson, H. L.; Blake, D. R.; Wisthaler, A.; Mikoviny, T.; Ryerson, T. B.; Pollack, I.; Peischl, J.; Wennberg, P. O.; Crounse, J. D.; St Clair, J. M.; Teng, A.; Huey, L. G.; Liu, X.; Fried, A.; Weibring, P.; Richter, D.; Walega, J.; Hall, S. R.; Ullmann, K.; Jimenez, J. L.; Campuzano-Jost, P.; Bui, T. P.; Diskin, G.; Podolske, J. R.; Sachse, G.; Cohen, R. C. Photochemical evolution of the 2013 California Rim Fire: synergistic impacts of reactive hydrocarbons and enhanced oxidants. *Atmos. Chem. Phys.* **2022**, *22*, 4253−4275.

(53) Ninneman, M.; Jaffe, D. A. The impact of wildfire smoke on ozone production in an urban area: Insights from field observations and photochemical box modeling. *Atmos. Environ.* **2021**, *267*, No. 118764.

(54) Rickly, P. S.; Coggon, M. M.; Aikin, K. C.; Alvarez, R. J., II; Baidar, S.; Gilman, J. B.; Gkatzelis, G. I.; Harkins, C.; He, J.; Lamplugh, A.; Langford, A. O.; McDonald, B. C.; Peischl, J.; Robinson, M. A.; Rollins, A. W.; Schwantes, R. H.; Senff, C. J.; Warneke, C.; Brown, S. S. Influence of Wildfire on Urban Ozone: An Observationally Constrained Box Modeling Study at a Site in the Colorado Front Range. *Environ. Sci. Technol.* **2023**, *57*, 1257−1267.

(55) U.S. Environmental Protection Agency (EPA). *8-h Ozone (2015) Nonattainment Areas by State/County/Area*; 2023. Retrieved from https://www3.epa.gov/airquality/greenbook/jncty.html.

(56) Long, R. W.; Whitehill, A.; Habel, A.; Urbanski, S.; Halliday, H.; Colón, M.; Kaushik, S.; Landis, M. S. Comparison of ozone measurement methods in biomass burning smoke: an evaluation under field and laboratory conditions. *Atmos. Meas. Technol.* **2021**, *14*, 1783−1800.

(57) Bernays, N.; Jaffe, D. A.; Petropavlovskikh, I.; Effertz, P. Comment on "Comparison of ozone measurement methods in biomass burning smoke: an evaluation under field and laboratory conditions" by Long et al. (2021). *Atmos. Meas. Technol.* **2022**, *15*, 3189−3192.

(58) Dunlea, E. J.; Herndon, S. C.; Nelson, D. D.; Volkamer, R. M.; San Martini, F.; Sheehy, P. M.; Zahniser, M. S.; Shorter, J. H.; Wormhoudt, J. C.; Lamb, B. K.; Allwine, E. J.; Gaffney, J. S.; Marley, N. A.; Grutter, M.; Marquez, C.; Blanco, S.; Cardenas, B.; Retama, A.; Ramos Villegas, C. R.; Kolb, C. E.; Molina, L. T.; Molina, M. J. Evaluation of nitrogen dioxide chemiluminescence monitors in a polluted urban environment. *Atmos. Chem. Phys.* **2007**, *7*, 2691−2704.

(59) Jaffe, D. A.; Ninneman, M.; Nguyen, L.; Lee, H.; Hu, L.; Ketcherside, D.; Jin, L.; Cope, E.; Lyman, S.; Jones, C.; O'Neil, T.; Mansfield, M. An Overview of the Salt Lake Smoke, Ozone, and Aerosol Experiment (SAMOZA). In-review for the *J. Air Waste Manage. Assoc.*

(60) Hu, L.; Millet, D. B.; Mohr, M. J.; Wells, K. C.; Griffis, T. J.; Helmig, D. Sources and seasonality of atmospheric methanol based on tall tower measurements in the US Upper Midwest. *Atmos. Chem. Phys.* **2011**, *11*, 11145−11156.

(61) Winberry, Jr., W. T.; Tejada, S.; Lonneman, B.; Kleindienst, T. *Compendium of Methods for the Determination of Toxic Organic Compounds in Ambient Air, Second ed., Compendium Method TO-11A: Determination of Formaldehyde in Ambient Air Using Adsorbent Cartridge Followed by High Performance Liquid Chromatography (HPLC)*; Report No. EPA/625/R-96/010b; U.S. Environmental Protection Agency: Cincinnati, OH, 1999.

(62) Baidar, S.; Hardesty, R. M.; Kim, S.-W.; Langford, A. O.; Oetjen, H.; Senff, C. J.; Trainer, M.; Volkamer, R. Weakening of the weekend ozone effect over California's South Coast Air Basin. *Geophys. Res. Lett.* **2015**, *42*, 9457−9464.

(63) de Foy, B.; Brune, W. H.; Schauer, J. J. Changes in ozone photochemical regime in Fresno, California from 1994 to 2018 deduced from changes in the weekend effect. *Environ. Pollut.* **2020**, *263*, No. 114380.

(64) Qin, Y.; Tonnesen, G. S.; Wang, Z. Weekend/weekday differences of ozone, $NO_x$, CO, VOCs, $PM_{10}$ and the light scatter during ozone season in southern California. *Atmos. Environ.* **2004**, *38*, 3069−3087.

(65) Laing, J. R.; Jaffe, D. A.; Slavens, A. P.; Li, W.; Wang, W. Can $\Delta PM_{2.5}/\Delta CO$ and $\Delta NO_y/\Delta CO$ Enhancement Ratios Be Used to Characterize the Influence of Wildfire Smoke in Urban Areas? *Aerosol Air Qual. Res.* **2017**, *17*, 2413−2423.

(66) Wolfe, G. M.; Marvin, M. R.; Roberts, S. J.; Travis, K. R.; Liao, J. The Framework for 0-D Atmospheric Modeling (F0AM) v3.1. *Geosci. Model Dev.* **2016**, *9*, 3309−3319.

(67) Jenkin, M. E.; Saunders, S. M.; Pilling, M. J. The tropospheric degradation of volatile organic compounds: a protocol for mechanism development. *Atmos. Environ.* **1997**, *31*, 81−104.

(68) Jenkin, M. E.; Saunders, S. M.; Wagner, V.; Pilling, M. J. Protocol for the development of the Master Chemical Mechanism, MCM v3 (Part B): tropospheric degradation of aromatic volatile organic compounds. *Atmos. Chem. Phys.* **2003**, *3*, 181−193.

(69) Jenkin, M. E.; Young, J. C.; Rickard, A. R. The MCM v3.3.1 degradation scheme for isoprene. *Atmos. Chem. Phys.* **2015**, *15*, 11433−11459.

(70) Bloss, C.; Wagner, V.; Jenkin, M. E.; Volkamer, R.; Bloss, W. J.; Lee, J. D.; Heard, D. E.; Wirtz, K.; Martin-Reviejo, M.; Rea, G.; Wenger, J. C.; Pilling, M. J. Development of a detailed chemical mechanism (MCMv3.1) for the atmospheric oxidation of aromatic hydrocarbons. *Atmos. Chem. Phys.* **2005**, *5*, 641−664.

(71) Saunders, S. M.; Jenkin, M. E.; Derwent, R. G.; Pilling, M. J. Protocol for the development of the Master Chemical Mechanism, MCM v3 (Part A): tropospheric degradation of non-aromatic volatile organic compounds. *Atmos. Chem. Phys.* **2003**, *3*, 161−180.

(72) Kleinman, L. I.; Daum, P. H.; Lee, Y.-N.; Nunnermacker, L. J.; Springston, S. R.; et al. Ozone production efficiency in an urban area. *J. Geophys. Res.* **2002**, *107*, ACH 23−1−ACH 23−12.

(73) Lin, M.; Fiore, A. M.; Cooper, O. R.; Horowitz, L. W.; Langford, A. O.; Levy, H., II; Johnson, B. J.; Naik, V.; Oltmans, S. J.; Senff, C. J. Springtime high ozone events over the western United States: Quantifying the role of stratospheric intrusions. *J. Geophys. Res.: Atmos* **2012**, *117*, No. D00V22.

(74) Ninneman, M.; Petropavlovskikh, I.; Effertz, P.; Chand, D.; Jaffe, D. Investigation of the Parameters Influencing Baseline Ozone in the Western United States: A Statistical Modeling Approach. *Atmosphere* **2022**, *13*, 1883.

(75) Trebs, I.; Bohn, B.; Ammann, C.; Rummel, U.; Blumthaler, M.; Königstedt, R.; Meixner, F. X.; Fan, S.; Andreae, M. O. Relationship between the $NO_2$ photolysis frequency and the solar global irradiance. *Atmos. Meas. Technol.* **2009**, *2*, 725−739.

(76) Taha, H. Urban climates and heat islands: albedo, evapotranspiration, and anthropogenic heat. *Energy Build.* **1997**, *25*, 99−103.

(77) Wolfe, G. *Overview of the Framework for 0-D Atmospheric Modeling (F0AM) Version 4.0*; 2020. Retrieved from https://github.com/AirChem/F0AM/blob/master/F0AM_UserManual.pdf.

https://doi.org/10.1021/acsearthspacechem.3c00235
*ACS Earth Space Chem.* XXXX, XXX, XXX−XXX

(78) Tang, M. J.; Cox, R. A.; Kalberer, M. Compilation and evaluation of gas phase diffusion coefficients of reactive trace gases in the atmosphere: volume 1. Inorganic compounds. *Atmos. Chem. Phys.* **2014**, *14*, 9233−9247.

(79) Lindsay, A. J.; Anderson, D. C.; Wernis, R. A.; Liang, Y.; Goldstein, A. H.; Herndon, S. C.; Roscioli, J. R.; Dyroff, C.; Fortner, E. C.; Croteau, P. L.; Majluf, F.; Krechmer, J. E.; Yacovitch, T. I.; Knighton, W. B.; Wood, E. C. Ground-based investigation of $HO_x$ and ozone chemistry in biomass burning plumes in rural Idaho. *Atmos. Chem. Phys.* **2022**, *22*, 4909−4928.

(80) Jacob, D. J. Heterogeneous chemistry and tropospheric ozone. *Atmos. Environ.* **2000**, *34*, 2131−2159.

(81) Slade, J. H.; Knopf, D. A. Multiphase OH oxidation kinetics of organic aerosol: The role of particle phase state and relative humidity. *Geophys. Res. Lett.* **2014**, *41*, 5297−5306.

(82) McDuffie, E. E.; Edwards, P. M.; Gilman, J. B.; Lerner, B. M.; Dubé, W. P.; Trainer, M.; Wolfe, D. E.; Angevine, W. M.; deGouw, J.; Williams, E. J.; Tevlin, A. G.; Murphy, J. G.; Fischer, E. V.; McKeen, S.; Ryerson, T. B.; Peischl, J.; Holloway, J. S.; Aikin, K.; Langford, A. O.; Senff, C. J.; Alvarez, R. J., II; Hall, S. R.; Ullmann, K.; Lantz, K. O.; Brown, S. S. Influence of oil and gas emissions on summertime ozone in the Colorado Northern Front Range. *J. Geophys. Res.: Atmos.* **2016**, *121*, 8712−8729.

(83) Ninneman, M.; Lu, S.; Zhou, X.; Schwab, J. On the Importance of Surface-Enhanced Renoxification as an Oxides of Nitrogen Source in Rural and Urban New York State. *ACS Earth Space Chem.* **2020**, *4*, 1985−1992.

(84) Thornton, J. A.; Wooldridge, P. J.; Cohen, R. C.; Martinez, M.; Harder, H.; Brune, W. H.; Williams, E. J.; Roberts, J. M.; Fehsenfeld, F. C.; Hall, S. R.; Shetter, R. E.; Wert, B. P.; Fried, A. Ozone production rates as a function of $NO_x$ abundances and $HO_x$ production rates in the Nashville urban plume. *J. Geophys. Res.: Atmos.* **2002**, *107*, ACH 7−1−ACH 7−17.

(85) Bhardwaj, N.; Kelsch, A.; Eatough, D. J.; Thalman, R.; Daher, N.; Kelly, K.; Jaramillo, I. C.; Hansen, J. C. Sources of Formaldehyde in Bountiful, Utah. *Atmosphere* **2021**, *12*, 375.

(86) Sillman, S.; Samson, P. J. Impact of temperature on oxidant photochemistry in urban, polluted rural and remote environments. *J. Geophys. Res.: Atmos.* **1995**, *100*, 11497−11508.

(87) Lee, H.; Jaffe, D. A. Evaluating the impact of wildfire smoke on ozone concentrations using a Generalized Additive Model in Salt Lake City, Utah, USA, 2006−2022. In-review for the *J. Air Waste Manage. Assoc.*

(88) Abeleira, A.; Pollack, I. B.; Sive, B.; Zhou, Y.; Fischer, E. V.; Farmer, D. K. Source characterization of volatile organic compounds in the Colorado Northern Front Range Metropolitan Area during spring and summer 2015. *J. Geophys. Res.: Atmos.* **2017**, *122*, 3595−3613.

(89) Jin, X.; Fiore, A.; Boersma, K. F.; De Smedt, I.; Valin, L. Inferring Changes in Summertime Surface Ozone−$NO_x$−VOC Chemistry over U.S. Urban Areas from Two Decades of Satellite and Ground-Based Observations. *Environ. Sci. Technol.* **2020**, *54*, 6518−6529.

(90) Khan, M. A. H.; Schlich, B.-L.; Jenkin, M. E.; Shallcross, B. M. A.; Moseley, K.; Walker, C.; Morris, W. C.; Derwent, R. G.; Percival, C. J.; Shallcross, D. E. A Two-Decade Anthropogenic and Biogenic Isoprene Emissions Study in a London Urban Background and a London Urban Traffic Site. *Atmosphere* **2018**, *9*, 387.

(91) Bastien, L. A. J.; Brown, N. J.; Harley, R. A. Contributions to local- and regional-scale formaldehyde concentrations. *Atmos. Chem. Phys.* **2019**, *19*, 8363−8381.

(92) Millet, D. B.; Guenther, A.; Siegel, D. A.; Nelson, N. B.; Singh, H. B.; de Gouw, J. A.; Warneke, C.; Williams, J.; Eerdekens, G.; Sinha, V.; Karl, T.; Flocke, F.; Apel, E.; Riemer, D. D.; Palmer, P. I.; Barkley, M. Global atmospheric budget of acetaldehyde: 3-D model analysis and constraints from in-situ and satellite observations. *Atmos. Chem. Phys.* **2010**, *10*, 3405−3425.

(93) Bates, K. H.; Jacob, D. J.; Wang, S.; Hornbrook, R. S.; Apel, E. C.; Kim, M. J.; Millet, D. B.; Wells, K. C.; Chen, X.; Brewer, J. F.; Ray, E. A.; Commane, R.; Diskin, G. S.; Wofsy, S. C. The Global Budget of Atmospheric Methanol: New Constraints on Secondary, Oceanic, and Terrestrial Sources. *J. Geophys. Res.: Atmos.* **2021**, *126*, No. e2020JD033439.

(94) Millet, D. B.; Apel, E.; Henze, D. K.; Hill, J.; Marshall, J. D.; Singh, H. B.; Tessum, C. W. Natural and Anthropogenic Ethanol Sources in North America and Potential Atmospheric Impacts of Ethanol Fuel Use. *Environ. Sci. Technol.* **2012**, *46*, 8484−8492.

(95) Jaffe, D.; Hu, L.; Lyman, S. *Datasets from the SAMOZA experiment*; 2023. Retrieved from http://hdl.handle.net/1773/50049.

https://doi.org/10.1021/acsearthspacechem.3c00235
*ACS Earth Space Chem.* XXXX, XXX, XXX−XXX

Exhibit 7

# NORTHERN WASATCH FRONT O3 STATE IMPLEMENTATION PLAN: MODELING UPDATES

## TECHNICAL ANALYSIS SECTION



# MODELING DOMAINS



**Episode: Jun. 15 - Aug. 1 2017**

**Base Year: 2017**
**Future Year: 2023 with on-the-books reductions**

# MODEL CONFIGURATION

| | |
|---|---|
| **Grid Resolution/Interaction** | 12 km one-way nesting<br>4/1.33 km two-way nesting |
| **Meteorology** | WRF4.2<br>– Hybrid Vertical Coordinate System<br>– GSL-specific Land Use Modifications |
| **Emission Inventories** | MOVES3, VCPy, beis3.6/beld4.1, etc. |
| **Vertical Diffusivity** | Adjusted kv depending on<br>% urban land use |
| **Gas-Phase Chemistry** | cb6r5h (inc. halogens chemistry) |

**Using CAMxv7.1**

**+ Some Other Considerations**

# GREAT SALT LAKE: SURFACE ALBEDO MODIFICATIONS



Salt Crust
Playa

- Used Satellite Imagery + Measurements + Literature data

  - Distinguished between playa and salt crust

  - Changed UV surface albedo value from 8% to 69% (salt crust) and 34% (playa)

# GREAT SALT LAKE: SURFACE ALBEDO MODIFICATIONS



- Used Satellite Imagery + Measurements + Literature data

  - Distinguished between playa and salt crust

  - Changed UV surface albedo value from 8% to 69% (salt crust) and 34% (playa)

# SENSITIVITY TO BIOGENICS MODEL





# SENSITIVITY TO BIOGENICS MODEL





# MODEL PERFORMANCE: SPATIAL VARIATION



Appellate Case: 25-9520    Document: 10-2    Date Filed: 02/24/2025    Page: 248



# SOURCE APPORTIONMENT

- ▶ Applied to 2023
- ▶ Determine source contributions to O3 & their origin
- ▶ Understand impact of controllable vs. non-controllable sources



**6 Regions**



Solvents

Nonroad

Onroad

Rail

Point

Nonpoint

Biogenics

Wildfires

International Emissions

# SOURCE APPORTIONMENT: CONTRIBUTION FROM ALL SOURCE GROUPS/REGIONS [11]

**Wildfires & Prescribed Burns in UT**

**Agricultural Fires & Lightning NOx in UT**

**Anthropogenic International Emissions**

**Biogenics in UT**

**UT Anthropogenic (solvents, nonroad, onroad, rail, point, airports, fertilizer, ERC bank, O&G, nonpoint, livestock, dust)**

**Natural (biogenic, fires, etc.) & Anthropogenic Outside UT**



# SOURCE APPORTIONMENT: CONTRIBUTION FROM ALL SOURCE GROUPS/REGIONS [12]

Wildfires & Prescribed Burns in UT

Agricultural Fires & Lightning NOx in UT

Anthropogenic International Emissions

Biogenics in UT

UT Anthropogenic (solvents, nonroad, onroad, rail, point, airports, fertilizer, ERC bank, O&G, nonpoint, livestock, dust)

Natural (biogenic, fires, etc.) & Anthropogenic  Outside UT







Bountiful

# SOURCE APPORTIONMENT: CONTRIBUTIONS FROM SOURCE GROUPS WITHIN THE NAA[13]



**Contributions to O3 from Source Groups Within the Nonattainment Area Counties (Salt Lake, Davis, Tooele, Weber) at the Monitor**

# SOURCE APPORTIONMENT: CONTRIBUTION FROM ALL SOURCE GROUPS/REGIONS <sup>14</sup>



**State-Regulated**
(solvents, point, nonpoint, fertilizer, livestock, dust, other from <u>within Utah</u>)

**Federally-Regulated**
(nonroad, onroad, rail, airports from <u>within Utah</u>)

**Natural & non-Utah Anthropogenic**
(biogenic, wildfires, prescribed fires, agricultural fires, lightning NOx, intl. anthropogenic emissions, anthropogenic emissions from other states, global natural emissions)





# ATTAINMENT DEMONSTRATION: PRELIMINARY RESULTS

## Exceptional Events (EE)

| Date | HW | | | BV | | | H3 | | | Event Type | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | PM2.5 24hr (ppb) | Monthly Avg. PM2.5 (ppb) | MD8A O3 (ppb) | PM2.5 24hr (ppb) | Monthly Avg. PM2.5 (ppb) | MD8A O3 (ppb) | PM2.5 24hr (ppb) | Monthly Avg. PM2.5 (ppb) | MD8A O3 (ppb) | Regional | Local |
| 8/4/2016 | 20.8 | 9.33 | 81 | 24.7 | 10.91 | 80 | 35.3 | 7.77 | 83 | ✔ | ✔ |
| 9/2/2017 | 14.5 | 6.98 | 83 | 15.9 | 8.33 | 78 | 12.1 | 5.68 | 83 | ✔ | ✔ |
| 9/5/2017 | 25.7 | 6.98 | 79 | 32.6 | 8.33 | 72 | 24.9 | 5.68 | 82 | ✔ | ✔ |
| 9/6/2017 | 35.2 | 6.98 | 76 | 43.4 | 8.33 | 81 | 32.4 | 5.68 | 72 | ✔ | ✔ |

| | Unadjusted BDV (2015-2019) | BDV (2015-2019, EE removed) |
|---|---|---|
| Bountiful | 76.7 | 75 |
| Hawthorne | 76.7 | 75 |
| Herriman | 76 | 74 |

# ATTAINMENT DEMONSTRATION: PRELIMINARY RESULTS

Exceptional Events (EE)

| Date | HW | | | BV | | | H3 | | | Event Type | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | PM2.5 24hr (ppb) | Monthly Avg. PM2.5 (ppb) | MD8A O3 (ppb) | PM2.5 24hr (ppb) | Monthly Avg. PM2.5 (ppb) | MD8A O3 (ppb) | PM2.5 24hr (ppb) | Monthly Avg. PM2.5 (ppb) | MD8A O3 (ppb) | Regional | Local |
| 8/4/2016 | 20.8 | 9.33 | 81 | 24.7 | 10.91 | 80 | 35.3 | 7.77 | 83 | ✔ | ✔ |
| 9/2/2017 | 14.5 | 6.98 | 83 | 15.9 | 8.33 | 78 | 12.1 | 5.68 | 83 | ✔ | ✔ |
| 9/5/2017 | 25.7 | 6.98 | 79 | 32.6 | 8.33 | 72 | 24.9 | 5.68 | 82 | ✔ | ✔ |
| 9/6/2017 | 35.2 | 6.98 | 76 | 43.4 | 8.33 | 81 | 32.4 | 5.68 | 72 | ✔ | ✔ |

| | FDV (using unadjusted BDV) | FDV (using BDV with EE removed) |
|---|---|---|
| Bountiful | 73.5 | 71.9 |
| Hawthorne | 74.3 | 72.7 |
| Herriman | 73.6 | 71.7 |

FDV = RRF x BDV_monitored, where RRF= Cavg_FY/Cavg_BY

# IMPACT OF INTERNATIONAL ANTHROPOGENIC EMISSIONS (IAE): PRELIMINARY RESULTS

17

|  | FDV (using unadjusted BDV) | FDV (using BDV with EE removed) | FDV (with EE & IAE removed) |
|---|---|---|---|
| **Bountiful** | 73.5 | 71.9 | 67.2 |
| **Hawthorne** | 74.3 | 72.7 | 67.9 |
| **Herriman** | 73.6 | 71.7 | 68 |

FDV_with EE & IAE removed = RRF x FDV_with EE removed,
where RRF= Cavg_FY, tagged/Cavg_FY,tot.

# THANK YOU

# ndaher@utah.gov



Exhibit 8

6905 S. 1300 E. #288, Cottonwood Heights, UT 84047-1817

**FUELING UTAH'S GROWTH & PROSPERITY**

March 10, 2023

Bryce Bird
Utah Division of Air Quality
P.O. Box 144820
Salt Lake City, Utah 84114-4820

***Submitted by email to bbird@utah.gov***

**Subject:  UDAQ Preliminary RACT Determinations for Petroleum Refineries in the Northern Wasatch Front Ozone Nonattainment Area**

Dear Bryce:

The Utah Petroleum Association ("UPA") sends this letter about recent Utah Division of Air Quality ("UDAQ") determinations of Reasonably Available Control Technology ("RACT") provided to some of our member company petroleum refineries operating within the Northern Wasatch Front ozone nonattainment area ("NWF").  In short, we are concerned that the determinations are inconsistent with applicable legal and regulatory requirements, will not assist in advancing the goal of attainment, are based on incomplete and inaccurate information, and are being developed on a fast-track schedule that does not provide adequate time for the normal exchanges of information that typically take place between affected sources and UDAQ.  We detail our concerns here for inclusion in the record.

In good faith, our member companies submitted updated RACT evaluations to UDAQ to ensure that the RACT determinations for the NWF Moderate State Implementation Plan ("SIP") would be based on more accurate, up-to-date information to the extent this could be prepared in the short time available, rather than pulling from five-year-old evaluations of Best Available Control Technology ("BACT") developed for the $PM_{2.5}$ SIP.[1]  UDAQ subsequently notified some of the refineries that they must install additional nitrogen oxide ("NOx") controls before the summer ozone season of 2026, stating that the "additional control technologies are considered RACT."

While UDAQ indicated that it has determined these controls to constitute RACT, it offered no basis for that determination.  For example, it did not address considerations related to cost

---

[1] While the updated information was better than the five-year old information, companies were still required to provide it on a relatively expedited basis.  This resulted in information and assumptions that, while the best available given the time constraints, was nonetheless itself incomplete and likely conservative in that it tended to underestimate total control cost.  Companies nonetheless believed this information to be sufficient for the purpose in that the estimates showed cost effectiveness significantly higher than what has been understood to constitute RACT (and even BACT).  Accordingly, companies considered the precision of the estimates to be sufficient for screening out certain controls from further consideration as RACT.

effectiveness[2] or timing for the installation of the controls.[3]   Nor did it address the necessity (or even the potential for marginal benefit) of the controls in bringing about attainment, an especially egregious oversight in view of the particular parameters of the airshed such as, for example, the contribution of international transport to nonattainment.   We explain below.

## UDAQ's Proposed RACT Does Not Comply with the Requirements of the Clean Air Act and the Corresponding Federal Regulations

The Clean Air Act ("CAA") and SIP rules for various National Ambient Air Quality Standards ("NAAQS") call for implementing RACT level of control.[4]   Additionally, states often apply RACT for Regional Haze SIPs.  The regulations for procedural requirements for SIPs define RACT as follows:

> *Reasonably available control technology (RACT) means devices, systems, process modifications, or other apparatus or techniques **that are reasonably available** taking into account:*
>
> *(1) The necessity of imposing such controls in order to attain and maintain a national ambient air quality standard;*
>
> *(2) The social, environmental, and economic impact of such controls; and*
>
> *(3) Alternative means of providing for attainment and maintenance of such standard. (This provision defines RACT for the purposes of § 51.341(b) only.)[5]*  [emphasis added]

An important aspect of this definition is that the controls be *reasonably available*.  Rather than applying the regulatory RACT criteria, UDAQ appears instead to have acted in an arbitrary, ad hoc manner to impose controls under the guise of RACT.  One of the hallmarks of administrative rulemaking is that an agency such as UDAQ provide a reasoned explanation for its proposed action.  UDAQ has done no such thing, instead, simply announcing its conclusion without providing any supporting rationale.

### *Cost Criteria*

Cost effectiveness has long been a key criterion in making determinations of what controls are appropriate under various Clean Air Act programs.  These include BACT for Prevention of Significant Deterioration ("PSD") review, BACT for SIPs, RACT for SIPs and the Regional Haze Program, MACT under the hazardous air pollutant program, and Lowest Achievable Emission Rate ("LAER") under the major nonattainment New Source Review ("NSR") program.  As

---

[2] The UDAQ RACT determinations have cost-effectiveness ranging between $24,000 and $28,000 per ton of NOx emissions reduced.  These values fall *far* outside of the upper range that has typically been considered to be cost effective for RACT.

[3] UDAQ is requiring that the controls be installed by the summer of 2026.  While it is not clear that the controls can even be installed by that deadline – additional analysis would be required to understand when such controls could be installed assuming that they were, in fact, determined to constitute RACT – they certainly cannot be installed by the regulatory deadline for RACT for the NWF nonattainment area which is January 1, 2023.

[4] See, for example, CAA §182(b)(2), CAA §182(f), and 40 CFR §51.1312 for ozone nonattainment areas; CAA §189(a)(1)(C) and 40 CFR 51.1009(a)(4) for particulate matter nonattainment areas.

[5] 40 CFR Part 51 Subpart F Procedural Requirements §51.100(o).

explained in our February 2023 letter, the maximum cost-effectiveness threshold indicated for ozone RACT should be no greater than $5,000 to $7,500 per ton of emission reduced (copy of February letter attached).[6]  Any higher level of control would not be *reasonably available*.   The controls being suggested as RACT by UDAQ's recent e-mail communications have cost effectiveness of $24,000 per ton and greater and, therefore, cannot be deemed to be "reasonably available."  In fact, the UDAQ RACT determinations are **three to four times more costly than appropriate** and even exceed levels typically used for the higher level of control for BACT determinations, as shown in the February 2023 letter.

No justification exists to make RACT determinations at such high cost effectiveness levels.  While we understand that UDAQ may be reluctant to offer an exact cost effectiveness threshold, there must be some reasonable upper-bound cost effectiveness that guides its decision making. We find no other examples of RACT determinations approaching this cost effectiveness threshold.  Moreover, setting the cost effectiveness level this high – and significantly higher than other similarly-situated states – sets a discouraging precedent for those that do, or might seek to do, business in Utah.  Such a precedent will discourage business and industry from relocating to Utah or from investing further within Utah due to the high costs of emission controls.[7]  The precedent would carry into future SIPs and even into minor NSR BACT determinations for air permitting.

## *Deadline for Installation of RACT Controls*

Furthermore, the installation deadline provided to the refineries (summer 2026) for the new controls fails to consider (i) the regulatory timeline requirement for RACT installation or (ii) whether the work could be done within the existing refinery planned turnaround schedule or even whether the engineering and procurement can be completed on time.

EPA's recently published Determination of Attainment by Attainment Date ("DAAD") for the 2015 ozone NAAQS established an installation date of January 1, 2023, for installation of all VOC and NOx RACT controls:

> *SIP revisions required for the newly reclassified Moderate areas must be submitted no later than January 1, 2023, and RACM/RACT for these areas must be implemented as expeditiously as practicable, but **no later than the same date***.[8, 9] [emphasis added]

---

[6] Letter, Rikki Hrenko-Browning to Bryce Bird, *Criteria for Selection of Reasonably Available Control Technology*, February 2, 2023 ("February 2023 Letter")

[7] We are assuming that UDAQ is applying its cost effectiveness threshold equally across all industries and not singling out the refineries for disparate treatment.  A central purpose of cost effectiveness is to create a level playing field so that all sources and industries are treated equally.

[8] 87 FR 60897, *Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Marginal for the 2015 Ozone National Ambient Air Quality Standards* ("DAAD"), p. 60907/1.

[9] This RACT installation date set in the DAAD comports with the requirements of the SIP implementation rule for the 2015 ozone standard:

> *For RACT required pursuant to reclassification, the state shall provide for implementation of such RACT as expeditiously as practicable, but **no later than the start of the attainment year ozone season associated with the area's new attainment deadline**, or January 1 of the third year after the associated SIP revision submittal deadline, **whichever is earlier; or the deadline established by the Administrator in the final action issuing the area reclassification**.  (*40 CFR Part 51 Subpart CC §51.1312(a)(3)(ii)) [emphasis added]

Letter, Rikki Hrenko-Browning to Bryce Bird, *RACT Determinations for Petroleum Refineries in the Northern Wasatch Front Ozone Nonattainment Area*, March 2023

UDAQ has not explained how these controls can be justified as RACT if such a clear, unambiguous deadline requirement cannot possibly be satisfied.  We are unaware of any authority that would allow UDAQ to ignore the regulatory requirement under which it purports to be acting pursuant to.

Even assuming that UDAQ had a basis for ignoring the legal deadline for RACT installation, the arbitrary summer of 2026 deadline that it would substitute is flawed for several reasons.  First, we are unaware of any analysis – by the subject companies or UDAQ – that has been completed to determine if the installation of these control systems could be accomplished that date.  The engineering, design, procurement, contracting, and scheduling associated with such significant projects is extensive and, at present, there is no basis for concluding that UDAQ's summer 2026 deadline is feasible.

An additional consideration impacting scheduling relates to refinery "turnaround" schedules.  Due to the integrated operating nature of refineries, projects of this magnitude are typically planned for a refinery's scheduled turnaround. Refineries establish their turnaround schedules years in advance to accommodate extensive engineering, maintenance, equipment codes, upgrades, product delivery commitments, and other factors, and typically spend years planning the myriad of details so they can procure the necessity parts and equipment including long-delivery items and execute the turnaround safely, on time, on budget, and without incident.  Disruptions to the schedule and inadequately planned turnarounds risk the safety of those involved as well as cost and schedule overruns and can lead to incidents including environmental incidents.

Requiring installation of controls without accounting for the established turnaround schedule could add millions of dollars to the installation cost based on the duration of the required additional turnaround and the lost profit opportunity associated with the additional turnaround.  Refineries did **not** consider disruptions to the normal planned turnaround schedule or lost profit opportunity in their cost effectiveness calculations in their RACT evaluations, nor did they think it would be necessary to do so because they did not anticipate being told to install controls as RACT with such high cost effectiveness values (even without accounting for these additional costs) and within a short time window.

Thus, the controls in the RACT determinations cannot be installed by the regulatory time frame – which has passed.  Nor can they be installed by the (unexplained) summer of 2026 deadline that UDAQ proposed.

### *Necessity of Controls to Attain/Maintain NAAQS*

As noted, the definition of RACT specifically provides for taking into consideration, "[t]he necessity of imposing such controls in order to attain and maintain a national ambient air quality standard." UDAQ has not shown if or how the controls in the RACT determinations would support the

---

EPA initially designated the NWF as nonattainment in 2018 with an effective date of August 3, 2018 (83 FR 25776).  Based on the effective initial designation date, the attainment date for the NWF at Moderate is six years later, in other words August 3, 2024 (See Table 1 of 40 CFR §51.1303).  EPA considers the "attainment year" to be the last full calendar year prior to the attainment date, and thus 2023 is the attainment year for the NWF at Moderate.  Thus, the installation date for RACT for the NWF, per the 2015 ozone NAAQS implementation rule, must be set no later than the start of the ozone season in 2023.  The date set in the DAAD for RACT installation – January 1, 2023 – comports with the SIP implementation requirements.

attainment demonstration at Moderate.  Furthermore, in UDAQ's industry stakeholder meeting held on February 15, 2023, UDAQ explained that they can provide a successful attainment demonstration by accounting for the combination of exceptional events and international emissions.[10]  Thus, the controls included in the RACT determinations are not necessary for the attainment demonstration.

## UPA Supports Controls Shown to be Cost Effective Towards Lowering Ozone

UPA and its member companies support installing those controls shown to be cost effective towards lowering NWF ozone levels.  We demonstrated our support for improving air quality through the voluntary implementation of Tier 3 gasoline in Utah, installation of controls that have been effective towards reducing $PM_{2.5}$ concentrations, and decades of cooperation with UDAQ to improve local air quality under other State Implementation Plans ("SIPs").

As shown in part A of the figure below, UDAQ's source apportionment modeling study shows that only 14% of the ozone during an episode (episode average) results from anthropogenic emissions *throughout Utah* (including point sources located in the NWF).[11]  The remaining 86% of NWF ozone arises from additional sources that **cannot be controlled within Utah** including the following:

- Anthropogenic sources located outside Utah including other states and international sources
- Various local and non-local natural sources (including biogenic emissions)

Furthermore, the 14% of ozone arising from anthropogenic sources throughout Utah includes onroad and off-road motor vehicle emissions.  Utah has no control over the motor vehicle emissions; the federal government controls these sources.  Yet they comprise 77% and 46% of NWF NOx and VOC emissions, respectively (61% of total NWF emissions as shown in part B of the figure).[12]  In other words, Utah can only control a fraction of the 14% of ozone during an episode that arises from anthropogenic emissions in Utah, that portion which does not come from on or off-road mobile sources.

Point sources generate only a small portion of NWF ozone and the four major source petroleum refineries account for only a small portion of that, as shown in part B of the figure.  The modeling study indicates that all point source emissions in the NWF account for approximately only 1 ppb of NWF ozone.[13]  Presumably, this includes point source volatile organic compound ("VOC") and NOx emissions.  The result is not surprising, for the following reasons:

---

[10] In view of UDAQ's findings in this regard, it would seem that UDAQ would be persuaded towards a lower – not higher – cost effectiveness threshold for making RACT determinations; or at least a threshold that is in keeping with norms.

[11] See *Northern Wasatch Front, O3 State Implementation Plan:  Modeling Updates*, presented by UDAQ's Technical Analysis Section on February 15, 2023 ("Modeling Update"), slide 11.

[12] Utah Division of Air Quality, *Marginal Ozone Inventory, Northern Wasatch Front, UT*, June 2020, available on UDAQ website at https://documents.deq.utah.gov/air-quality/planning/air-quality-policy/DAQ-2022-012149.pdf ("NWF 2017 Inventory") (accessed on March 6, 2023).

[13] See Modeling Update, slide 13.  (The slide does not indicate if the point source contribution shown represents an average modeled day, episode average day, or exceedance day.)

- UDAQ's NWF emission inventory for 2017 indicates that point sources account for only 21% of NWF anthropogenic NOx emissions and only 6% of NWF anthropogenic VOC emissions, or 13% of all NWF anthropogenic emissions.[14]

- The point source inventory for 2017 indicates that the four major source petroleum refineries account for 11% of the NWF point source NOx, corresponding to only 2.4% of the NWF anthropogenic NOx emissions (11% of 21%).

- While the major source petroleum refineries account for 53% of NWF anthropogenic point source VOC emissions, that amount equates to only 3.2% of all NWF anthropogenic VOC emissions (53% of 6%).[15]

In other words, *the petroleum refineries emit only a very small portion of NWF anthropogenic emissions and therefore account for only a very small fraction of locally formed ozone*.



**A. Modeled Source Apportionment, Ozone Episode Average**

**B. NWF 2017 Emissions Inventory**

We are also not surprised that the RACT evaluations submitted by our member companies did not identify very many additional controls that would qualify as RACT or very large emission reductions as RACT. *Our member company petroleum refineries are already very well controlled.* The petroleum refineries comply with various federal rules under New Source Performance Standards ("NSPS") and Maximum Achievable Control Technology ("MACT"), including complying with the recent 2015 extensive revisions to petroleum refinery requirements.[16] The petroleum refineries have undergone decades of new source review air permitting. Furthermore, they have also installed controls for prior SIPs including most recently RACT and BACT for the $PM_{2.5}$ Moderate and Serious SIPs, respectively.

Considering the very small effect of the petroleum refineries on local ozone and the already high level of control on their operations, UDAQ has not demonstrated the need for the NOx emission reductions that they have called for.

---

[14] NWF 2017 Inventory.

[15] *Base Year Ozone SIP Point Source Inventory*, located on UDAQ website at https://documents.deq.utah.gov/air-quality/planning/DAQ-2023-001356.pdf (accessed on March 6, 2023).

[16] 80 FR 75178, *Petroleum Refinery Sector Risk and Technology Review and New Source Performance Standards*.

## The Controls are Not Needed for Inclusion in the Moderate SIP

The proposed controls do not comport with the RACT determination requirements and will not contribute to the attainment demonstration for the Moderate SIP.  The remaining Moderate SIP requirement for adding controls to existing sources is the requirement for Reasonable Further Progress ("RFP").

RFP for the NWF at Moderate requires reducing VOC by 15% from the 2017 baseline emissions inventory amount.[17]  The requested controls will not help to fulfill the Moderate RFP requirements for the NWF because they would reduce NOx and would not contribute to the required *VOC reductions.*

## Additional Discussion

We understand the difficulties in developing the Moderate SIP for the NWF, especially in light of the large effects of wildfire exceptional events and international emissions on NWF ozone, as shown in the Modeling update presented in February 2023.[18]  Although EPA disapproved the retroactive 179B demonstration submitted by UDAQ in May 2021, we encourage UDAQ to prepare a new package with appropriate exceptional events justifications and a new 179B demonstration, a prospective demonstration this time, using UDAQ's much more refined photochemical modeling and other weight-of-evidence technical information such as EPA or peer-reviewed studies showing the effect of international emissions on ozone in the intermountain west. To its credit, UDAQ has shown through its modeling that the combination of exceptional events and international emissions accounts for the NWF not attaining the 2015 ozone NAAQS.  These results and information should not be ignored.

## Conclusion

As detailed above, the incremental controls deemed to be RACT by UDAQ do not meet the reasonableness or the timing requirements of RACT, and therefore cannot be RACT.[19]

We have further shown that these controls will not contribute to fulfilling any other Moderate SIP requirement and will not contribute to attaining and maintaining the NAAQS.  We remind UDAQ of the terms of its rulemaking authority.  Any controls that go beyond federal requirements must have written justification meeting certain requirements.[20]

Considering the relatively large effects of exceptional events plus international anthropogenic emissions on the NWF compared to the relatively small portion of NWF ozone produced by NWF anthropogenic emissions, there is no prospect for bringing the area into attainment in the near term.  We encourage UDAQ to utilize the tools provided in the CAA, namely exceptional events and 179B for international emissions, to help to fulfill the SIP requirements at this time.  When Congress amended the CAA in 1990, they provided these tools for areas like the NWF that are

---

[17] See 40 CFR 51.1310(a)(4)(i).  Note that EPA also uses the term "ROP", Rate of Progress, instead of RFP.

[18] See Modeling Update, slides 15 through 17.

[19] Consistent with UDAQ's communications, we understand that the controls are being proposed as satisfying the RACT requirements for Utah's Moderate ozone SIP for the NWF nonattainment area.  If UDAQ is assuming some other legal authority for its proposal, we request that UDAQ promptly disclose such authority so that we may evaluate it.

[20] See Utah Code 19-2-106.

impacted by ozone concentrations that are effectively beyond their control. Using these tools would allow UDAQ more time to study appropriate ways to achieve beneficial emission reductions that will improve air quality and to work with sources to implement reductions on appropriate and achievable timelines. Forcing the petroleum refineries to implement unjustified controls under the pretense of RACT will not achieve the goal of attainment and only serves to divert technical and financial resources from the only path that will reasonably satisfy the SIP requirements.

We re-emphasize that our member company petroleum refineries are already very well controlled, through a litany of other requirements. Both the model and emission inventory evidence discussed above validate this point, demonstrating that the petroleum refineries contribute only a small fraction of a ppb to local ozone during an episode.

Finally, for all the reasons stated the requested controls are not RACT and so are not appropriate at this time, but nonetheless we remain committed to working with UDAQ on potential solutions that have a demonstrated air quality benefit.

Sincerely,

Rikki Hrenko-Browning
President, Utah Petroleum Association

cc:    Gordon Larson - gordonlarsen@utah.gov
       Neil Abercrombie - nabercrombie@utah.gov
       Marina Thomas – marinathomas@agutah.gov
       Kim Shelley - kshelley@utah.gov
       Becky Close – bclose@utah.gov
       Ryan Bares – rbares@utah.gov
       Brian Somers - bsomers@utahmining.org

Attachment: February 2023 letter (Rikki Hrenko-Browning to Bryce Bird, Criteria for Selection of Reasonably Available Control Technology, February 2, 2023)

**Attachment I.**
**February 2023 Letter**

Rikki Hrenko-Browning to Bryce Bird, *Criteria for Selection of Reasonably Available Control Technology*, February 2, 2023



6905 S. 1300 E. #288, Cottonwood Heights, UT 84047-1817

**FUELING UTAH'S GROWTH & PROSPERITY**

February 2, 2023

Bryce Bird
Utah Division of Air Quality
P.O. Box 144820
Salt Lake City, Utah 84114-4820

**Submitted by email to** [bbird@utah.gov](mailto:bbird@utah.gov)

**Subject: Criteria for Selection of Reasonably Available Control Technology**

Dear Bryce:

In a recent meeting between the Utah Petroleum Association (UPA) and staff members from the Utah Division of Air Quality (UDAQ), we discussed the question of objective criteria for establishing cost-effectiveness thresholds in Reasonably Available Control Technology (RACT) for the ozone Moderate State Implementation Plan (SIP). Staff were not certain how the RACT cost-effectiveness thresholds would be established for the case-by-case facility RACT analyses.

RACT cost-effectiveness thresholds should be selected on objective measures comparable to RACT cost-effectiveness thresholds in other jurisdictions. Towards that end, this memo summarizes some research on RACT decisions in other jurisdictions nationwide. Based on this research, **we recommend that the RACT cost-effectiveness thresholds for the Moderate ozone SIP be selected in a range no higher than $5,000 to $7,500 per ton of emissions reduced.**

The Clean Air Act (CAA) and SIP rules for various National Ambient Air Quality Standards (NAAQS) call for implementing the RACT level of control.[1] Additionally, states often apply RACT for Regional Haze SIPs. The regulations for procedural requirements for SIPs define RACT as follows:

> *Reasonably available control technology (RACT) means devices, systems, process modifications, or other apparatus or techniques **that are reasonably available** taking into account:*
>
> *(1) The necessity of imposing such controls in order to attain and maintain a national ambient air quality standard;*

---

[1] See, for example, CAA §182(b)(2), CAA §182(f), and 40 CFR §51.1312 for ozone nonattainment areas; CAA §189(a)(1)(C) and 40 CFR 51.1009(a)(4) for particulate matter nonattainment areas.

*(2) The social, environmental, and economic impact of such controls; and*

*(3) Alternative means of providing for attainment and maintenance of such standard. (This provision defines RACT for the purposes of § 51.341(b) only.)[2]* [emphasis added]

The NOx Supplement to the General Preamble indicates that, "decisions on RACT may be made on a case-by-case basis, considering the technological and economic circumstances of the individual source."[3]

Generally, states have made decisions on RACT cost-effectiveness thresholds by evaluating the cost (dollars) per ton of emission reduced and comparing that to a threshold value deemed to be economically reasonable.

Our research, provided in Table 1, shows that states have recently generally selected the RACT level of control at about $3,000 per ton of emission reduced and no higher than $5,500 per ton for RACT applied outside of Regional Haze SIPs.  The highest RACT values that we identified, $10,000 per ton, were selected for Regional Haze by Utah and Oregon.

Based on this research, ***we recommend that Utah select RACT for the Moderate ozone SIP in a range no higher than $5,000 to $7,500 per ton***, which would put Utah at the high end of non-Regional Haze RACT evaluations among the states identified.

For comparison purposes, we also researched Best Available Control Technology (BACT).  BACT is defined as follows:

> *Best Available Control Technology means an emissions limitation (including a visible emission standard) based on the **maximum degree of reduction** for each pollutant subject to regulation under the Act which would be emitted from any proposed major stationary source or major modification which the Administrator, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant. In no event shall application of best available control technology result in emissions of any pollutant which would exceed the emissions allowed by any applicable standard under 40 CFR part 60, 61, or 63. If the Administrator determines that technological or economic limitations on the application of measurement methodology to a particular emissions unit would make the imposition of an emissions standard infeasible, a design, equipment, work practice, operational standard, or combination thereof, may be prescribed instead to satisfy the requirement for the application of best available control technology. Such standard shall, to the degree possible, set forth the emissions reduction achievable by implementation of such design, equipment, work practice or operation, and shall provide for compliance by means which achieve equivalent results.[4]* [emphasis added]

BACT provides a higher level of control than RACT, evidenced by the "maximum degree of reduction" for BACT compared to controls that are "reasonably available" for RACT in the regulatory definitions noted above.  For example, the $PM_{2.5}$ SIP implementation rule requires

---

[2] 40 CFR Part 51 Subpart F Procedural Requirements §51.100(o).

[3] 57 FR 55624/3.

[4] 40 CFR §52.21(b)(12).

RACT for Moderate nonattainment areas and BACT for Serious nonattainment areas.[5] Furthermore, RACT for both ozone and $PM_{2.5}$ considers controls that are reasonably available but, on the other hand, EPA considers BACT, a concept included for $PM_{2.5}$ SIPs but not included for ozone SIPs, to be generally independent of achieving attainment.[6]  BACT is also considered in New Source Review for major precursors of both ozone and $PM_{2.5}$.

As provided in Table 2, our research shows that, outside of a few outliers, states have generally applied BACT at control levels ranging from $10,000 to $20,000 per ton of emissions reduced. Considering that BACT is a higher level of control than RACT, these values further substantiate our conclusion and recommendation above, that ***RACT should be chosen no higher than the range of $5,000 to $7,500 per ton.***

We hope that you will find our research into objective measures for RACT to be useful.  Please do not hesitate to contact me if you have any questions or feedback.

Sincerely,

Rikki Hrenko-Browning
President, Utah Petroleum Association

cc:    Becky Close – bclose@utah.gov
       Ryan Bares - rbares@utah.gov
       Jon Black - jlblack@utah.gov
       John Jenks - jjenks@utah.gov

---

[5] See 40 CFR Part 51 Subpart Z "Provisions for implementation of $PM_{2.5}$ National Ambient Air Quality Standards".
[6] See, for example, 81 FR 58081.

Table 1.  Regional Haze and RACT Cost-Effectiveness Determinations

| Agency | Year | NOₓ Cost-Effectiveness ($/ton) | Regulatory Driver | Type of Determination | Source |
|---|---|---|---|---|---|
| Colorado – Department of Public Health and Environment | 2021 | 5,000 | Regional Haze | Threshold | 1 |
| | 2019 | | | | 2 |
| | 2011 | | | | 3 |
| Illinois – Environmental Protection Agency | 2020 | 2,500 - 3,000 | RACT | Threshold | 4 |
| | 2016 | | | | 5 |
| | 2007 | 2,500 | | | 6 |
| Maryland – Department of Environment | 2020 | 3,500 - 5,000 | RACT | Threshold | 4 |
| | 2016 | | | | 5 |
| New York – Department of Environmental Conservation | 2020 | 5,000 - 5,500 | RACT | Threshold | 4 |
| | 2016 | | | | 5 |
| | 1994 | 3,000 | | | 7 |
| Ohio – Environmental Protection Agency | 2020 | 5,000 | RACT | Threshold | 4 |
| | 2016 | | | | 5 |
| | 2007 | | | | 6 |
| Pennsylvania – Department of Environmental Protection | 2020 | 2,800 | RACT | Threshold | 4 |
| | 2016 | | | | 5 |
| | 2016 | 3,500 | Regional Haze | | 8 |
| Wisconsin – Department of Natural Resources | 2020 | 2,500 | RACT | Threshold | 9 |
| | 2016 | | | | 5 |
| | 2010 | | | | 10 |
| | 2007 | | | | 6 |
| Texas – Texas Commission on Environmental Quality | 2021 | 5,000 | Regional Haze | Threshold | 11 |
| Oregon – Department of Environmental Quality | 2021 | 10,000 | Regional Haze | Threshold | 12 |
| Minnesota – Minnesota Pollution Control Agency | 2022 | 7,600 | Regional Haze | Threshold | 13 |
| Utah – Department of Environmental Quality | 2022 | 10,000 | Regional Haze | Threshold | 14 |
| Maine – Department of Environmental Protection | 2010 | <7,360 | Regional Haze | Project Determination | 15 |

[1] [EPA–R08–OAR–2020–0114; FRL–10019–22–Region 8]

[2] 5 CCR 1001-9 XVII.E.3.a.(ii)

[3] Colorado Visibility and Regional Haze State Implementation Plan for the Twelve Mandatory Class I Federal Areas in Colorado

[4] EPA–R03–OAR–2019–0657; FRL–10014–53–Region 3

[5] "Responses to Frequently Asked Questions" Final Rulemaking  Additional RACT Requirements for Major Sources of NOx and VOCs 25 Pa. Code Chapters 121 and 129 46 Pa. B. 2036 (April 23, 2016)

[6] Order of the State of Wisconsin Natural Resource Board Amending and Creating Rules. State Implementation Plan

[7] DAR-20:Economic and Technical Analysis for Reasonably Available Control Technology (RACT) Networks (August 8, 2013)

[8] RACT II Overview and Implementation Presentation

[9] [EPA–R05–OAR–2020–0097; EPA–R05–OAR–2020–0199; EPA–R05–OAR–2020–0200; FRL–10011–90–Region 5]

[10] [EPA–R05–OAR–2007–0587; EPA–R05–OAR–2009–0732; FRL–9205–8]

[11] Texas Commission on Environmental Quality Agenda Item Request For Proposed State Implementation Plan Revision

[12] Oregon Regional Haze State Implementation Plan

[13] Minnesota Draft SIP

[14] Technical Support Document for Proposed Action on Area Source Rule Revisions

[15] 2010 Departmental Finding of Fact and Order Regional Haze Best Available Retrofit Technology Determination

Table 2. BACT Cost-Effectiveness Determinations

| Agency | Applicability | NAAQS Designation (Applicable NAAQS) | Year | NOₓ Cost-Effectiveness ($/ton) | Type of Determination | Source |
|---|---|---|---|---|---|---|
| California - San Diego County Air Pollution Control District | Local | Moderate Nonattainment (1997 Ozone) | 2011 | 12,000 | Threshold | 1 |
| California - San Joaquin Valley Air Quality District | Local | Extreme Nonattainment (1997 Ozone); Serious (1997, 2006, 2012 PM$_{2.5}$) | 2022 | 18,000 | Threshold | 2 |
| California - Bay Area Air Quality District | Local | Marginal Nonattainment (2008 Ozone); Moderate (2006 PM$_{2.5}$) | 2016 | 17,500 | Threshold | 3 |
| California - South Coast Air Quality District | Local | Extreme Nonattainment (all Ozone) and Serious (2006, 20012 PM$_{2.5}$) | 2022 | 38,575 | Threshold | 4 |
| Massachusetts - Massachusetts Department of Environmental Protection | Federal | Marginal Nonattainment (2008 Ozone); Moderate (1997 Ozone) | 2011 | 11,000-13,000 | Threshold | 5 |
| Alaska - Alaska Department of Environmental Conservation | Federal | Attainment | 2022 | 7,133 < Threshold < 10,123 | Project Determinations | 6 |
| | Federal | Attainment | 2021 | | | 7 |
| | Federal | Attainment | 2020 | | | 8 |
| Alabama - Alabama Department of Environmental Management | Federal | Attainment | 2021 | <20,400 | Project Determinations | 9 |
| Minnesota - Minnesota Pollution Control Agency | Federal | Attainment | 2007 | 3,201 < Threshold < 12,727 | Project Determinations | 10 |
| | Federal | Attainment | 2015 | | | 11 |
| Washington - Washington Department of Ecology | Federal | Attainment | 2018 | 10,000 | Threshold | 12 |

[1] June 2011 "New Source Review Requirements for Best Available Control Technology BACT"
[2] April 28, 2021, BACT Policy Updates
[3] September 2016 "BAAQMD New Source Review Permitting"
[4] 2022 South Coast Air Quality Management District BACT Maximum Cost Effectiveness Value ($/ton)
[5] June 2011 "Best Available Control Technology (BACT) Guidance"
[6] July 2022 Technical Analysis Report for Construction Permit AQ1539CPT01
[7] March 2021 Technical Analysis Report for Construction Permit AQ0083CPT07
[8] August 2020 Technical Analysis Report for Construction Permit AQ1524CPT01
[9] 2021 Preliminary Determination Tennessee Valley Authority (TVA) – Colbert
[10] October 2007 Minnesota Public Utilities Commission Staff Briefing
[11] May 2015 Air Emission Permit NO. 14100071-001
[12] Pollution Control Hearings Board State of Washington PCHB No. 17-055c



**REGIONAL AIR QUALITY COUNCIL**

***For Immediate Release***

Contact:
David Sabados
Communications Director
Regional Air Quality Council
DSabados@RAQC.org
(303) 629-5450 ext. 220

**Ozone State Implementation Plan Passes RAQC Board**
**RAQC Also Votes to Forward Polis Administration Request for Cost-Benefit Analysis on Reformulated Gas**

The Regional Air Quality Council (RAQC), the lead air quality planning agency for the nine-county North Front Range region, voted to forward the ozone State Implementation Plan (SIP) to the Colorado Department of Public Health and Environment (CDPHE) during the RAQC's August 5 meeting.

The SIP analyzes data from ozone sensors across the front range, stationary and mobile ozone precursor sources, population growth, and other factors to create a plan that will bring Colorado's front range into compliance with Environmental Protection Agency (EPA) ozone standards. The EPA has two standards, first enacted in 2008 and 2015 with the next deadlines in 2027 and 2024, respectively.

The plan projects full compliance with the 2008 75 parts per billion standard by the 2027 deadline and brings the region closer to the 2015 70 parts per billion standard by the 2024 deadline.

"Colorado has made tremendous progress on ozone in the last few years," said Mike Silverstein, Executive Director of the RAQC. "In 2020, only 12% of sensors showed compliance. This year, 56% are currently showing compliance three-quarters of the way through ozone season. This plan continues best practices of the last few years to bring ozone levels down across the front range."

The RAQC board also voted to forward to the Air Quality Control Commission a letter from the Polis administration requesting a cost-benefit analysis of reformulated gas and potentially a waiver from the EPA from the reformulated gas (RFG) requirement under the federal Clean Air Act. RFG is required when a region is deemed "Severe." The EPA is expected to designate the 9-county nonattainment area Severe in the near future after failing to meet the 2021 deadline for the 2008 standard.

"This SIP projects attainment of the 2008 standard by 2027 with or without reformulated gas," said Will Toor, who serves on the RAQC board. "If Colorado can come into compliance without RFG by utilizing other strategies, we can reduce ozone levels without potentially raising gas prices for Coloradans. It's appropriate for the EPA to allow a cost-benefit analysis of this decades old rule."

The 2022 SIP shows ozone improvements made from existing strategies, several of which have phased implementation times so benefits are currently taking effect and will continue to increase over time. A few of the prominent current strategies include:

*the Denver Metro/North Front Range region's air quality planning agency*

1445 Market Street, Suite 260 ▪ Denver, CO 80202
P: (303) 629-5450        F: (303) 629-5822
RAQC.org | CleanAirFleets.org | SimpleStepsBetterAir.org

- Major stationary source permitting reducing allowed tonnage of VOCs and NOx (ozone precursors) from 50 tons/year to 25 tons/year.
- A change in requirements on consumer products such as paints, varnishes, and degreasers that emit ozone precursors to require fewer ozone precursor emissions.
- Greenhouse gas standards through Metropolitan Planning Organizations (MPOs) for transportation, housing, and other regional planning that reduces vehicles miles traveled and otherwise reduces greenhouse gas emissions.

Other strategies currently in implementation include:

- Electric vehicle standards that reduce the number of gas-powered on-road vehicles in the region
- Electrification programs such as the RAQC's Mow Down Pollution program that help businesses, municipalities, and the general public replace gas-powered small engine devices with electric options.

A more extensive list of strategies is below:

## Strategies Implemented Over Time

| Implemented Prior to 2011 | Implemented for 2017 | Implemented for 2020 | Implemented for 2023+ |
|---|---|---|---|
| • Vehicle Inspection/Maintenance<br>• Federal Engine Standards (On- and Non-Road)<br>• 7.8 RVP Fuel Standard<br>• Ultra Low Sulfur Diesel Standards<br>• Stage 1 Vapor Recovery<br>• Regulation No. 7<br>• Other Stationary Source Regs.<br>• Small Business Assistance Program<br>• Clean Air Fleets<br>• Diesel Inspection/Maintenance<br>• Transit and Transportation Network Improvements<br>• Bicycle and Pedestrian Facilities<br>• Land Use Planning and Development<br>• Transit Measures | • Tier 3 Fuel Standards<br>• Renewable Fuel Standard Program<br>• Regulation No. 7 Revisions<br>• Other Stationary Source Reg. Revisions<br>• Energy Efficiency and Renewable Energy Policies<br>• Regional Haze SIP Provisions<br>• Clean Air/Clean Jobs Act<br>• EnginesOFF! Anti-Idling Measures<br>• Charge Ahead Colorado<br>• ALT Fuels Colorado<br>• Mow Down Pollution<br>• Simple Steps. Better Air.<br>• Ozone Forecasting – Voluntary Emission Reduction Actions | • Regulation No. 7 Revisions<br>• Low VOC AIM and Consumer Products<br>• Low/Zero Emission Vehicle Regulation Adoption<br>• Electric Transit Infrastructure | • Revisions and Expansions of Oil and Gas emissions of VOC and NOx<br>• Regional Haze Limits Revisions<br>• Additional Stationary Source Regulations, Nos. 3, 6, 7, 8 in Northern Weld County<br>• Control of Consumer Products and Architectural and Industrial Maintenance Coatings expansion to Northern Weld County<br>• Greenhouse Gas Emissions and Energy Management Program for Manufacturers<br>• Electric Vehicle Group Purchase Programs<br>• Denver Love My Air monitoring and messaging program<br>• Expansion of Mow Down Pollution Program including electrification of commercial equipment<br>• Establishment of State-Run Enterprises<br>• Home Electrification and Electric Bicycle rebate programs<br>• Reformulated Gasoline<br>• 25 tpy major source threshold + LAER and Offsets |

The SIP now goes to CDPHE, where they will review the plan, accept more public input, and potentially make additional recommendations or changes before it is forwarded to the EPA.

\*\*\*

*the Denver Metro/North Front Range region's air quality planning agency*

1445 Market Street, Suite 260 ▪ Denver, CO 80202
P: (303) 629-5450        F: (303) 629-5822
RAQC.org | CleanAirFleets.org | SimpleStepsBetterAir.org



Aug. 5, 2022

**SIP attachment for consideration as supplement to Regional Air Quality Council (RAQC) recommendations**

The RAQC's proposed SIP recognizes the severity of Colorado's air quality situation. This increasing challenge affects Coloradans daily lives and human health in too many ways, and we face a shared imperative to act boldly and swiftly to surmount it. That is why the Polis Administration remains committed to pursuing the most efficient and effective strategy that we can to fight the severity of our ozone situation.

Tackling this challenge necessitates creativity and an "all of government" approach to finding and implementing the most impactful measures that we can to combat severe air quality challenges. That is why the past several years have been marked by consistent and aggressive actions to improve our air for citizens and fight climate change.

The Administration has taken and continues to take a host of actions in the transportation space, among others, recognizing that the sector is a significant contributor to the pollutants — including ozone — that cause climate change and threaten human health. These actions include bold steps on electrification, including adopting Zero Emission Vehicle (ZEV) standards for cars, extensive investments in accelerating charging infrastructure and the transition to an electric fleet, and pursuit of a clean truck strategy that is underway. Notably, Colorado has become a leader on ZEV adoption. Moreover, the state's first of its kind Pollution Reduction Planning Standards for transportation infrastructure recognize the air quality impacts of the choices that government agencies make with respect to the built environment, and the need to offer travelers more clean choices. And, it is important to note that this letter coincides with "Zero Fare August," one of several transit strategies — including significant expansions of state transit service along our interstate routes, that were established in law this past legislative session. These are just a few examples of the major steps that are underway as we pursue a cleaner transportation sector that offers cost effective choices to Coloradans.

To that end, the Administration has concerns about a rigid approach — the requirement to use Reformulated Gasoline (RFG) — that was written into the Clean Air Act decades ago but may not be the best way to reach our air quality goals, and we believe merits rigorous analysis of costs and benefits.

The use of RFG would automatically take effect one year after the official reclassification, which would translate to the summer of 2024 at the earliest.



Notably, the SIP does not currently presume that RFG will be the driver of the clean air improvements that we need — and the RAQC is not proposing that RFG be adopted as a control measure by the Air Quality Control Commision (AQCC) or requesting that reformulated gasoline requirements be included in the SIP. Instead, the SIP proposes state level actions that meet the needs of the plan without relying on reformulated gasoline. The attainment modeling demonstrates that the state will achieve ozone attainment under the 2008 standard without the potentially costly requirement from the federal government of requiring reformulated gasoline. Sensitivity modeling shows that the ozone reduction benefit from reformulated gasoline is only approximately 0.1 parts per billion.

This plan is written to address the potential requirements and options under that severe ozone nonattainment scenario, not simply a broad plan for the state. Additionally, modeled scenarios for achieving attainment under this revised state implementation plan does not include reductions from reformulated gasoline. The required inclusion of the reformulated gasoline in some modeling does not reduce Colorado's legal options to seek waivers.

However, Ch. 15 of the Regional Air Quality Council's proposed state implementation plan (SIP) references reformulated gasoline solely because it is required by the federal government under a severe nonattainment designation.

Automatic applicability of RFG in the 2008 ozone nonattainment area is problematic for a variety of reasons. First, the air quality benefits from RFG are fairly minimal at a few tons per day of VOC reductions, resulting in an approximately 0.1 part per billion reduction of ozone in 2026. Further, these benefits will continue to diminish over time without any corresponding reduction in associated fuel costs. Second, the ultimate solution to addressing the impact of mobile sources on ozone concentrations is through the rapid transition to ZEVs, not through the costly imposition of requirements that tweak fuel specifications. Over the past several years Colorado has been a leader in advancing strategies to transition to ZEVs and has committed significant resources to ensuring that these strategies have been successful. Unlike RFG, these approaches also lead to significant reductions in greenhouse gas pollution. Imposition of RFG requirements fails to account for these efforts and places significant burdens on Coloradans, without achieving corresponding benefits. Third, other existing fuel requirements achieve much of the benefit that historically have been achieved by reformulated gasoline. Finally, RFG is not necessary for the area to attain the 2008 standard. The state's modeled attainment demonstration does not include the modest reductions that could be achieved by reformulated gasoline and shows that nonetheless the area will be well below the standard in 2026.

The state is frustrated that the Clean Air Act offers only a decades old one-size-fits-all approach that does not provide states with the latitude to make data driven decisions on what works best for improving air quality in an economically effective manner.

 COLORADO

To that end, the state requests that prior to any implementation of RFG , the EPA work with us to conduct a detailed cost - benefit analysis that measures both the cost of RFG for Coloradans and the benefits from RFG for human health and combating ozone pollution and climate change.  We request that this analysis compare RFG with other strategies, and account for the range of potential gas prices across the state, as compared to other reduction strategies. These comparative scenarios should include a range of possible mitigations that could be effective as alternatives to RFG, potentially including control measures that are not currently included in the SIP.

Should the state demonstrate that the control measures included in the SIP will result in the state achieving attainment without RFG, that RFG does not provide a benefit to Coloradans that outweighs the costs, or challenging economic scenarios exist at the time the use of RFG would be put into effect by the EPA, the state will utilize available tools to avoid ineffective and costly measures. Further, the state also reserves the right to request that an assessment of attainment be conducted in the event that the state is in attainment and the RFG requirement does not apply. In the interim, the state of Colorado strives to exhaust other meaningful strategies to reduce ozone pollution in an attempt to avoid the federal requirement to use RFG. The final state implementation plan submittal to EPA should make reference to the following:

The SIP proposes state level actions that meet the needs of the plan without relying on RFG. The attainment modeling demonstrates that the state will achieve ozone attainment under the 2008 standard without the potentially costly requirement from the federal government of requiring RFG. Sensitivity modeling shows that the ozone reduction benefit from RFG is only approximately 0.1 parts per billion.

If RFG is sought to be implemented by the EPA, and economic conditions exist that will create strain for Coloradans, the state reserves the right to pursue any legal options, such as waivers, extensions or state level actions to avoid undue economic strain on Coloradans as we pursue other aggressive environmental strategies. In conjunction with any such actions, Colorado requests that the EPA exercises the authority afforded to it under the Clean Air Act to protect Coloradans from unnecessary costs that do not provide a corresponding environmental benefit.

###

**Attachment 5**

UPA's Petition for Reconsideration and Stay of EPA's Final Action:
*Finding of Failure to Attain and Reclassification of an Area in Utah as Serious for the 2015 Ozone National Ambient Air Quality Standards*
(Feb. 4, 2025)

**PETITION FOR RECONSIDERATION AND STAY OF EPA'S FINAL ACTION:
FINDING OF FAILURE TO ATTAIN AND RECLASSIFICATION OF AN AREA IN UTAH AS SERIOUS FOR THE
2015 OZONE NATIONAL AMBIENT AIR QUALITY STANDARDS,
FINAL RULE, 89 FED. REG. 97,545 (DECEMBER 9, 2024)
DOCKET NO. EPA-R08-OAR-2024-0552**

**&**

**PETITION FOR RULEMAKING TO APPROVE UTAH'S REQUEST TO ADJUST THE BOUNDARY FOR THE
NORTHERN WASATCH FRONT OZONE AIR QUALITY CONTROL AREA**

**FEBRUARY 4, 2025**

**TABLE OF CONTENTS**

I.    EXECUTIVE SUMMARY ........................................................................................ 2

II.   UPA'S INTEREST IN THE FINAL RULE AND RECONSIDERATION ................................... 2

III.  BACKGROUND ................................................................................................... 4

   A.   The Unique Characteristics of the Northern Wasatch Front ................................ 4

   B.   The Ozone NAAQS and Designation of the Northern Wasatch Front ...................... 5

   C.   Utah's Request to Expand the Boundary of the NWF ........................................ 6

IV.   PETITION FOR RECONSDERATION AND 3-MONTH STAY OF THE FINAL RULE ........ 8

   A.   EPA Should Grant Reconsideration under CAA Section 307(d)(7)(B) ...................... 9

      i.    EPA Violated the APA by Erroneously Invoking the "Good Cause" Exception to
            Avoid Public Notice and Comment ........................................................ 10

      ii.   It was Impracticable for UPA to Object to the Final Rule ............................ 12

      iii.  Utah's 2024 179B(b) Demonstration is of Central Relevance to the Outcome of the
            Final Rule ..................................................................................... 13

   B.   UPA Additionally Requests Reconsideration Under the APA .................................. 17

   C.   Request for Stay of the Final Rule under CAA Section 307(d)(7)(B) ........................ 17

      i.    UPA is Likely to Succeed on the Merits .................................................. 18

      ii.   UPA Will Be Irreparably Harmed if a Stay is Not Granted ............................ 18

      iii.  A Stay Will Not Harm EPA and a Stay is in the Public Interest ...................... 19

V.    PETITION FOR RULEMAKING TO EXPAND THE BOUNDARY OF THE NWF OZONE AIR
      QUALITY CONTROL AREA TO INCLUDE U.S. MAGNESIUM ........................................ 20

   A.   Granting the Request Respects the Principle of Cooperative Federalism .................. 20

   B.   EPA has Unlawfully Withheld Acting on the Request ....................................... 21

VI.   CONCLUSION ................................................................................................. 21

**BEFORE THE ADMINISTRATOR**
**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

| | |
|---|---|
| Finding of Failure to Attain and ) | Docket No. EPA–R08–OAR–2024– |
| Reclassification of an Area in Utah as Serious ) | 0552 |
| for the 2015 Ozone National Ambient Air ) | |
| Quality Standards, 89 Fed. Reg. 97,545 ) | |
| (December 9, 2024) ) | |

## <u>PETITION FOR RECONSIDERATION AND RULEMAKING</u>

Pursuant to Section 307(d)(7)(B) of the Clean Air Act ("CAA"), 42 U.S.C. § 7607(d)(7)(B), and Section 553(e) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(e), the Utah Petroleum Association ("UPA") hereby petitions the Administrator of the U.S. Environmental Protection Agency ("EPA" or the "Agency") to reconsider and stay the effectiveness of its final rule entitled Finding of Failure to Attain and Reclassification of an Area in Utah as Serious for the 2015 Ozone National Ambient Air Quality Standards, 89 Fed. Reg. 97,545 (December 9, 2024) ("Final Rule"). In addition, UPA petitions EPA to commence a rulemaking pursuant to 5 U.S.C. § 553(e) approving the State of Utah's request to redesignate the Northern Wasatch Front ozone nonattainment area ("NWF") by expanding its boundary.

Reconsideration of these EPA actions is consistent with President Trump's January 20, 2025, executive orders "Unleashing American Energy"[1] and "Declaring a National Energy Emergency."[2] These executive orders recognize the vital importance of the oil and gas industry to America's economy and national security and direct EPA, among other federal agencies, to use their authority to lift these restrictions.

President Trump's executive order on "Unleashing American Energy" specifically requires EPA to "ensure that all regulatory requirements related to energy are grounded in clearly applicable law" and "provide opportunity for public comment and rigorous, peer-reviewed scientific analysis."[3] The order also directs EPA to review all agency actions that "impose an undue burden" on energy development "with particular attention to oil [and] natural gas" resources and "implement plans to suspend, revise, or rescind" such agency actions.[4] Granting reconsideration of the Final Rule would carry out these express directives.

---

[1] Available at https://www.whitehouse.gov/presidential-actions/2025/01/unleashing-american-energy/.
[2] Available at https://www.whitehouse.gov/presidential-actions/2025/01/declaring-a-national-energy-emergency/.
[3] Executive Order, Unleashing American Energy, Section 2(d), (h) (January 20, 2025).
[4] *Id.* Sec. 3.

## I.  EXECUTIVE SUMMARY

In the Final Rule, EPA determined without notice and comment and in violation of the APA that the NWF failed to attain the 2015 National Ambient Air Quality Standard for ozone ("2015 ozone NAAQS") and, as a result, EPA reclassified the NWF to Serious nonattainment. This action results in additional costly regulatory burdens on UPA member refineries in northern Utah and limits the development of Utah's energy resources.

EPA acted arbitrarily and contrary to principles of cooperative federalism by issuing the Final Rule before the State of Utah could submit its demonstration under CAA Section 179B(b), which showed that the NWF would have attained the 2015 ozone NAAQS but for emissions emanating from outside the United States. Under the CAA, Utah's demonstration prevents EPA from reclassifying the NWF to Serious nonattainment. Utah had been closely coordinating with EPA on the 179B(b) demonstration and delayed its submission based on EPA's recommendation to further refine the demonstration. EPA knew that Utah planned to submit the demonstration shortly thereafter. Nonetheless, EPA promulgated the Final Rule before Utah could submit the demonstration. EPA's actions violate both the APA and the CAA.

Relatedly, UPA asks EPA to engage in a rulemaking to approve Utah Governor Spencer Cox's request under CAA Section 107(d)(3)(D) to expand the boundary of the NWF. Granting the request would enable Utah to control emissions from one of the largest contributors to ozone pollution in the NWF. Given the limited remaining strategies to reduce ozone pollution in the NWF, this boundary expansion is necessary for the NWF to attain the 2015 ozone NAAQS. Moreover, as the statutory deadline for EPA to act on this request has long passed, EPA has unlawfully withheld action on this request in violation of the CAA and APA.

## II.  UPA'S INTEREST IN THE FINAL RULE AND RECONSIDERATION

Utah's oil and gas industry—including Utah's five petroleum refineries—operates under a complex system of environmental laws and regulations promulgated and implemented by local, state, and federal governments. Prior to the Final Rule, UPA member refineries in the NWF were already subject to strict regulatory requirements as a result of the NWF's status as a Moderate ozone nonattainment area and a Serious nonattainment area for $PM_{2.5}$. EPA's reclassification of the NWF to Serious ozone nonattainment intensified these regulatory requirements.  Moreover, as a result of the limited number of industrial sources along the NWF, UPA member refineries are likely to bear a disproportional burden despite the fact that local major stationary sources account for an average of approximately only 3% of Utah-formed ozone pollution on exceedance days in the nonattainment area, and refineries are responsible for only a subset of this pollution.[5]

---

[5] Local anthropogenic sources only account for 25% of the ozone pollution in the NWF on exceedance days. Attachment 1, Northern Wasatch Front Nonattainment Area 2015 Ozone NAAQS, Clean Air Act 179B(b) Demonstration, Utah Division of Air Quality [hereinafter "2024 179B(b) Demonstration"], Appendix I at 34,

Onerous permitting requirements were triggered on January 8, 2025, effective date of the Final Rule, that will make any expansion project—or even projects that might otherwise improve efficiency and reduce certain emissions—extremely costly and difficult. For example, in Serious ozone nonattainment areas, the major source threshold is cut in half to 50 tons per year, the major modification threshold for all major sources reduces to 25 tons per year of NOx or VOC, and the required emissions offset ratio increases to 1.2 to 1 (in an area where there is limited availability of offsets). Further, modifications of existing sources are also subject to stricter permitting requirements, including an even higher offset ratio of 1.3 to 1 for certain projects.[6]

Additionally, Utah must now develop and submit to EPA a Serious ozone State Implementation Plan ("SIP") for the NWF.[7] Under the Serious SIP, Utah is required to impose reasonably available control technology ("RACT") on all major sources with potential emissions of 50 tpy or more.[8] Based on discussions with UDAQ staff, the cost of additional emission controls will be substantially greater than under previous SIPs. Finally, in addition to an existing requirement to find an additional 15% in VOC reductions—which UDAQ was unable to do when developing the Moderate SIP—Utah must identify another 3% reduction in VOC or NOx emissions each year for the next three years.[9, 10]

---

https://lf-public.deq.utah.gov/WebLink/DocView.aspx?id=499026&eqdocs=DAQ-2024-012072. Major point sources—including not only refineries, but all major sources—account for only 13% of the local anthropogenic ozone precursor emissions in the NWF. Attachment 2, UPA Comments on UDAQ Preliminary RACT Determinations for Petroleum Refineries in the Northern Wasatch Front Ozone Nonattainment Area at 6 (March 10, 2023). Thus, the emissions from major stationary sources only account for 3.25% of the total ozone pollution in the NWF (0.13 x 25% = 3.25%).

[6] In Serious nonattainment areas, the threshold at which modifications require major modification permitting drops from an increase of VOC or NOx emissions of 40 tpy to 25 tpy. 40 C.F.R. § 51.165(a)(1)(x)(B), (C). Additionally, modifications which increase emissions above a lowered "de minimis" threshold are only excluded from certain major permitting requirements if the source offsets its emissions at a ratio of 1.3 to 1. 42 U.S.C. § 7511a(c)(6)-(8). For sources emitting less than 100 tpy of VOC, modifications above the de minimis threshold are subject to major source permitting requirements except the implementation of the lowest achievable emission rate ("LAER") if such projects do not comply with the 1.3 to 1 offset ratio. *Id.* at § 7511a(c)(7). Instead of LAER, such projects must implement best available control technology ("BACT"). *Id.* For sources emitting 100 tpy or more of VOC, all modifications resulting in emissions above the de minimis threshold are subject to major source permitting. *Id.* § 7511a(c)(8). For such projects, complying with the 1.3 to 1 offset ratio only exempts the project from the LAER requirement. *Id.*

[7] *Id.* § 7511a(c).

[8] *Id.*

[9] *Id.* § 7511a(c)(2)(B). Alternatively, a Serious ozone nonattainment SIP may demonstrate reasonable further progress of less than 3% per year if (1) the SIP includes all technologically feasible emission control measures and (2) includes the control measures implemented by sources in the same source categories in Severe nonattainment areas. *Id.* § 7511a(c)(2)(B)(ii).

[10] Rather than relying exclusively on VOC reductions to meet this reasonable further progress requirement, the SIP may provide for reductions of VOCs and NOx that would result in a reduction in ozone concentrations equivalent to a 3% year over year reduction in VOCs alone. *Id.* § 7511a(c)(2)(C).

3

## III.    BACKGROUND

"The CAA is an exercise in cooperative federalism."[11] Under the CAA, Congress directed EPA to establish National Ambient Air Quality Standards ("NAAQS") for criteria pollutants, such as ozone.[12] Congress then obligates the States to determine how they will meet the NAAQS through SIPs, "affording each state leeway to select means consistent with its particular circumstances and priorities."[13] States have "wide discretion" in formulating SIPs,[14] and the States, not EPA, have "the power to determine which sources would be burdened by regulation and to what extent."[15]

### A.  The Unique Characteristics of the Northern Wasatch Front

The Northern Wasatch Front exhibits unique demographic, topographic, and meteorological characteristics which present significant challenges to attaining the ozone NAAQS. The Northern Wasatch Front covers Utah's most densely populated areas, including approximately two-thirds of the State's population. As a result, the area experiences the highest volume of emissions from automotive transportation in the State. The area is also experiencing rapid population growth as the State is projected to add 2.2 million new residents by 2060,[16] with the majority of the growth occurring in the area covered by the NWF.

These population centers sit within a long and narrow valley surrounded by steep mountain ranges—the Wasatch Mountains to the east and the Oquirrh mountains to the west—as well as the Great Salt Lake to the north. The average elevation in the valley is 4,327 feet above sea level, while the bordering mountains rise to elevations over 11,000 feet. This geography creates a unique bowl shape which traps emissions from sources within the valley during certain meteorological conditions.

The Northern Wasatch Front exhibits a dry-summer continental climate. During the summertime, the area experiences elevated concentrations of ground-level ozone associated with extended periods of high-pressure coinciding with high temperatures, low relative humidity, limited cloud cover, and intense incoming solar radiation. Together,

---

[11] *Env't Comm. of the Fla. Elec. Power Coordinating Grp., Inc. v. EPA*, 94 F.4th 77, 93 (D.C. Cir. 2024); *see US Magnesium, LLC v. EPA*, 690 F.3d 1157, 1159 (10th Cir. 2012).

[12] 42 U.S.C. §§ 7408–7409.

[13] *Env't Comm. of the Fla. Elec. Power Coordinating Grp., Inc.*, 94 F.4th at 93.

[14] *Texas v. EPA*, 829 F.3d 405, 411 (5th Cir. 2016).

[15] *Union Elec. Co. v. EPA*, 427 U.S. 246, 269 (1976).

[16] Utah population to increase by 2.2 million people through 2060, Kem C. Gardner Policy Institute, University of Utah, https://gardner.utah.edu/news/utah-population-to-increase-by-2-2-million-people-through-2060/#:~:text=News%20Release-,Utah%20population%20to%20increase%20by%202.2%20million%20people%20through%202060,to%205.5%20million%20by%202060 (last visited February 3, 2025).

these factors result in a high "background"[17]concentration of ozone, which cannot be controlled, as well as greater ozone production from local emission sources.[18]

## B.    The Ozone NAAQS and Designation of the Northern Wasatch Front

EPA established the current 8-hour ozone NAAQS in 2015 ("2015 ozone NAAQS"), tightening the standard from 75 parts per billion ("ppb") to 70 ppb.[19]  In 2016, Utah Governor Spencer Cox submitted initial designation recommendations for Utah, including a recommendation to designate the NWF as Marginal nonattainment.[20] In 2018, EPA determined that the NWF was in violation of the 2015 ozone NAAQS, classified the NWF as a Marginal ozone nonattainment area,[21] and set August 3, 2021 as the attainment date.[22]

In May 2021, the Utah Division of Air Quality ("UDAQ") submitted to EPA a retrospective 179B(b) demonstration ("2021 179B(b) Demonstration") that the NWF would have attained the 2015 ozone NAAQS by the Marginal attainment date but for the influence of emissions from international sources.[23] In October 2022—more than eight months past the six-month deadline for EPA to make the attainment determination—EPA denied Utah's 2021 179B(b) Demonstration, determined that the NWF failed to meet the 2015 ozone NAAQS by the Marginal attainment date, and reclassified the NWF to Moderate nonattainment as a result.[24] Notably, EPA followed the notice-and-comment procedures required under the APA when it promulgated the finding of failure and reclassification.[25]

As a result of the reclassification of the NWF to Moderate nonattainment, Utah developed and submitted a Moderate ozone SIP on September 25, 2023.[26] In the Moderate SIP, UDAQ had few options to impose additional emission control measures on sources because UDAQ had already implemented the majority of the feasible measures in its 2020 Serious SIP for the $PM_{2.5}$ Salt Lake City nonattainment area. Indeed, as NOx and VOCs are precursors of both ozone and $PM_{2.5}$, this Serious $PM_{2.5}$ SIP already imposed such controls

---

[17] "Background" concentration in this context refers "the uncontrollable fraction entering and impinging on the area of concern. . . include[ing] all domestic and global natural sources (biogenic, stratospheric, natural fires, lightning, etc.) and foreign anthropogenic or IA sources (industrial/ commercial, transportation, residential, agricultural fires, etc.)." Attachment 1, 2024 179B(b) Demonstration, Appendix I at 17.

[18] Attachment 3, State Implementation Plan, 2015 Ozone NAAQS Northern Wasatch Front Moderate Nonattainment Area, Section IX Part D.11, at 13, Utah Division of Air Quality (2023) [hereinafter "Moderate SIP"], https://lf-public.deq.utah.gov/WebLink/DocView.aspx?id=385736&eqdocs=DAQ-2023-011344; Attachment 1, 2024 179B(b) Demonstration, Appendix I at 2-3.

[19] 80 Fed. Reg. 65,292 (October 26, 2015).

[20] Utah 2015 8-Hour Ozone Designation Recommendation (Sept. 29, 2016).

[21] 83 Fed. Reg. 25,776 (June 4, 2018)

[22] 83 Fed. Reg. 10,376 (May 8, 2018).

[23] Attachment 4, Retrospective 179B(b) Demonstration for Utah's Northern Wasatch Front Ozone Nonattainment Area, Utah Department of Environmental Quality (May 28, 2021) [hereinafter "2021 179B(b) Demonstration"], https://lf-public.deq.utah.gov/WebLink/DocView.aspx?id=455709&eqdocs=DAQ-2022-012013&cr=1.

[24] 87 Fed. Reg. 60,897 (October 7, 2022).

[25] 87 Fed. Reg. 21,842 (April 13, 2022).

[26] Attachment 3, Moderate SIP, https://lf-public.deq.utah.gov/WebLink/DocView.aspx?id=385736&eqdocs=DAQ-2023-011344.

on major sources of these pollutants. The Moderate SIP also included a prospective 179B(a) demonstration ("2023 179B(a) Demonstration") that the SIP would be adequate to achieve attainment of the 2015 ozone NAAQS but for the presence of international emissions.[27]

EPA determined that the Moderate SIP was complete on October 11, 2023.[28] On December 12, 2024, Utah then submitted an amended moderate SIP to demonstrate further reasonable progress.[29] The Moderate SIP remains pending before EPA.[30]

After the Moderate attainment date had passed, UDAQ also coordinated with EPA to develop a 179B(b) retrospective demonstration. Consistent with EPA guidance, UDAQ submitted a draft version of its 179B(b) demonstration to EPA on November 26, 2024. Shortly thereafter, UDAQ submitted its final 179B(b) demonstration ("2024 179B(b) Demonstration") to EPA on December 12, 2024.

Based on the Moderate attainment date of August 3, 2024, EPA had until February 3, 2025, to determine whether the NWF met the 2015 ozone NAAQS. To the surprise of the State and the public, EPA took final action on December 9, 2024, determining *without notice and comment* that the NWF failed to attain the standard and reclassifying the NWF to Serious nonattainment.[31]

### C.   Utah's Request to Expand the Boundary of the NWF

When EPA promulgates new NAAQS, the CAA provides the Governor of each State with the initial responsibility to submit a list of all air quality control areas within their State and to designate each area as in attainment or nonattainment with the standard, or otherwise as unclassifiable.[32] EPA then officially promulgates the designations after making any necessary modifications, "including to the boundaries of such areas."[33]

CAA Section 107(d)(3)(D) authorizes the governor of any State to submit "a revised designation of any area or portion thereof within the State" and EPA is required to approve or deny such a redesignation within 18 months.[34] The CAA explains that Governors may submit such redesignations "for purposes of efficient and effective air quality management."[35]

---

[27] *Id.* at 145-154.

[28] Petition for Repeal or Reconsideration and Administrative Stay by the State of Utah at 12 (January 22, 2025).

[29] *Id.*

[30] Under the CAA, EPA has up to 18 months to approve or disapprove a SIP. *See* 42 U.S.C. § 7410(k) (establishing that EPA has 6 months to determine if a SIP is complete, followed by 12 months to approve or disapprove the SIP).

[31] 89 Fed. Reg. 97,545 (December 9, 2024).

[32] 42 U.S.C. § 7407(d)(1)(A).

[33] *Id.* § 7407(d)(1)(B)(ii).

[34] *Id.* § 7407(d)(3)(D).

[35] *Id.* § 7407(e)(1).

When EPA first promulgated the 2015 ozone NAAQS, the State submitted an initial designation for the NWF based on the previously designated boundary for the Salt Lake PM$_{2.5}$ nonattainment area.[36] The proposed nonattainment area included Salt Lake and Davis counties as well as sections of Weber County and Tooele County.[37] Utah included a portion of Tooele County because vehicle emissions from Tooele residents commuting into Salt Lake and Davis Counties significantly contributed to ozone concentrations in the area.[38] Data from Tooele County also indicated that the area would violate the ozone standard in the near future.[39] In 2018, EPA finalized this initial boundary for the NWF.[40]

On February 27, 2023, Utah Governor Spencer Cox submitted a letter requesting that EPA expand the boundary of the NWF,[41] as shown in Figure 1 below. Governor Cox made the request to allow UDAQ to control emissions from U.S. Magnesium, a mining and processing facility located just outside the boundary in Tooele County, which significantly contributes to ozone levels in the NWF. Despite this reasonable request to provide Utah with the tools it needs to achieve attainment of the 2015 ozone NAAQS in the NWF, EPA ignored Governor Cox's letter.

---

[36] Utah 2015 8-Hour Ozone Designation Recommendation (Sept. 29, 2016); *see* 81 Fed. Reg. 58,010 (Aug. 24, 2016).

[37] *Id.*

[38] Attachment 5, Letter from Utah Governor Spencer Cox to Kathleen Becker, EPA Region 8 Administrator (February 27, 2023) [hereinafter "Boundary Request Letter"], https://lf-public.deq.utah.gov/WebLink/DocView.aspx?id=385703&eqdocs=DAQ-2023-002065, https://lf-public.deq.utah.gov/WebLink/DocView.aspx?id=385704&eqdocs=DAQ-2023-002086.

[39] *Id.*

[40] 83 Fed. Reg. 25,776 (June 4, 2018).

[41] Attachment 5, Boundary Request Letter.

Figure 1—Current and Proposed NWF Boundary



## IV.   PETITION FOR RECONSDERATION AND 3-MONTH STAY OF THE FINAL RULE

Pursuant to CAA Section 307(d)(7)(B) and APA Section 553(e), UPA petitions EPA for reconsideration of (1) the determination that the NWF failed to attain the 2015 ozone NAAQS by the Moderate attainment date of August 3, 2024, and (2) the reclassification of the NWF to Serious nonattainment.

UPA petitions for reconsideration under the CAA *and* the APA for an important reason: to ensure EPA has authority to correct a significant procedural error that EPA made in finalizing the Final Rule. Indeed, UPA's reliance on both the CAA's and the APA's reconsideration provisions is necessary because of EPA's error.

Specifically, EPA issued the Final Rule without complying with the APA's notice-and-comment procedures by erroneously invoking APA Section 553(b)(B)'s "good cause" exception.[42] By doing so, EPA deprived UPA and other members of the public not only of

---

[42] 89 Fed. Reg. at 97,548 (citing 5 U.C.C. § 553(b)(B)).

8

the opportunity to meaningfully participate in this rulemaking, but also of the subsequent opportunity to seek CAA reconsideration of the Final Rule. That is because Section 307(d)(1) of the CAA states that the CAA reconsideration process "shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of title 5 [the APA]."[43] However, where EPA's decision to invoke the "good cause" exception was factually and legally wrong (as described below), that procedural violation should not be made worse by depriving Utah, UPA, or EPA of this opportunity to correct that violation. Because EPA should have provided the notice and comment opportunities from the outset, EPA's reliance on APA Section 553(b)(B) was invalid, and thus CAA Section 307(d)(1)'s bar on reconsideration cannot apply.

EPA should grant UPA's petition under CAA Section 307(d)(7)(B) because it meets the standard for reconsideration and would provide an opportunity to fix EPA's prior procedural error and consider Utah's 2024 179B(b) Demonstration. In light of the significant harms that the Serious reclassification imposes on UPA and its members, UPA also requests that EPA issue a 3-month stay of the Final Rule pending reconsideration.

In the alternative, if EPA finds that CAA Section 307(d)(1) prevents reconsideration of the Final Rule because EPA invoked the "good cause" exception of APA Section 553(b)(B), EPA should grant UPA's petition for reconsideration under APA Section 553(e) for the same reasons.

Based on Utah's 2024 179B(b) Demonstration, EPA should conclude its reconsideration by repealing the Final Rule and issuing a new rule approving Utah's 2024 179B(b) Demonstration, determining that the NWF would have attained the 2015 ozone NAAQS by the Moderate attainment date but for emissions emanating from outside the United States, and explaining that the NWF cannot be reclassified to Serious nonattainment.

### A.  EPA Should Grant Reconsideration under CAA Section 307(d)(7)(B)

EPA must reconsider a final rulemaking when a petitioner shows that: (1) the grounds for its issues were either impracticable to raise during the comment period or arose subsequent to the end of the comment period (but within the time specified for judicial review); and (2) those objections are of central relevance to the Final Rule.[44]

Here, EPA issued the Final Rule without complying with the notice-and-comment procedures required by the APA by erroneously relying on APA Section 553(b)(B)'s "good cause" exception.[45] This made it impossible to raise any comments on Utah's 2024 179B(b) Demonstration and the significant harm that the Serious reclassification inflicts on UPA members. Utah's 2024 179B(b) Demonstration is of central relevance to the Final Rule

---

[43] 42 U.S.C. § 7607(d)(1).
[44] *Id.* § 7607(d)(7)(B).
[45] 89 Fed. Reg. at 97,548 (citing 5 U.C.C. § 553(b)(B)).

because it would have prohibited the reclassification if EPA had considered and approved the demonstration.

Reconsideration would afford EPA the opportunity to correct this procedural violation of the APA and to provide an opportunity for public comment on Utah's 2024 179B(b) Demonstration before EPA takes final action on whether to reclassify the NWF. Accordingly, UPA's petition satisfies both elements of CAA Section 307(d)(7)(B) and the EPA Administrator "shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed."[46]

### i. EPA Violated the APA by Erroneously Invoking the "Good Cause" Exception to Avoid Public Notice and Comment

When engaging in rulemaking, the APA requires administrative agencies to provide notice of "the legal authority under which the rule is proposed" and "the terms or substance of the proposed rule or a description of the subjects and issues involved."[47] The APA also requires agencies to "give interested persons an opportunity to participate in the rule making through submission of data, views, or arguments."[48]

The APA provides an exception to these required notice-and-comment procedures when an agency finds "for good cause" that such procedures are "impracticable, unnecessary, or contrary to the public interest."[49] However, Congress explained and courts have long held that this exception is "narrowly construed and only reluctantly countenanced" in "emergency situations" or "where delay could result in serious harm."[50] It should not be used "to circumvent the notice and comment requirements whenever an agency finds it inconvenient to follow them."[51]

Under the "good cause" exception, an agency's authority to claim that notice and comment were "unnecessary" is "confined to those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and the to the public."[52] On the other hand, public notice and comment is

---

[46] *Id.*

[47] 5 U.S.C. § 553(b).

[48] *Id.* § 553(c).

[49] *Id.* § 553(b)(B).

[50] *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (citing *Util. Solid Waste Activities Grp.*, 236 F.3d at 754; *Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1144, 297 U.S. App. D.C. 141 (D.C. Cir. 1992); *New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980); *Jifry*, 370 F.3d at 1179 ("The exception excuses notice and comment in emergency situations, or where delay could result in serious harm."); *Am. Fed. of Gov't Emps. v. Block*, 655 F.2d 1153, 1156, 210 U.S. App. D.C. 336 (D.C. Cir. 1981) ("As the legislative history of the APA makes clear, moreover, the exceptions at issue here are not 'escape clauses' that may be arbitrarily utilized at the agency's whim. Rather, use of these exceptions by administrative agencies should be limited to emergency situations . . . .")).

[51] *New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980) (quoting *United States Steel Corp. v. United States Envtl. Prot. Agency*, 595 F.2d 207, 214 (5th Cir. 1979)).

[52] *Mack Trucks, Inc.*, 682 F.3d at 93 (quoting *Util. Solid Waste Activities Grp.*, 236 F.3d at 755).

necessary where a rule concerns administrative actions "about which members of the public were greatly interested."[53]

EPA claimed that it had good cause to issue the Final Rule without notice and comment on the basis that the determination of whether the NWF attained the 2015 ozone NAAQS by the applicable attainment date depended solely on the NWF's design values and "involve[d] no exercise of judgment or discretion."[54] Accordingly, EPA concluded that notice and comment procedures were "unnecessary."[55] EPA cited no caselaw or previous attainment determinations where EPA found notice and comment were unnecessary to support this reasoning—indeed, no authority exists because EPA's unprecedented action contradicts longstanding caselaw and EPA's previous attainment determinations and reclassifications.

Far from being the type of inconsequential administrative rule for which notice and comment may be unnecessary, the Final Rule has dramatic consequences on air quality regulation for both the State of Utah and emission sources. EPA's reclassification of the NWF to Serious nonattainment imposes strict permitting requirements on the construction of new and modified facilities that emit VOCs and NOx, including projects to develop and refine energy resources in northern Utah. Additionally, the Final Rule requires UDAQ to develop and implement a Serious SIP by January 1, 2026, that imposes emission control measures on a much larger pool of emission sources, among many other burdensome requirements. Based on the significant and extensive consequences of the Final Rule, it is wholly inappropriate for EPA to claim that public notice and comment is unnecessary.

Even if EPA could demonstrate that notice-and-comment were unnecessary because the nonattainment determination involved no judgment or discretion, the reclassification of the NWF did require EPA to exercise judgment and discretion. Indeed, CAA Section 179B(b) prohibits EPA from reclassifying the NWF to Serious nonattainment if Utah "establishes to the satisfaction of the Administrator" that the NWF would have attained the ozone standard but for international emissions.[56]

Nor does this circumstance present an emergency situation where delay could result in serious harm. EPA had ample of time to provide notice and an opportunity to comment—EPA issued the Final Rule eight weeks before the February 3, 2025, statutory deadline to determine whether the NWF met the ozone standard. Additionally, the D.C. Circuit has explained in the context of the CAA that "the mere existence of deadlines for agency action, whether set by statute or court order, does not in itself constitute good cause for a § 553(b)(B) exception."[57]

---

[53] *Id.*
[54] 89 Fed. Reg. at 97,548.
[55] *Id.*
[56] *See* 42 U.S.C. § 7509a(b).
[57] *New Jersey*, 626 F.2d at 1041 (quoting and adopting the reasoning of the Fifth Circuit in *United States Steel Corp.*, 595 F.2d at 214).

Moreover, EPA's decision to deny public notice and comment arbitrarily contradicted EPA's prior precedent of providing notice and an opportunity for public comment when making attainment determinations and reclassifying ozone nonattainment areas,[58] except when States voluntarily request reclassification.[59] For instance, EPA's 2022 rule reclassifying the NWF to Moderate nonattainment followed this longstanding practice.[60] In that rulemaking, EPA provided a thorough discussion of its proposal to deny Utah's 2021 179B(b) Demonstration and specifically requested comment on the denial.[61] EPA then considered and responded to public comment on the 2021 179B(b) Demonstration in a final version of the rule.[62] EPA departed from this approach here when it reclassified the NWF to Serious nonattainment but provided no explanation for breaking from prior precedent. This "unexplained inconsistency in agency policy" is a classic example of arbitrary and capricious rulemaking prohibited by the APA.[63]

Additionally, EPA cannot in good faith argue that it had no obligation to consider Utah's 2024 179B(b) Demonstration on the grounds that Utah had not submitted it by the time EPA issued the Final Rule. Such a claim rings hollow as Utah had been closely coordinating with EPA to refine the demonstration, EPA had received the draft demonstration prior to issuance of the Final Rule, and knew that Utah planned to submit the final demonstration well before the statutory deadline for EPA to act. The arbitrary and capricious nature of EPA's disregard for essential rulemaking procedures in the Final Rule further highlights this procedural violation of the APA.

### ii.  It was Impracticable for UPA to Object to the Final Rule

As a result of EPA denying the opportunity for public comment, it was not only impracticable, but also impossible for UPA to object to reclassification of the NWF based on Utah's 2024 179B(b) Demonstration.

---

[58] *See, e.g.,* 87 Fed. Reg. 60,897 (October 7, 2022) (reclassifying the NWF to Moderate nonattainment); 89 Fed. Reg. 66,291 (August 15, 2024) (proposed determination that the Los Angeles-South Coast Air Basin failed to attain the 1997 8-hour ozone standard by the Extreme attainment date); 88 Fed. Reg. 775 (January 5, 2023) (reclassifying the Las Vegas ozone nonattainment area to Moderate nonattainment); 84 Fed. Reg. 70,897 (December 26, 2019) (reclassifying the Denver ozone nonattainment areas to Serious nonattainment); 81 Fed. Reg. 91,841 (December 19, 2026) (reclassifying the Sheboygan ozone nonattainment area to Moderate nonattainment).

[59] In some instances, EPA has reclassified areas without notice and public comment when States have voluntarily requested reclassification. *See, e.g.,* 89 Fed. Reg. 60,827 (July 29, 2024) (approving Connecticut's voluntary request to reclassifying the Greater Connecticut ozone nonattainment area to Serious nonattainment); 89 Fed. Reg. 61,025 (July 30, 2024) (approving voluntary requests from Pennsylvania, New Jersey, Maryland, and Delaware to reclassify the Philadelphia-Wilmington-Atlantic City ozone nonattainment area to Serious nonattainment).

[60] 87 Fed. Reg. at 60,897.

[61] 87 Fed, Reg. at 21,852.

[62] 87 Fed. Reg. at 60,905-06.

[63] *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) ("'[A] unexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'") (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)).

Following submission of the Moderate ozone SIP, UDAQ began consulting with EPA on development of another 179B(b) retrospective demonstration that the NWF would have attained the 2015 ozone NAAQS by the Moderate attainment date but for international emissions. UDAQ followed EPA's recommended steps for consultation as outlined in EPA's 2020 Guidance.[64] Pursuant to the 2020 Guidance, UDAQ met with EPA on September 12, 2024, to discuss development of the demonstration and to review UDAQ's data on international emissions. During this meeting, EPA recommended that UDAQ conduct additional analyses and review the performance of its photochemical model. While UDAQ had originally notified EPA of its plan to submit the final demonstration the following month, UDAQ agreed to delay submission to conduct the additional work that EPA had recommended. After updating its modelling and analysis, UDAQ then submitted a draft version of the demonstration to EPA on November 26, 2024. This was consistent with EPA's 2020 Guidance which recommends that States submit draft 179B demonstrations to EPA "for review and discussion" before submitting final demonstrations.[65]

Just two weeks later on December 9, 2024, EPA issued the Final Rule—bypassing the notice-and-comment procedures required under the APA and without any acknowledgement that UDAQ's final 179B(b) demonstration was forthcoming.[66] This prevented any public comment on how Section 179B(b) should impact EPA's determination of attainment and reclassification of the NWF. Thus, UPA meets the first required element for reconsideration under CAA Section 307(d)(7)(B).

### iii. Utah's 2024 179B(b) Demonstration is of Central Relevance to the Outcome of the Final Rule

The second element for reconsideration—that the objection is "of central relevance to the outcome of the rule"—turns on "whether the objections provide substantial support for the argument that the regulation should be revised."[67] Here, Utah's 2024 179B(b) demonstration is of central relevance to the Final Rule because it strikes at the very legality of EPA's actions.

CAA Section 179B prevents reclassification of an ozone nonattainment area if a State "establishes to the satisfaction of the [EPA] Administrator" that the area would meet the applicable ozone NAAQS "but for emissions emanating from outside of the United States."[68, 69] Since 2021, UDAQ has studied the influence of emissions from international sources on

---

[64] Guidance on the Preparation of Clean Air Act Section 179B Demonstrations for Nonattainment Areas Affected by International Transport of Emissions, EPA at 4 (December 2020) [hereinafter "2020 Guidance"], https://www.epa.gov/sites/default/files/2020-01/documents/draft_179b_guidance-final_draft_for_posting.pdf.

[65] *See* 2020 Guidance at 4.

[66] 89 Fed. Reg. 97,545 (December 9, 2024).

[67] *Chesapeake Climate Action Network v. EPA*, 952 F.3d 310, 322 (D.C. Cir. 2020)

[68] 42 U.S.C. § 7509a.

[69] 179B demonstrations can be either provide prospective or retrospective relief. Under CAA Section 179B(a), a State may include in its SIP a prospective demonstration that the SIP would achieve the NAAQS but for international emissions. *Id.* § 7509a(a). If EPA approves a prospective 179B(a) demonstration, then it must also approve the SIP as long as the SIP meets all other statutory requirements. *Id.* Section 179B(b) also allows

ozone concentrations in the NWF. UDAQ has repeatedly found that the NWF would have attained the 2015 ozone NAAQS but for such international emissions.

In 2021, UDAQ submitted a retrospective 179B(b) demonstration that the NWF would have attained the standard by the Marginal attainment date but for international emissions.[70] When EPA reclassified the NWF to Moderate nonattainment, EPA disapproved UDAQ's 2021 179B(b) Demonstration based solely on the Agency's December 2020 Guidance, rather than the text of Section 179B or any implementing regulations.[71]

In the 2020 Guidance, EPA interpreted Section 179B as incorporating many factors beyond the straightforward statutory requirement to review whether a nonattainment area would have attained the ozone NAAQS but for international emissions. Despite establishing that Section 179B "is not restricted to areas adjoining international borders,"[72] EPA imposed a more stringent evidentiary requirement for the NWF because it exhibited the following characteristics:

- Air quality monitors not located near an international border;

- Specific international sources and their emissions were difficult to identify;

- Exceedances on internationally influenced days in the range of typical exceedances attributable to local sources; and

- Exceedances on internationally influenced days that occurred in association with local emissions or on days where meteorological conditions supported local formation of ozone.[73]

Based on this heightened standard of review, EPA disapproved UDAQ's 2021 179B(b) Demonstration for the following reasons:

---

a State to submit a retrospective demonstration after the attainment date has passed. *Id.* § 7509a(b). If EPA approves a 179B(b) retrospective demonstration, then EPA cannot reclassify the area to a higher level of nonattainment. *Id.*

[70] Retrospective 179B(b) Demonstration for Utah's Northern Wasatch Front Ozone NAA (May 28, 2021); DAQP-048-21, Docket Id. No. EPA-HQ-OAR-2021-0742-0019, https://www.regulations.gov/document/EPA-HQ-OAR-2021-0742-0019. The 2021 179B(b) Demonstration included four different technical analyses to support UDAQ's conclusion: (i) synoptic meteorological pattern analysis; (ii) Hybrid Single-Particle Lagrangian Integrate Trajectory modelling; (iii) photochemical modeling; and (iv) conceptual modeling of the high ozone days in the NWF.

[71] 87 Fed. Reg. at 60,905-06; 179B Northern Wasatch Front TSD (January 2022), Dkt. No. EPA-HQ-OAR-2021-0742, https://www.regulations.gov/document/EPA-HQ-OAR-2021-0742-0043; *see* Guidance on the Preparation of Clean Air Act Section 179B Demonstrations for Nonattainment Areas Affected by International Transport of Emissions, EPA (December 2020) [hereinafter "2020 Guidance"], https://www.epa.gov/sites/default/files/2020-01/documents/draft_179b_guidance-final_draft_for_posting.pdf.

[72] 2020 Guidance at 5 (citing the preambles to the implementation rules for the 2008 and 2015 ozone NAAQS where EPA explained that Section 179B does not prohibit such demonstrations for areas not located on international borders); *see* 80 Fed. Reg. 12,294 (March 6, 2015); 83 Fed. Reg. 63,010 (December 6, 2018).

[73] 87 Fed. Reg. at 60,906.

14

- Insufficient technical information;

- International emissions in the NWF contributed less to local ozone than domestic emissions, were not significantly different on ozone-exceedance days, and were not predominantly responsible for ozone exceedances;

- Utah did not address which emission control measures it has evaluated; and

- The Southern Wasatch Front ("SWF") ozone Marginal nonattainment area experienced similar contributions from international sources and attained the standard.[74] EPA said this despite significant differences in the local emission levels between the SWF and NWF.

While the text of Section 179B provides EPA some discretion to interpret how to review State demonstrations—by requiring States to establish the impact of international emissions "to the satisfaction of the Administrator."[75]—EPA must exercise such discretion within "the boundaries of [the] delegated authority" established by the CAA.[76] EPA's current interpretation of Section 179B is arbitrary and capricious because it violates this principle by relying upon "factors which Congress has not intended it to consider."[77] Indeed, CAA Section 179B does not identify any of these factors as required or relevant to analyzing a State's demonstration.

EPA's interpretation turns Section 179B provision on its head by requiring States to establish that international emissions are the primary cause of ozone exceedances, rather than simply determining whether an area would have attained the standard "but for emissions emanating from outside of the United States."[78] UPA thoroughly explained the issues with EPA's interpretation of CAA Section 179B in comments on the 2020 Guidance[79] and EPA's disapproval of UDAQ's 2021 179B(b) Demonstration.[80]

Despite continuing to disagree with EPA's interpretations of Section 179B, Utah addressed EPA's concerns in 2023 when UDAQ submitted a 179B(a) Demonstration as part of its Moderate ozone SIP for the NWF.[81] UDAQ then coordinated with EPA on the development of its 2024 179B(b) Demonstration. The 2024 Demonstration shows that international anthropogenic emissions from Mexico and Asia account for 6 to 7% of the

---

[74] 179B Northern Wasatch Front TSD at 2-3.

[75] 42 U.S.C. § 7509a(b).

[76] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024).

[77] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[78] *See* 42 U.S.C. § 7509a(b).

[79] Attachment 6, UPA Comments on EPA's Proposed 179B Guidance (March 10, 2020).

[80] Attachment 7, UPA Comments on Proposed Reclassification of the NWF to Moderate Nonattainment at 4 (June 13, 2022).

[81] Attachment 3, Moderate SIP at 144-153. UDAQ used updated photochemical modeling to refine its analysis of international emissions in the NWF and to demonstrate that the impact of international emissions is significant when compared to those from local anthropogenic sources within the nonattainment area.  To address EPA's remaining concerns, UDAQ explained that the Moderate ozone SIP implements all feasible emission controls strategies and highlighted important distinctions between the NWF and SWF areas that render EPA's comparison unreasonable.

15

ozone contribution in the NWF on ozone exceedance days and provides additional evidence that the international contribution is even higher during locally elevated ozone events.[82] Most importantly, the 2024 179B(b) Demonstration shows that, after discounting the influence of international emissions, the design value of the NWF met the 2015 ozone NAAQS by the Moderate attainment date.[83]

The significance of these international emissions is underscored by Utah's limited authority to regulate ozone pollution in the NWF. On average exceedance days, natural and out-of-state sources of ozone are responsible for approximately 58 to 59% of the ozone pollution in the NWF, in-state Utah natural sources contribute 10%, and international anthropogenic sources contribute 6.5 to 7%.[84] Of the 24 to 25% attributed to Utah anthropogenic sources,[85] we estimate that approximately 14% of the ozone pollution emanates from federally regulated sources which Utah does not have authority to control.[86] That leaves approximately 11% of the ozone pollution in the NWF available for Utah to regulate, of which only 3% comes from major source refineries.[87] Moreover, the 2024 demonstration highlights that ozone concentrations in the NWF have actually increased over the last decade despite the State implementing control measures that have reduced emissions of ozone precursors by well over 40% over that time.[88] This indicates that international ozone precursor emissions may have even greater influence on ozone concentrations in the NWF than local VOC and NOx emissions within the nonattainment area.

UDAQ's 2024 179B(b) Demonstration presents compelling analysis—refined over years of study and coordination with EPA—to show that the NWF would have attained the 2015 ozone NAAQS by the Moderate attainment date *but for* the impact of international emissions. This essential finding meets the statutory requirement under CAA Section 179B(b) to prevent reclassification,[89] the very action that EPA took in the Final Rule.

---

[82] Attachment 1, 2024 179B(b) Demonstration, Appendix I at 3, https://lf-public.deq.utah.gov/WebLink/DocView.aspx?id=499026&eqdocs=DAQ-2024-012072.

[83] *Id.*, Overview, Table 1; *id.* Appendix I at 38-39, Tables 6 and 7.

[84] *Id.*, Appendix I at 34-35.

[85] *Id.* Anthropogenic sources include mobile sources such as on-road motor vehicles (*e.g.*, cars, trucks, and buses), non-road engines (*e.g.*, construction equipment, lawn and garden equipment, rail, airports, board, and four-wheelers), and stationary sources.

[86] 2023 UDAQ data demonstrates that federally-regulated and state-regulated anthropogenic sources account for 7.9% and 6.3% of the ozone pollution in the NWF, respectively, on average. Attachment 8, Northern Wasatch Front 03 State Implementation Plan: Modeling Updates, Technical Analysis Section at 14, Utah Department of Environmental Quality, Division of Air Quality (February 15, 2023). Based on this data, UPA calculated the portion of anthropogenic emissions attributed to federally-regulated sources (7.9/(6.3 + 7.9) = 0.556). UPA then multiplied this ratio by the percentage of ozone pollution in the NWF attributable to all Utah anthropogenic sources (0.556 x 25% = 13.9%).

[87] *See* Attachments 1 and 2, *supra* note 5.

[88] Attachment 1, 2024 179B(b) Demonstration, Appendix I at 21-22.

[89] *See* 42 U.S.C. 7509a(b) (simply requiring that the "State would have attained the national ambient air quality standard for ozone by the applicable attainment date, but for emissions emanating from outside of the United States").

16

Accordingly, commenting on how the 2024 179B(b) Demonstration impacts EPA's attainment determination is of central relevance to the outcome of the Final Rule.

As both elements for reconsideration under CAA Section 307(d)(7)(B) are met, EPA must reconsider the Final Rule. Ultimately, EPA should issue a new rule (1) determining—based on the text of the CAA—that the NWF would have attained the 2015 ozone NAAQS by the Moderate attainment date but for emissions emanating from outside of the United States and (2) explaining that the CAA thus prohibits reclassification of the NWF.

### B. UPA Additionally Requests Reconsideration Under the APA

As discussed above, if EPA finds that CAA Section 307(d)(1) prevents reconsideration of the Final Rule because EPA invoked the "good cause" exception of APA Section 553(b)(B), UPA alternatively petitions for reconsideration of the Final Rule under the APA.

APA Section 553(e) requires that "each agency shall give an interested person the right to petition for issuance, amendment, or repeal of a rule."[90] "Interested person" in this context includes a private association such as UPA.[91] For the same reasons discussed above, including the need to provide an opportunity for public participation and consideration of Utah's 179B(b) demonstration, EPA should reconsider and amend the rule under the APA.

### C. Request for Stay of the Final Rule under CAA Section 307(d)(7)(B)

UPA respectfully requests that that EPA stay the effectiveness of the Final Rule for three months pending reconsideration. CAA Section 307(d)(7)(B) establishes that "[t]he effectiveness of the rule may be stayed during . . . reconsideration . . . by the Administrator . . . for a period not to exceed three months."[92]

The CAA does not describe the factors that EPA must consider in granting a stay pending reconsideration. However, when issuing administrative stays pending judicial review under the APA, agencies generally determine the appropriateness of such stays by applying the same criteria that govern requests to a court for preliminary injunctive relief.[93] Those criteria are "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties

---

[90] 5 U.S.C. § 553(e).

[91] *Id.* (defining "person" to include "an individual, partnership, corporation, association, or public or private organization other than an agency").

[92] 42 U.S.C. § 7607(d)(7)(B).

[93] *See Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 30-31 (D.D.C. 2012) ("[T]he standard for a stay at the agency level is the same as the standard for a stay at the judicial level: each is governed by the four-part preliminary injunction test applied in this Circuit.").

interested in the proceeding; and (4) where the public interest lies."[94] To the extent that those criteria are relevant to an administrative stay under CAA Section 7607(d)(7)(B), all four criteria are satisfied here.

### i. UPA is Likely to Succeed on the Merits

The Final Rule violated the APA on both procedural and substantive grounds. First, as discussed above, EPA violated the procedural rulemaking requirements under the APA by issuing the Final Rule without notice and an opportunity for public comment. EPA's attempt to avoid these procedures under the "good cause" exception fails to meet the strict standard for such exceptions.

Second, the Final Rule is arbitrary and capricious. EPA failed to provide a reasoned explanation that notice-and-comment procedures were "unnecessary," given that Utah's 179B(b) demonstration required EPA to exercise judgement when reclassifying the NWF. EPA's denial of notice and comment also arbitrarily deviated from EPA's policy of following notice-and-comment procedures when making nonattainment determinations and reclassifying ozone nonattainment areas. Further, EPA issued the Final Rule before Utah could submit its 179B(b) determination, despite recommending Utah refine the demonstration further and knowing that Utah planned to shortly submit the final version.

These procedural and substantive claims under the APA present a strong likelihood of success on the merits.

### ii. UPA Will Be Irreparably Harmed if a Stay is Not Granted

Absent a stay, UPA will be irreparably harmed because the reclassification of the NWF to Serious nonattainment triggered significant permitting restrictions on the development of new sources of VOC and NOx emissions as well as the modification of current sources. Additionally, the Serious reclassification requires the State of Utah to develop a Serious ozone SIP, which in turn requires UPA member companies to coordinate with UDAQ on whether their facilities are currently implementing RACT. Not only does this process require costly and time-consuming analysis, but it will likely result in the imposition of additional control measures at member facilities. Indeed, UDAQ is currently reviewing RACT analyses submitted by UPA members for their facilities. Additionally, UDAQ is currently developing a rulemaking for new emission controls on refinery tanks.[95] These permitting restrictions and SIP actions not only jeopardize current projects to construct new sources and make necessary modifications at existing sources, but also restrain UPA members from planning future projects to develop energy resources in northern Utah. These restrictions would even apply to future refinery modifications

---

[94] *Clean Air Council v. Pruitt*, 862 F.3d 1, 8 (D.C. Cir. 2017) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)); Planned Parenthood of Kan. v. Andersen, 882 F.3d 1205, 1223 (10th Cir. 2018); *Sierra Club*, 833 F. Supp. 2d at 30-31.

[95] UDAQ Stakeholder Meeting on the Development of the Serious ozone SIP for the NWF (September 22, 2024).

required to comply with control measures under the CAA, such as the prohibition on the sale of conventional gasoline and the required production of reformulated gasoline for gasoline sales within the NWF.[96]

Additionally, the Final Rule deprived UPA and its members the opportunity to comment on how Utah's 2024 179B(b) Demonstration impacts EPA's attainment determination. Without a stay, these substantive and procedural harms are irreparable.

### *iii.  A Stay Will Not Harm EPA and a Stay is in the Public Interest*

The balance of harms favors a stay. A stay would maintain the status quo—which already includes strict controls on sources under the $PM_{2.5}$ Serious SIP and the Moderate Ozone SIP —and provide EPA the necessary time to review and approve Utah's 179B(b) demonstration. A brief three-month stay would not harm the public because it would not affect the ability of the NWF to attain the 2015 ozone NAAQS by the Serious attainment date of August 3, 2027, if EPA concluded its reconsideration by retaining the Final Rule. In that case, a short delay in the requirement that Utah develop a Serious ozone SIP for the NWF would have little effect on the eventual implementation of controls under such a SIP. Moreover, as Utah's 2024 179B(b) Demonstration establishes, the NWF would already attain the standard, without a Serious SIP, but for the presence of international admissions.

Additionally, there is a strong public interest in maintaining the CAA's system of cooperative federalism.[97] A three-month stay would respect this principle by providing time for EPA to review the state-specific data in Utah's 2024 179B(b) demonstration before acting unilaterally to dictate how Utah must manage air quality within its borders.

UPA supports the articulation of the harms and how they favor a stay in the State of Utah's Petition for Reconsideration[98] and Kennecott Utah Copper's letter supporting Utah's petition.[99] A stay is in the public interest because it will maintain the status quo while EPA resolves the procedural and substantive violations in the Final Rule.

---

[96] *See* 42 U.S.C. § 7545(k)(10)(D) (imposing reformulated gasoline requirements on ozone nonattainment areas one year after reclassification to Severe nonattainment).

[97] *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016).

[98] Petition for Repeal or Reconsideration and Administrative Stay by the State of Utah at 12 (January 22, 2025).

[99] Attachment 9, Letter in Support of the Utah Division of Air Quality's Request that the Environmental Protection Agency Repeal or Reconsider and Stay the Final Rule, Kennecott Utah Copper (January 22, 2025).

19

### V.    PETITION FOR RULEMAKING TO EXPAND THE BOUNDARY OF THE NWF OZONE AIR QUALITY CONTROL AREA TO INCLUDE U.S. MAGNESIUM

Pursuant to APA Section 553(e),[100] UPA petitions EPA to issue a rulemaking approving Governor Spencer Cox's request to expand the boundary of the NWF to include U.S. Magnesium. As discussed above, Governor Cox submitted this request pursuant to CAA Section 107(d)(3)(D), which authorizes the governor of a State to submit "a revised designation of any area or portion thereof within the State" and obligates EPA to approve or deny such a redesignation within 18 months.[101]

EPA should initiate a rulemaking to approve the request because (A) such action respects the principle of cooperative federalism under the CAA and (B) EPA has unlawfully withheld agency action on the request.

### A.  Granting the Request Respects the Principle of Cooperative Federalism

The CAA authorizes each Governor to "redesignate from time to time the air quality control regions within such State for purposes of efficient and effective air quality management," subject to approval by EPA.[102] This provision embodies the cooperative federalism principle that is woven throughout the CAA by vesting the primary responsibility for managing air quality in the States. Granting Governor Cox's request to expand the boundary of the NWF would respect this bedrock principle.

During development of the Moderate Ozone SIP, UDAQ examined sources that are outside the boundary of the NWF but nonetheless contribute to ozone pollution in the NWF. UDAQ found that VOC and NOx emissions from U.S. Magnesium, a mining and processing facility located just outside the boundary in Tooele County, significantly contributes to ozone levels in the NWF.[103] Accordingly, on February 27, 2023, Utah Governor Spencer Cox submitted a request to EPA under CAA Section 107(d)(3)(D) to expand the boundary of the NWF to include U.S. Magnesium.[104] The letter explained that the expanded boundary would capture an area sharing the same airshed as the rest of the NWF.[105]

Additionally, the letter explained that identifying viable emission control measures to meet the 15% reasonable further progress requirement of the Moderate ozone SIP was exceedingly difficult because UDAQ's implementation of emissions controls under the Salt Lake City PM$_{2.5}$ Serious SIP had already identified the majority of the feasible emission controls.[106] As a result, the Governor sought to include U.S. Magnesium within the

---

[100] 5 U.S.C. § 553(e) ("Each agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule.").

[101] 42 U.S.C. § 7407(d)(3)(D).

[102] *Id.* § 7407(e)(2).

[103] Attachment 5, Boundary Request Letter at 4-5.

[104] Attachment 5, Boundary Request Letter.

[105] *Id.*

[106] *Id.*

boundary of the NWF because it is one of the largest sources of VOC and $NO_x$ in northern Utah and the largest source of hazardous air pollutants in the entire State.[107] The letter provided data from several studies demonstrating that emissions from U.S. Magnesium directly contribute to summertime ozone concentrations in the NWF.[108]

Expanding the boundary to include U.S. Magnesium would allow UDAQ to impose control measures on the facility and require emissions offsets for major modifications. These regulatory actions are crucial not only for Utah to meet the reasonable further progress requirements under the Moderate and Serious ozone SIPs, but also to ensure that the NWF attains the 2015 ozone NAAQs as expeditiously as possible. However, to date, EPA has ignored this request.

In sum, the State of Utah submitted a reasonable request to expand the boundary of the NWF and provided a thorough explanation, supported by air quality data, of why the expanded boundary is necessary for the State to manage ozone concentrations in the NWF. Granting the request recognizes Utah as the primary steward of air quality in the NWF, not EPA.

### B. EPA has Unlawfully Withheld Acting on the Request

Under the APA, courts "shall compel agency action unlawfully withheld or unreasonably delayed."[109] Agency action is "unlawfully withheld" when an agency "fails to comply with a statutorily imposed absolute deadline."[110]

CAA Section 107(d)(3)(D) requires EPA to "approve or deny such redesignation" "[w]ithin 18 months of receipt of a complete State redesignation submittal."[111] As Governor Cox submitted the redesignation request on February 27, 2023, EPA had a statutory duty to approve or deny the redesignation by August 27, 2024. To date, EPA has ignored the request. Accordingly, EPA has "unlawfully withheld" agency action in violation of the APA. UPA requests that EPA resolve this violation by reviewing the request and approving the redesignation of the NWF to include U.S. Magnesium.

### VI.    CONCLUSION

For the reasons explained above, EPA should grant UPA's petition for reconsideration and three-month stay of the Final Rule pending reconsideration as well as UPA's petition for rulemaking on Governor Cox's request to expand the boundary of the NWF. UPA respectfully requests that EPA take the following actions on reconsideration:

---

[107] *Id.*
[108] *Id.*
[109] 5 U.S.C. 706(1).
[110] *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 57 (2004).
[111] 42 U.S.C. 7407(d)(3)(D).

    i.    issue a new rule determining that the NWF would have attained the 2015 ozone NAAQS by the Moderate attainment date of August 3, 2024, but for emission emanating from outside the United States; and

    ii.    issue a new rule approving the request to expand the boundary of the NWF.

The administrative actions that UPA requests are consistent with President Trump's executive orders to EPA and other administrative agencies to unleash American energy production.

Dated: February 4, 2025.

Respectfully submitted,

Rikki Hrenko-Browning
President
UTAH PETROLEUM ASSOCIATION
6905 S. 1300 E. #288
Cottonwood Heights, UT 84047
(435) 219-0963
rhrenko-browning@utahpetroleum.org

Emily C. Schilling
Andrew P. Revelle
HOLLAND & HART LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101
Ph. 801-799-5753 / Fax 202-747-6574
ecschilling@hollandhart.com
aprevelle@hollandhart.com

Kristina (Tina) R. Van Bockern
Aaron B. Tucker
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Ph. 303-295-8107 / Fax 720-545-9952
trvanbockern@hollandhart.com
abtucker@hollandhart.com

*Counsel for Petitioner Utah Petroleum Association*

22

**Attachment 6**

UPA's Comments on EPA's Proposed Reclassification of the NWF to
Moderate Nonattainment (June 13, 2022)





6905 South 1300 East #288
Cottonwood Heights, UT 84047

4286 South Main Street
Salt Lake City, UT 84107

June 13, 2022

Ms. Emily Millar
Mr. Robert Lingard
Office of Air and Radiation Docket
Mail Code 28221T
1200 Pennsylvania Avenue NW
Washington, DC 20460.

***Submitted electronically to Docket ID. No. EPA-HQ-OAR-2021-0742 at [www.regulations.gov](www.regulations.gov)***

**Subject:   Comments from the Utah Petroleum Association and the Utah Mining Association on "Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Marginal for the 2015 Ozone National Ambient Air Quality Standards" proposed rule; Federal Register, Volume 87, Number 71; April 13, 2022; p. 21842**

Dear Ms. Millar and Mr. Lingard:

The Utah Petroleum Association ("UPA") and the Utah Mining Association ("UMA") appreciate the opportunity to provide comments on the "Determinations of Attainment by the Attainment Date, Extensions of the Attainment Date, and Reclassification of Areas Classified as Marginal for the 2015 Ozone National Ambient Air Quality Standards" proposed rule; Federal Register, Volume 87, Number 71; April 13, 2022; p. 21842 ("DAAD").

UPA is a statewide oil and gas trade association established in 1958 representing companies involved in all aspects of Utah's oil and gas industry. UPA members range from independent producers to midstream and service providers, to major oil and natural gas companies widely recognized as industry leaders responsible for driving technology advancement resulting in environmental and efficiency gains.  UPA member companies operate oil and gas production and midstream facilities within the Uintah Basin ozone nonattainment area ("UB").  Additionally, five member companies each operate a petroleum refinery in the Northern Wasatch Front ozone nonattainment area ("NWF").  Thus, our member companies will be affected by the rulemaking.

UMA was founded in 1915 and represents hardrock, industrial mineral, and coal mine operators as well as service companies which support the mining industry.  Numerous UMA member companies operate within Utah, the largest of which is Rio Tinto Kennecott, whose Bingham Canyon Mine is one of the largest copper mines in the world and one of the very few which

operates in a densely populated urban interface area.  UMA has an interest in air quality in support of the communities in which our member companies operate.

UPA and UMA provide this letter jointly with our comments regarding the NWF portion of the DAAD and its supporting record.  UPA provides a separate letter with its comments regarding the UB portion of the DAAD.

In short, UPA and UMA disagree with much of EPA's analysis for disapproving the 179B Demonstration for the NWF, many aspects of which fall outside the boundaries of the statutory requirements of the Clean Air Act ("CAA") and/or are arbitrary and capricious.  We therefore request that EPA update the Technical Support Document for the NWF[1] accordingly and correct the record with regard to each of our comments.

## 1. Background

In 2015, EPA revised the National Ambient Air Quality Standard ("NAAQS") for ozone and lowered the level of the NAAQS to 70 parts per billion ("ppb").[2]  In 2018, EPA designated nonattainment areas nationwide including the NWF, and classified it initially at the Marginal level, with an effective date of August 3, 2018.[3]  In accordance with 40 CFR §51.1303 Table 1, EPA established the attainment date to be the date three years after the effective date of designation, or August 3, 2021.  According to the Clean Air Act ("CAA"), within 6 months following the applicable attainment date for an ozone nonattainment area, the Administrator shall determine, based on the area's design value (as of the attainment date), whether the area attained the standard by that date.  Any area that the Administrator finds has not attained the standard by that date shall be reclassified by operation of law.[4]

For the NWF, the Utah Department of Environmental Quality ("UDEQ") submitted a demonstration prepared by the Utah Division of Air Quality ("UDAQ") under CAA §179B(b).[5]  This paragraph of the CAA allows that:

> [A]ny State that establishes to the satisfaction of the Administrator that, with respect to an ozone nonattainment area in such State, such State would have attained the national ambient air quality standard for ozone by the applicable attainment date, but for emissions emanating from outside of the United States, shall not be subject to" the reclassification provisions of the CAA.[6]

---

[1] Technical Support Document, "Northern Wasatch Front (NWF), Utah: Failure to Attain 2015 Ozone National Ambient Air Quality Standard by Attainment Date; Reclassification and Disapproval of International Emissions Demonstration," January 2022, located in Docket No. EPA–HQ–OAR–2021–0742 for the DAAD at www.regulations.gov ("NWF TSD" or "TSD").

[2] "National Ambient Air Quality Standards for Ozone" final rule; Federal Register, Volume 80, Number 206; October 26, 2015; p. 65292.

[3] "Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards" final rule; Federal Register, Volume 83, Number 107; June 4, 2018; p. 25776.

[4] CAA §181(b)(2)(A).

[5] See "Clean Air Act 179B(b) Demonstration, Northern Wasatch Front Nonattainment Area," 05/05/2021, attached to Letter, Kimberly D. Shelley, Executive Director, Utah Department of Environmental Quality, to Debra H. Thomas, Acting Regional Administrator, Environmental Protection Agency, Region 8; May 28, 2021 ("179B Demonstration")

[6] EPA's longstanding view is that CAA section 179B(b) contains an erroneous reference to section 181(a)(2), and that Congress actually intended to refer here to section 181(b)(2). See "State

## 2. The NWF meets the statutory threshold for a successful 179B demonstration according to the plain language of the CAA.

A successful CAA §179B demonstration need only show that the area would have attained the NAAQS "but for" the influence of international emissions.  CAA §179B(a) states:

*Implementation Plans and Revisions.— Notwithstanding any other provision of law, an implementation plan or plan revision required under this Act* **shall be approved by the Administrator if—**

> *(1) such plan or revision meets all the requirements applicable to it under the Act other than a requirement that such plan or revision demonstrate attainment and maintenance of the relevant national ambient air quality standards by the attainment date specified under the applicable provision of this Act, or in a regulation promulgated under such provision, and*

> *(2) the submitting State establishes to the satisfaction of the Administrator that the implementation plan of such State would be adequate to attain and maintain the relevant national ambient air quality standards by the attainment date specified under the applicable provision of this Act, or in a regulation promulgated under such provision, but for emissions emanating from outside of the United States.* [emphasis added]

CAA §179B(b) which is specific to ozone NAAs states:

> *(b) Attainment of Ozone Levels.— Notwithstanding any other provision of law, any State that establishes to the satisfaction of the Administrator that, with respect to an ozone nonattainment area in such State, such State* **would have attained the national ambient air quality standard for ozone** *by the applicable attainment date,* **but for emissions emanating from outside of the United States, shall not be subject to the provisions of section [181(b)(2)]**[7,8] *or (5) or section 185.* [emphasis added]

These two provisions of the CAA, §179B(a) and §179B(b), provide all of the requirements for an ozone nonattainment area to be eligible for treatment under §179B and not be subject to reclassification to a higher nonattainment level under CAA §181(b)(2)(A). In addition to meeting the applicable SIP requirements, **CAA §179B requires only that the State establish that the area would have attained "but for emissions emanating from outside the United States."**

---

Implementation Plans; General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990," 57 Fed. Reg. 13498, 13569 n.41 (Apr. 16, 1992).

[7] See "State Implementation Plans; General Preamble for the Implementation of Title I of the Clean Air Act Amendments of 1990", General preamble for future proposed rulemakings; Federal Register, Vol. 57, No. 74; April 16, 1992 ("General Preamble"), note 41 on page 13569, which states, "Note that the statute contained an erroneous reference to section 181(a)(2) instead of 181(b)(2)."  EPA has not changed their position on this reference; the recently finalized 179B Guidance, states, "EPA's longstanding view is that CAA section 179B(b) contains an erroneous reference to section 181(a)(2), and that Congress actually intended to refer here to section 181(b)(2)."  See also note 7 on page 3 of the 179B Guidance.

[8] CAA §181(b)(2) refers to reclassification of ozone nonattainment areas upon failure to attain the NAAQS, in other words bump up.

In other words, a 179B demonstration need only meet this "but for" test to be policy relevant and approvable. The plain language of the CAA adds no other limitations on the use of §179B. Furthermore, under §179B(a), the Administrator ***shall approve*** such a demonstration.

Two modeling studies, the Ramboll Modeling Report included as part of the 179B Demonstration[9] and the modeling developed by EPA for the Good Neighbor Rule,[10, 11] both show a substantial contribution of international emissions to ozone concentrations in the NWF, enough to meet the "but for" test of CAA §179B.

The figure below provides a graphical summary of the information provided in EPA's GNR Modeling TSD, Appendix C, Design Values and Contributions for 2023. The figure shows that ***over 70% of NWF ozone originates from non-US man-made and natural sources***. This report does not provide enough information to separate the non-US and natural source contributions from each other, but these results are consistent with the Ramboll Modeling Report.



_____

[9] Appendix C to the 179B Demonstration ("Ramboll Modeling Report").

[10] "Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standard" proposed rule; Federal Register, Volume 87, Number 66; April 6, 2022; p. 20036 ("Good Neighbor Rule").

[11] Air Quality Modeling Technical Support Document "Federal Implementation Plan Addressing Regional Ozone Transport for the 2015 Ozone National Ambient Air Quality Standards Proposed Rulemaking," Office of Air Quality Planning and Standards, United States Environmental Protection Agency, located in Docket Number EPA–HQ–OAR–2021–0668 for the Good Neighbor Rule ("GNR Modeling TSD").

These estimates are also consistent with another modeling study that EPA described in its 2015 Background White Paper:

> *This analysis concluded that "emissions-influenced background," a metric intended to represent the combined influence of natural sources and sources of [ozone] from outside the modeling domain on total modeled [ozone], as well as combined chemical interactions between the U.S. manmade and background sources, **could comprise a substantial fraction (e.g., greater than 70 percent) of the annual-average, total hourly [ozone] at high elevation sites in the western U.S.**[12]* [emphasis added]

The Ramboll Modeling Report shows that the NWF would attain but for the influence of international emissions, with a margin for error. Ramboll recommends:

> *A more rigorous State-led modeling analysis employing higher resolution and area-specific meteorology and emission inventories is warranted to confirm these results and to support a Section 179B demonstration.*[13]

And Ramboll's results are consistent with the results for the NWF presented in the Henderson/Simon Memo in the docket for this rulemaking. The Henderson/Simon Memo attributes over 8 ppb of ozone in the NWF to international sources.[14]

UDAQ is in the process of developing its NWF-specific photochemical model. The more rigorous modeling for the NWF could provide more definitive information that may support a future 179B demonstration for the area.

### 3. EPA has imposed invalid criteria on the NWF that must not be included in the final rulemaking.

EPA has imposed arbitrary hurdles on the NWF to achieve a successful 179B demonstration, hurdles not supported by the statute and outside of Congress' intent. EPA must correct the record and remove these arbitrary hurdles from their analysis and disapproval of the 179B demonstration.

#### a. Congress intended CAA §179B only to ensure that States would not have to be responsible for international pollution that neither the Federal nor State government could control.

No matter how large the international contribution and no matter how the international contribution compares to local and domestic contributions to ozone in the NWF area, neither Utah nor the U.S. Federal government can control the international contribution. Congress intended for CAA §179B to address this situation for ozone and other air pollution that neither

---

[12] "Implementation of the 2015 Primary Ozone NAAQS: Issues Associated with Background Ozone White Paper for Discussion"; December 30, 2015 ("2015 Background White Paper"), p. 5.

[13] Ramboll Modeling Report, p. 20.

[14] See Table 3 (p. 16) in "Modeled U.S. and International Contributions for 2015 Ozone NAAQS Nonattainment Areas" memorandum from Barron Henderson and Heather Simon (EPA, OAQPS) to Ozone Determination of Attainment by the Attainment Date Rule Docket (EPA-HQ-OAR-2021-0742); December 10, 2021 ("Henderson/Simon Memo").

Appellate Case: 25-9520    Document: 10-2    Date Filed: 02/24/2025    Page: 308
Comments from the Utah Petroleum Association and Utah Mining Association on the Determination of Attainment
by Attainment Date for the 2015 Ozone NAAQS and 179B Demonstration for the Northern Wasatch Front

the state nor the U.S. federal government can control.  In comparing and contrasting the interstate transport provisions of the CAA to the provisions of §179B regarding the influence of international emissions, EPA stated the following:

> . . . . [T]he kind of concerns that led Congress to adopt section 179B for international border areas—concerns that areas not be held accountable for pollution over which they exercise no control.[15]

> The fact that upwind States are subject to the requirements of section 110(a)(2)(D) [related to interstate transport] but other countries are not provides a possible explanation as to why Congress explicitly provided that ozone nonattainment areas not be reclassified upwards if they would have attained by their attainment dates "but for emissions emanating from outside" the United States (section 179B(b)) but provided no such express exemption from the reclassification provisions in the case of domestic transport. See IV 1990 Legis. Hist. 5741–42 (remarks of Sen. Gramm introducing the international provision and Sen. Baucus supporting it; Senator Gramm stated: "It is unfair to hold El Paso accountable for pollution that is generated in a foreign country that they have no control over.  So what this amendment does it says that in assessing whether or not the State implementation plan has been met, and when assessing the levels of ozone * * * pollution that is being generated across the border has to be taken into account so that our cities and regions will be judged based on what they do. * * *. [The State, region and city] will have the opportunity to come to EPA an[d] say that they are in compliance in terms of their emissions, that their failure to meet the overall standards is due to something that is happening in a sovereign foreign country over which they exercise no control." Senator Baucus stated that, "It is clear that cities like El Paso in the State of Texas do not have control of their own destiny themselves.  Much of the air that affects them is from outside, from another country, over which the Senator said the State of Texas and EPA in this country has virtually no control.").[16]

In the NWF, neither Utah nor the U.S. federal government has control over the very significant portion of NWF ozone caused by the influence of international emissions, just exactly the situation that Congress intended to address by including §179B in the CAA.

And yet, as explained below, even though Congress' intent was clear and simple, EPA tries to make a 179B demonstration far more complex than intended by Congress by imposing criteria to evaluate the NWF 179B Demonstration that fall outside the simple "but for" the influence of international emissions criterion of the CAA and outside of Congress' intent.  EPA sets up hurdles to make a successful 179B demonstration impossible or nearly impossible for the NWF to clear.

### b.  EPA incorrectly seeks feasible control measures.

***EPA used one criterion in the NWF determination that EPA had already rejected in prior rulemaking as not being part of the CAA***, namely whether feasible measures have been implemented.  EPA stated that one of their reasons for disapproving the 179B Demonstration

---

[15] "Approval and Promulgation of Air Quality Implementation Plans; Connecticut; One-Hour Ozone Attainment Demonstration and Attainment Date Extension for the Greater Connecticut Ozone Nonattainment Area" Final Rule; Federal Register, Vol. 66, No. 2; Wednesday, January 3, 2001 ("Connecticut One-Hour Attainment Date Extension"); p. 638.
[16] Connecticut One-Hour Attainment Date Extension, p. 640.

**Appellate Case: 25-9520   Document: 10-2   Date Filed: 02/24/2025   Page: 309**

Comments from the Utah Petroleum Association and Utah Mining Association on the Determination of Attainment by Attainment Date for the 2015 Ozone NAAQS and 179B Demonstration for the Northern Wasatch Front

was "insufficient showing that feasible measures have been implemented," and "[T]he State has not made a compelling demonstration that it has implemented controls to mitigate local contributions on exceedance days."[17]

In the proposal for the implementation rule for the 2015 ozone NAAQS, EPA considered requiring Reasonably Available Control Technology ("RACT") or Reasonably Available Control Measures ("RACM") for 179B areas.[18]   But EPA chose to not adopt this proposal in the final implementation rule "because the Act does not require states to implement RACM/RACT in Marginal ozone nonattainment areas." [emphasis added] EPA went on to say, "For purposes of CAA section 179B demonstrations for the 2015 ozone NAAQS, we are maintaining the approach used for prior ozone standards that only areas classified Moderate and higher must show that they have implemented RACM/RACT."[19]

EPA cannot change its mind now in the TSD and contradict the prior rulemaking without substantial explanation for changing its mind, explanation that EPA did not provide.

Moreover, EPA's search for more controls ignores substantial year-round emission reductions which reduced volatile organic compound and nitrogen oxide emissions, both ozone precursors, by nearly 40% over the past 15 years as a result of controls for fine particulate.[20]

EPA took its argument for controls even farther in the TSD by claiming that 179B is intended to apply to areas that could not attain the NAAQS, even after adopting all feasible emissions control measures and technologies because of large contributions from international transport.[21] This goes far beyond the CAA requirements.  The EPA Guidance for 179B demonstrations also does not require this.[22]   And nothing in the Congressional record suggests this to be a valid requirement.

***Thus, EPA's criterion to implement feasible measures is invalid because it is inconsistent with prior rulemaking, is not required by the CAA, and does not comport with Congress' intent.***  The CAA only requires that the area could attain "but for" the influence of international emissions, not that it could not attain after adopting all feasible measures and technologies.

### c. EPA contradicted its 179B Guidance in its discussion of photochemical modeling in the TSD.

---

[17] TSD, p. 3; see also discussions of control measures on pp. 11 and 14.

[18] "Implementation of the 2015 National Ambient Air Quality Standards for Ozone: Nonattainment Area Classifications and State Implementation Plan Requirements" proposed rule, Federal Register, Volume 81, Number 222; November 17, 2016; p. 81276

[19] "Implementation of the 2015 National Ambient Air Quality Standards for Ozone: Nonattainment Area State Implementation Plan Requirements" final rule; Federal Register, Volume 83, Number 234; December 6, 2018; p. 63010.

[20] Even though controls for wintertime fine particulate were intended to control a wintertime problem, most or all of these controls must be operated year-round.

[21] TSD, p. 11.

[22] "Guidance on the Preparation of Clean Air Act Section 179B Demonstrations for Nonattainment Areas Affected by International Transport of Emissions" EPA-457/P-20-001F; U.S. Environmental Protection Agency, Office of Air Quality Planning and Standards, Air Quality Policy Division; December 2020 ("179B Guidance").

EPA rebuked UDAQ's reliance on the amount of international influence shown by modeling in its discussion of "unique interpretation of CAA 179B(b)":

> [T]he state has assumed that it is sufficient merely to subtract the estimated international contribution from the design value (DV),2 and if the result does not exceed 70 ppb, then EPA should approve the demonstration without further evaluation. Per the CAA section 179B Guidance,3 EPA's interpretation of the statute is that a more compelling demonstration would address other considerations, such as whether there is a large international contribution relative to the domestic contribution and whether there are larger international contributions on exceedance days compared to non-exceedance days. Utah seeks approval of its demonstration despite that the factual basis for the State's submission is not compelling under EPA's interpretation of the statute, as described both in EPA's Guidance and in the accompanying preamble:
>    a. International emissions have a lower contribution to local ozone than domestic emissions;
>    b. International transport is not significantly different on ozone exceedance days compared to non-exceedance days; and
>    c. Utah analysis of meteorological conditions and back trajectories suggests that ozone exceedance days in the Northern Wasatch Front are predominantly due to local contributions.[23]

This discussion contradicts the 179B Guidance.  The 179B Guidance describes photochemical modeling as "the most complete way to estimate the contribution of international emissions to monitors exceeding the NAAQS"[24] and as the "preferred approach for quantifying international contribution for pollutants with a secondary component (such as $O_3$ and $PM_{2.5}$, which are formed, at least in part, as a result of photochemical reactions of precursor gases in the atmosphere)."[25]  Furthermore, 179B guidance refers to SIP photochemical modeling guidance, both of which recommend estimating source sector contributions to DV and reductions in DV from removing or reducing specific source sector emissions.  The 179B guidance states:

> To summarize the results, the contribution estimates may be applied to the design value from the designation or attainment period in a relative manner that is consistent with the Relative Reduction Factor approach (RRF). [26]

Thus, photochemical modeling is the preferred method to quantify the effect of international pollutants on ozone.  Furthermore, we contend that photochemical modeling provides the **only scientifically reliable method** to estimate the international influence from global sources.

### d. Requiring a large international contribution relative to the domestic contribution contradicts EPA's intent in the 179B Guidance.

The discussion seeks a large international contribution relative to the domestic contribution as a requirement for the 179B Demonstration.  Yet, EPA's Response to Comment for the 179B Guidance indicates this is not and was not intended to be considered a requirement:

---

[23] TSD, pp. 2-3.
[24] 179B Guidance, p. 40.
[25] 179B Guidance, p. 41.
[26] 179B Guidance, p. 41.

> *The legislative history supports the conclusion that Congress designed section 179B to apply to nonattainment areas with large amounts of international transport that made attainment of the NAAQS difficult, if not impossible, through controls on domestic sources. As such, it makes sense that a comparatively large international contribution would support a successful 179B demonstration more than if the domestic contribution were larger.* ***The guidance frames this as a recommendation rather than a requirement. This approach maintains flexibility*** *for states and EPA to later make decisions based on area-specific facts. Alternatively, if the guidance did not have a recommendation for what would make a strong demonstration, the guidance would not be as helpful to states or to EPA when evaluating a demonstration.*[27]  [emphasis added]

***Requiring a large international contribution relative to the domestic contribution is an invalid criterion. It is not required by the Clean Air Act and the established record for the 179B Guidance expressly states this is not a requirement.***

### e. Requiring international emissions to be responsible for peak contributions rather than base contributions contravenes the CAA and the 179B Guidance.

The discussion criticizes 179B Demonstration in yet another inappropriate way in stating that that ozone exceedance days "are predominantly due to local contributions". EPA implies that the base contribution of 10-15% of local ozone from international sources does not meet the CAA "but for" criteria and that only sources causing peak ozone concentrations matter in the 179B evaluation.

However, the ***CAA makes no such distinction***. Although the CAA establishes the "but for" criteria, it makes no differentiation between base contributions or peak contributions.

On the other hand, the guidance states:

> *Such evidence, for example, may include data indicating that NAAQS exceedances or violations could be predominantly attributed to local, intrastate, or interstate U.S. sources which may otherwise be addressed by other CAA authorities.* <u>*EPA will weigh the body of available evidence to determine whether it collectively indicates that the SIP would be adequate to attain and maintain the NAAQS, or the area would have attained the NAAQS, but for emissions emanating from outside of the U.S*</u>.  [emphasis added]

In other words, the guidance does not require this but merely states that this <u>might</u> be the case and EPA will evaluate the body of evidence. Again, EPA applied an inappropriate criterion. ***The CAA only relies on "but for" the influence of international emissions, not the relative international contribution compared to local.***

---

[27] "Review Of Draft CAA Section 179b Guidance On International Emissions", Section 179B Guidance Briefing for OMB; September 16, 2020; p. 2; attachment to email dated November 18, 2020, from Gobeail McKinley to Elke L. Hodson Marten transmitting responses to interagency comments on the CAA Section 179B Guidance Document; located in Docket Number EPA-HQ-OAR-2019-0668 at regulations.gov (accessed on June 9, 2022) ("Response to Comment").

Appellate Case: 25-9520    Document: 10-2    Date Filed: 02/24/2025    Page: 312

Comments from the Utah Petroleum Association and Utah Mining Association on the Determination of Attainment by Attainment Date for the 2015 Ozone NAAQS and 179B Demonstration for the Northern Wasatch Front

### f.   Comparisons to other nearby areas have no relevance and, in this case, are not congruent with EPA's own technical evidence.

The TSD considers that the Southern Wasatch Front ozone nonattainment area ("SWF") attained the NAAQS as yet another significant factor in EPA's disapproval for the NWF.[28]

***Whether adjacent areas attain the standard is irrelevant when determining if an area would attain "but for" international emissions.*** Adjacent areas have different characteristics including but not limited to different emission inventories, different types of sources, different localized meteorology, and different topography. The only valid comparison to an adjacent area would entail detailed comparisons of source apportionment photochemical modeling, which EPA has not supplied in its criticism.

Furthermore, this line of reasoning fails to recognize that EPA's own modeling study in the Henderson/Simon Memo in the docket for this action indicates that the NWF has 3 to 5 ppb more natural contribution to ozone compared to the SWF.[29] While EPA expounds on the need to apply more controls to the NWF which is an already heavily controlled area, this ***uncontrollable natural contribution accounts for a large part of the difference in ozone levels between the NWF and SWF***.

Again, ***EPA applied an invalid criterion; adjacent areas attaining is not a consideration or requirement of the CAA and the EPA analysis ignores other contributing factors such as large differences in natural contributions.***

### g.   Requiring international contributions to be greater on exceedance days than on non-exceedance days does not match the extensive body of peer-reviewed scientific literature, the CAA, or the 179B Guidance.

***By seeking international contributions to be greater on exceedance days than on non-exceedance days, EPA suggests that international emissions influence on NWF ozone must be event-based rather than continuous. Yet this line of reasoning is inconsistent with the scientific literature*** cited by EPA indicating well-documented and substantial international influence on ozone concentrations in the intermountain west, describing global transport to the intermountain west as a "conveyor belt" of emissions traveling between nearly continuous low- and high-pressure systems from Asia to the U.S. intermountain west.[30] In other words, this international influence is relatively constant and not likely to fluctuate between exceedance and non-exceedance days.

All discussion in the 179B Guidance of event-based situations addresses exceptional events, not international transport. ***The 179B Guidance does not seek for international transport to be event based and neither should EPA's evaluation of the 179B Demonstration.***

Furthermore, nothing in the CAA requires the influence to be event-based rather than continuous; Congress included 179B to address international emissions because the area

---

[28] TSD, pp. 3 and 13-14.
[29] Henderson/Simon Memo, Table 3, p. 16.
[30] 179B Guidance, p. 9.

cannot be held responsible for that which it has no control over, with no consideration to event-based or continuous influences.

Thus, *any suggestion of the need for international influence to be greater on exceedance days than on non-exceedance days or to be event-based is an inappropriate and invalid criterion.*

### 4. EPA failed to apply consistent criteria in its separate evaluations of the NWF and San Antonio 179B demonstrations.

*EPA inappropriately judged the NWF and San Antonio ("SAT") demonstrations on different criteria,* considering mainly the value of the technical evidence for SAT but as explained above, primarily policy considerations that are well outside CAA requirements and the EPA's own guidance for the NWF, thus using an arbitrary and capricious standard for the NWF.

The SAT disapproval and associated Technical Support Document make no mention of many of the factors discussed above that EPA inappropriately considered for the NWF, namely:[31]

1. Large international contribution relative to the domestic contribution
2. Larger international contributions on exceedance days compared to non-exceedance days
3. Ozone exceedance days "predominantly due to local contributions"
4. Feasible measures implemented
5. Adjacent areas attaining the NAAQS
6. Areas that could not attain the NAAQS, even after adopting all feasible emissions control measures and technologies because of large contributions from international transport
7. Event-based influence rather than allowed continuous influence

Although EPA considered the relative size of the international contribution in the SAT TSD, EPA looked at it entirely differently than for the NWF. In the SAT TSD, EPA looked at the size of the international contribution relative to modeling error and relative to state and US contributions which are an order of magnitude or more, greater than the international.[32] For NWF, the same considerations do not apply; the various modeling studies all show the international contribution to be greater, and the GNR Modeling TSD shows State and US contributions for the NWF to be smaller when compared to SAT.[33] In other words, NWF does not have the order of magnitude differences that SAT has.

*The omission of any discussion of the above listed factors in the SAT TSD indicates that EPA did not evaluate the two demonstrations on the same or similar criteria, an arbitrary and capricious difference.*

---

[31] See Technical Support Document, "Evaluating the Clean Air Act Section 179B Demonstration for the San Antonio Marginal Ozone Nonattainment Area," December 2021, located in Docket No. EPA–HQ–OAR–2021–0742 for the DAAD at www.regulations.gov ("SAT TSD").

[32] SAT TSD, pp. 32-33.

[33] GNR Modeling TSD, Appendix C.

### 5. EPA's reasoning to disapprove the 179B Demonstration is arbitrary and capricious and EPA must correct its errors.

A court may reverse an agency decision under the arbitrary and capricious standard if the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem or offered an explanation for its decision that runs counter to the evidence before the agency. As shown above, EPA committed each of these errors in its evaluation of the 179B Demonstration. Instead, the agency must articulate a rational connection between the facts found and the conclusions made, and yet EPA has failed to do so in some cases. In many cases, EPA has used criteria to evaluate and disapprove the 179B Demonstration that go far beyond the statutory criteria.

The CAA requires that the 179B Demonstration be established "to the satisfaction of the Administrator" but that does not mean that EPA may invent approval criteria outside the plain language of the Act or that go beyond Congress' clear intent. EPA unlawfully subjected the 179B Demonstration to criteria without regard to whether the criteria matched widely accepted peer-reviewed scientific literature cited by EPA itself in various documents, or if they matched the plain language of the CAA or Congress' intent.

In the 179B Demonstration, UDAQ provided a foundation for a potentially successful demonstration. More technical support such as a well-tuned area-specific model would strengthen the 179B Demonstration. Nonetheless, EPA must not interject unlawful criteria into its analysis. *EPA must correct the record so that its unlawful evaluation of the 179B Demonstration does not stand as a policy precedent.* EPA must confine its evaluation of the 179B Demonstration to whether the NWF *would have attained the national ambient air quality standard for ozone* by the applicable attainment date, *but for emissions emanating from outside of the United States.*

### 6. EPA improperly assumes that approving the 179B Demonstration would preclude adding any new controls to the NWF.

The TSD suggests that if EPA approves the 179B Demonstration, that no additional controls will be added to the NWF:

> Approval of an inadequate CAA section 179B(b) demonstration for the NWF could mean that Utah would not continue efforts to assess and adopt additional emissions controls measures and to perform ozone attainment modeling, in order to assess the feasibility of attaining the NAAQS.[34]

***EPA draws this conclusion of no further controls incorrectly and without basis.***

UPA and UMA have always advocated that a successful 179B Demonstration would provide the time that the NWF needs to successfully improve air quality. For example, 60% of the nitrogen oxide plus volatile organic compound emissions in the NWF come from on-road and non-road mobile sources over which Utah has only limited authority. A substantial amount of these emissions come from heavy duty on-road vehicles, for which EPA has recently proposed new emission standards, twenty years after the most recent standards for these vehicles. Point sources in the NWF are already well-controlled under the Serious $PM_{2.5}$ State Implementation

---

[34] TSD, p. 14.

Plan for the Salt Lake City nonattainment area.  UDAQ recently showed that personal care products and other area sources comprise a substantial amount of volatile organic compound emissions.  We anticipate these sources to be controllable but perhaps slow to control while the lower-emitting products gain consumer acceptance.

UDAQ has rulemaking authority outside of this EPA process and has on multiple occasions stated its intent to create rules to improve air quality regardless of the outcome of the 179B demonstration. There is no evidence or statement to imply that UDAQ would not impose further controls.  If EPA is going to base a decision on this criteria -- even though it again goes beyond the requirements of the Act or guidance -- it needs to provide evidence of that statement.  The pure speculation that EPA applied in its TSD is entirely unacceptable.

***Considering the large portion of mobile source emissions in the NWF, EPA and not UDAQ holds the biggest key to reducing local emissions in the NWF.***

### 7. EPA pre-judged future 179B demonstrations for the NWF by speculation and without facts.

EPA committed yet another grievous error.  EPA ***inappropriately pre-judged future attempts for a 179B demonstration for the NWF and must remove such statements from the final record.***

EPA stated in the conclusion of the TSD:

> Thus, even if the State of Utah were to move forward with completing and submitting a modeling analysis as outlined in their CAA section 179B demonstration, we do not anticipate that the conclusion would be materially different than what was submitted in May 2021, and thus still would not be a satisfactory demonstration.[35]

Study after study including scientific and modeling studies have shown a substantial international contribution to ozone in the intermountain west, and yet EPA still tried to pick apart the modeling and cast doubt on future modeling efforts that have not even been performed yet.

It is entirely inappropriate for EPA to pre-judge technical information that has not yet been developed or submitted to the agency.  Such statements can bias future actions without the benefit of a technical record for the actions.  EPA has no basis to make such statements.  ***EPA must strike such speculative statements from its analysis.***

### 8. Conclusion

EPA imposed unlawful criteria on the NWF 179B Demonstration in its evaluation of the adequacy of the 179B Demonstration.  The numerous inconsistencies between EPA's proposed disapproval of the 179B Demonstration for the NWF and the CAA, 179B Guidance, prior rulemakings, scientific literature, various modeling studies including studies performed by EPA itself, and the SAT TSD ***go far beyond statutory requirements and can only be considered to be arbitrary and capricious.  The final rulemaking record must be consistent with prior records and studies and with concurrent, contemporary, or future similar decisions***.

---

[35] TSD, p. 15.

UPA/UMA are not recommending that the proposed reclassification to Moderate be changed, but the inconsistencies related to the 179B analysis must be corrected for the record. While the 179B demonstration for the NWF could be strengthened by bolstering technical evidence especially with more detailed local modeling, EPA cannot rely on its inappropriate "policy" criteria and its arbitrary and capricious standard applied to the NWF in this proposal. Additionally, EPA must not apply these criteria to other nonattainment areas or future demonstrations.

In conclusion, ***EPA must correct the record for the NWF in this rulemaking.***

Sincerely,

Rikki Hrenko-Browning
President
Utah Petroleum Association

Brian Somers
President
Utah Mining Association

cc:
Bryce Bird – bbyrd@utah.gov
Becky Close – bclose@utah.gov
Ryan Bares – rbares@utah.gov

**Attachment 7**

Declaration of Stephen Jeffs, Chief Operating Officer for Wax
Production & Refining, International Group, Inc., Silver Eagle Refining,
Inc.

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

UTAH PETROLEUM ASSOCIATION, )
                                               )

           Petitioner,         )

                                               )

v.                                  )     Case No. 25-9520

                                               )

U.S. ENVIRONMENTAL          )
PROTECTION AGENCY, and       )
LEE ZELDIN, Administrator, U.S.   )
EPA,                              )

                                             )

                                             )

         Respondents.      )

---

# DECLARATION OF STEPHEN JEFFS IN SUPPORT OF PETITIONER UTAH PETROLEUM ASSOCIATION'S MOTION TO STAY FINAL RULE

---

I, Stephen Jeffs, hereby declare and state that the following is true and correct to the best of my knowledge, information, and belief.

1. I am the Chief Operating Officer for Wax Production & Refining at International Group Inc.'s ("IGI"), which fully owns Silver Eagle Refining, Inc. ("Silver Eagle"). I have been employed at IGI since August 1, 2005. I am fully responsible for the Silver Eagle business including operations, regulatory reporting, and compliance. I am over

1

the age of 18 years and am competent to testify concerning the matters of this declaration.

2.     I am a qualified engineer with a Bachelor of Engineering in Engineering from Manchester University, UK. I have worked in the chemical and petro-chemicals industry for over 35 years including 20 plus years in the USA. Since 2019 I have been fully responsible for Silver Eagle's regulatory compliance and reporting. I oversee Silver Eagle's refining operations and environmental regulatory and compliance efforts, including its permitting applications and coordination with the Utah Department of Air Quality ("UDAQ").

3.     Silver Eagle owns and operates the Silver Eagle Refining-Woods Cross refinery ("SER-WCR"), which is located in Woods Cross, Utah a few miles north of downtown Salt Lake City, in the Northern Wasatch Front ("NWF") area. SER-WCR is a small refinery as defined under 40 C.F.R. § 80.2, providing definitions for regulations of fuels and fuel additives. The company has about 70 employees working at the refinery. SER-WCR is a niche plant that predominately produces wax products and diesel fuel. This refinery does not have the complexity and production capabilities of typical refineries in the region. Given its

2

small size, output, and low air emissions, UDAQ and the

Environmental Protection Agency ("EPA") classify the plant as a

"minor" source refinery.

4.    SER-WCR is subject to various EPA and UDAQ

environmental control regulations including regulations for new or

modified petroleum refineries (40 C.F.R. Part 60 Subpart Ja) and other

regulations pertaining to small sources.

5.    The Wood Cross Plant was originally built in 1954 as a Sure-

Seal wax refining plant. Since Silver Eagle acquired it in January 2000,

the plant has supplied waxy feedstock to IGI. In 2011, Silver Eagle was

acquired by IGI, which allowed IGI to secure a constant, stable supply

of wax material.

6.    Today, the SER-WCR operates three primary processing

units: an atmospheric crude distillation unit, a vacuum distillation unit,

and a Mobil Distillate De-waxing Unit. The SER-WCR processes yellow

wax crude exclusively. The yellow wax crude is a unique crude with a

high wax content and very low sulfur content. Products from the crude

distillation unit include naphtha, diesel, atmospheric gas oil, and

atmospheric bottoms (the heaviest part of the crude).

7.　　Naphtha is shipped to the Silver Eagle Evanston Refinery in Wyoming for use in the production of gasoline. Diesel is further processed into ultra-low-sulfur-diesel fuel. Diesel from the crude distillation unit must be dewaxed. The Mobil Distillate De-waxing Unit uses a de-waxing process to convert waxy diesel to ultra-low-sulfur-diesel fuel. It produces approximately 4,500 barrels of diesel fuel per day.

8.　　The atmospheric bottoms are processed in the vacuum distillation unit, and the resulting refined wax materials are vacuum unit overhead, light vacuum gas oil, heavy vacuum gas oil, and vacuum tower bottoms.

9.　　The wax materials produced by the SER-WCR are supplied to IGI and other purchasers and are used in a number of consumer products critical to the American and world economies. To name a few, SER-WCR's wax materials is used to wax boxes for wet food transportation such as vegetables and proteins, anti-ozone waxes for automotive tire production, rheology modifiers for hot melt adhesives, cosmetics including petroleum jelly, candles and building products such as oriented strand board ("OSB") and PVC pipe process aids.

4

10.    From Silver Eagle waxy products, approximately 250 million pounds of finished waxes are made annually. This represents approximately 15% of the waxes consumed in the USA annually, and 20% of the waxes produced in the USA. Silver Eagle is the only global company making waxes on purpose rather than as a by-product of other refining processes.

11.    The SER-WCR is the smallest petroleum refinery in Utah in terms of crude oil throughput capacity and is just a fraction of the size of the largest refineries in the US, which can process up to nearly 50 times as much crude oil as the SER-WCR[1].

12.    Silver Eagle is a member of the Utah Petroleum Association ("UPA"). UPA is a statewide oil and gas trade association, representing companies involved in all aspects of Utah's oil and gas industry, including refineries.

13.    I understand that on December 9, 2024, the EPA promulgated a Final Rule under the Clean Air Act ("CAA") titled "Finding of Failure To Attain and Reclassification of an Area in Utah as

---

[1] Table 3. Capacity of Operable Petroleum Refineries by State, Utah Refineries, page 20.
https://www.eia.gov/petroleum/refinerycapacity/table3.pdf.

5

Serious for the 2015 Ozone National Ambient Air Quality Standards," at 89 Federal Register 97,545 (Dec. 9, 2024) (the "Final Rule"). I am providing this declaration in support of UPA's motion to stay the Final Rule.

## I.   EPA's Final Rule - "Serious" Nonattainment Reclassification

14.   I understand that through this Final Rule, EPA determined that the NWF nonattainment area failed to attain the 2015 8-hour ozone National Ambient Air Quality Standards ("NAAQS") by the applicable attainment date, August 3, 2024. Based on that determination, EPA reclassified the NWF area from "Moderate" to "Serious" nonattainment.

15.   I understand that EPA promulgated the Final Rule without giving the public—including UPA and its members—an opportunity to provide public comment.

16.   As a consequence of EPA's reclassification of the NWF to "Serious," the State of Utah is obligated to submit a Serious ozone State Implementation Plan ("SIP"). The SIP must demonstrate how Utah will attain the ozone NAAQS as expeditiously as practicable. It must also impose Reasonably Available Control Technology ("RACT") for sources

in the NWF that emit 50 tons per year or more of volatile organic compounds ("VOC") or oxides of nitrogen ("NOx"). The CAA requires the SIP to include an 3% reduction in VOC or NOx per year. Lastly, the SIP must demonstrate attainment of the ozone NAAQS by August 3, 2027.

17.    It is my understanding that in addition to the SIP requirements, any project commencing construction on or after January 8, 2025, with a net VOC or NOx emission increase greater than 25 tons per year (as opposed to 40 tons per year under a Moderate designation) will trigger a "major modification" and will be required to obtain or purchase emissions offsets at a ratio of 1.2:1. This means that emissions from new or modified sources may only occur if they are offset by reductions in emissions from existing sources.

18.    Before the Final Rule's reclassification, only sources emitting 100 tons per year or more of VOC or NOx were considered "major." Additionally, the offset ratio was 1.15:1. With the Serious classification, sources are considered "major" if they emit 50 tons per year or more of VOC or NOx. This means that the reclassification to "Serious" results in sources that were once considered "minor" now being considered "major," as well as a larger offset ratio being required

7

for construction of a major source or a major modification of an existing source.

19.    That change in threshold also means that more existing sources will be required to apply for Title V operating permits, and must do so in a relatively short amount of time, within one year of the effective date of the Final Rule.

## II.    The Final Rule's "Serious" Nonattainment Reclassification Significantly Impacts Silver Eagle

20.    As a result of EPA reclassifying the NWF as a Serious nonattainment area, Silver Eagle will be significantly impacted.

21.    Silver Eagle has a strong interest in remaining a "minor" source, else it becomes subject to much more onerous and costly emission and permitting control requirements that are disproportionate to the size of its operations. Silver Eagle has already submitted a proposal to UDAQ (a Notice of Intent) to remain a "minor" source by voluntarily reducing emissions from 70 tons of VOC and NOx per year to 50 tons or less per year. Under this Notice of Intent, UDAQ would ultimately issue Silver Eagle an enforceable permit to limit emissions accordingly.

22.     The cost per ton of emissions reduced for projects in the Notice of Intent will be significant. Silver Eagle has already incurred costs to develop and submit the Notice of Intent. Those costs include employee development and planning time, and will soon require expenditures to install the projects described in its Notice of Intent.

23.     If SER-WCR is not successful in remaining a minor source, then, under the Final Rule's Serious reclassification, the State of Utah must impose RACT on it as a source emitting 50 tons per year or more of VOC or NOx in its Serious SIP. RACT implementation costs will certainly exceed $1,500,000 the first year with ongoing annual compliance costs estimated to range from $450,000 to $550,000 per year.

24.     EPA defines RACT as "the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility." 44 Fed. Reg. 53,762 (Sept. 17, 1979).

25.     For purposes of developing its Serious SIP, sources emitting 50 tons per year or more of VOC and NOx must submit RACT analyses to the State. These analyses must, among other things, identify "all

9

available and prevalent control technologies . . ., with a thorough description and discussion of technological feasibility." Utah Department of Environmental Quality, RACT Process Ozone SIP, https://deq.utah.gov/air-quality/reasonably-available-control-technology-ract-process-ozone-sip.

26.    In Utah's Moderate SIP, UDAQ required RACT for one refinery at a cost of $39,770 per ton of emissions reduced,[2] far in excess of more typical RACT costs in other states of less than $10,000 per ton.[3] Although RACT is not currently required at Silver Eagle's Woods Cross Plant, and Silver Eagle has not fully evaluated what RACT would be for the plant, SER-WCR anticipates RACT for the Serious SIP to cost $50,000 per ton or more.[4]

---

[2] Utah State Bulletin, October 1, 2023, Vol. 2023, No. 19, https://rules.utah.gov/wp-content/uploads/b20231001.pdf.

[3] Letter from UPA to UDAQ, Subject: Criteria for Selection of Reasonably Available Control Technology, at 2 (Feb. 2, 2023) (PDF page 49 of 76), at https://lf-public.deq.utah.gov/WebLink/DocView.aspx?id=392311&eqdocs=DAQ-2023-004691&cr=1.

[4] UPA estimates this cost based on estimated and publicly available costs for additional emission controls on tanks that UDAQ indicated they plan to pursue as RACT for the Serious SIP.  See Supporting TSD at https://deq.utah.gov/air-quality/northern-wasatch-front-serious-ozone-sip-technical-support-documentation.

27. If Silver Eagle is subject to RACT, they would be required to undertake numerous projects. Silver Eagle would also need to hire additional engineering and maintenance employees. Capital costs are estimated to be over $1,500,000. Ongoing RACT costs are estimated to be between $450,000 to $550,000 annually, including monitoring, reporting, maintenance of new equipment, and other tasks.

28. Apart from imposing RACT on sources, the State's Serious ozone SIP must include measures to reduce VOC or NOx emissions by 3% each year. UDAQ may require further measures from refineries in the NWF to attempt to meet the reasonable further progress goal.

29. As a result of EPA's reclassification of the NWF to "Serious," sources making major modifications to their facilities will be required to purchase emissions offsets at a ratio of 1.2:1. While Utah maintains an emissions offset bank, it is my understanding that it does not contain ample offset credits, especially VOC offsets. The limited availability of emissions offsets impedes our ability to plan for future projects that may be considered major modifications.

30. Additionally, when the NWF is reclassified as a "Serious" nonattainment area, and if the SER-WCR does not remain a minor source, it will

11

be required to obtain a Title V permit. To obtain a Title V permit Silver Eagle would be required to engage an environmental consulting company. To meet Title V requirements Silver Eagle would need to hire additional engineering and environmental technical staff. The estimated cost to obtain and maintain a Title V permit is significant and estimated to range between $300,000 and $400,000 annually.

III. **The Final Rule's Impacts Cause Irreparable Harm to Both Silver Eagle and its Customers**

31. As outlined above, the Final Rule will harm Silver Eagle in multiple ways. Because of the lowered threshold for "major" sources, Silver Eagle has undertaken a costly process to remain a "minor" source including its Notice of Intent to reduce its emissions under an enforceable permit. If Silver Eagle is forced to be a "major" source, its operations will be more stringently regulated with stricter control measures. Silver Eagle has already begun planning for compliance now with the Submission of its Notice of Intent to UDAQ.

32. The financial impact of the harms described is difficult to predict with precision; however, substantial financial impact is certain.

33. As discussed above, SER-WCR's wax is used in many products across the health, cosmetic, home goods, shipping,

construction, and automobile industries. Its customers depend on a reliable supply of wax-base material. Increased compliance costs will impact the cost of wax-based materials and will negatively impact downstream customers and, ultimately, will negatively affect consumers.

34.    If the Final Rule is vacated by the Court, this harm would be redressed because the NWF would remain in Moderate nonattainment and the SER-WCR would maintain its current status as a "minor" source. The SER-WCR would not be subject to the heightened regulation required for Serious nonattainment areas. Simply put, the status quo at SER-WCR's small refinery would continue.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 18, 2025.

_____
Stephen Jeffs

34171516

13

**Attachment 8**

Declaration of Lauren Vander Werff, Environmental Team Lead of the Chevron Salt Lake City Refinery on Behalf of Chevron Products Company

UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

UTAH PETROLEUM ASSOCIATION, )
                             )
            Petitioner,      )
                             )
v.                           )        Case No. 25-9520
                             )
U.S. ENVIRONMENTAL           )
PROTECTION AGENCY, and       )
LEE ZELDIN, Administrator, U.S. )
EPA,                         )
                             )
                             )
            Respondents.     )

**DECLARATION OF LAUREN VANDER WERFF ON BEHALF OF CHEVRON PRODUCTS COMPANY IN SUPPORT OF PETITIONER UTAH PETROLEUM ASSOCIATION'S MOTION TO STAY FINAL RULE**

I, Lauren Vander Werff, hereby declare and state that the following is true and correct to the best of my knowledge, information, and belief.

1.    I am the Environmental Team Lead of the Chevron Salt Lake City Refinery ("SLC Refinery"). I am over the age of 18 years and am competent to testify concerning the matters of this declaration. I have been employed at Chevron Products Company for approximately 13 years. I have spent most of that time in environmental air regulatory

1

compliance work for petroleum refining. I have a Bachelor of Science in Environmental Systems Engineering from Pennsylvania State University.

2.    I currently have lead responsibilities in air regulatory compliance and permitting for the SLC Refinery, including the development and submittal of air permit applications to the Utah Division of Air Quality ("UDAQ"). I am involved in day-to-day air compliance tracking and management and reporting under various Clean Air Act programs and support my team with ongoing permitting work with UDAQ.

3.    Chevron Products Company ("Chevron") is a division of Chevron U.S.A. Inc. Chevron operates the SLC Refinery, located in Salt Lake City, Utah, and thus located within the Northern Wasatch Front ("NWF"), to manufacture transportation fuels and other products for distribution in Utah and throughout the Mountain West. The SLC Refinery currently operates under two approval orders issued by UDAQ. Additionally, a Title V Operating Permit Application was submitted to UDAQ on January 31, 2020.

2

4.    Chevron is a member of the Utah Petroleum Association ("UPA"). UPA is a statewide oil and gas trade association established in 1958, representing companies involved in all aspects of Utah's oil and gas industry.

5.    I understand that on December 9, 2024, the Environmental Protection Agency ("EPA") promulgated a Final Rule titled "Finding of Failure To Attain and Reclassification of an Area in Utah as Serious for the 2015 Ozone National Ambient Air Quality Standards," at 89 Federal Register 97,545 (the "Final Rule"). I am providing this declaration in support of the UPA's motion to stay the Final Rule.

## I.    EPA's Final Rule

6.    I understand that through this Final Rule, EPA determined that the NWF area failed to attain the 2015 8-hour ozone National Ambient Air Quality Standards ("NAAQS") by the applicable attainment date, August 3, 2024. Based on that determination, EPA reclassified the NWF area to "Serious" nonattainment.

7.    I understand that EPA promulgated the Final Rule without giving the public—including UPA and its members—an opportunity to provide public comment.

3

## A.     "Serious" Nonattainment Reclassification

8.     As a consequence of EPA's reclassification of the NWF to "Serious," the State of Utah is obligated to submit a Serious ozone State Implementation Plan ("SIP"). The SIP must demonstrate how Utah will attain the ozone NAAQS as expeditiously as practical. It must also impose Reasonably Available Control Technologies ("RACT") for all major sources (those emitting 50 tons per year or more of volatile organic compounds ("VOC") or oxides of nitrogen ("NOx")) in the NWF. The Clean Air Act requires that a Serious ozone nonattainment SIP ("Serious SIP") include a 3% reduction in VOC or NOx emissions per year. Lastly, the SIP must demonstrate attainment of the ozone NAAQS by August 3, 2027.

9.     It is my understanding that in addition to the SIP requirements, any major source or major modification commencing construction on or after January 8 will be required to purchase emissions offsets at a ratio of 1.2:1. This means that emissions from new or modified sources may only occur if they are offset by reductions in emissions from existing sources. In a Serious ozone nonattainment area, a major modification is any physical change or change in method

4

of operation at a facility that results in a net emissions increase of VOC or NOx greater than 25 tons per year (as opposed to 40 tons per year under a Moderate designation).

10.    As a result of the reclassification, refinery projects are more likely to be considered major modifications that have to undergo an extensive "new source review" air permitting process. A larger emissions offset ratio would also be required, resulting in substantial cost outlays to purchase emission reduction credits and/or identify emissions reductions elsewhere within the refinery.  The reclassification therefore makes refinery projects more expensive and requires additional time and resources to plan and permit these projects.

## II.    The Final Rule's "Serious" Nonattainment Reclassification Significantly Impacts Chevron

11.    As a result of EPA reclassifying the NWF as a Serious nonattainment area, Chevron's existing and future operations in the area will be significantly impacted.

12.    Chevron's SLC Refinery meets the threshold of emitting 50 tons per year or more of VOC and NOx. Under the Final Rule's Serious reclassification, the State of Utah must impose RACT on sources emitting 50 tons per year or more of VOC and NOx in its Serious SIP.

5

13. EPA defines RACT as "the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility." 44 Fed. Reg. 53,762 (Sept. 17, 1979).

14. For purposes of developing its Serious SIP, sources emitting 50 tons per year or more of VOC and NOx were required to submit RACT analyses to the State. These analyses, among other things, identified "all available and prevalent control technologies . . ., with a thorough description and discussion of technological feasibility." Utah Department of Environmental Quality, RACT Process Ozone SIP, https://deq.utah.gov/air-quality/reasonably-available-control-technology-ract-process-ozone-sip. Chevron submitted a RACT analysis to UDAQ for its SLC Refinery on January 2, 2024, and submitted an addendum with additional information requested by UDAQ on May 2, 2024.

15. At this time, UDAQ has not decided which RACT measures will be required at the SLC Refinery.

16. However, I understand that as part of the development of the Serious SIP, the UDAQ is developing a rule to further reduce VOC emissions from refinery tanks. UDAQ's proposed rule would require

tanks with external floating roofs at the SLC Refinery to be retrofitted with a geodesic dome. Retrofitting these tanks would result in these tanks being fitted with a permanent, fixed geodesic dome as a roof, intended to reduce the impact of the sun or wind on product being stored in the tanks, and thus reduce emissions. This work would require extensive engineering evaluations to ensure the tanks could accommodate the new domes, cleaning and degassing the tanks to ensure the work could be safely performed, the costs of the materials and installation of the domes, temporary storage or interruption in refinery operation and production, and increased lifetime maintenance costs.

17.   Currently, the SLC Refinery has 46 tanks that would be subject to such a rule. Simply retrofitting all 46 tanks is currently estimated to require an upfront capital investment of at least $57 million, with an additional $3 million in annual operating costs. Preliminary analysis indicates that the cost effectiveness of this requirement ranges on a tank-by-tank basis from $30,000 to over $174 million per ton of VOC removed, with an average cost of well above $1 million per ton of VOC removed.

7

18.    Additionally, these dome retrofits could result in tanks with decreased storage capacity, which may require the construction of additional tanks and thus additional air emissions and permitting requirements. These costs have not been included in the preliminary estimates provided above.

19.    In addition to these substantial costs, because states are given the discretion to establish their own thresholds for which RACT controls are economically feasible and thus appropriate for inclusion in a SIP, UDAQ could also impose additional controls at the SLC Refinery that are both economically onerous and would result in other environmental harms. For example, UDAQ previously considered imposing a control technology to reduce emissions from furnaces at the SLC Refinery that would have required Chevron to spend more than $13 million for a total reduction of less than ten tons per year of NOx. This control technology would also have resulted in additional emissions of air pollutants such as particulate matter, which could affect the community surrounding the SLC Refinery which is currently classified as in Serious nonattainment of the 2006 24-hour PM2.5 NAAQS, and generated additional volumes of solid waste.

8

20. I understand that RACT under the Serious SIP will include cost thresholds that are higher than they were under the Moderate ozone nonattainment SIP. This means that although Chevron was ultimately not required to install RACT pursuant to Utah's Moderate ozone nonattainment SIP, it could be required to install RACT controls pursuant to the forthcoming Serious SIP, and those will likely be even more costly to Chevron.

21. Installing control technologies, such as those that may be required by the Serious SIP, would generally require shutting down portions of the SLC Refinery during construction or installation. Performing major retrofits requires coordination of technical and logistical details concerning design, engineering, procurement, and construction, which takes substantial time. As a result, major retrofits are usually performed during scheduled shutdowns and are planned on multi-year schedules to minimize the number of shutdowns required, as is standard in the industry.

22. The RACT controls required by the Serious SIP, however, could force the SLC Refinery to install significant control technologies within a compressed timeframe, far shorter than the typical shutdown

9

schedule at a refinery, and thus could result in unplanned shutdowns and thus even more costs as well as impact to production and unexpected shortages. The cost estimates provided in this Declaration and in Chevron's RACT analyses to UDAQ assume that the control technology could be installed during a scheduled shutdown event and planned in advance, and thus do not reflect the additional costs and consequences of an unplanned shutdown.

23.    Apart from imposing RACT on sources, the State's Serious ozone SIP must include measures to reduce VOC or NOx emissions by 3% each year.  I understand that UDAQ may require further measures from refineries in the NWF to attempt to meet the reasonable further progress goal. These would likely require UDAQ to increase their cost threshold and consider even more extreme control measures, which would be extremely costly and difficult.

24.    If the Final Rule is vacated by the Court, the NWF would remain in Moderate nonattainment and would not be subject to the heightened regulation required for Serious nonattainment areas. Planning refinery projects would be simpler and less costly, Chevron would not be required to install additional RACT controls at the SLC

Refinery, and the additional controls or measures required in a Serious ozone nonattainment area would no longer be required. Simply put, the status quo at the SLC Refinery would continue and Chevron would not incur the significant expenses described above.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 12, 2025.

_____
Lauren Vander Werff

**Attachment 9**

Declaration of Welsey J. Waida, P.E., Environmental, Safety and Security Manager, Tesoro Refining & Marketing Company LLC d/b/a Marathon Salt Lake City Refinery

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

UTAH PETROLEUM ASSOCIATION,)
                )
      Petitioner,     )
                )
v.                )    Case No. 25-9520
                )
U.S. ENVIRONMENTAL    )
PROTECTION AGENCY and  )
LEE ZELDIN, Administrator, U.S.  )
EPA,             )
                )
                )
      Respondents.   )

---

## DECLARATION OF WESLEY J. WAIDA, P.E. IN SUPPORT OF PETITIONER UTAH PETROLEUM ASSOCIATION'S MOTION TO STAY FINAL RULE

---

I, Wesley J. Waida hereby declare and state that the following is true and correct to the best of my knowledge, information, and belief.

1.    I am the Environmental, Safety, and Security Manager of the petroleum refinery owned and operated by Tesoro Refining & Marketing Company LLC ("TRMC") d/b/a Marathon Salt Lake City Refinery, and have been employed at the refinery since September 2021 (3 years and 5 months). I am over the age of 18 years and am competent to testify concerning the matters of this declaration.

1

2.      I have been a Registered Professional Environmental Engineer in Texas since 2002 and have over 25 years of environmental and safety experience within refining and chemical facilities.  I have been actively involved in a multitude of environmental permits spanning from basic valve additions to complex Clean Air Act ("CAA") prevention of significant deterioration permits for multiple refineries and refining companies.

3.      TRMC's petroleum refinery is located at 474 West 900 North, Salt Lake City, Utah ("Marathon Salt Lake City Refinery"). The Marathon Salt Lake City Refinery has a total crude oil refining capacity of 68,000 barrels per calendar day and processes crude oil from Utah, Colorado and Wyoming to manufacture gasoline, distillates including diesel fuels, aviation fuel, propane and heavy fuel oil. These products are distributed by truck through a system of terminals and by pipelines to Utah, Idaho, and Las Vegas customers. TRMC is authorized to operate under several Approval Orders issued by the State of Utah, Department of Environmental Quality, Division of Air Quality ("UDAQ").

4.      TRMC is a wholly owned indirect subsidiary of Marathon Petroleum Corporation ("MPC"). MPC is a member of the Utah Petroleum Association ("UPA"). UPA is a statewide oil and gas trade association established in 1958, representing companies involved in all aspects of Utah's oil and gas industry.

5.      I understand that on December 9, 2024, the Environmental Protection Agency ("EPA") promulgated a Final Rule titled "Finding of Failure To Attain and Reclassification of an Area in Utah as Serious for the 2015 Ozone National Ambient Air Quality Standards," at 89 Federal Register 97,545 (the "Final Rule"). I am providing this declaration in support of the UPA's motion to stay the Final Rule.

## I.      EPA's Final Rule

6.      I understand that through this Final Rule, EPA determined that the Northern Wasatch Front ("NWF") area failed to attain the 2015 8-hour ozone National Ambient Air Quality Standards ("NAAQS") by the applicable attainment date, August 3, 2024. Based on that determination, EPA reclassified the NWF area to "Serious" nonattainment.

3

7.    I understand that EPA promulgated the Final Rule without giving the public—including UPA and its members—an opportunity to provide public comment.

**A.    "Serious" Nonattainment Reclassification**

8.    As a consequence of EPA's reclassification of the NWF to "Serious," the State of Utah is obligated to submit a Serious ozone State Implementation Plan ("SIP"). The SIP must demonstrate how Utah will attain the ozone NAAQS as expeditiously as practicable. It must also impose Reasonably Available Control Technologies ("RACT") for sources in the NWF that emit 50 tons per year or more of volatile organic compounds ("VOC") or oxides of nitrogen ("NOx"). Additionally, the CAA requires the SIP to include a 3% reduction in VOC, or an equivalent combination of VOC and NOx, per year. Lastly, the SIP must demonstrate attainment of the ozone NAAQS by August 3, 2027.

9.    It is my understanding that in addition to the SIP requirements, all major sources (those emitting 50 tons per year or more of VOC or NOx) and "major modifications" (significant emissions increase greater than 25 tons per year of VOC or NOx for a major source) commencing construction on or after January 8, 2025 will be

required to purchase or obtain emissions offsets at a ratio of 1.2:1. This means that emissions from new or modified sources may only occur if they are offset by reductions in emissions from existing sources within the NWF area.

10.     Before the Final Rule's reclassification, only sources emitting 100 tons per year or more of VOC or NOx were considered "major" and only significant emissions increases greater than 40 tons per year of VOC or NOx at a major source were considered a "major modification". Additionally, the offset ratio was 1.15:1. This means that the reclassification to "Serious" results in more sources being considered "major," more major source modifications being considered "major modifications," as well as a larger offset ratio being required for construction of a major source or a major modification of an existing source.

## II.     The Final Rule's "Serious" Nonattainment Reclassification Significantly Impacts the Marathon Salt Lake City Refinery

11.     As a result of EPA reclassifying the NWF as a Serious nonattainment area, TRMC's existing and future operations at the Marathon Salt Lake City Refinery will be significantly impacted.

12. Under the Final Rule's Serious reclassification, the State of Utah must impose RACT on sources emitting 50 tons per year or more of VOC and NOx in its Serious SIP. The new RACT is in addition to the existing RACT that was imposed on major sources emitting 100 tons per year or more, such as the Marathon Salt Lake City Refinery, under the Moderate SIP.

13. EPA defines RACT as "the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility." 44 Fed. Reg. 53,762 (Sept. 17, 1979).

14. For purposes of developing its Serious SIP, sources emitting 50 tons per year or more of VOC and NOx must submit RACT analyses to the State. These analyses must, among other things, identify "all available and prevalent control technologies . . ., with a thorough description and discussion of technological feasibility." Utah Department of Environmental Quality, RACT Process Ozone SIP, https://deq.utah.gov/air-quality/reasonably-available-control-technology-

ract-process-ozone-sip. Sources in the NWF above this threshold, including TRMC, have already submitted these analyses to UDAQ.[1]

15.    Although UDAQ has not decided which sources at the Marathon Salt Lake City Refinery will be subject to RACT as part of the Serious SIP, potential controls include doming tanks, enhanced tank monitoring and repair, and additional NOx controls (known as Selective Catalytic Reduction emission control technology) on process unit heaters and boilers.  During the development of RACT under the Moderate SIP, UDAQ applied a pollution control cost effectiveness value as high as $39,770 per ton of pollutant removed,[2] which it considered "beyond RACT" based on the higher cost per ton of pollutant removed than what is typically accepted as RACT.[3]  RACT is typically determined to be an appropriate cost threshold between $5,000 - $10,000 per ton of pollutant removed. TRMC estimates that the cost per ton of pollutant removed for the Serious SIP RACT, such as doming

---

[1] Northern Wasatch Front Serious Ozone SIP Technical Support Documentation - Utah Department of Environmental Quality
[2] Utah State Bulletin, October 1, 2023, Vol. 2023, No. 19 (page 68)
[3] https://www.utah.gov/pmn/files/1019341.pdf (page 41 of pdf)

tanks and additional combustion NOx controls, will be in excess of the Moderate SIP costs per ton of pollutant removed.

16.    For example, I understand that the UDAQ is developing a rule to regulate VOC emissions from refinery tanks to reduce VOC emissions, which will likely be required as RACT. TRMC's Serious Ozone Nonattainment SIP RACT Analysis estimates doming tanks at the Marathon Salt Lake City Refinery pursuant to this potential rule to have a cost effectiveness of approximately $380,000 to $1,000,000 per ton VOC removed.[4] TRMC estimates, then, that the total installed cost for this potential rule (to reduce VOC emissions from refinery tanks) to be in excess of $8,000,000, which assumes the controls could be installed on tanks during their normal outage windows.[5] If the Serious SIP included additional requirements to reduce NOx on combustion units, TRMC estimates the cost effectiveness for these controls at the Marathon Salt Lake City Refinery to be $128,000 to $425,000 per ton of

---

[4] https://lf-public.deq.utah.gov/WebLink/DocView.aspx?id=455663&eqdocs=DAQ-2024-008125 (page 115 of pdf) (considering only tanks with True Vapor Pressure > 3.0 psi).

[5] *Id.*

NOx removed.[6] Put simply, additional RACT controls under a Serious SIP for the NWF will likely be quite costly to TRMC.

17.     Costs may be significantly impacted by the schedule required to install controls.  For example, a Serious SIP that includes NOx controls would require the controls to be installed by June 1, 2026, which is the beginning of the ozone season of the third year of air quality data used to determine attainment. This would likely interfere with TRMC's typical project planning cycle and schedule for a similar project of the same size and scope and thus could impact costs by millions of dollars. TRMC follows an established project development process with many checks and balances with the aim of executing successful projects on time and on budget. This includes aligning major projects with process unit turnaround cycles to avoid significant impact on operations. In many cases, major engineering projects can take up to five years to complete.  In short, installation of controls by June 1, 2026, would likely significantly impact TRMC's project development process and operations.

---

[6] *Id* at 33 of pdf.

18.    Apart from imposing RACT on sources, the State's Serious ozone SIP must include measures to reduce VOC, or an equivalent combination of VOC and NOx, by 3% each year. UDAQ may require further measures from refineries in the NWF to attempt to meet the reasonable further progress goal.

## III.    The Final Rule's Impacts Cause Irreparable Harm to TRMC

19.    As outlined above, the Final Rule will harm TRMC in multiple ways. TRMC's operations will be more stringently regulated with stricter control measures. TRMC must begin planning for compliance now and take action now to account for higher operating costs in the future.

20.    The financial impact of the harms described above is difficult to predict with precision; however, substantial financial impact is certain. TRMC's Serious Ozone Nonattainment SIP RACT Analysis submitted to UDAQ estimates financial impacts ranging from $8.0 MM (doming tanks) to $110 MM (doming tanks, Selective Catalytic

Reduction emission control technology on heaters, and reformer compressor motor replacement).[7]

21. If the Final Rule is vacated by the Court, this harm would be redressed because the NWF would remain in Moderate nonattainment and would not be subject to the heightened regulation required for Serious nonattainment areas. TRMC would not be required to install additional RACT controls, and the additional controls or measures required in a Serious nonattainment area would no longer be required. Simply put, the status quo at the Marathon Salt Lake City Refinery would continue.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 18, 2025.

_____
Wesley J. Waida, P.E.

---

[7] *Id.* at page 91 of pdf (See Appendix B) (considering only tanks with True Vapor Pressure > 3.0 psi).

11

**Attachment 10**

Declaration of Alec Klinghoffer, Vice President of Operations and
General Refinery Manager of Big West Oil LLC

## UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

| | |
|---|---|
| UTAH PETROLEUM ASSOCIATION,) ) | |
| Petitioner, ) ) | |
| v. ) ) | Case No. 29-9520 |
| U.S. ENVIRONMENTAL ) PROTECTION AGENCY, ) ) ) | |
| Respondent. ) | |

## DECLARATION OF BIG WEST OIL LLC IN SUPPORT OF PETITIONER UTAH PETROLEUM ASSOCIATION'S MOTION TO STAY FINAL RULE

I, Alec Klinghoffer, hereby declare and state that the following is true and correct to the best of my knowledge, information, and belief.

1.     I am the Vice President of Operations and General Refinery Manager of Big West Oil LLC ("Big West") and have been employed at Big West since August 8, 2022. I have responsibility for the overall operations of the Big West refinery ("Refinery"). I am over the age of 18 years and am competent to testify concerning the matters of this declaration.

1

2.      I hold a PhD in Chemical Engineering from Texas A&M University. Prior to my current employment, I worked at CVR Energy in Wynnewood, OK and Coffeyville, KS, holding numerous positions in Operations and Process Engineering, including Operations Manager, Operations Superintendent, Technical Manager, and Process Engineer over multiple refinery process units. I started my career in Research Development with Phillips 66 in Bartlesville, OK. I am familiar with environmental permitting and regulations, and their impact on Refinery operations and planning.

3.      The Refinery is located within the Northern Wasatch Front ("NWF") in Davis County, Utah at 333 West Center Street, North Salt Lake, Utah, with a refining product ("Product") throughput of 36,000 barrels per day.

4.      Big West is a member of the Utah Petroleum Association ("UPA"). UPA is a statewide oil and gas trade association established in 1958, representing companies involved in all aspects of Utah's oil and gas industry.

5.      I understand that on December 9, 2024, the Environmental Protection Agency ("EPA") promulgated a Final Rule titled "Finding of

Failure To Attain and Reclassification of an Area in Utah as Serious for the 2015 Ozone National Ambient Air Quality Standards," at 89 Federal Register 97,545 (the "Final Rule"). I am providing this declaration in support of the Utah Petroleum Association's motion to stay the Final Rule.

## I.    EPA's Final Rule

6.    I understand that through this Final Rule, EPA determined that the Northern Wasatch Front ("NWF") area failed to attain the 2015 8-hour ozone NAAQS by the applicable attainment date, August 3, 2024. Based on that determination, EPA reclassified the NWF area to "Serious" nonattainment.

7.    I understand that EPA promulgated the Final Rule without giving the public—including Utah Petroleum Association and its members—an opportunity to provide public comment.

## A.    "Serious" Nonattainment Reclassification

8.    As a consequence of EPA's reclassification of the NWF to "Serious," the State of Utah is obligated to submit a Serious ozone State Implementation Plan ("SIP"). The SIP must demonstrate how Utah will attain the ozone NAAQS as expeditiously as practicable. It must also impose Reasonably Available Control Technologies ("RACT") for sources

3

in the NWF that emit 50 tons or more per year of VOC or $NO_x$. The CAA requires the SIP to include a 3% reduction in VOC or $NO_x$ per year. Lastly, the SIP must demonstrate attainment of the ozone NAAQS by August 3, 2027.

9.    It is my understanding that in addition to the SIP requirements, all major sources (those emitting 50 tons per year or more of ozone, VOC, or $NO_x$) and "major modifications" commencing construction on or after January 8, 2025 will be required to purchase emissions offsets at a ratio of 1.2:1. This means that emissions from new or modified sources may only occur if they are offset by reductions in emissions from existing sources.

10.    Before the Final Rule's reclassification, only sources emitting 100 tons per year or more of ozone, VOC, or NOx were considered "major." Additionally, the offset ratio was 1.15:1. This means that the reclassification to "Serious" results in more sources being considered "major," as well as a larger offset ratio being required for construction of a major source or a major modification of an existing source.

4

11.    That change in threshold also means that more existing sources will be required to apply for Title V operating permits, and must do so in a relatively short amount of time.

## II.    The Final Rule's "Serious" Nonattainment Reclassification Significantly Impacts Big West Oil LLC

12.    As a result of EPA reclassifying the NWF as a Serious nonattainment area, Big West's existing and future operations will be significantly impacted.

13.    Under the Final Rule's Serious reclassification, the State of Utah must impose RACT on sources emitting 50 tons per year or more of VOC and $NO_x$ in its Serious SIP.

14.    In addition to the sources currently above the existing 100 tons per year threshold, is anticipated that additional sources will be included within the 50 ton per year limit.

15.    EPA defines RACT as "the lowest emission limitation that a particular source is capable of meeting by the application of control technology that is reasonably available considering technological and economic feasibility." 44 Fed. Reg. 53,762 (Sept. 17, 1979).

16.    For purposes of developing its Serious SIP, sources emitting 50 tons per year or more of VOC and $NO_x$ must submit RACT analyses

5

to the State. These analyses must, among other things, identify "all available and prevalent control technologies . . ., with a thorough description and discussion of technological feasibility." Utah Department of Environmental Quality, RACT Process Ozone SIP, https://deq.utah.gov/air-quality/reasonably-available-control-technology-ract-process-ozone-sip. Sources in the NWF above this threshold have already submitted these analyses to UDAQ.

17.    Although UDAQ has not decided which sources at Big West will be subject to RACT resulting from the redesignation to Serious, the likelihood is that potential controls will be required.  These additional controls are likely to include doming tanks, enhanced tank monitoring and repair, and additional VOC and NOx controls for process heaters and boilers. The requirement to retrofit tanks with geodesic domes includes installing a permanent, fixed geodesic dome as a roof which is intended to reduce the impact of sun or wind on product being stored in tanks and thus reduce emissions. This substantial modification to impacted tanks would require extensive engineering evaluations to ensure the tanks could accommodate the new domes, permitting, cleaning and degassing the tanks to ensure the work could be safely

6

performed, the costs of the materials and installation of the domes, increased lifetime maintenance costs, and temporary storage and interruption in refinery operation and production during installation, all of which would result in a significant reduction in refined Product availability for Big West's customers in Utah and throughout the Intermountain West.

18. For example, I understand that UDAQ is developing a rule to regulate VOC emissions from refinery tanks in order to reduce VOC emissions, which will likely be required as RACT. Big West's analysis estimates of the total installed costs for installation of: 1) geodesic domes on tanks; and 2) installation of Low Nox burners and Selective Catalytic Reduction on heaters and boilers at the Big West Refinery to be in excess of $21,000,000. That estimate assumes installation of the tanks can be accomplished during regularly scheduled Refinery downtime. Costs may significantly increase depending on the schedule required to implement required controls. An installation deadline of June 1, 2026, could adversely impact Big West's typical planning process for a similar project of the same size and scope and result in increased costs of millions of dollars. To achieve successful projects Big

7

West has established a detailed review and approval process.  To avoid adverse impacts on operations, major projects are coordinated with process unit turnaround cycles.  Major engineering projects can take between 3 and 5 years to complete.

19.    If a Big West source emits more than 50 tons per year, I understand that RACT under the Serious SIP will include cost thresholds that are higher than they were under the Moderate SIP. This means that although Big West was not required to install RACT pursuant to Utah's Moderate SIP, it will likely be required to install RACT controls pursuant to the forthcoming Serious SIP, and those will likely be quite costly to Big West.

20.    Apart from imposing RACT on sources, the State's Serious ozone SIP must include measures to reduce VOC and/or $NO_x$ by 3% each year. UDAQ may require further measures from refineries in the NWF to attempt to meet the reasonable further progress goal. A reduction of the emissions threshold to 50 tons per year will impact

planned projects currently in the review process and will require changes in permitting resulting in delay and increased costs.

21.    As a result of EPA's reclassification of the NWF to "Serious," to permit these projects, Big West will be required to purchase emissions offsets at a ratio of 1.2:1. While Utah maintains an emissions offset bank, it is my understanding that it does not contain ample offset credits, especially VOC offsets, which may impede our and other sources' ability to pursue projects.

## III.    The Final Rule's Impacts Cause Irreparable Harm to Big West Oil LLC and Utah Customers

22.    As outlined above, the Final Rule will harm Big West in multiple ways. Big West's operations will be more stringently regulated with stricter control measures. Big West must begin planning for compliance now, and account for higher operating costs in the future.

23.    The financial impact of the harms described is difficult to predict with precision; however, substantial financial impact is certain.

24.    The increased capital and operational costs resulting from the reclassification of the NWF from Moderate to Serious and the imposition of RACT will ultimately have a negative impact on Big

9

West's customers in Utah and other states throughout the

Intermountain West.

25.    If the Final Rule is vacated by the Court, this harm would be

redressed because the NWF would remain in Moderate nonattainment

and would not be subject to the heightened regulation required for

Serious nonattainment areas. Big West would not be required to install

RACT controls for those sources above the 50 ton per year threshold,

and the additional controls or measures required in a Serious

nonattainment area would no longer be required. Simply put, the status

quo at Big West's Refinery would continue.

*Signature on following page*

*Signature page to the Declaration of Big West Oil LLC
in Support of Petitioner Utah Petroleum Association's
Motion To Stay Final Rule*

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 12, 2025.

_____
Alec Klinghoffer

11

# Attachment 11

Utah Manufacturers Association Letter



February 17, 2025

*Submitted Electronically and Via First-Class Mail*

**United States Court of Appeals for the Tenth Circuit**
**Byron White U.S. Courthouse**
**1823 Stout Street**
**Denver, CO 80257-1823**

**Lee Zeldin**
**Administrator**
**Environmental Protection Agency**
**Mail Code: 1101A**
**1200 Pennsylvania Avenue, N.W.**
**Washington, DC**

**Mark A. Smith**
**Acting Regional Administrator, Region 8**
**Environmental Protection Agency**
**1595 Wynkoop Street**
**Denver, CO 80202**
**Smith.Marka@epa.gov**

**Amanda Brimmer**
**Air and Radiation Division, Region 8**
**Environmental Protection Agency**
**1595 Wynkoop Street**
**Denver, CO 80202**
**Brimmer.amanda@epa.gov**

>       **Re:**    **Letter in Support of the Utah Petroleum Agency's Motion for Stay of the**
>                 **Environmental Protection Agency's Final Rule Finding of Failure to Attain**
>                 **and Reclassification of an Area in Utah as Serious for the 2015 Ozone**
>                 **National Ambient Air Quality Standards; Docket No. EPA-R08-OAR-2024-**
>                 **0552**

To Whom is May Concern,

The Utah Manufacturers Association ("Utah Manufacturers") submits this letter in support of the Utah Petroleum Association's Motion to Stay the Environmental Protection Agency's ("EPA") final rule entitled Finding of Failure to Attain and Reclassification of an Area

1

in Utah as Serious for the 2015 Ozone National Ambient Air Quality Standards, 89 Fed. Reg. 97,545 (December 9, 2024) ("Final Rule"). In the Final Rule, EPA (1) determined that the Northern Wasatch Front ozone nonattainment area ("NWF") failed to attain the 2015 National Ambient Air Quality Standard for ozone ("2015 ozone NAAQS") and (2) reclassified the NWF to Serious nonattainment. We urge the Court to grant UPA's Motion to Stay the Final Rule because small and medium-sized manufacturing businesses that are the economic lifeblood of NWF communities will bear the brunt of the expenses that will flow from the Final Rule, which necessarily impacts the public interest.

Utah Manufacturers has been the voice of the manufacturing community in Utah since 1905. Utah Manufacturers represents over 1,200 manufacturing and service providers across Utah, including numerous sources along the NWF. Utah Manufacturers' members contribute substantially to the State economy as well as to the local economies of cities and counties in the NWF. Manufacturing employment within the NWF makes up more than a 50% share of all manufacturing employment in Utah. Additionally, the counties in the NWF experience the highest rate of employment growth for manufacturing in the state. Tax revenue from Utah Manufacturers' members is used to fund crucial government services at both the State and local levels. The onerous control requirements that result from the Final Rule will make operations more expensive for Utah Manufacturers member companies—many of which are small businesses—and will not move the needle towards attaining the ozone NAAQS.

The Final Rule already has triggered burdensome regulatory restrictions on current operations and future growth of Utah Manufacturers' member companies in the NWF. Most notably, the reclassification lowered the threshold for "major sources" from 100 tons per year of ozone-precursor emissions to only 50 tpy.[1] This lower threshold will sweep in at least two Utah Manufacturers members, which will either have to apply for major source operating permits, which impose substantial monitoring, recordkeeping, and reporting requirements, or find reductions through curtailing operations or installing control equipment in order to remain below the new, lower threshold.[2] For sources that remain above this threshold, any expansion projects would be subject to costly and complicated permitting requirements.

The reclassification also requires Utah to develop and submit to EPA a Serious ozone State Implementation Plan ("SIP") for the NWF.[3] The costly control requirement obligations for existing sources will impact our member facilities along the NWF.

Additionally, the Final Rule sets up the NWF for further reclassification to Severe nonattainment in the near future. Further reclassification would significantly intensify these harms by subjecting far more facilities—including not only those operated by Utah Manufacturers' members, but also a host of local businesses and small emission sources in the NWF—to strict permitting and emission control requirements.

To prevent these irreparable harms to Utah Manufacturers' members as well as to the State and local economies, we urge the Court to grant the Motion to Stay the Final Rule.

---

[1] *Id.* § 7511a(c).

[2] Utah Petition for Repeal or Reconsideration and Administrative Stay of the Final Rule at 16 (January 22, 2025).

[3] 42 U.S.C. § 7511a(c).

2

Sincerely,

Todd Bingham
President & CEO
Utah Manufacturers Association

**Attachment 12**

Letter to Acting EPA Administrator Nishida from Members of Congress
(Jan. 14, 2025) ("Nishida Letter")

## Congress of the United States
### Washington, DC 20510

January 14, 2025

The Honorable Jane Nishida
Acting Administrator
Environmental Protection Agency
1200 Pennsylvania Avenue NW
Washington, D.C. 20460

Dear Acting Administrator Nishida:

We write to request that you reconsider the Environmental Protection Agency's (EPA) reclassification of the Northern Wasatch Front (NWF) ozone nonattainment area from Moderate to Serious. We also urge you to reconsider the EPA's denial of the State of Utah's and the Ute Indian Tribe's request for a one-year extension of the Marginal ozone attainment date and reclassified Uinta Basin ozone nonattainment area.

These decisions fail to adequately account for international emissions, disregard public comment processes, and risk devastating Utah's communities that depend on natural resource production and commercial operations. The EPA is acting in the eleventh hour of the Biden Administration to penalize Utah's productive energy, mineral, and manufacturing industries under the guise of improving air quality, yet it has disregarded extensive efforts from the State and stakeholders to craft solutions that benefit both the industries and the environment.

Section 179B of the Clean Air Act (CAA) enables air agencies to demonstrate that a nonattainment area would attain and maintain the relevant National Ambient Air Quality Standard (NAAQS) but for emissions from outside the United States. Peer-reviewed science clearly shows that emissions from Asia significantly contribute to ozone pollution along the NWF, which neither Utah nor the EPA can control. Petroleum refineries, mines, and other industries along the Wasatch Front invested significantly in emissions control efforts, resulting in reductions to near-background levels.

Designating the NWF as a Serious nonattainment area imposes costly economy-wide emissions controls and mandates a fuel blend that will negatively impact gasoline supply and increase fuel prices across the West. States rely on the EPA to assess international emissions to prevent unfair penalties, as specified in Section 179B. By including emissions from outside the U.S. in its nonattainment classification, the EPA is holding American energy and mineral producers responsible for air quality issues they neither caused nor have the ability to mitigate.

Additionally, the EPA recently denied a one-year extension to the Marginal ozone attainment date and reclassified the Uinta Basin ozone nonattainment area as Moderate. The Uinta Basin meets the criteria outlined in the CAA for extension. Rather than working with the Ute Tribe and the State of Utah to improve air quality while enabling economic development on rural and

Tribal lands, the EPA dismissed the extension request. The EPA is abusing its discretionary authority to accelerate a Serious attainment classification in Utah's largest oil and gas-producing basin. This decision ignores years of good-faith efforts and significant progress made by the State, Tribe, and stakeholders to reduce ozone precursor emissions in the Uintah Basin.

As you reconsider these actions, we emphasize the importance of adhering to proper public comment processes to ensure input from local communities and stakeholders is fully considered. The NWF decision forfeited the public comment process when EPA moved directly to a final decision. When the EPA changed course from a proposed approval to a final disapproval in the Uinta Basin, no opportunity was provided for public comment on the revision. Utahns have a right to weigh in on decisions that will significantly impact their state's economy and operations.

We look forward to your prompt response and thorough reconsideration of recent EPA actions that unfairly punish Utah.

Sincerely,

Sincerely,

Michael S. Lee
United States Senator

John Curtis
United States Senator

Blake Moore
Member of Congress

Burgess Owens
Member of Congress

Celeste Maloy
Member of Congress

Mike Kennedy, M.D.
Member of Congress

2

**Attachment 13**

Letter to EPA Administrator Lee Zeldin from Members of Congress
(Jan. 23, 2025) ("Zeldin Letter")



Jan. 23, 2025


The Honorable Lee Zeldin
Administrator
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC  20460


Dear Administrator Zeldin,

Congratulations on your successful confirmation hearing. We're eager to begin working with you, and we request your assistance in correcting irresponsible and unjustified actions taken by the Environmental Protection Agency (EPA) in the final days of the Biden Administration. These detrimental actions will limit Utah's ability to responsibly develop critical oil and gas resources, penalize petroleum refineries, and harm Utah's mining industry and critical mineral production.

On December 9, 2024, the EPA published a reclassification of Utah's Northern Wasatch Front (NWF) ozone nonattainment area from Moderate to Serious. This action disregarded the State of Utah's pending demonstration of the considerable influence of international emissions on nonattainment and ignored Utah Governor Cox's request to expand the NWF boundaries, now several months past the Clean Air Act's (CAA) eighteen-month response deadline (a clear violation of section 107(d)(3)(D) of the CAA).

Accepted peer-reviewed scientific analysis demonstrates that emissions from Asia contribute significantly to NWF ozone pollution, an issue over which both Utah and the EPA lack control. The CAA has a provision known as 179B to ensure that states will not be penalized for international emissions. On December 12, 2024, Utah submitted a Clean Air Act Section 179B International Transport Demonstration for the Northern Wasatch Front Ozone Nonattainment Area to the EPA for review. This submittal indicates that, barring international emissions, the Northern Wasatch Front Nonattainment Area would have achieved compliance with the 2015 National Ambient Air Quality Standard for ozone by August 3, 2024. Further, this analysis shows that international emissions contribute 6%-7% of ozone in the NWF on an average day. Ozone levels continue to increase despite a roughly 50% reduction in precursor emissions of NOx and VOC and 75.7% of total ozone emissions are attributed to sources outside of Utah's regulatory authority or to natural or background sources. Thus, it is crucial that the EPA allows the state to utilize provision 179B of the CAA. This would aid in mitigating the current untenable situation and the resulting punitive economic impacts.

The EPA's Serious classification for the NWF went into effect on January 8, 2025, requiring extensive and costly new economy-wide emissions controls, despite significant reductions in ozone precursor emissions. Utah's five NWF petroleum refineries, the mining industry—including one of the world's largest copper mines—and other regulated industries have already installed costly air emission controls resulting in significant emission reductions to near background levels. These critical industries rely on the EPA's fair assessment of international emissions to ensure they do not continue to be penalized for emissions originating outside the United States. Otherwise, the resulting unfair classification puts Utah's economy at a significant disadvantage. Once reclassified as Serious, the EPA is required to subsequently reclassify NWF to Severe within three years if the ozone nonattainment area does not reach standards. A Severe designation would result in more stringent control measures, including requiring a boutique fuel blend for the NWF, thus reducing gasoline supply and increasing retail gas prices in Western states supplied by NWF refineries.

On December 16, 2024, the EPA also published its denial of the State of Utah's and the Ute Indian Tribe's requests for a second one-year extension to the Marginal ozone attainment date and reclassified the Uinta Basin ozone nonattainment area (UB)—Utah's largest oil and natural gas producing basin—as Moderate, escalated from Marginal. The UB clearly meets the CAA criteria for an extension based on monitored air quality levels from 2020 to 2022, the regulatory period that coincides with the second extension (if approved). These air quality levels revealed that, despite significant production growth, ozone precursor emissions have been dropping in the UB. Rather than working cooperatively to continue improving air quality while enabling economic development in rural areas and on Tribal lands, the EPA used its discretionary authority to accelerate the UB's trajectory to a Serious nonattainment classification.

The EPA reclassification of the Uinta Basin to Moderate—and the imminent Serious reclassification— triggers key CAA deadlines, more stringent permits, additional emissions control requirements, emission offset requirements with no federal mechanism to facilitate the offset process, and other actions that will severely constrain oil and natural gas development in communities dependent on these industries for economic stability. The extension denial and the Moderate reclassification for the UB went into effect on January 15, 2025, making this last action outside the purview of a new administration "pause" authority.

In both decisions, the EPA ignored longstanding process and public comment. In the NWF decision, the EPA forfeited the proposal and public comment process, moving directly to a final decision. In the UB decision, they reversed course, moving from a proposed approval to a final disapproval, again without providing for public comment on the revised decision. As such, the State of Utah, and multiple impacted parties intend to file for administrative and judicial relief. We strongly urge the EPA to support these efforts and the State's request for stays on these vindictive and procedurally flawed rules, thus undertaking swift rulemaking processes to:

1. Reconsider the NWF reclassification to Serious by considering the 179B international emissions demonstration which Utah has submitted to the EPA, include the requested Tooele County border adjustment, and hold the NWF at Moderate by issuing a new rule approving the 179B international emissions demonstration.

2. Reconsider the UB extension denial and issue a rule granting another one-year extension to display that the UB attained the ozone standard, thus reversing the reclassification to Moderate and halting the imminent subsequent reclassification to Serious.

It is imperative that the Trump Administration—and the EPA under your leadership— take action to prevent Northern Wasatch Front industries from being held responsible for international emissions over which they have little responsibility and no ability to reduce, thus ensuring one of the major oil and natural gas producing basins in the country is not immediately encumbered by unjust  classifications.

Thank you for your attention to this matter. As elected leaders in Utah, we are ready to support your incoming team at the EPA by providing all relevant data and documentation as you consider our request.

Sincerely,

Spencer J. Cox
Governor

J. Stuart Adams
President
Utah State Senate

Mike Schultz
Speaker
Utah House of Representatives